No. 03-1874C
Judge Hewitt

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

EWARD T. ARAKAKI and HELEN ARAKAKI,

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS FILED ON JANUARY 16, 2003

DECLARATION OF EDWARD T. ARAKAKI

EXHIBITS A-E

CERTIFICATE OF FILING

R. PATRICK JARESS, ESQ.
JARESS & LEONG, AAL, ALC
737 Bishop Street, Suite 2920
Honolulu, Hawaii 96813
Tel: (808) 531-3151

Attorney for Plaintiff

## I. THE STATUTE OF LIMITATIONS HAS NOT RUN

### A. UNDER FRANCONIA ASSOCIATES v. U.S., 536 U.S. 129 (2002) THE STATUTE OF LIMITATIONS DOES NOT START RUNNING WHEN THE GOVERNMENT REPUDIATES THE AGREEMENT

The Defendant argues that a notice that it published in 1995 should be treated as a repudiation, of its obligation to Plaintiff's and triggers the statute of limitation to run. [1]

Plaintiffs argue that at the earliest, the Government breached its agreement with Plaintiffs on July 27, 1996 when it conducted an auction of Plaintiffs' $3 million loan without allowing Plaintiffs to bid on their own loan and the Plaintiff's loan was sold. Since the initial complaint was filed on June 5, 2002. The six year statute of limitations under the Tucker Act was clearly met.

The Defense argument that the Government can elect to treat its own repudiation to commence the statute to run, has recently been decided against the Government.

The U.S. Supreme Court held that, under the Tucker Act, traditional contract principles apply when the government transacts business with private parties. Since, under contract law, the statue of limitations does not start running when a party repudiates an agreement, the Supreme Court held that the statute of limitations does not start running when the Government repudiates a contract. Franconia Associates v. U.S., 536 U.S. 129 (2002). Justice Ginsberg reasoned that to allow the Government the right to start the statute of limitations when Government itself repudiates the agreement would "convert the repudiation doctrine from a

[1] According to Defendant, HUD published a notice in the Federal Register from which Plaintiffs could purportedly determine that the defendant was repudiating its agreement that plaintiffs could bid on their own loan at an "open loan auction."

Since the regulations on which defendant relies were permissive, the regulations did not preclude a sale of the mortgage to the Arakaki's if they were otherwise qualified bidders. The publication of the regulations did not amount to an anticipatory repudiation of the agreement that the Arakaki's could bid on their loan.

shield for the promisee into a sword by which the promisor Government could invoke its own wrongdoing to defeat otherwise timely suits." Id. (Emphasis added).

In the Franconia case, the Plaintiffs had a right to prepay HUD loans. The Government then passed a law prohibiting prepayment. When interest rates dropped, and the borrowers wanted to prepay. HUD refused to allow the prepayment citing the new law.

Just as in this case, the government argued that the Statute of Limitations began running when the government published its regulations that repudiated its obligations to allow prepayment and not later. But the Supreme Court rejected this argument. Id. "Such a repudiation ripens into a breach prior to the time for performance, only if the promisee "elects to treat it as such." 153 L. Ed. 2d at 146. (emphasis added). The Court held that no special contract principles apply to the government when it contracts with private parties:

> "When the United States enters into contract relations, its rights and duties therein are governed generally by the law applicable to contracts between private individuals." *Mobil Oil Exploration & Producing Southeast, Inc. v. United States*, 530 U.S. 604, 607, 120 S.Ct. 2423, 147 L.Ed.2d 528 (2000) (internal quotation marks omitted). [153 L. Ed. 2d at 132.]

The court held that to allow the wrongdoer to use its own repudiation to commence the statute of limitations takes a shield the law provides to a party injured by a breach and turns it into a sword to be used by a wrongdoer to defeat proper lawsuits.

In the present case, the Plaintiffs did not elect to treat the possible repudiation by the government as a breach of the agreement. Plaintiffs instead worked vigorously to try to persuade the government to adhere to the agreement that induced the Plaintiffs to invest $500,000 into a troubled apartment building. Not until the auction was held on July 27, 1996 did their loan transfer to a third-party bidder. Fourth Amended Complaint, ¶16.

The two sides of the issue are clear: according to the Defense, the Government can trigger the statute running even if the Plaintiff had no actual notice. Plaintiff's point out that under Franconia, even actual notice of repudiation will not start the Tucker Act statute running. Instead, when the Government intends to breach a contract, it cannot use a promisee's right to call a breach by repudiation as a sword to create a premature commencement of the statute of limitations. The election to treat repudiation as a breach of contract allowing a party immediately to sue belongs to the innocent party, not the wrongdoer who allegedly breaches the contract.

B. THE STATUTE OF LIMITATIONS DO NOT COMMENCE BEFORE THE BREACH AND DAMAGES OCCURRED OR THE GOVERNMENT RENEGED ON ITS "REASSURANCES" OF MAY 24, 1996

Often, an actual breach of contract is a material breach allowing a lawsuit to be filed. But it sometimes does not become a material breach. A breach may not be a material breach and damages don't arise until a later date.

The statute of limitations would not begin to run until there was a breach of contract. HUD breached its promise to Plaintiffs on June 27, 1996, when it sold his loan without allowing Plaintiffs to bid.[2] Plaintiffs were not actually damaged until the property was lost in foreclosure in 1998. Id. ¶ 17. Prior to November 28, 1997, a bankruptcy stay had precluded a foreclosure sale of the property. See Attached Declaration and Exhibit E. Before the sale, Arakaki engaged in extensive efforts to avoid the damages he ended up suffering.

Cacciacarne v. G. Searle & Co., 908 F. 2d 95 (6th Cir. 1990) was a products liability case in which plaintiff was suing the manufacturer of an IUD that caused her to become sterile. The statute of limitations required suit within two years "after the cause thereof arose." Although the damage from the IUD evidently occurred much earlier, plaintiff was not informed until later that

[2] If no one had purchased the loan, nothing would have changed.

the IUD was the cause of inability to conceive. The court held that the claim "did not accrue until Dr. Schmidt informed her that she would not be able to conceive. Prior to that time there was no certainty about plaintiff's condition, or the cause of her condition. The nature of the problem was unclear. . . . It is undisputed that plaintiff thought the IUD might possibly have caused her problem. But her doctor did not know the cause. He did not rule out endometriosis or other possible causes."

An early case, The Board of Commissioners of Wabash County v. Pearson, 120 Ind. 426, 22 N.E. 134 (1889) is illustrative. A bridge was constructed in 1871 and then collapsed in 1884, injuring the plaintiff. The Court held that the statute of limitations did not begin to run when the bridge was negligently constructed but only when the bridge collapsed and injured the plaintiff.

So too, in the present case, there is evidence indicating that the claim did not accrue until damage resulted from the loss of the property in foreclosure. See Dixon Ticonderoga Co. v. Estate of O'Connor, 248 F.3d 151, 162 (3rd Cir. 2001) ("Damages must be 'real and substantial as opposed to speculative' to start the running of the statute of limitations. . . .").

C. THE DOCTRINES OF EQUITABLE TOLLING AND EQUITABLE ESTOPPEL APPLY

Because the statute of limitations was complied with, no tolling devices are needed. However, the doctrines of equitable estoppel and equitable tolling are applicable. Pursuant to Mr. Ewing's initial assurances, in 1995 and 1996, Arakaki sent letters to HUD in an effort to negotiate a purchase of his loan. See Declaration and Exhibits A and B attached hereto. HUD initially ignored these letters and made no response. When it finally responded, HUD led Arakaki to believe that further negotiations were still possible. On May 24, 1996, HUD informed the plaintiffs that, even though the loan was being sold, HUD would "retain a passive equity interest" and that "Mr. Arakaki may be reassured in learning that borrowers in default will

still be able to negotiate a discounted settlement or restructure the non-performing loan into a performing loan." See Exhibit C, page two. Thus, HUD led Arakaki to believe that he would have the same rights to negotiate after the June 27, 1996 sale as before, lulling him into inaction. Exhibit C at 2. See In re Daisy Systems Corp., 1993 W.L. 491309 at 6 (N.D. Cal. 1993) (Defendant "continued to reassure" claimant "as to the availability of financing.")

Over a year later, on Sept. 22, 1997, HUD retracted the assurances given on May 24, 1996. Exhibit D. The September 22, 1997 letter states:

> In my May 24, 1996 letter to you, I stated that "Mr. Arakaki [Plaintiffs] may be reassured in learning that borrowers in default will be able to negotiate a discounted settlement or restructure the non-performing loan into a performing loan." Unfortunately that statement was not accurate. After the loans were sold, the Department did not retain authority with respect to the homes were underlying projects. (Empasis added). Exhibit D, at 1.

The letter then goes on to say: "I apologize to Mr. Arakaki for the confusion." Exhibit D.

In Santa Maria v. Pacific Bell, 202 F. 3d 1170 (9th Cir. 2000), the Court explained equitable estoppel and equitable tolling as follows:

> Equitable estoppel focuses primarily on the actions taken by the defendant in preventing a plaintiff from filing suit, whereas equitable tolling focuses on the plaintiff's excusable ignorance of the limitations period and on lack of prejudice to the defendant. . . . A finding of equitable estoppel rests on the consideration of a non-exhaustive list of factors, including (1) the plaintiff's actual and reasonable reliance on the defendant's conduct or representations, (2) evidence of improper purpose on the part of the defendant, or of the defendant's actual or constructive knowledge of the deceptive nature of it's conduct and (3) the extent of which the purposes of the limitations period have been satisfied. *See id.* The Seventh Circuit has further explained that equitable estoppel "comes into play if the defendant takes active steps to prevent the plaintiff from suing in time, as by promising not to plead the statute of limitations. . . . Equitable estoppel in the limitations setting is sometimes called fraudulent concealment. . . . ." [202 F. 3d at 1176.]

Regarding equitable tolling, the court continued:

> "Equitable tolling may be applied if, despite all due diligence, a plaintiff is unable to obtain vital information bearing on the existence of his claim. *See Holmberg v. Armbrecht*, 327 U.S. 392, 397, 66 S.Ct. 582, 90 L.Ed 743 (1946).

> Unlike equitable estoppel, equitable tolling does not depend on any wrongful conduct by the defendant to prevent the plaintiff from suing. Instead it focuses on whether there was an excusable delay by the plaintiff. If a reasonable plaintiff would not have known of the existence of a possible claim within the limitations period, then equitable tolling will serve to extend the statute of limitations for filing suit until the plaintiff can gather the information he needs. . . ." [Id. at 1178]

Here, when Arakaki learned that a bundled sale was a possibility, he had every reason to believe that, if HUD was reminded of its initial promise, it would pull Arakaki's loan out of the bundled sale. See Arakaki Declaration attached hereto. Arakaki, far from being aware that he had been wronged, viewed the auction as an opportunity to negotiate a purchase of his own mortgage from HUD. He had not been damaged and certainly had not discovered that he had been wronged. The fact that Arakaki continued to deal with HUD concerning a private sale is evidence that Arakaki still had hope. HUD contributed to this belief.

D. THE AMENDED PLEADINGS "RELATE BACK" TO JUNE 5, 2002

Defendant erroneously measures the statute of limitations from the filing of the Fourth Amended Complaint in this court. Actually, the case was filed for statue of limitations purposes when it was initially filed in state court on June 5, 2002. Fourth Amended Complaint, ¶ 23. The amendments to the pleadings thereafter relate back to the initial filing. Rule 15(c) of the Rules of the United States Court of Federal Claims. Copies of the initial Complaint were served on the filing of this action on the U.S. Attorneys' office in Honolulu, the Office of the Attorney General in Washington D.C., as well as on HUD. See Returns of Service filed August 19, 2002 and August 21, 2002; Notice of Removal filed on July 8, 2002 at 2.

The relations back doctrine applies even as to the additional plaintiff (Helen Arakaki) added in the Third Amendment filed March 14, 2003. This is deemed fair because, where the claim of the new plaintiff arose out the same transaction or occurrence, the defendant has sufficient notice to enable it to litigate the claim. Fleck v. Cablevision VII, Inc., 799 F.Supp.

187, 192 (D.D.C. 1992) (Amended complaint naming additional plaintiff related back to time of filing of limited partners' original complaint; filing of original complaint was sufficient to provide general partner with notice of additional plaintiff's potential claim.); Stoppelman v. Owens, 580 F.Supp. 944 (D.D.C. 1983) (When the initial complaint was brought by certain limited partners, the amended complaint which added as plaintiffs additional limited partners whose claims arose out of the same occurrence alleged in the original complaint related back to the date of the filing of the original complaint.); Wassel v. Eglowsky, 399 F.Supp. 13380, 1335 n. 1 (D.C.Md. 1975) (When the complaint was amended to add the wife as an additional plaintiff after defendants raised the issue of her absence, contending that she was an indispensable party, when there was no allegation of prejudice to defendants resulting from the wife's late joinder, and when the wife's claim was the same as that of the plaintiff and arose out of the transaction set forth in the original pleading, the amendment related back to the date of the original pleading, even though it added a new plaintiff.); Yorden v. Flaste, 374 F.Supp. 516 (D.C.Del. 1974) (When an alleged tortfeasor had notice within the statutory period that a wrongful death action was contemplated, and the tortfeasor could demonstrate no prejudice that would result if the deceased's alleged common-law wife, who had initiated the wrongful death action during the statutory period but later discovered the existence of a surviving widow of the deceased, were permitted to substitute the widow as party plaintiff, leave would be granted to amend the complaint so as to effect that substitution and the amendment would relate back to the filing of the complaint.)

This is an appropriate case for application of the doctrine of relations back. The claims of Helen unquestionably "arose out of the conduct, transaction, or occurrence set forth" in Edward's original pleading. United States Court of Federal Claims Rule 15(c)(2). There is no prejudice.

Bowles v. Reade, 198 F.3d 752 (9th Cir. 1999) is instructive. The Court noted "the strong policy permitting amendment" of pleadings. Id. at 757. Even though the claim would otherwise have been barred by the statute of limitations, the Court held that leave to amend should have been granted and that the claim was timely under the relations back doctrine. This was because the "nature of the breach of fiduciary duty claims remain the same." Id. at 759. The lower Court had "abused its discretion in denying the motion for leave to amend."

## II. A CLAIM UPON WHICH RELIEF CAN BE GRANTED IS ALLEGED

There is nothing wrong or deficient in the allegations of the Fourth Amended Complaint ("Complaint"). If the allegations are established at trial, Defendants are liable. The allegations are entitled to a reading most favorable to Plaintiff. Beacon Theatres, Inc. v. Westover, 359 U.S. 500 (1959); In re Dominguez, C.A. 9th, 1995, 51 F.3d 1502; *see generally* 5 Wright & Miller, Federal Practice and Procedure § 1215 at 145 (2nd ed. 1990).

> All doubts and ambiguities concerning the meaning and intendments of the pleader's language must be resolved in favor of the claim attempted to be stated. Clyde v. Broderick, C.A. 10th, 1944, 144 F. 2d 348.

Defendant argues that the HUD official who made the promise to plaintiffs that they could bid on the loan did not have the authority to bind the United States to such a contract. HUD's agent had authority: there is evidence that the agent managed the loan. Arakaki Declaration.

12 U.S.C. § 1715 broadly authorizes HUD's Secretary "to process applications and issue commitment with respect to insurance of mortgages . . . ." 12 U.S.C. § 1715z-1a(b) (part of Title II) authorizes the Secretary to "make available, and contract to make available, . . . . financial assistance to owners of rental or cooperative housing projects." 12 U.S.C. § 1701z-11(c) authorized the Secretary to "dispose of a multifamily housing project owned by the Secretary on a negotiated, competitive bid or other basis . . . ." 12 U.S.C. § 1701x authorizes the

Secretary "to provide . . . . information, advice, and technical assistance. . . ." 12 U.S.C § 1701h authorizes the Secretary to "utilize such Federal officers and employees . . . . as he may find necessary . . . . and to "delegate any of the functions and powers conferred upon him . . . . to such officers, agents, and employees . . . ."

In meeting with Arakaki, Ewing was carrying out provisions of the HUD statute. He was talking about what HUD does. He was talking about HUD's practices. He was talking about what he would do as HUD's agent. He was talking about how HUD would handle delinquent loans. These activities are part and parcel of what he had authority to do.

The Court of Federal Claims has jurisdiction to render judgment upon any claim against the United States founded upon any implied contract with the United States. United States v. Mitchell, 463 U.S. 206 (1980); Atlas Corp. v. United States, (CA FC) 895 F.2d 745, cert. denied, 498 U.S. 811 (1990). An agreement implied in fact is founded upon a meeting of minds that, although not embodied in express contract, is inferred from conduct of the parties showing, in light of the surrounding circumstances, their tacit understanding. Cities Service Gas Co. v. United States, 205 Ct. Cl. 16, 500 F.2d 448 (1974).

The mere fact that the agreement was oral does not result in a dismissal any more than it would allow such dismissal of the action between two private parties. Under Franconia, the U.S. Supreme Court requires that general contract principles be applied to agreements between individuals and the government.

Defendants have pointed to no statute or regulation that requires that the type of agreements Ewing made must be put in writing. No mortgage was being amended. An independent promise was being made to induce a purchase Defendant wanted to happen.

## CONCLUSION

Statutes of limitations are affirmative defenses on which the defendant must carry the burden of proof. "Celotex," which requires the plaintiff to present a prima facia case on an issue on which the plaintiff bears the burden of proof, does not apply. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

Defendant's statute of limitation defense raises issues of fact. The first question is when the claim accrued. The damages occurred in 1998. Fourth Amended Complaint ¶18. Exceptions to the statute of limitations are unnecessary unless the statute began to run more than six years before the case was filed. There are issues of fact regarding equitable tolling and estoppel.

This court is in no position to determine, on the face of the pleadings, that the claim arose more than six years before it was filed. The Motion should be denied.

DATED: Honolulu, Hawaii, March 4, 2004.

R. PATRICK JARESS
Attorney for Plaintiffs
(808) 531-3151
(808) 531-6064