# EXHIBIT C

U. S. Department of Housing and Urban Development
Washington, D.C. 20410-8000

OFFICE OF THE ASSISTANT SECRETARY FOR
CONGRESSIONAL AND INTERGOVERNMENTAL RELATIONS

MAY 24 1996

Honorable Daniel K. Inouye
United States Senator
Prince Kuhio Federal Building
Room 7325
300 Ala Moana Boulevard
Honolulu, HI 96850-4975

Dear Senator Inouye:

Thank you for your letter of May 1, 1996, on behalf of Ed Arakaki, regarding the impending sale of the HUD-held mortgage on the Lake Mead Villas Apartments that Mr. Arakaki and his mother, Helen Arakaki, own in Las Vegas.

First, you may be interested in knowing that this loan was included in the Department's Structured Finance Sale of Partially Assisted Mortgage Loans on May 23, 1996.

I would like to give you some background on the Department's decision to conduct a structured financing with this loan sale. Mr. Arakaki was initially told by the Nevada State Office that if the mortgage was ever sold, he would be able to bid on it. In fact, all of the multifamily loan sales that HUD has conducted thus far have been "whole loan" sales, in which owners could bid on their loans. However, as the mortgages in the sale have project-based Section 8 subsidy, and this is the first time the market has been exposed to a product such as this, HUD reconsidered its decision to employ a whole loan sale and instead opted for a structured financing, which does not allow for the purchase of individual loans.

In a structured financing, the mortgage loans will be sold to a legal entity constituted as a trust. The cash flows from the mortgages will secure both debt and equity interest issued by the trust purchaser. HUD will receive proceeds from the sale at closing, and potentially as the troubled loans are resolved.

Structured financing will also help ensure that HUD is not penalized by the uncertainty in the market place over Section 8. This uncertainty will cause potential purchasers to discount any bid price for these mortgages. As purchasers work through the portfolio and become familiar with how Section 8 works, however,

**EXHIBIT C**

they have a good chance of resolving the portfolio for more than their discounted price. HUD's ability to retain a passive equity interest will allow the Department to share in the equity (the upside) and mitigate the financial penalty associated with market discounting.

Most importantly, the loan sale will help ensure that HUD fulfills its obligations to tenants, because HUD's rule for this sale mandates non-discrimination against voucher holders. Additionally, it preserves the Section 8 contract for the remainder of their terms and prohibits buyers from circumventing Section 8 contracts and responsibilities, as well as ensuring tenant protections are enforced.

HUD Headquarters staff reviewed the accounting records and determined that the amount necessary to bring Mr. Arakaki's account current is $713,127.69. The unpaid principal balance is $2,377,153.59. Mr. Arakaki may be reassured in learning that borrowers in default will be able to negotiate a discounted settlement or restructure the non-performing loan into a performing loan. While the threat of foreclosure is always a concern, good faith negotiations can result in a solution that works for all parties. Foreclosure is a last resort, used in a small percentage of cases For instance the Resolution Trust Corporation's (RTC) experience was that foreclosure occurred in only 3 percent of RTC mortgages sold.

I hope this information is helpful to you in your response to Mr. Arakaki. If I can be of further assistance, please do not hesitate to contact me again.

Sincerely,

Hal C. DeCell III

Hal C. DeCell III
Assistant Secretary