# In the United States Court of Federal Claims

No. 03-1874 C

(E-Filed: September 1, 2004)

| | | |
|---|---|---|
| EDWARD T. ARAKAKI and HELEN ARAKAKI, Plaintiffs, v. THE UNITED STATES, Defendant. | ) | Contract; Motion to Dismiss; RCFC 12(b)(1); RCFC 12(b)(6); Motion for Summary Judgment; Rule 56; Statute of Limitations; Authority of HUD Field Asset Manager to agree to permit prospective purchaser of property to bid on HUD mortgage in foreclosure |

R. Patrick Jaress, Honolulu, HI, for plaintiffs.

Steven M. Mager, with whom were Peter D. Keisler, Assistant Attorney General, David M. Cohen, Director, and Kathryn A. Bleecker, Assistant Director, Department of Justice, Washington, DC, for defendant.

## OPINION

HEWITT, Judge

This case is before the court on defendant's motion to dismiss for lack of subject matter jurisdiction or, in the alternative, for failure to state a claim upon which relief may be granted, pursuant to Rules 12(b)(1) and 12(b)(6) of the Rules of the United States Court of Federal Claims (RCFC).[1] Because materials outside the pleadings were

---

[1]The court has before it Plaintiffs' Fourth Amended Complaint for Breach of Contract

(continued...)

introduced by both parties and relied on by the court in reaching its decision, the court treats defendant's motion to dismiss under RCFC 12(b)(6) as a motion for summary judgment under RCFC 56. RCFC 12(b) ("If, on a motion . . . to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in RCFC 56 . . . .").

## I. Background[2]

Plaintiffs allege that, in October 1991, United States Department of Housing and Urban Development (HUD) officials persuaded Edward T. Arakaki and Helen Arakaki (collectively, plaintiff[3]) to purchase a 76-unit apartment building in Las Vegas, Nevada (Lake Mead Villas or the Property)–a purchase that otherwise seemed an unwise, unprofitable investment–by making two promises to Mr. Arakaki. Compl. ¶¶ 5-9, 20; Def.'s Mot. at 3 n.5; Tr. at 39. First, plaintiff alleges that Mr. Ewing, a HUD official, promised that "HUD would allow any unpaid loan amounts to accumulate without foreclosing until the building became profitable." Id. ¶ 7. HUD allegedly followed through on this promise. Id. ¶ 5, 15. Second, plaintiff alleges that Mr. Ewing promised that, if HUD ever sold the Property, plaintiff would have the right to bid on his mortgage.

---

[1](...continued)
(Compl.), Defendant's Motion to Dismiss (Def.'s Mot.), Plaintiffs['] Memorandum in Opposition to Defendant's Motion to Dismiss Filed on January 16, 2003 (Pl.'s Opp.), Defendant's Reply to Plaintiffs' Opposition to Defendant's Motion to Dismiss (Def.'s Reply), Plaintiff's Sur-Reply in Opposition to Defendant's Motion to Dismiss Filed on January 16, 2003 (Pl.'s Sur-Reply), Transcript of June 22, 2004 Oral Argument (Tr.), Defendant's Response to the Court's June 14, 2004 Order (Def.'s Resp. to June 14, 2004 Order), Plaintiff's Response to the Court's June 23, 2004 Order (Pl.'s Resp. to June 23, 2004 Order), and Defendant's Response to the Court's June 23, 2004 Order and Withdrawal of Argument (Def.'s Resp. to June 23, 2004 Order).

[2]Except as otherwise indicated by the text or context, facts cited to the filings of only one party do not appear to be disputed in connection with the pending motion. The court recites only the facts relevant to the present decision.

[3]Prior to the original filing of this case by Edward T. Arakaki, his mother, Helen Arakaki, had assigned her claim to him. See Am. Compl. of Sept. 25, 2002 ¶ 1. When plaintiff filed his third amended complaint on March 14, 2003, in the United States District Court for the District of Hawaii, he joined Helen Arakaki as plaintiff. See Third Am. Compl. ¶ 1. For convenience, and because most of the allegations relate to alleged events involving Mr. Arakaki alone, the court refers to Edward T. Arakaki and Helen Arakaki collectively as plaintiff.

Id. ¶ 8. Because the type of mortgage encumbering the Property usually sold at a large discount–as plaintiff's mortgage eventually did–this second promise allegedly would have allowed plaintiff to cut any possible losses and would have made an otherwise unprofitable investment attractive to plaintiff. Id. ¶¶ 9-11. Plaintiff claims that "HUD's promise that Plaintiff could bid on his loan was made in consideration of Plaintiff['s] investing more tha[n] $500,000" in the Property. Id. ¶ 12. Plaintiff agreed to purchase the Property on October 20, 1991. Id. ¶ 14. Shortly afterwards, the bank assigned the mortgage loan to HUD. Id. ¶ 15. The alleged promise by HUD–that if HUD ever decided to sell the mortgage on the Property, plaintiff would be allowed to bid on it–is the source of the present dispute.

Defendant has moved to dismiss plaintiff's complaint as untimely or, alternatively, for failure to state a claim upon which relief may be granted. As to timeliness, defendant argues that new regulations published by HUD on March 21, 1996 and effective on April 22, 1996 prevent plaintiff from bidding on his mortgage. Def.'s Mot. at 8. Defendant argues that on April 26, 1996 these regulations were applied to plaintiff's mortgage by a publication officially opening an auction including plaintiff's mortgage. Id. at 9. This auction was an "FHA Partially-Assisted Bundled Loan Sale," at which plaintiff's mortgage was eventually sold to a third party.[4] Id. at 4; Compl ¶ 17.

Plaintiff claims that he was precluded from bidding on his mortgage both because the HUD regulations strictly forbid it,[5] and because the bundling of the loans made the purchase inaccessible to plaintiff.[6] Compl. ¶ 17; Def.'s Mot. at 4; Tr. at 23 (statement of plaintiff's counsel Mr. Jaress). The third party who purchased plaintiff's mortgage

---

[4]As discussed in part II.A.3 below, the sale occurred at some point between May 23 and June 27, 1996. The exact date of the sale, however, is disputed and is not decided here. See Tr. at 7-15, 58-68 (statements of plaintiff's counsel Mr. Jaress and defendant's counsel Mr. Mager illustrating the disagreement concerning the exact sale date of plaintiff's mortgage).

[5]The "Notice of Sale" published by HUD provided that "[b]idders must be eligible institutional investors in order to have their bids considered." Notice of Sale of HUD-Held Multifamily Mortgage Loans, 61 Fed. Reg. 18,652-01 (Apr. 26, 1996) (Notice of Sale). Included among the list of ineligible bidders are "[a]ny Mortgagor of any of the Mortgage Loans or an entity affiliated with any such Mortgagor." Id. at 18,653.

[6]Defendant's counsel stated in argument that the bundled group of loans sold for approximately $885 million. Tr. at 55 (statement of defendant's counsel Mr. Mager).

subsequently foreclosed on the loan[7] and plaintiff lost his property and his initial investment of approximately $500,000. Compl. ¶ 18; Def.'s Mot. at 4. Plaintiff claims that, by not allowing him to bid on his mortgage, HUD breached its oral contract. Compl. ¶ 20.

The original complaint–naming only Edward T. Arakaki as plaintiff–was filed in Hawaii state court on June 5, 2002 against then-Secretary of HUD Mel Martinez and HUD.[8] On July 8, 2002, the case was removed to the United States District Court for the District of Hawaii pursuant to 28 U.S.C. § 1442 (2000). Notice of Removal of Civil Action filed in Arakaki v. Martinez, No. 02-00417 (July 8, 2002). On March 6, 2003, the case was dismissed with leave to amend. Arakaki v. Martinez, No. 02-00417, slip op. at 12 (D. Haw. Mar. 6, 2003). The Order Dismissing Case specified that if plaintiff filed a third amended complaint, he could "only name the United States as a defendant and . . . only assert contract claims arising out of HUD's alleged breach of the oral agreement to allow [Mr.] Arakaki to bid on his loan at an auction." Id. Accordingly, plaintiff filed his third amended complaint on March 14, 2003, in the United States District Court for the District of Hawaii, and joined Helen Arakaki as plaintiff. Third Am. Compl. On May 27, 2003, the District Court for the District of Hawaii ordered that the case be transferred to the United States Court of Federal Claims. Arakaki v. United States, No. 02-00417, slip op. at 11 (D. Haw. May 27, 2003) (Transfer Order). Plaintiff filed his Fourth Amended Complaint in this court on September 10, 2003. Compl. Defendant then moved to dismiss the complaint under RCFC 12(b)(1) for lack of subject-matter jurisdiction, alleging an expired limitations period, and under RCFC 12(b)(6) for failure to state a claim upon which relief may be claimed, alleging lack of authority of the contracting party.[9] See Def.'s Mot at 1, 7-16.

---

[7]Foreclosure occurred at some point in 1998. Compl. ¶ 18.

[8]In his first complaint in the United States District Court for the District of Hawaii, plaintiff joined as defendants any person, corporation, governmental agency or entity "connected in some manner with Defendant." Complaint of June 5, 2002 ¶ 4.

[9]In its Reply to Plaintiff's Opposition to Defendant's Motion to Dismiss and during oral argument, defendant also urged the court to dismiss plaintiff's claim as barred by the parol evidence rule and the statute of frauds. See Def.'s Reply at 13 (alleging parol evidence rule violations); Tr. at 79 (statement of defendant's counsel Mr. Mager alleging that, if the contract claimed by plaintiff is an independent contract, it violates the statute of frauds). The court will not consider arguments that were presented for the first time in a reply brief or after briefing was complete. See Novosteel SA v. United States, 284 F.3d 1261, 1274 (Fed. Cir. 2002) (holding that the plaintiff waived an argument in support of its motion for summary judgment because
(continued...)

## II. Discussion

### A. Lack of Subject Matter Jurisdiction

#### 1. Standard of Review

RCFC 12(b)(1) governs dismissal of a claim for lack of subject matter jurisdiction. RCFC 12(b)(1). Such a dismissal is warranted when, "assuming the truth of all allegations, jurisdiction over the subject matter is lacking." Beekwilder v. United States, 55 Fed. Cl. 54, 57 (2002). When a party challenges the jurisdictional facts alleged in the complaint, the court may consider relevant evidence outside the pleadings to resolve the factual dispute. Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 747 (Fed. Cir. 1988); Indium Corp. of Am. v. Semi-Alloys, Inc., 781 F.2d 879, 884 (Fed. Cir. 1985). Plaintiff bears the burden of establishing subject matter jurisdiction. McNutt v. Gen. Motors Acceptance Corp., 298 U.S. 178, 188-89 (1936); Beekwilder, 55 Fed. Cl. at 58.

#### 2. The Tucker Act

The Tucker Act, 28 U.S.C. § 1491, confers on the Court of Federal Claims jurisdiction over certain claims against the United States. 28 U.S.C. § 1491 (2000). The Tucker Act does not, however, create a substantive right enforceable against the sovereign. United States v. Testan, 424 U.S. 392, 398 (1976); Khan v. United States, 201 F.3d 1375, 1377 (Fed. Cir. 2000). Instead, a claimant must found his claim "either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). The general rule is that this court has jurisdiction over a case if a claimant makes a non-frivolous allegation that he is "entitled to money from the United States because a statute or regulation grants him that right," or because a contract creates an equivalent right. Ralston Steel Corp. v. United States, 340 F.2d 663, 667 (Ct. Cl. 1965); Adarbe v. United States, 58 Fed. Cl. 707, 714 (2003).

---

[9](...continued)
plaintiff "did not present its . . . argument to the [trial] [c]ourt . . . until after it had filed its principal summary judgment brief, and . . . parties must give a trial court a fair opportunity to rule on an issue other than by raising that issue for the first time in a reply brief"); Cubic Def. Sys., Inc. v. United States, 45 Fed. Cl. 450, 467 (1999) ("A court might in its discretion permit a new theory to be raised at oral argument, but it certainly need not. And if it did, it would have to allow the other side sufficient time to prepare and present a response.").

Here, plaintiff's alleged basis for jurisdiction is an express oral contract with HUD. See Compl. at 2. Defendant argues that, because the government agent who allegedly entered into this contract on behalf of HUD did not possess the authority to do so, no contract was formed.[10] Def.'s Mot. at 11-16. At this stage of the analysis, the court deems plaintiff to have made a non-frivolous allegation that there is a contract. For the purposes of this motion, the alleged contract serves as a sufficient basis for the court's jurisdiction. See Cincinnati v. United States, 153 F.3d 1375, 1377 (Fed. Cir. 1998) (holding that "the invocation of [a] . . . contract . . . is sufficient . . . to set forth a basis for subject-matter jurisdiction.")

3. Statute of Limitations

Defendant argues that plaintiff's claims are barred by the statute of limitations and therefore fall outside this court's jurisdiction. Def.'s Mot. at 7. All claims that otherwise fall within the jurisdiction of the United States Court of Federal Claims "shall be barred unless the petition thereon is filed within six years after such claim first accrues." 28 U.S.C. § 2501 (2000). Accrual occurs "when all events have occurred that fix the alleged liability of the Government and entitle the plaintiff to institute an action." Creppel v. United States, 41 F.3d 627, 631 (Fed. Cir. 1994). The six-year statute of limitations "on actions against the United States is a jurisdictional requirement attached by Congress as a condition of the government's waiver of sovereign immunity and, as such, must be strictly construed." Hopland Band of Pomo Indians v. United States, 855 F.2d 1573, 1576-77 (Fed. Cir. 1988) (Hopland Band). The statute of limitations may not be waived by the parties or ignored by the courts. Hart v. United States, 910 F.2d 815, 818-19 (Fed. Cir. 1990).

a. Relation back to original filing date in state court

Defendant removed this case pursuant to title 28, section 1442 of the United States Code, which provides:

> A civil action . . . commenced in a State court against any of the following may be removed by them to the district court of the United States for the district and division embracing the place wherein it is pending: (1) The United States or any agency thereof or any officer (or any person acting

[10]The issue of contracting authority as it pertains to the pending motion to dismiss for failure to state a claim upon which relief can be granted is discussed below in part II.B.3 of this opinion.

> under that officer) of the United States or of any agency thereof, sued in an official or individual capacity for any act under color of such office . . . .

28 U.S.C. § 1442. This case was brought against an agency of the United States (HUD) and an officer (Secretary Martinez).

This case was transferred to the United States Court of Federal Claims pursuant to title 28, section 1631 of the United States Code, which provides:

> Whenever a . . . court finds that there is a want of jurisdiction, the court shall, if it is in the interest of justice, transfer such action or appeal to any other such court in which the action or appeal could have been brought at the time it was filed or noticed, and the action or appeal shall proceed as if it had been filed in or noticed for the court to which it is transferred on the date upon which it was actually filed in or noticed for the court from which it is transferred.

28 U.S.C. § 1631(2000) (emphasis added); see also Best v. United States, 14 Cl. Ct. 720, 724 (1988) ("When transfer is effected to cure want of jurisdiction, the transferee court proceeds as if the case originally had been properly filed and the action is afforded the benefit of the filing date in the transferor court.").

Plaintiff filed his initial complaint in state court on June 5, 2002. The case was removed by defendant to federal court on July 8, 2002, dismissed with leave to amend on March 6, 2003,[11] and finally transferred to the United States Court of Federal Claims on

---

[11]Controlling authority in the Ninth Circuit states that after a dismissal with leave to amend the complaint, the amended complaint generally relates back to the date of filing of the original complaint if the claims in the amended complaint arise out of the same transaction described in the original complaint and the defendant had notice of the claims. See Ashland v. Ling-Temco-Vought, Inc., 711 F.2d 1431, 1437 (9th Cir. 1983) (holding that when the plaintiffs' complaints were dismissed for subject matter jurisdiction with leave to amend, "under Rule 15(c) [of the Federal Rules of Civil Procedure] the amended complaints relate back to the original filing date"); see also Fed. R. Civ. P. 15 (c) ("An amendment of a pleading relates back to the date of the original pleading when . . . (2) the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth . . . in the original pleading . . . ."); FDIC v. Jackson, 133 F.3d 694, 702 (9th Cir. 1998) ("While it is generally true that an amendment supersedes an original pleading, this Circuit has held that the filing date of an original complaint remains operative for relation back purposes even where otherwise superseded by amendments." (citations omitted)). The Ninth Circuit has also taken a position that the
(continued...)

May 27, 2003. Consequently, no complaint was filed in the United States Court of Federal Claims until September 10, 2003. Defendant initially contended that "plaintiffs['] efforts to file an amended complaint [in the United States Court of Federal Claims] were untimely." Def.'s Mot. at 10. Upon further questioning, however, defendant conceded "generally that [plaintiff's complaint] does relate back" to the date of the original filing in state court (here, June 5, 2002). Tr. at 39 (statement of defendant's counsel Mr. Mager). The court nonetheless must inquire as to whether defendant's concession–that the complaint filed in this court relates back to the June 5, 2002 state court filing in Hawaii–comports with federal law. See Jones v. United States, 801 F.2d 1334, 1335 (Fed. Cir. 1986) ("Compliance with the Claims Court's statute of limitations is jurisdictional."); S. Cal. Edison v. United States, 58 Fed. Cl. 313, 317 (2003) ("The government has not contested jurisdiction. The Court nonetheless has an independent obligation to satisfy itself that jurisdiction exists over the claims presented by the Complaint.").

Clearly, the United States District Court for the District of Hawaii took plaintiff's original filing date in state court as the applicable filing date for its consideration of the statute of limitations issue. See Transfer Order at 6-8 (discussing the parties' arguments for various accrual dates for plaintiff's cause of action and measuring the limitations period from the original state court filing date of June 5, 2002). That court's discussion of the applicable filing date for measuring the limitations period was in contemplation of the transfer of this case to the United States Court of Federal Claims and specifically referred to this court's statute of limitations, 28 U.S.C. § 2501. Id. at 6-7. Although, as discussed in the following paragraphs, the relation back to the original state court filing date of a removed and transferred case may not always be appropriate, the court agrees

---

[11](...continued)
dismissal of a complaint with leave to amend is not a final order dismissing a case, and has found itself without jurisdiction to entertain appeals of these dismissals. See WMX Techs., Inc. v. Miller, 104 F.3d 1133, 1136-37 (9th Cir. 1997) (en banc) ("[W]hen a district court expressly grants leave to amend, it is plain that the order is not final. Something more is both anticipated and required."); see also Santoro v. CTC Foreclosures Servs. Corp., 193 F.3d 1106, 1107 (9th Cir. 1999) (per curiam) (holding, where district court granted defendants' motion for summary judgment but gave plaintiffs leave to amend their complaint, that "the case is still in the district court, and the [plaintiffs] can still obtain a final order by informing the district court that they do not plan to amend"). Here, plaintiff Arakaki filed a notice of appeal of the dismissal with leave to amend, but apparently dismissed that appeal. See Transfer Order at 1 n.1 (noting that Arakaki "represented to the court at the hearing that he would be dismissing this appeal" and commenting that "Arakaki [had been] attempting to appeal an unappealable order").

with the District Court's choice of the state court filing date as the filing date for statute of limitations purposes.

The analysis of the District Court for the District of Hawaii of the applicable filing date, Transfer Order at 6-8, interprets the "actually filed" language of the federal transfer statute with respect to a case removed from state court. See 28 U.S.C. § 1631 (stating that "the action or appeal shall proceed as if it had been filed in or noticed for the court to which it is transferred on the date upon which it was actually filed in or noticed for the court [in this case, the United States District Court for the District of Hawaii] from which it is transferred"); Best, 14 Cl. Ct. at 724 (holding that "the transferee court proceeds as if the case originally had been properly filed and the action is afforded the benefit of the filing date in the transferor court [in this case, the United States District Court for the District of Hawaii]"). The District Court's choice of the June 5, 2002 state court filing date as the applicable filing date appears to be correct for the reasons more particularly explained in a 1997 decision by the District Court for the District of New Jersey:

> For the purposes of calculating the date when an action was filed, where the action was removed from state court to this Court, the Court has used the date of the filing in state court . . . . Since the Court has the power to transfer an action which was removed from a state court to another federal district court, Plaintiff should be able to take full advantage of the portion of Section 1631 which provides that the original date of filing shall be respected by the transferee court.

Chicosky v. Presbyterian Med. Ctr., 979 F. Supp. 316, 321 n.4 (D.N.J. 1997) (citations omitted).

Admittedly, other interpretations of the "actually filed" language in Section 1631 are conceivable. In 1987, the Tenth Circuit overturned a summary judgment of the District Court for the District of Colorado which had dismissed a complaint on statute of limitations grounds, holding that the removal date, i.e., the date when the case arrived in the first federal court in New York, must be accepted as the filing date by the federal district court in Colorado. See Ross v. Colo. Outward Bound Sch., Inc., 822 F.2d 1524, 1527 (10th Cir. 1987) ("We hold that § 1631 requires that the Colorado district court . . . accept the date on which the action was removed [from the New York state court] to the New York [federal] district court as the filing date in the Colorado [federal] district court; and that the action shall proceed in the Colorado district court as not time barred by the two year statute of limitations provision [in Colorado state law applicable to the action]."). In that case, however, the date of removal from state court to federal court was within the limitations period, and the Tenth Circuit had no need to reach back to the state

court filing date to reverse the judgment below. Id. at 1528 (stating that the removal date was "well within the two year statute of limitations period" and holding "that the action was timely filed"). The state court filing date in that case was also within the limitations period. Id. at 1526. The difference in dates between the state court filing and the removal was of no legal significance for the statute of limitations analysis. In this case, however, the difference between the state court filing date of June 5, 2002 and the removal date of July 8, 2002 is legally significant. Plaintiff's accrual date theory is founded on a June 1996 sale date, a date which, if accepted by the court as the proper accrual date, would take the removal date of July 8, 2002 outside the limitations period. The Tenth Circuit was not presented with the precise issue of a removed and transferred case which was potentially time-barred as of the removal date, but potentially timely filed as of the state court filing date. However, to the extent Ross suggests or requires a resolution of that issue in favor of finding the applicable federal filing date to be the date of removal, the court respectfully declines to follow that guidance.

The court believes that using the state court filing date as the applicable filing date for a removed and transferred case is sound where, as here, the transferor district court has analyzed the issue and found the state court filing date to be the proper filing date in federal court for statute of limitations purposes. Even if that analysis were not sound, however, an alternative source of support for using the state court filing date as the applicable filing date for statute of limitations purposes can be found in recent precedential decisions of the United States Supreme Court and the Federal Circuit, decisions extending the doctrine of equitable tolling of statutes of limitations to suits against the United States.

In Irwin v. Department of Veterans Affairs, the Supreme Court held that, when discussing "statutory time limits applicable to lawsuits," "the same rebuttable presumption of equitable tolling applicable to suits against private defendants should also apply to suits against the United States. Congress, of course, may provide otherwise if it wishes to do so." 498 U.S. 89, 95-96 (1990) (Irwin). The court in Irwin described two types of cases that merit equitable tolling of limitations periods:

> We have allowed equitable tolling in situations where the claimant has actively pursued his judicial remedies by filing a defective pleading during the statutory period, or where the complainant has been induced or tricked by his adversary's misconduct into allowing the filing deadline to pass.

Id. at 96 (footnotes omitted). The court also described a type of case which does not merit equitable tolling of a statutory limitations period:

> We have generally been much less forgiving in receiving late filings where the claimant failed to exercise due diligence in preserving his legal rights.

Id. (citation omitted).

These statements in Irwin have given rise to extensive jurisprudence, binding upon this court, deciding both whether Congress, in enacting a particular statute, "provide[d] otherwise" than the "rebuttable presumption of equitable tolling," see, e.g., Stone Container Corp. v. United States, 229 F.3d 1345, 1352-53 (Fed. Cir. 2000) (listing Supreme Court and Federal Circuit cases applying or refusing to apply equitable tolling to particular statutes of limitations in lawsuits against the United States), and whether a particular plaintiff has "failed to exercise due diligence in preserving his legal rights," see, e.g., Frazer v. United States, 288 F.3d 1347, 1353 (Fed. Cir. 2002) (finding that equity did not require the tolling of the six-year statute of limitations at the Court of Federal Claims because the plaintiffs "fail[ed] to bring the action within the limitations period" and "they had the responsibility to determine whether to attempt to bring the action in a timely fashion").

The Federal Circuit has not spoken decisively as to whether the six-year statute of limitations in 28 U.S.C. § 2501 is subject to equitable tolling. See, e.g., Martinez v. United States, 333 F.3d 1295, 1318 (Fed. Cir. 2003) (stating that "we have not decided whether equitable tolling applies with respect to the general statute of limitations for Tucker Act claims, 28 U.S.C. § 2501"); Frazer, 288 F.3d at 1353 (stating that "we need not determine whether equitable principles may ever toll the statute of limitations codified in § 2501"); Bath Iron Works Corp. v. United States, 20 F.3d 1567, 1572 n.2 (Fed. Cir. 1994) (discussing statutes of limitations that are considered "jurisdictional," such as 28 U.S.C. § 2501, and stating that "those time limits, while jurisdictional, can be equitably tolled in certain circumstances," but concluding that "we need not decide that issue here"). The court believes that the Federal Circuit has left the door open for a sufficiently compelling set of facts which would equitably toll section 2501. See Martinez, 333 F.3d at 1318 ("To be sure, section 2501 appears to have more in common with the limitations statute at issue in Irwin [where the Supreme Court announced the general rule permitting equitable tolling of limitations periods even where the United States is the defendant] than with the statutes at issue in Brockamp [United States v. Brockamp, 519 U.S. 347 (1997)] and Beggerly [United States v. Beggerly, 524 U.S. 38 (1998)] [two cases where the Supreme Court rejected the availability of the doctrine of equitable tolling for the particular statutes of limitation at issue]."). But see id. (stating that "[o]n the other hand, section 2501 differs from the Irwin statute in that it contains its own tolling provision for persons 'under legal disability or beyond the seas at the time the claim accrues,'" and concluding that "the matter [whether section 2501 may be tolled] is not free from doubt")

(quoting 28 U.S.C. § 2501). For the reasons discussed below, the facts presented by the procedural history of this case, if the initial filing was "defective," fit squarely into the category of cases mentioned in Irwin that merit equitable tolling due to a defective filing within the limitations period.

Irwin cited to three cases, 498 U.S. at 96 n.3, as examples of lawsuits where a timely but defective filing merited tolling of a statutory limitations period: Burnett v. New York Central Railroad Co., 380 U.S. 424 (1965), Herb v. Pitcairn, 325 U.S. 77 (1945) and American Pipe & Construction Co. v. Utah, 414 U.S. 538 (1974). American Pipe dealt with "an aspect of the relationship between a statute of limitations and the provisions . . . regulating class actions in the federal courts," 414 U.S. at 540, and is not pertinent to the discussion here. But the other two cited cases, Herb and Burnett, are examples of the kinds of cases where tolling because of a state court filing is appropriate for statute of limitations purposes.

In Herb, the plaintiffs sued in a city court that did not have jurisdiction but where process was nevertheless served on the defendants. 325 U.S. at 78. The Illinois Supreme Court held that the action had not commenced with this filing because the city court did not have jurisdiction. Id. The Supreme Court disagreed, stating that "[a]n action is 'commenced' for these purposes as a matter of federal law when instituted by service of process issued out of a state court, even if one which itself is unable to proceed to judgment, if the state law or practice directs or permits the transfer through change of venue or otherwise to a court which does have jurisdiction to hear, try, and otherwise determine that cause." Id. at 78-79. Because "process [was] adequate to bring in the parties and to start the case on a course of judicial handling which [might] lead to final judgment without issuance of new initial process, it [was] enough to commence the action within the federal statute." Id. at 79.

In Burnett, the plaintiff sued before the limitations period had run in a state court which possessed jurisdiction, and served process on the defendant. 380 U.S. at 424-25. The state court claim was dismissed for improper venue, and plaintiff's subsequent filing in federal court was deemed untimely by both the district court and the Sixth Circuit. Id. at 425. The Supreme Court reversed and tolled the limitation period "during the pendency of the state suit." Id. at 435.

Burnett discussed extensively aspects of Ohio and federal law that justified tolling of the federal statute of limitations where the initial state suit was dismissed, not transferred. 380 U.S. at 426-36. The Court stated that in other circumstances, justification for tolling was provided by Herb: "Had Ohio law permitted this state court action simply to be transferred to another state court, Herb v. Pitcairn holds that it would

have been timely." Id. at 426. Because plaintiff's suit here was removed to federal court as allowed by federal law, and was not dismissed by the state court, the court believes this uninterrupted litigation is analogous to a transfer at the state court level and that tolling is justified under the reasoning of Irwin, Burnett and Herb.

Because Irwin, Burnett and Herb all point to the conclusion that a defective but timely state court filing could toll a federal statute of limitation, unless Congress "provide[d] otherwise," the proper inquiry here is whether the state court filing in this case is "defective," and if so, whether the defect is serious enough to prevent tolling on equitable grounds. See, e.g., Irwin, 498 U.S. at 96 ("Federal courts have typically extended equitable relief only sparingly."); Jaquay v. Principi, 304 F.3d 1276, 1283 (Fed. Cir. 2002) (noting that "'fail[ure] to exercise due diligence in preserving [the plaintiff's] legal rights'" and "'garden variety claim[s] of excusable neglect'" were disapproved by the Court in Irwin as justifications for equitable tolling). The Federal Circuit has commented that "the diligence requirement is more relaxed for cases where the claimant filed a pleading in the wrong place as opposed to filing it after a statutory deadline," Jacquay, 304 F.3d at 1287, but did not offer a specific tolling rule for misfiled or defective complaints, see id. at 1288 (noting a split in the circuits regarding the doctrine of equitable tolling of statutes of limitation for misfiled actions in state court and stating that "[w]e . . . need not follow the direction of one circuit or reject the position of another").[12]

Taking the 'more relaxed diligence requirement' as a lodestar, plaintiff here has met that standard, if indeed his filing could be described as defective in state court. Plaintiff's original complaint, naming as defendants, among others, the Secretary of the Department of Housing and Urban Development (HUD) and HUD itself, sought monetary and other relief under the National Housing Act, 12 U.S.C. §§ 1701-1750g (2000) and cited specifically to 12 U.S.C. § 1702. Complaint of June 5, 2002 ¶¶ 2-3, 31. A seminal Supreme Court case "liberally construed" the waiver of sovereign immunity in section 1702 to permit suits in state or federal courts against what is now HUD. Fed. Hous. Admin., Region No. 4 v. Burr, 309 U.S. 242, 245 (1940) (Burr); see Armor Elevator Co. v. Phoenix Urban Corp., 655 F.2d 19, 21 (1st Cir. 1981) (Armor II)

---

[12]Irwin cited to Baldwin County Welcome Center v. Brown, 466 U.S. 147 (1984) for one example where lack of due diligence in preserving one's legal rights prohibited the application of the doctrine of equitable tolling. 498 U.S. at 96. In Baldwin County, the plaintiff was informed three times regarding a ninety-day limitations period for filing an action and still missed the deadline for filing. 466 U.S. at 151. Here, plaintiff did not ignore the six year limitations period but filed in state court within six years of the event plaintiff alleges as the accrual date of the claim asserted.

(describing Burr as a "seminal case" and describing a circuit split as to the breadth of the waiver of sovereign immunity in section 1702); 12 U.S.C. § 1702 ("The Secretary shall, in carrying out the provisions of this subchapter and [several] subchapters . . . of this chapter [National Housing], be authorized, in his official capacity, to sue and be sued in any court of competent jurisdiction, State or Federal."). Burr arose in a state court garnishment action against the Federal Housing Administration (FHA) and held that Congress had waived sovereign immunity for such a suit, if funds available for the damages asserted were already paid to the FHA and were "severed from Treasury funds and Treasury control." 309 U.S. at 250.

In light of the holding in Burr, there is no indication, at least on the face of the pleading, that plaintiff's initial complaint was misfiled or defective in state court. See Armor Elevator Co. v. Phoenix Urban Corp., 493 F. Supp. 876, 880-82, 890 (D. Mass. 1980) (Armor I) (noting that, of the seven suits brought by different plaintiffs under section 1702, six were filed initially in state court and removed to federal court, and deciding to transfer all seven claims against HUD to the Court of Federal Claims), aff'd as to the disposition, Armor II, 655 F.2d at 22 ("If any federal jurisdiction exists, it is in the Court of Claims as the district court decided, and it is for that court to determine if it has jurisdiction."). Both the trial court, Armor I, 493 F. Supp. at 890, and the First Circuit, Armor II, 655 F.2d at 22, proposed transfer, rather than dismissal, to avoid limitations problems. The procedural posture of those cases is similar to this case. In this case, an arguably timely-filed state court action under section 1702 against HUD has been removed to federal court and transferred. The statute of limitations would bar a new filing in this court. Under the Armor I and Armor II precedents, plaintiff's initial choice of forum does not appear to be defective.

This case arose in Hawaii, and was removed to a district court within the Ninth Circuit. Ninth Circuit precedent also permits suits filed in state court under section 1702, subsequently removed to federal court, to be transferred to the Court of Federal Claims. See Marcus Garvey Square, Inc. v. Winston Burnett Constr. Co. of Cal., 595 F.2d 1126, 1128, 1129 n.1, 1132-33 (9th Cir. 1979) (finding, on the facts of that removed case, that "where the United States is the real party in interest, [section 1702] statutory authority for the federal official to be sued does not operate as a complete waiver of the sovereign immunity of the United States" and remanding claims against the FHA, HUD and the Secretary of HUD to the lower court "for the limited purpose of permitting the district court to transfer this case [to the Court of Claims, this court's predecessor] if the district court should find transfer appropriate"). There is no mention in Marcus Garvey of statute of limitations problems or whether the transferred case should relate back to the state court date of filing. Importantly, the Marcus Garvey court does not characterize as misfiled or defective a state court complaint under section 1702 naming HUD and the

Secretary of HUD as defendants. Instead, the Ninth Circuit, on appeal from summary judgment for the defendants, remanded the claims against the United States, the real party in interest, to the district court for a discretionary transfer decision. Id. at 1133. Here, the district court in Hawaii has similarly made a discretionary decision to transfer this case to the Court of Federal Claims, as permitted by the Marcus Garvey precedent.

In its Marcus Garvey opinion, the Ninth Circuit left open the question of whether jurisdiction of some claims under section 1702 might be exclusive to the United States Court of Federal Claims under the Tucker Act and therefore whether a state court within the Ninth Circuit, under facts different from those then before it, can possess jurisdiction under section 1702 over claims against HUD or the Secretary of HUD. See id. at 1132 ("We need not decide whether the Tucker Act is an exclusive grant of jurisdiction; no other waiver of sovereign immunity or grant of jurisdiction exists which would apply to the facts of this case."). If state courts within the Ninth Circuit are without jurisdiction over any suits under section 1702, perhaps plaintiff here would be deemed to have misfiled his suit in state court. The court has found no definitive pronouncement from the Ninth Circuit, or from the state courts of Hawaii, on this subject.[13] Lacking a clear prohibition on the filing of a section 1702 claim in the state courts of Hawaii, plaintiff's initial complaint filed in state court, if deemed to be misfiled or defective but otherwise timely, would bring this case squarely within the equitable tolling doctrine of Irwin. See

[13]In Teitelbaum v. United States Department of Housing and Urban Development, the United States District Court for the District of Nevada found that certain claims filed in federal court under section 1702 sounded in contract and were only cognizable under the Tucker Act. 953 F. Supp. 326, 329 (D. Nev. 1996). That court specifically rejected the plaintiff's arguments that section 1702 waived immunity for a suit which claimed, among other charges, breach of an oral contract that modified a HUD mortgage to give "Plaintiffs . . . the right of first refusal to purchase the loans at a thirty or forty percent discount." Id. at 328, 330-31. The HUD officer who was alleged to have made the oral contract in that case was the same HUD officer alleged to have made the oral contract in this case. Compare id. at 327-28 with Pl.'s Opp. Declaration of Edward T. Arakaki at 1 (both referencing HUD employee David Ewing). The court refers to Teitelbaum, although it is not controlling authority for either the District Court for the District of Hawaii or this court, to note its statement that the complaint in that case "simply stretche[d] [section 1702's] waiver of sovereign immunity beyond its purpose [and that plaintiff could not rely upon section 1702 to create jurisdiction in the District Court for a contract claim based on an oral modification of a HUD mortgage]." 953 F. Supp. at 331. To the extent that the foregoing view of the Teitelbaum court could be read to decide the jurisdictional issue related to a state court filing under section 1702 on the facts of this case, the court declines to apply that view to an issue not before that court. When other issues related to the alleged contract in this case are explored in further proceedings, Teitelbaum may well prove instructive to the court with regard to the merits of plaintiff's claims.

498 U.S. at 96 ("We have allowed equitable tolling in situations where the claimant has actively pursued his judicial remedies by filing a defective pleading during the statutory period." (footnoes omitted)); cf. Jaquay, 304 F.3d at 1288 (when applying Irwin, citing Goldlawr, Inc. v. Heiman, 369 U.S. 463, 467 (1962), for the proposition that, in veterans' benefits cases, "[t]he [timely] filing of the misdirected paper itself satisfies the diligence requirement as a matter of law").

For the foregoing reasons, the court chooses the June 5, 2002 state court filing date as the filing date in this court for statute of limitations purposes.

b. Accrual date

For the purposes of the six-year statute of limitations governing the Court of Federal Claims, "[a] claim accrues when all events have occurred that fix the alleged liability of the Government and entitle the plaintiff to institute an action." Creppel v. United States, 41 F.3d at 631; see also Sankey v. United States, 22 Cl. Ct. 743, 745 (1991) ("[T]he court must focus on the issue of 'first accrual,' i.e., that point at which events transpired 'entitling the claimant to bring suit alleging the breach.'" (quoting Nager Elec. Co. v. United States, 368 F.2d 847, 851 (Ct. Cl. 1966))). In breach of contract actions, accrual generally occurs "at the time of the breach." Martinez v. United States, 48 Fed. Cl. 851, 857 (2001) (citing Brighton Village Assocs. v. United States, 52 F.3d 1056, 1060 (Fed. Cir. 1995)).

The facts of a claim need not be known but must only be knowable to plaintiff. Menominee Tribe of Indians v. United States, 726 F.2d 718, 720-21 (Fed. Cir. 1984). Hence, plaintiff need only be "on inquiry [notice] that it has a potential claim" to start the running of the statute of limitations. Japanese War Notes Claimants Ass'n of the Philippines, Inc. v. United States, 373 F.2d 356, 359 (Ct. Cl. 1967) (Japanese War Claimants). A reasonable inquiry is required. Id.

Several dates have been put forth as possible accrual dates for plaintiff's claim. The court will discuss, first, whether plaintiff's claim accrued before its mortgage loan was sold and, second, whether it accrued at the time of sale.

When a promisor fails "to perform at the time indicated for performance in the contract," that failure is an actual breach. Franconia Assocs. v. United States, 536 U.S. 129, 142-43 (2002); see Restatement (Second) Contracts § 235(2) (1981) ("When performance of a duty under a contract is due[,] any non-performance is a breach."). A "promisor's renunciation of a 'contractual duty before the time fixed in the contract for . . . performance' is a repudiation." Franconia, 536 U.S. at 143 (quoting 4 Arthur L. Corbin,

Contracts § 959 at 855 (1951)). Repudiation entails a statement or "voluntary affirmative act" by the promisor, before performance is due, indicating either that the promisor will commit a breach or is incapable of performing. Restatement (Second) Contracts § 250 (1981). Repudiation only "ripens into a breach prior to the time for performance . . . if the promisee 'elects to treat it as such.'" Franconia, 536 U.S. at 143 (citation omitted).

i. Accrual Date Before Time of Sale

Defendant claims that plaintiff's alleged right to bid on its mortgage "was foreclosed well before the actual date of the sale of the loan." Def.'s Mot. at 7. In support, it invokes Plaintiffs in Winstar-Related Cases v. United States for the proposition that "at some point a largely anticipatory breach may be sufficiently "actual" to trigger the statute of limitations." 37 Fed. Cl. 174, 183 (1997) (Winstar (1997)), aff'd sub nom., Ariadne Fin. Servs. Pty., Ltd. v. United States, 133 F.3d 874 (Fed. Cir. 1998).[14] In defendant's view, this case is governed by Winstar (1997) because both cases involve the enactment of regulations that precluded the United States from fulfilling the terms of a previous promise. See Def.'s Reply at 4-5 (comparing Winstar (1997) with this case). Defendant relies on language in Winstar (1997) that the claim accrued when the new regulations became effective because, once the "regulations took effect, [plaintiff] [was] legally subject to new . . . standards that were in direct contradiction to the terms of their . . . agreements." Winstar (1997), 37 Fed. Cl. at 185; see Def.'s Reply at 5 (noting that 24 C.F.R. § 290.31, the HUD regulation published on March 21, 1996, was "in direct contradiction" to the terms of plaintiff's alleged agreement).

Initially, defendant argued that the statute of limitations began to run on March 21, 1996, when HUD published new regulations regarding the sale of HUD-held mortgages. Def.'s Mot. at 8. These regulations provided:

> HUD will sell current mortgages securing subsidized projects, as follows: (a) Current mortgages with FHA mortgage insurance will be sold either: (1) On a competitive basis to FHA-approved mortgagees; or (2) On a negotiated basis, to State or local governments, or to a group of investors that includes an agency of a State or local government if, in addition to meeting the requirements of the Statute, the sales price is the best price that

[14]See also Shiny Rock Mining Corp. v. United States, 906 F.2d 1362, 1364 (9th Cir. 1990) (holding that an action challenging an agency order removing public land from appropriation under mining laws accrued when the order was published in the Federal Register and interested parties acquired a right to bring the action).

> HUD can obtain from an agency of a State or local government while maintaining occupancy for the tenant group originally intended to be served by the subsidized housing program.

Disposition of Multifamily Projects and Sale of HUD-Held Multifamily Mortgages, 61 Fed. Reg. 11,684, 11,690 (Mar. 21, 1996) (codified at 24 C.F.R. § 290.31 (1996)). In its motion, defendant claimed that these regulations precluded plaintiff from bidding on his mortgage loan. See Def.'s Mot. at 8. Likening plaintiff's situation to that of the plaintiffs in Winstar (1997), defendant argued that, once effective, these regulations constituted an actual breach that started the statute of limitations running. Def.'s Mot. at 8; Winstar (1997), 37 Fed. Cl. at 183. The new regulations became effective on April 22, 1996. 61 Fed. Reg. at 11684. Since plaintiff's original complaint was filed on June 5, 2002, the accrual date of April 22, 1996 would time-bar plaintiff's case. See 28 U.S.C. § 2501 ("Every claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues.").

Specifically, defendant argued that plaintiff should have been aware that the new HUD regulations precluded plaintiff from bidding on his loan and that the new regulations therefore "served as a material breach . . ." of defendant's alleged promise. Def.'s Reply at 4. Defendant was unable, however, to establish either that the regulations conclusively excluded plaintiff from bidding, or that plaintiff should have been aware of any possible exclusion. See Tr. at 46-48 (exchange between defendant's counsel Mr. Mager and the court evidencing defendant's inability to rule out the possibility that plaintiff could be an "FHA[15]-approved mortgagee"). After further review of the regulations in response to the court's request for further briefing, Tr. at 48, 88; June 23, 2004 Order, defendant withdrew its argument. Def.'s Resp. to June 23, 2004 Order at 1.

Nor was defendant able to support its contention that the statute of limitations started running on April 26, 1996, when HUD published a notice opening the multifamily loan auction that specifically applied the new regulations to plaintiff's mortgage. Def.'s Mot. at 9.

The HUD notice explained that "[b]idders must be eligible institutional investors in order to have their bids considered." Notice of Sale of HUD-Held Multifamily Mortgage Loans, 61 Fed. Reg. 18,652, 18,652 (April 26, 1996) (Notice of Sale). The list of ineligible bidders included "[a]ny Mortgagor of any of the Mortgage Loans or an entity affiliated with any such Mortgagor." Id. at 18,653. Again relying on Winstar (1997),

---

[15]Federal Housing Administration.

defendant argues that this notice–by explicitly foreclosing plaintiff, as a mortgagor, from bidding on his mortgage–constituted an actual breach of the right to bid allegedly promised to plaintiff. See Def.'s Mot. at 8.

Defendant claims that plaintiff was aware that the Notice of Sale pertained to his mortgage because HUD had previously written to inform plaintiff that his mortgage was to be included in an upcoming sale, and because "the bidding materials" that were sent to plaintiff specifically listed his mortgage loan. Tr. at 49-50 (statement of defendant's counsel Mr. Mager); Pl.'s Resp. to June 23, 2004 Order Ex. A (July 5, 1995 letter from Alfred B. Sullivan, HUD Director of Multifamily Housing Management, to plaintiff); Def.'s Resp. to June 23, 2004 Order at Tab V (Mortgage Loan Schedule listing plaintiff's property, Lake Mead Villa Apartments, as HUD/FHA case # 125-35100). Plaintiff, however, insists he "did not see any Notice [of Sale] published in the Federal Register," and, in spite of the HUD letter, "continued to hope that HUD would keep its promises." Declaration of Edward T. Arakaki ¶¶ 9-10 (Mar. 4, 2004).

The court notes that the issue is not whether plaintiff personally saw the Notice of Sale, but whether plaintiff knew, or should have known, of a breach by the government of its alleged contract with plaintiff. See Hopland Band, 855 F.2d at 1577 (stating that "for the purposes of section 2501, it would appear more accurate to state that a cause of action against the government has 'first accrued' only when all the events which fix the government's alleged liability have occurred and the plaintiff was or should have been aware of their existence"). The standard for notice of the government's liability for claims is an objective one, and does not require the plaintiff's personal knowledge. See Coastal Petroleum Co. v. United States, 228 Ct. Cl. 864, 866 (1981) (stating that although "there are certain instances in which the running of the statute will be suspended when an accrual date has been ascertained, but plaintiff is unaware of his potential cause of action[,] [p]laintiff's ignorance of a claim of which he should be aware . . . is not enough to toll the statute"); Japanese War Claimants, 373 F.2d at 359 ("Ignorance of rights which should be known is not enough [to toll a statute of limitations]. Plaintiff must . . . show . . . that its injury was 'inherently unknowable' . . . ." (citations and footnote omitted)).

Sufficient notice of a government act which allegedly creates liability may be defined differently according to the context in which the claim arises. See, e.g., Venture Coal Sales Co. v. United States, 370 F.3d 1102, 1107 (Fed. Cir. 2004) (holding that "a claim for damages from an invalid [taxation] statute [that offends the Constitution] accrues on making a payment under that statute" and stating that such a claim was not inherently unknowable at the time simply because a subsequent suit by other plaintiffs had not yet highlighted the constitutional flaw); Banks v. United States, 314 F.3d 1304, 1310 (Fed. Cir. 2003) (holding that takings claims due to shore erosion caused by jetties

built by the Army Corps of Engineers were not time-barred because "of the justifiable uncertainty of the permanence of the taking caused by the actual mitigation efforts of the Corps" and did not accrue until reports from the Corps "collectively indicated that erosion was permanent and irreversible"); Kasarsky v. Merit Sys. Prot. Bd., 296 F.3d 1331, 1337 (Fed. Cir. 2002) (stating that the government's "delay in paying the attorney fees could not amount to a breach of the fee agreement [between the government and the plaintiff], until it communicated its refusal to pay"); Welcker v. United States, 752 F.2d 1577, 1581 (Fed. Cir. 1985) (holding that the plaintiff's claims accrued when "he strongly suspected in 1949-50 that the FBI had lied in its reports" and his claims were not subject to tolling simply because he was not able to access FBI records relating to his claim until 1981); L.S.S. Leasing Corp. v. United States, 695 F.2d 1359, 1366 (Fed. Cir. 1982) (holding that plaintiff, a lessor, was "relieved . . . of the costly obligation of monitoring [the government's usage of a rented facility in excess of lease terms] . . . [and] [w]e see no basis for holding that it would have been reasonable for the lessor to have discovered the [excess] use at an earlier date [than when the government reported the excess use to plaintiff] under these circumstances"). Here, plaintiff disputes that he had personal knowledge through the Notice of Sale of the government's breach of its alleged contract with him, but the real issue is whether he should have known, before June 6, 1996, about government acts that might have created liability for breach of that alleged contract.

Plaintiff contends that, even if he had seen the Notice of Sale, the terms of the notice were insufficient to have constituted notice of an actual breach. Pl.'s Sur-Reply at 4. First, plaintiff maintains that the notice in no way specifically identified his mortgage but, instead, "generically [referred] to 'its intention to dispose of approximately 157 . . . loans.'" Id. (quoting 61 Fed. Reg. at 18,652). Thus plaintiff could have seen the Notice of Sale and, not knowing that it concerned the Property, could have remained unaware that he had a claim. Id. Second, plaintiff notes that HUD reserved the right to "delete any Mortgage Loan from the Partially Assisted Sale . . . for any reason and . . . for any reason whatsoever, to reject any and all bids . . . [and] to terminate the Partially Assisted Sale at any time prior to the Class A Trust Certificate bid date." 61 Fed. Reg. at 18,652-53; Pl.'s Sur-Reply at 4. Third, plaintiff points out that the Notice of Sale did not establish a "firm auction date," Pl.'s Sur-Reply at 4, and instead signaled that a closing of bids was "'expected in the middle of June 1996.'" Id. (quoting 61 Fed. Reg. at 18,652).[16]

---

[16]After oral argument on defendant's motion, defendant filed with the court bid information documents dated May 15, 1996 (Preliminary Bidding Materials), that appear to establish a Class A Trust Certificate bid date of May 28, 1996 for the bundled mortgages including plaintiff's mortgage. Def.'s Resp. to June 23, 2004 Order (Preliminary Bidding Materials–Partially Assisted Multifamily Mortgage Loans Structured Finance Disposition at 1).

(continued...)

Plaintiff argues that the Notice of Sale merely established a tentative sale and that HUD could have "[changed] its mind before the bid and pull[ed] Plaintiff's loan off the auction or allow[ed] Plaintiffs to bid." Pl.'s Sur-Reply at 4. The possibility that the government could change its mind and perform was part of the Supreme Court's reasoning in Franconia for deciding that a claim had not accrued on the date of a statutory enactment the terms of which foreshadowed the breach of a loan agreement: "Just as Congress may announce the Government's intent to dishonor an obligation to perform in the future through a duly enacted law, so may it retract that renouncement prior to the time for performance, thereby enabling the agency or contracting official to perform as promised." Franconia, 536 U.S. at 148. Therefore, plaintiff insists, the Notice of Sale constituted a mere anticipatory repudiation and not an actual breach. See Pl.'s Opp. at 1-2; Pl.'s Sur-Reply at 4-5.

Plaintiff argues that this case is "almost identical" to Franconia. Pl.'s Sur-Reply at 3. In Franconia, plaintiffs were promised a right to prepay their mortgages, a promise that was later precluded by the Congressional enactment of a statute that placed "permanent restraints upon prepayment of [plaintiffs'] loans." Franconia, 536 U.S. at 133. The Court held that plaintiff's claim accrued, and the statute of limitations began to run, when plaintiffs attempted to prepay, rather than on the date of the statutory enactment. Id. at 133. This was because, under the Franconia contract, the government's performance only became due when plaintiffs actually attempted to prepay their mortgages:

> If petitioners enjoyed a "right to prepay their loans at any time," then necessarily the Government had a corresponding obligation to accept prepayment and execute the appropriate releases. . . . Viewed in this light, [the Act] effected a repudiation of the . . . loan contracts, not an immediate

---

[16](...continued)
A review of the Preliminary Bidding Materials, however, raises issues regarding the effectiveness of the notice the Preliminary Bidding Materials could have provided plaintiff of the sales procedures they describe. See Preliminary Bidding Materials at 1 ("These Preliminary Bidding Materials are confidential and may not be copied or distributed without the permission of the Federal Housing Administration of the U.S. Department of Housing and Urban Development" (all capital letters in original)); id. at 2 ("Bidding rules described herein are subject to change. Any such changes will be provided supplementally."); id. ("FHA reserves the right, at its sole discretion and for any reason whatsoever, to reject any and all offers to purchase the Bonds or Class A Trust Certificate."). Because the legal import of the Preliminary Bidding Materials has not been fully explained to the court by the parties, the court defers determination of whether the Preliminary Bidding Materials effected notice to plaintiff that would cause the accrual of his claim.

> breach. The Act conveyed an announcement by the Government that it would not perform as represented in the promissory notes if and when, at some point in the future, petitioners attempted to prepay their mortgages.

Id. at 142-43 (quotations and citations omitted). Plaintiff relies on Franconia to support his proposition that the present breach could not have occurred "until the tender of Plaintiff[']s bid was rejected." Pl.'s Sur-Reply at 3. Thus, even if the Notice of Sale put him on notice of a potential HUD breach, plaintiff alleges that it was a mere anticipatory repudiation that did not ripen into full breach until HUD actually sold the mortgage, having first rejected plaintiff's attempts to persuade[17] HUD to "adhere to [its] agreement." Pl.'s Opp. at 1-2. Because a promisee may treat a repudiation as a breach or choose wait until the time for performance, Franconia, 536 U.S. at 143, this argument–if accepted by the court–would invalidate defendant's proposed April 26, 1996 accrual date.[18]

Defendant attempts to distinguish Franconia by asserting that the government's time for performance was at the opening of the auction, and not at the time of sale. Tr. at 54 (statement of defendant's counsel Mr. Mager). A repudiation might not ripen into a breach until the time performance is due. Franconia, 536 U.S. at 143. Thus, if defendant's performance was due at the opening of the auction, as it alleges, this would mean that plaintiff's claim accrued no later than April 26, 1996, when "the auction process was opened." Tr. at 50 (statement of defendant's counsel Mr. Mager). Defendant's argument does not, however, eliminate the possibility that HUD could have changed its plans and excluded plaintiff's mortgage from the auction. Because the Notice of Sale expressly reserved HUD's right to do so, 61 Fed. Reg. at 18,652-53, the court cannot discount plaintiff's argument that the opening of the auction was not the government's time for performance.[19]

---

[17]See Pl.'s Opp. Ex. A (August 19, 1995 letter from Edward T. Arakaki to Robin Rains, Hamilton Securities Financial Advisor, expressing plaintiff's interest in negotiating for the mortgage on its property: "I . . . am prepared to begin negotiations immediately or sooner"); Id. Ex. B (September 27, 1994 letter from Edward T. Arakaki to Albert B. Sullivan, HUD Office of Multifamily Housing Management Director, expressing plaintiff's interest in "negotiating the purchase of the mortgage note on [his] property").

[18]Whether the bid date for the Class A Trust Certificate, apparently set by the Preliminary Bidding Materials of May 15, 1996, might be considered to be the accrual date for plaintiff's claims has not been fully briefed by the parties and is not decided by the court. See supra note 16, and infra note 21 and accompanying text.

[19]The parties introduced other related arguments contesting or defending defendant's
(continued...)

The court finds that the question of whether plaintiff's claim accrued before the date of sale of plaintiff's mortgage is a mixed question of law and fact that cannot be resolved upon the record before the court[20] and reserves decision of the issue.

ii. Accrual Date at the Time of Sale

Defendant also contends that, even if the claim accrued on the date HUD actually sold its mortgage, as plaintiff contends, Pl.'s Opp. at 3, plaintiff's mortgage was in fact sold before June 5, 1996 and plaintiff's claim is time-barred. Tr. at 58-60 (statements of defendant's counsel Mr. Mager). The actual date of sale is a hotly contested issue. Id. at 7-15 (statements of plaintiff's counsel Mr. Jaress), 58-62 (statements of defendant's counsel Mr. Mager). Seven different documents have been introduced, each suggesting a different sale date for plaintiff's mortgage. Four of these documents–one of which was introduced by defendant–indicate that plaintiff's mortgage sold after June 5, 1996:

- The Notice of Sale, 61 Fed. Reg. 18652, states that "closing is expected in the middle of June, 1996." Pl.'s Sur-Reply Ex. A (emphasis added).

- In response to the court's June 23, 2004 Order, plaintiff introduced a letter dated June 21, 1996 from Dorothy A. Manz, HUD Multifamily Asset Branch Chief, to Aurea Mabe, of a Nevada property management company, concerning the Property, Lake Mead Villa Apartments. Pl.'s Resp. to June 23, 2004 Order Ex. B. The letter indicates that "[t]he loan on the above property sold at the Partially Assisted Loan Sale on June 6, 1996." Id. (emphasis added); see http://www.ebmc.com (last visited Aug. 23, 2004).

- Plaintiff also introduced a letter dated September 22, 1997 from HUD Assistant Secretary Hal C. DeCell III to Senator Daniel K. Inouye. Pl.'s Opp. Ex. D. This

---

[19](...continued)
proposed pre-sale accrual date. Def.'s Mot. at 7-10; Pl.'s Opp. at 1-6; Def.'s Reply at 1-7. The parties' other arguments revolved around Winstar, Franconia, and the stabilization doctrine (damages must be fully stabilized before statute of limitations begins to run). Def.'s Mot. at 7-10; Pl.'s Opp. at 1-4; Def.'s Reply at 1-7; see Dixon Ticonderoga Co. v. Estate of O'Connor, 248 F.3d 151, 162 (3rd Cir. 2001) ("Damages must be 'real and substantial as opposed to speculative' to start the running of the statute of limitations . . . ." (quoting Grunwald v. Bronkesh, 621 A.2d 459, 465 (N.J. 1993))). None of defendant's arguments has so far been persuasive of an accrual date prior to the time of sale of the Property.

[20]See supra notes 16, 18, 19.

letter–correcting the Assistant Secretary's statements in a prior letter to Senator Inouye–states that "HUD included [plaintiff's] loan in the June 27, 1996, Partially Assisted Loan Sale." Id. at 1 (emphasis added).

- In response to the court's June 23, 2004 Order, defendant introduced a copy of the Trust Certificate Purchase Agreement for the HUD 1996 Partially Assisted Multifamily Mortgage Loans disposition. Def.'s Resp. to June 23, 2004 Order (Trust Certificate Purchase Agreement). This document provides: "Payment of the Closing Date Payment will be made against delivery of the Class A Trust Certificate . . . on June 27, 1996 (the 'Closing Date')." Id. ¶ 3(b) (emphasis added).

Three other documents, however, point to a sale date prior to June 5, 1996. Assuming that plaintiff's claim accrued when his mortgage was sold, any of these sale dates would time-bar plaintiff's claim:

- The initial letter, dated May 24, 1996, from HUD Assistant Secretary Hal C. DeCell III to Senator Daniel K. Inouye in response to the Senator's inquiries regarding the Property states that plaintiff's loan "was included in the Department's Structured Finance Sale of Partially Assisted Mortgage Loans on May 23, 1996." Pl.'s Opp. Ex. C (emphasis added).

- The bid information documents issued by HUD on May 15, 1996 apparently set a Class A Trust Certificate bid date of May 28, 1996. Def.'s Resp. to June 23, 2004 Order (Preliminary Bidding Materials–Partially Assisted Multifamily Mortgage Loans Structured Finance Disposition at 1) (Preliminary Bidding Materials).[21]

---

[21]The legal import of the Class A Trust Certificate bid date has not been fully explained to the court. See Tr. at 58-60 (Mr. Mager, defendant's counsel, stating that "to explain how this sale was structured, some of this is in the Federal Register and some of it is in the preliminary bidding materials" and mentioning several dates as significant to the auction process, including May 28, 29 and 30, 1996 and June 3, 4 and 27, 1996, with May 28, 1996 denoted as the due date for "trust certificate servicing bids for the trust certificate"); Def.'s Resp. to June 23, 2004 Order at 2 (describing the filed bidding materials and trust certificate purchase agreement as "further support[] [for] the Government's statute of limitations argument" but offering no legal analysis of the documents). See also supra notes 16, 18.

- The signature portion of the Trust Certificate Purchase Agreement–purportedly signed by the purchaser of the Property–is dated May 29, 1996.[22] Def.'s Resp. to June 23, 2004 Order (Trust Certificate Purchase Agreement at 15).

Plaintiff has sufficiently supported a sale date after June 5, 1996 to avoid dismissal at this juncture for failure to bring its claim within this court's six-year statute of limitations, 28 U.S.C. § 2501.[23]

---

[22] This date is twenty-nine days before the June 27, 1996 "Closing Date" denoted in the same document. Def.'s Resp. to June 23, 2004 Order (Trust Certificate Purchase Agreement ¶ 3(b)). The court notes that, if evidence subsequently reveals that plaintiff's mortgage sold before the general auction closed, and if this information was known, or knowable, by plaintiff, plaintiff's claim might have accrued on the date of sale instead of on the date of closing. See Menominee Tribe of Indians, 726 F.2d at 721 (discussing the plaintiffs' obligation in that case to "make inquiry or seek advice" regarding facts related to an "ordinary accrual date").

[23] Although he contends that the statute of limitations was strictly complied with, plaintiff alternatively invokes the doctrine of equitable estoppel. Pl.'s Opp. at 4-6. Tolling of an accrual date is available "where the complainant has been induced or tricked by his adversary's misconduct into allowing the filing deadline to pass." Irwin, 498 U.S. at 96 (footnotes omitted). The traditional elements of equitable estoppel, where prior actions of a party may prevent the assertion of certain claims or defenses by that party, have been described in the context of a contract dispute with the government:

> (1) the government must know the true facts; (2) the government must intend that its conduct be acted on or must so act that the contractor asserting the estoppel has a right to believe it so intended; (3) the contractor must be ignorant of the true facts; and (4) the contractor must rely on the government's conduct to his injury.

JANA, Inc. v. United States, 936 F.2d 1265, 1270 (Fed. Cir. 1991) (citing Am. Elec. Labs., Inc. v. United States, 774 F.2d 1110, 1113 (Fed. Cir. 1985)). The United States may not, however, "be estopped on the same terms as any other litigant." Heckler v. Community Health Servs. of Crawford County, Inc., 467 U.S. 51, 60 (1984) (footnote omitted). In addition to the traditional elements, "some form of affirmative misconduct must be shown." Zacharin v. United States, 213 F.3d 1366, 1371 (Fed. Cir. 2000) (citing Office of Pers. Mgmt. v. Richmond, 496 U.S. 414, 421 (1990); INS v. Miranda, 459 U.S. 14, 19 (1982); Schweiker v. Hansen, 450 U.S. 785, 788 (1981)).

Plaintiff asserts that equitable estoppel would apply to the facts of this case. Pl.'s Opp. at 4. In particular, plaintiff relies on written statements made by the Assistant Secretary of HUD to Senator Daniel K. Inouye in response to the Senator's inquiries on behalf of plaintiff. Id.; see also Pl.'s Opp. Ex. C at 2 (May 24, 1996 letter from HUD Assistant Secretary Hal C. DeCell III

(continued...)

B. Failure to State a Claim Upon Which Relief Can be Granted

1. Standard of Review

RCFC 12(b)(6) governs dismissal of a claim for "failure to state a claim upon which relief can be granted." RCFC 12(b)(6). Such a dismissal is warranted "when the facts asserted by the plaintiff do not entitle him to a legal remedy." Boyle v. United States, 200 F.3d 1369, 1372 (Fed. Cir. 2000). A motion to dismiss for failure to state a claim is treated as a motion for summary judgment under Rule 56 if "matters outside the pleading are presented to and not excluded by the court." RCFC 12(b). Here, plaintiff included materials extrinsic to the pleadings, Pl.'s Opp. Exs. A-D, and these were considered by the court in arriving at its decision. The court must therefore address defendant's motion to dismiss as a motion for summary judgment under RCFC 56. RCFC 12(b).

Summary judgment is warranted where the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." RCFC 56(c). A material fact is one that could significantly affect the outcome of the suit. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Because only disputes over material facts will preclude the entry of summary judgment, the court must look to governing substantive law to distinguish material facts from irrelevant ones. Id. Disputes over facts that are not outcome determinative are disregarded. Id.

2. Contract Formation

To establish the existence of an express contract, plaintiff "must show a mutual intent to contract including an offer, an acceptance, and consideration." Trauma Serv.

---

[23](...continued)
to Senator Daniel K. Inouye) ("Mr. Arakaki may be reassured in learning that borrowers in default will be able to negotiate a discounted settlement or restructure the non-performing loan into a performing loan. . . . [and that] good faith negotiations can result in a solution that works for all parties."); Pl.'s Opp. Ex. D (September 22, 1997 letter from HUD Assistant Secretary Hal C. DeCell III to Senator Daniel K. Inouye) ("[M]y May 24 . . . statement was not accurate. After the loans were sold, the Department did not retain authority with respect to the loans or underlying projects. . . . Any other actions taken after the sale, including foreclosure . . . are solely within the discretion of the purchaser of the loans.").

Because plaintiff has so far sufficiently established that his complaint was filed within the statute of limitations, however, this issue is not yet ripe.

Group v. United States, 104 F.3d 1321, 1325 (Fed. Cir. 1997) (citing City of El Centro v. United States, 922 F.2d 816, 820 (Fed. Cir. 1990)). When the United States is a party, plaintiff must also show that "the Government representative who entered or ratified the agreement had actual authority to bind the United States." Id. Defendant's motion is not based on contesting the existence of the customary contract elements of offer and acceptance, intent, and consideration, but instead argues that Mr. Ewing did not possess the requisite authority to bind the government in contract. Def.'s Mot. at 11-16.

3. Authority of the Contracting Party

Defendant argues that Mr. Ewing–the HUD agent who allegedly promised plaintiff the right to bid on its mortgage–was not authorized to bind the government in contract. Def.'s Mot. at 14. A government agent can bind the United States in contract only when the Constitution, a statute, or a regulation grants the authority to do so in unambiguous terms. Howard v. United States, 31 Fed. Cl. 297, 312 (1994). The sovereign "is not bound by the acts of its agents beyond the scope of their actual authority." Harbert/Lummus Agrifuels Projects v. United States, 142 F.3d 1429, 1432 (Fed. Cir. 1998) (citations omitted). Hence, where a contracting official exceeds his authority, "the government can disavow the official's words and is not bound by . . . contract." Eliel v. United States, 18 Cl. Ct. 461, 467 (1989) (citing New Am. Shipbuilders v. United States, 871 F.2d 1077, 1080 (Fed. Cir. 1989); Empresas Elecs. Walser, Inc. v. United States, 650 F.2d 286 (1980) (unpublished opinion)), aff'd, 909 F.2d 1495 (Fed. Cir. 1990).

Contractors dealing with the United States "take[] the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority." Fed. Crop Ins. Corp. v. Merrill, 332 U.S. 380, 384 (1947). This is because an agent's authority to bind the government may be expressly defined or implicitly limited, even when the agent is unaware of such definitions or limitations. Id. Parties contracting with the government are therefore "charged with having knowledge of the law governing the formation of such contracts." Am. Gen. Leasing, Inc. v. United States, 587 F.2d 54, 58 (Ct. Cl. 1978). They must ascertain the contracting official's authority–and the limits of that authority–to ensure a valid contract with the government. Harbert/Lummus Agrifuels Projects, 142 F.3d at 1432. Plaintiff bears the burden of proof in regard to the contracting official's authority to bind the United States. Howard, 31 Fed. Cl. at 312 (citing Kania v. United States, 650 F.2d 264, 268 (Ct. Cl. 1981).

Plaintiff claims he was promised the right to bid on his property by HUD agent David F. Ewing. Compl. ¶¶ 6-8. A letter from HUD Assistant Secretary Hal C. DeCell III to Senator Daniel K. Inouye, written in response to the Senator's inquiries on plaintiff's behalf, identifies David F. Ewing as the "asset manager for Lake Mead Villas

Apartments." Pl.'s Opp. Ex. D at 2. Defendant argues that Mr. Ewing's duties were purely managerial and that he did not have the authority to make the alleged oral contract with plaintiff.[24] Def.'s Mot. at 14-15; Def.'s Reply at 10; Tr. at 76-77 (statement of defendant's counsel Mr. Mager). If Mr. Ewing lacked the authority to contract directly with plaintiff, no contract could have arisen between plaintiff and the government, even if the court accepts plaintiff's allegations as true. Harbert/Lummus Agrifuels Projects, 142 F.3d at 1432; Eliel, 18 Cl. Ct. at 467; Pollack v. United States, 15 Cl. Ct. 46, 49 (1988).

An additional complication is injected into this case by the fact that the scope of Mr. Ewing's authority might vary depending on whether the alleged promise to allow plaintiff to bid was a modification of plaintiff's mortgage or an independent agreement. Defendant claims that the alleged contract can only be interpreted as a purported modification of plaintiff's mortgage, Def.'s Reply at 13, while plaintiff claims the alleged contract was a separate and distinct agreement. Pl.'s Opp at 9; Pl.'s Sur-Reply at 5. Plaintiff insists that the alleged oral agreement–a promise that plaintiff could bid on his mortgage–was not an oral modification of plaintiff's mortgage, but "[a]n independent promise . . . to induce a purchase Defendant wanted to happen." Pl.'s Opp. at 9. The alleged contract could not be otherwise, plaintiff alleges, since it was entered into before the mortgage was signed. Pl.'s Sur-Reply at 5. Further, plaintiff claims that he would not have purchased the property in question without the inducement of defendant's promise, and that the promise was made in consideration of plaintiff's subsequent investment. Compl. ¶ 12. Plaintiff's arguments are not effectively rebutted by defendant and the court is persuaded that the alleged contract was an independent agreement.

An agent purporting to act on behalf of the sovereign must possess actual authority to bind the United States, by way of Congressional delegation or agency rule-making and delegation. City of El Centro, 922 F.2d at 820. This is because "Federal expenditures would be wholly uncontrollable if Government employees could, of their own volition, enter into contracts obligating the United States." Id. Moreover, authority cannot be inferred from the absence of an express limitation of an agent's authority but must be affirmatively delegated. Id. (finding that the issue of authority does not concern "whether some authority exists that prohibits [the government agent] from obligating the

---

[24] According to defendant, Mr. Ewing was a "loan specialist in the local Las Vegas, Nevada HUD office . . . [whose] job was to service loans in the portfolio, specifically multifamily properties, administer and distribute reserve replacement withdrawals, conduct physical and financial inspection of the property, approve rent increases, process and handle tenant complaints and approve management companies." Tr. at 67-68 (statement of defendant's counsel Mr. Mager).

Government in contract . . . [but] whether [the agent] had been granted the authority to affirmatively obligate the Government").

Where an agent "by ignoring statutory and regulatory requirements . . . exceeds his actual authority, the Government is not estopped to deny the limitations on his authority, even though the private contractor may have relied on the contracting officer's apparent authority to his detriment." Prestex Inc. v. United States, 320 F.2d 367, 371 (Ct. Cl. 1963). Thus, where a contract is based on the "alleged representations of unauthorized officials," the government is not bound by it. Howard, 31 Fed. Cl. at 314 n.13.

A contracting officer's authority can be either express or implied. H. Landau & Co. v. United States, 886 F.2d 322, 324 (Fed. Cir. 1989). Authority can be implied "when such authority is considered to be an integral part of the duties assigned to a Government employee." Id. (quoting John Cibinic, Jr. & Ralph C. Nash, Jr., Formation of Government Contracts 43 (1982)). It is appropriate for the court to inquire into the precise nature of a government employee's duties "to determine whether implied actual authority exists." Leonardo v. United States, 60 Fed. Cl. 126, 130 (2004).

Under the portion of NHA that addresses rental housing mortgage insurance, United States Code title 12, section 1713, the Secretary of HUD is authorized to acquire insured mortgages[25] in default. 12 U.S.C. § 1713(g) (2000). Subsection (l) of this provision grants the Secretary great discretion in purchasing, managing, and disposing of such mortgage loans:

> Notwithstanding any other provisions of law relating to the acquisition, handling, or disposal of real and other property by the United States, the Secretary shall also have power, for the protection of the interests of the General Insurance Fund . . . to deal with, . . . make contracts for the management of . . . or sell for cash or credit or lease in his discretion, any property acquired by him under this section . . . .

12 U.S.C. § 1713(l) (2000).

---

[25]Plaintiff's mortgage was acquired by HUD as an insured mortgage in default. Def.'s Mot. at 14.

A different section of the NHA, dedicated to the management and disposition of multifamily housing projects,[26] directs the Secretary to "dispose of a multifamily housing project . . . on a negotiated, competitive bid, or other basis, on such terms as the Secretary deems appropriate . . . consistent with the goals in subsection (a) of this section." 12 U.S.C. § 1701z-11(c) (2000). The goals of the cited subsection provide that the Secretary shall dispose of or manage mortgages "in a manner that . . . will protect the financial interests of the Federal Government." Id. at § 1701z-11(a).

The provisions concerning the acquisition and disposal of both insured mortgages [12 U.S.C. § 1723] and multifamily housing projects [12 U.S.C. § 1701z-11] give the Secretary of HUD wide latitude in disposing of mortgages, as long as the economic interests of United States are protected.

In order to carry out these, and the other provisions of the NHA, the Secretary is empowered to promulgate any necessary rules or regulations. 12 U.S.C. § 1715b (2000). In addition, in order to fulfill his duties, the Secretary is given broad powers to delegate his authority. In particular, the Secretary may

> utilize such Federal officers and employees . . . and appoint such other officers and employees as he may find necessary, and . . . may delegate any of the functions and powers conferred upon him under [the Act] . . . to such officers, agents, and employees as he may designate or appoint.

12 U.S.C. § 1702 (2000).

Defendant first argues that the broad discretion afforded the Secretary by statute precludes the alleged contract with plaintiff. Def.'s Reply at 11. Defendant cites to 12 U.S.C. § 1701z-11(k) (2000) for the proposition that "[t]he language of this subsection grants the Secretary unbridled discretion to decide the terms and conditions of a [HUD-insured] loan sale." Id. Defendant contends that "[t]he Secretary cannot authorize a delegation of authority [to any HUD employee] that would strip himself of the ability to make such decisions or that would tie his hands to make another decision at his discretion." Id.

Defendant's argument, the court believes, proves too much. The Secretary could not enter into any transactions unless the Secretary gave up some options in order to pursue a particular end. A contract is a choice among options. While Congress can set standards and take away the authority to make certain kinds of contracts, the statutory

[26]The Property was a multifamily housing project. See Def.'s Mot. at 4.

scheme here does not prevent the Secretary from making deals, or delegating authority to make deals. The court understands, as conceded by the government during oral argument on June 22, 2004, that the Secretary cannot "bind his hands against a subsequent change in the law." Tr. at 86 (statement of the court). If an agreement were entered into, specific performance of it might be avoided by subsequent regulations. In some circumstances, however, the performance avoided might constitute a breach, giving rise to damages. See United States v. Winstar Corp., 518 U.S. 839, 870 (1996) (finding that newly promulgated federal regulations breached a previous contract between plaintiffs and the United States, thereby entitling plaintiffs to damages).

Next, defendant challenges the authority of the HUD agent, Mr. Ewing, who purportedly promised plaintiff the right to bid on his mortgage, to bind the United States in an independent contract. While defendant acknowledges that "[t]he Secretary would have the authority to enter into an independent, separate agreement," Tr. at 67 (statement of defendant's counsel Mr. Mager), defendant argues that this authority did not extend to Mr. Ewing. Id. Plaintiff responds with the contention that, while Mr. Ewing may not have possessed independent statutory authority, he did possess the Secretary's own delegated authority. Pl.'s Opp. at 9. Defendant, while recognizing that this kind of delegation is permitted by the statutory scheme, claims that plaintiff "fail[s] to demonstrate any actual delegation of contractual authority to Mr. Ewing." Def.'s Reply at 12. Specifically, defendant asserts that "[w]hile plaintiffs point to a general housekeeping statute [12 U.S.C. § 1702] that provides that the Secretary generally may delegate his authority, they make no showing that any statute or regulation actually served to delegate contractual authority to Mr. Ewing." Def.'s Reply at 12. To support its argument, defendant relies on Schism v. United States, 316 F.3d 1259 (Fed. Cir. 2002) (en banc), and maintains that this case stands for the proposition that "[a] general housekeeping statute is not sufficient to constitute a specific delegation of authority." Def.'s Reply at 12.

The court believes that defendant's reliance on Schism is misplaced. The Federal Circuit's holding in Schism teaches that a housekeeping statute relating to procedure and form cannot by itself confer a right relating to substance. Schism, 316 F.3d at 1281. The plaintiff in Schism was given a promise that directly contradicted a statute. Id. at 1272-75. The Federal Circuit held that, where Congress has legislated, "a service secretary cannot contract (even if it may be true that in the absence of congressional action, and with congressional authority, a secretary could have contracted with respect to the pay or benefits)." Id. 1274. This is true even where an agency's regulations attempt to sidestep statutory authority. "[A]n agency cannot do by regulation what the applicable statute

itself does not authorize." Id. at 1285 (citation omitted). In contrast, the NHA expressly allows for the kind of delegation that plaintiff claims.[27]

Furthermore, authority need not have been explicitly delegated to Mr. Ewing, but may have been implicit in his duties. H. Landau & Co., 886 F.2d at 324; see also Zoubi v. United States, 25 Cl. Ct. 581, 587 (1992) (holding that the "nature of the duties assigned . . . must be examined to determine whether [the federal employee] had the implied authority to bind the [government]"). Plaintiff maintains that Mr. Ewing managed, and possibly had a right to make contracts with respect to, its mortgage loan. See Pl.'s Opp. at 8; Tr. at 35 (statement of plaintiff's counsel Mr. Jaress). In addition, Mr. Ewing apparently had the authority to devise workout agreements for "troubled" HUD mortgages and projects. Pl.'s Resp. to June 23, 2004 Order Ex. C (HUD Transmittal for Loan Handbook No. 4350.1 Rev-1 Chg-8 at 1 (July 18, 1995)).

HUD apparently endows Field Asset Managers–such as Mr. Ewing–with a broad authority to design "[w]orkout-type arrangements . . . to stabilize still insured but troubled or potentially troubled projects." Id. These "workouts" are short term arrangements meant to avoid default and reflect "HUD's basic objective . . . [of] develop[ing] a workable plan to stabilize the property, both financially and physically, and to minimize losses to the Department." Id. at 11-1. This objective is commonly met by "providing the borrower with debt service relief." Id. Asset managers are empowered–by way of workouts–to make arrangements meant to stabilize a project's financial problems, secure "competent, interested owners," and develop a "reinstatement plan that will protect the long term financial interest of HUD and ensure that the project can continue to be a viable operation." Id. at 11-2 to 11-3. These duties could be consistent with the existence of contracting authority.

Drawing inferences in plaintiff's favor, Mr. Ewing's duties might indicate the implied actual authority to enter into the alleged oral agreement on behalf of the United States. H. Landau & Co., 886 F.2d at 324.

In further response to defendant's allegations, plaintiff introduced evidence that may indicate recognition of Mr. Ewing's authority on behalf of HUD. Pl.'s Opp. at Ex. C. HUD Assistant Secretary Hal C. DeCell III, writing to Senator Daniel K. Inouye in response to the Senator's letter on behalf of plaintiff, stated: "[Plaintiff] was initially told

---

[27]See also Franklin Fed. Sav. Bank v. United States, 53 Fed. Cl. 690, 708 (2002) (finding that a so-called "'housekeeping' statute" empowered the Federal Savings and Loan Insurance Corporation to enter into contracts on behalf of the government), consolidated appeals docketed, Nos. 04-5137, 04-5138 (Fed. Cir. Aug. 23, 2004).

by the Nevada State Office that if the mortgage was ever sold, he would be able to bid on it." Pl.'s Opp. Ex. C at 1. As the court noted in oral argument, this letter could possibly be construed as a ratification of Mr. Ewing's authority by HUD. Tr. at 80 (statement of the court); see Harbert/Lummus Agrifuels Projects, 142 F.3d at 1433 (stating that "[a]greements made by government agents without authority to bind the government may be subsequently ratified by those with authority if the ratifying officials have actual or constructive knowledge of the unauthorized acts").

For the foregoing reasons, the issue of whether Mr. Ewing possessed the authority to bind defendant in contract involves genuine disputes of material fact which preclude resolution in defendant's favor.

III. Conclusion

For the foregoing reasons, defendant's motion to dismiss, which, as to defendant's defense under Rule 12(b)(6), the court treats as a motion for summary judgment, is DENIED.

IT IS SO ORDERED.

s/ Emily C. Hewitt
EMILY C. HEWITT
Judge