No. 03-1874C
Judge Hewitt

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

EDWARD T. ARAKAKI and HELEN ARAKAKI,

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

# DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, PARTIAL MOTION TO DISMISS

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

KATHRYN A. BLEECKER
Assistant Director

STEVEN M. MAGER
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L St. NW
Washington, D.C. 20530
Tele: (202) 616-2377

November 15, 2005

Attorneys for Defendant

# TABLE OF CONTENTS

PAGE

STATEMENT OF THE ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I. Nature Of The Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II. Statement Of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

I. Standards Of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

II. The United States Is Entitled To Summary Judgment Because Plaintiffs Cannot Demonstrate The Elements Of A Valid Breach Of Contract Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

A. The Elements Of A Valid Breach Of Contract Claim . . . . . . . . . . . . . . . . 9

B. Plaintiffs Cannot Demonstrate That They Entered Into A Contract With A Government Agent With Authority To Bind The Government . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

1. HUD Field Offices Were Never Delegated Any Authority To Contract Regarding The Terms Of A Note Sale . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

2. Loan Specialists Lacked The Authority To Enter Into An Oral Contract . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

3. Loan Specialists Lacked The Authority To Enter Into Workout Agreements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

C. Plaintiffs Cannot Demonstrate An Unambiguous Offer and Acceptance, Nor Mutual Intent To Enter Into A Contract . . . . . . . . . . . . 20

D. The Alleged Oral Agreement Is Barred By The Nevada Statute of Frauds . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

E. Plaintiffs Cannot Allege A Separate Implied In Fact Contract Where There Is A Related Express Contract . . . . . . . . . . . . . . . . 25

F. Plaintiffs Cannot Demonstrate That Any Breach By HUD Caused Them Damages . . . . . . . . . . 26

III. Ms. Arakaki's Claims For Relief Should Be Dismissed . . . . . . . . . . 27

A. This Court Lacks Jurisdiction Over Ms. Arakaki's Claims Because Her Claims Were Filed Outside Of This Court's Six-Year Statute Of Limitations . . . . . . . . . . 27

B. Ms. Arakaki Fails To State A Claim Upon Which Relief May Be Granted. . . . . . . . . . . 29

CONCLUSION . . . . . . . . . . 30

## TABLE OF AUTHORITIES

**CASES:** **PAGE(S)**

Alder Terrace, Inc. v. United States,
161 F.3d 1372 (Fed. Cir. 1998) . . . . . . . . . . 8

Algonac Mfg. Co. v. United States,
192 Ct. Cl. 649, 428 F.2d 1241 (1970) . . . . . . . . . . 25

American Gen. Leasing, Inc. v. United States,
218 Ct. Cl. 367, 587 F.2d 54 (1978) . . . . . . . . . . 12

American Nat'l Bank & Trust Co. of Chicago v. United States,
22 Cl. Ct. 7 (1990) . . . . . . . . . . 8

Anderson v. Liberty Lobby, Inc.,
477 U.S. 242 (1986) . . . . . . . . . . 7

Arakaki v. Martinez,
No. 02-00417 (D. Hawaii 2003) . . . . . . . . . . 2, 3

Arakaki v. United States,
62 Fed. Cl. 244 (2004) . . . . . . . . . . 3, 29

Atlas Corp. v. United States,
895 F.2d 745 (Fed. Cir. 1990) . . . . . . . . . . 25

Bighorn Lumber Co., Inc. v. United States,
49 Fed. Cl. 768 (2001) . . . . . . . . . . 26

Board of County Sup'rs of Prince William County, Va. v. United States,
23 Cl. Ct. 205 (1991) . . . . . . . . . . 23

Bowen v. United States,
49 Fed. Cl. 673 (2001),
aff'd, 292 F.3d 1383 (Fed. Cir. 2002) . . . . . . . . . . 8

CACI, Inc. v. Stone,
990 F.2d 1233 (Fed. Cir. 1993) . . . . . . . . . . 11

Cherokee Oil Co., Ltd. v. Union Oil Co.,
706 F. Supp. 826 (M.D. Fla. 1989) . . . . . . . . . . 24

Chung v. Atwell,
103 Nev. 482, 745 P.2d 370 (Nev 1987) . . . . . . . . . . 22

**CASES (continued):** **PAGE(S)**

City of El Centro v. United States,
922 F.2d 816 (Fed. Cir. 1990) . . . . . . . . . . 9, 11

Conley v. Gibson,
355 U.S. 41 (1957) . . . . . . . . . . 7

De Remer v. Anderson,
41 Nev 287, 169 P. 737 (1918) . . . . . . . . . . 22

Dynalectron Corp. v. United States,
4 Cl. Ct. 424,
aff'd, 758 F.2d 665 (Fed. Cir. 1984) (table) . . . . . . . . . . 27

Erickson Air Crane Co. v. United States,
731 F.2d 810 (Fed. Cir. 1984) . . . . . . . . . . 30

Erie R. Co. v. Tompkins,
304 U.S. 64 (1938) . . . . . . . . . . 23

Federal Crop Ins. Corp. v. Merrill,
332 U.S. 380 (1947) . . . . . . . . . . 9, 10, 11

Fidelity Construction Co. v. United States,
700 F.2d 1379 (Fed. Cir.),
cert. denied, 464 U.S. 826 (1983) . . . . . . . . . . 28

Gould, Inc. v. United States,
935 F.2d 1271 (Fed. Cir. 1991) . . . . . . . . . . 8

H. Landau & Co. v. United States,
886 F.2d 322 (Fed. Cir. 1989) . . . . . . . . . . 11-12, 12

Habermann v. United States,
26 Cl. Ct. 1405 (1992) . . . . . . . . . . 25

Hadley v. Baxendale,
9 Ex. 341, 156 Eng. Rep. 145 (1854) . . . . . . . . . . 26

Harbert/Lummus Agrifuels Projects v. United States,
142 F.3d 1429 (Fed. Cir. 1998),
cert. denied, 525 U.S. 1177 (1999) . . . . . . . . . . 12

Haynes v. United States,
61 Fed. Cl. 788 (2004) . . . . . . . . . . 26

**CASES (continued):** **PAGE(S)**

Hopland Band of Pomo Indians v. United States,
855 F.2d 1573 (Fed. Cir. 1988) . . . . . . . . . . 28

Housing Authority of Everett v. Terry,
114 Wash. 2d 558, 789 P.2d 745 (1990) . . . . . . . . . . 23

Howard v. United States,
31 Fed. Cl. 297 (1994) . . . . . . . . . . 11

Hughes Communications Galaxy, Inc. v. United States,
271 F.3d 1060 (Fed. Cir. 2001) . . . . . . . . . . 26

ITT Fed. Support Services v. United States,
531 F.2d 522, 209 Ct. Cl. 157 (1976) . . . . . . . . . . 25

Jascourt v. United States,
207 Ct. Cl. 955,
cert. denied, 423 U.S. 1032 (1975) . . . . . . . . . . 11

Juda v. United States,
6 Cl. Ct. 441 (1984),
cert. denied, 501 U.S. 1230 (1991) . . . . . . . . . . 9

Kania v. United States,
650 F.2d 264 (Ct. Cl. 1981) . . . . . . . . . . 12

Kargman v. Sullivan,
552 F.2d 11 (1st Cir. 1977) . . . . . . . . . . 23

Kinne v. United States,
21 Cl. Ct. 104 (1990) . . . . . . . . . . 8

Klaxon Co. v. Stentor Electrical Mfg. Co.,
313 U.S. 487 (1941) . . . . . . . . . . 23

Lucas v. United States,
25 Cl. Ct. 298 (1992) . . . . . . . . . . 20

Malissa Co. v. United States,
18 Cl. Ct. 672 (1989) . . . . . . . . . . 26

Martinez v. United States,
48 Fed. Cl. 851 (2001) . . . . . . . . . . 29

**CASES (continued):** **PAGE(S)**

McCauley v. United States,
38 Fed. Cl. 250 (1997),
aff'd, 152 F.3d 948 (Fed. Cir.) (table),
cert. denied, 525 U.S. 1032 (1998) . . . . . . . . 7

McNutt v. General Motors Acceptance Corp.,
298 U.S. 178 (1936) . . . . . . . . 8

Merritt v. United States,
267 U.S. 338 (1925) . . . . . . . . 30

Mingus Constructors, Inc. v. United States,
812 F.2d 1387 (Fed. Cir. 1987) . . . . . . . . 7

Modern Systems Technology Corp. v. United States,
24 Cl. Ct. 360 (1991) . . . . . . . . 22

New Am. Shipbuilders, Inc. v. United States,
871 F.2d 1077 (Fed. Cir. 1989) . . . . . . . . 12

Office of Personnel Management v. Richmond,
496 U.S. 414 (1990) . . . . . . . . 19

Orthomet, Inc. v. A.B. Medical, Inc.,
990 F.2d 387 (8th Cir. 1993) . . . . . . . . 24

Paxson Elec. Co. v. United States,
14 Cl. Ct. 634 (1988) . . . . . . . . 7

Prestex, Inc. v. United States,
162 Ct. Cl. 620, 320 F.2d 367 (1963) . . . . . . . . 11

Primary Metal & Mineral Corp. v. United States,
556 F.2d 507 (Ct. Cl. 1977) . . . . . . . . 20

Rochman v. United States,
27 Fed. Cl. 162 (1992) . . . . . . . . 9

Scheuer v. Rhodes,
416 U.S. 232 (1974) . . . . . . . . 8

Schism v. United States,
316 F.3d 1259 (Fed. Cir. 2002) (en banc) . . . . . . . . 14, 25

**CASES (continued):** **PAGE(S)**

Singleton v. United States,
6 Cl. Ct. 156 (1984) . . . . . . . . . . 20

Sweats Fashions, Inc. v. Pannill Knitting Co.,
833 F.2d 1560 (Fed. Cir. 1987) . . . . . . . . . . 7

Teitelbaum v. Dept. Housing & Urban Dev.,
953 F. Supp. 326 (D. Nev. 1996) . . . . . . . . . . 17

Topa Equities Ltd. v. City of Los Angeles,
342 F.3d 1065 (9th Cir. 2003) . . . . . . . . . . 23

Transamerica Equipment Leasing Corp. v. Union Bank,
426 F.2d 273 (9th Cir. 1970) . . . . . . . . . . 20

Trauma Serv. Group v. United States,
104 F.3d 1321 (Fed. Cir. 1997) . . . . . . . . . . 8, 9

United States v. Mitchell,
445 U.S. 535 (1980) . . . . . . . . . . 28

United States v. Testan,
424 U.S. 392 (1976) . . . . . . . . . . 28

V.S. Ltd. Partnership v. Dept. Housing & Urban Dev.,
235 F.3d 1109 (8th Cir. 2000) . . . . . . . . . . 16-17

Williamson v. Gen. Dynamics Corp.,
208 F.3d 1144 (9th Cir. 2000) . . . . . . . . . . 23

**STATUTES:**

12 U.S.C. §§ 1701 et seq. . . . . . . . . . . 24

12 U.S.C. § 1701t . . . . . . . . . . 24

12 U.S.C. § 1702 . . . . . . . . . . 14

12 U.S.C. § 1713(g). . . . . . . . . . . 13

12 U.S.C. § 1713(l). . . . . . . . . . . 13

12 U.S.C. § 1715b . . . . . . . . . . 16

12 U.S.C. § 1715z-4 . . . . . . . . . . 16

**STATUTES (continued):** **PAGE(S)**

28 U.S.C. § 1491 . . . . . . . . . . 28

28 U.S.C. § 2501 . . . . . . . . . . 28

42 U.S.C. § 1441(a) . . . . . . . . . . 24

Nev. Rev. Stat § 111.205(1) . . . . . . . . . . 24

Nev. Rev. Stat § 111.210 . . . . . . . . . . 24

**REGULATIONS:**

24 C.F.R § 207.3 . . . . . . . . . . 16

24 C.F.R § 221.511 . . . . . . . . . . 16

24 C.F.R. §§ 290 et seq. . . . . . . . . . . 24

24 C.F.R § 290.30 . . . . . . . . . . 13

**MISCELLANEOUS:**

U.S. CONST., Art. IV . . . . . . . . . . 22

RCFC 12(b)(1) . . . . . . . . . . 1, 3, 7

RCFC 12(b)(6) . . . . . . . . . . 1, 3, 8

RCFC 56 . . . . . . . . . . 1

Notice of Sale of HUD-Held Multifamily Mortgage Loans,
61 Fed. Reg. 18,652 (Apr. 26, 1996) . . . . . . . . . . 5, 6

R. NASH, JR. & J. CIBINIC, JR.,
FORMATION OF GOVERNMENT CONTRACTS (2d ed. 1986) . . . . . . . . . . 11

RESTATEMENT (SECOND) OF CONTRACTS (1981) . . . . . . . . . . 20, 22

WILLISTON ON CONTRACTS (4th ed. 2004) . . . . . . . . . . 20, 24

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| EDWARD T. ARAKAKI and HELEN ARAKAKI, Plaintiffs, | ) | |
| v. | ) | No. 03-1874C (Judge Hewitt) |
| THE UNITED STATES, Defendant. | ) | |

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT,**
**OR, IN THE ALTERNATIVE, PARTIAL MOTION TO DISMISS**

Pursuant to Rule 56 of the Rules of the United States Court of Federal Claims ("RCFC"), defendant, the United States, respectfully requests that this Court enter summary judgment in favor of the defendant and dismiss plaintiffs' complaint. In the alternative, pursuant to RCFC 12(b)(1) and 12(b)(6), defendant respectfully requests that the Court dismiss Helen Arakaki as a plaintiff for lack of subject matter jurisdiction and for failure to state a claim upon which relief may be granted.

In support of defendant's motion, we rely upon the complaint and answer, the following brief, the proposed findings of uncontroverted facts, and the attached appendix.

**STATEMENT OF THE ISSUES**

1. Whether the United States is entitled to summary judgment, because plaintiffs fail to demonstrate the requite elements of a contract.

2. Whether Helen Arakaki must be dismissed as a plaintiff for lack of jurisdiction or failure to state a claim upon which relief may be granted.

## STATEMENT OF THE CASE

### I. Nature of the Case

On June 5, 2002, Mr. Edward T. Arakaki filed an action in the Hawaii state court against Mel Martinez, then-Secretary of the United States Department of Housing and Urban Development ("HUD" or the "agency"), and HUD itself. Def. App. 1-6.[1] The case was removed to the United States District Court for the District of Hawaii on July 8, 2002. On March 6, 2003, the United States district court issued an amended order dismissing Mr. Arakaki's second amended complaint[2] based on lack of jurisdiction due to "HUD's sovereign immunity." Amended Order Dismissing Case at 12, Arakaki v. Martinez, No. 02-00417 (D. Hawaii Mar. 6, 2003). The court's amended order, however, granted Mr. Arakaki leave to file a third amended complaint. Id. at 12. The court instructed that if Mr. Arakaki sought to file a third amended complaint, the complaint "may only name the United States as a defendant and may only assert contract claims arising out of HUD's alleged breach of the oral agreement to allow [Mr.] Arakaki to bid on his loan at auction." Id. The court further conditioned filing by stating that "[a]ny Third Amended Complaint [Mr.] Arakaki files must be accompanied by [Mr.] Arakaki's motion (a) asserting that the interests of justice require the transfer of the action to the Court of Claims and (b) discussing how [Mr.] Arakaki satisfies any applicable statute of limitations in the event of transfer." Id.

---

[1] "Def. App. __" refers to the appendix attached to defendant's motion for summary judgment, or, in the alternative, partial motion to dismiss.

[2] Prior to dismissal, Mr. Arakaki had twice amended his complaint in the United States district court proceedings.

On March 14, 2003, Mr. Arakaki and his mother, Ms. Helen Arakaki (collectively, the "plaintiffs") filed a third amended complaint with the United States district court, and moved the court to transfer the case to the United States Court of Federal Claims. Ms. Arakaki had not previously been named as a plaintiff in this action. Compare Def. App. 1-2 with Def. App. 7-8. The Government opposed the plaintiffs' transfer motion. On May 27, 2003, the United States district court ordered the case transferred to this Court. Order Transferring Case to the Court of Federal Claims, Arakaki v. Martinez, No. 02-00417 (D. Hawaii May 27, 2003).

On September 10, 2003, the plaintiffs filed their "fourth amended complaint" with this Court.[3] In this complaint, plaintiffs assert a claim for HUD's breach of an alleged oral agreement to allow plaintiffs to "bid" upon their mortgage loan at auction. See Compl. ¶ 3.

On January 16, 2004, defendant filed a motion to dismiss plaintiffs' complaint pursuant to RCFC 12(b)(1) and 12(b)(6). On March 3, 2004, plaintiffs responded to the motion, and we filed our reply on April 5, 2004. Upon leave of Court, plaintiffs filed a sur-reply on May 3, 2004, and oral argument was held on June 22, 2004. This Court treated the motion to dismiss as a motion for summary judgment and, on September 1, 2004, denied the motion. Specifically, the Court held that: (1) a genuine issue of material fact as to when the breach of contract claim accrued precluded summary judgment on the ground of statute of limitations; and (2) a genuine issue of material fact as to whether David Ewing, a loan specialist at the Las Vegas, Nevada HUD field office, possessed the authority to bind the Government precluded summary judgment on the basis of authority. Arakaki v. United States, 62 Fed. Cl. 244 (2004).

[3] The plaintiffs' "fourth amended complaint" is actually the first complaint that they filed in this Court.

## II. Statement Of Facts

Plaintiffs allege that on or about October 18, 1991, Mr. Arakaki, Mr. Larry Little (plaintiffs' real estate broker), and Mr. Keith Matsuoka (plaintiffs' lawyer) met with a HUD employee, David Ewing, in connection with plaintiffs' possible purchase of a 76-unit apartment building in Las Vegas, Nevada, known as Lake Mead Villas ("Lake Mead"). Compl. ¶ 6; Def. App. 13, 195. While Lake Mead was owned by a third party, and the mortgage was held by a different third party, the mortgage was insured by HUD and a number of the units on the property were subsidized by the agency. Further, the mortgage loan for Lake Mead was in the process of being assigned to HUD. Compl. ¶ 7. Mr. Arakaki alleges that Mr. Ewing made oral representations to Mr. Arakaki that if HUD ever wished to sell the mortgage loan after assignment, plaintiffs would have the "right" to bid on the loan at an auction. Compl. ¶ 8. Mr. Arakaki, however, is the only party at the meeting that has purported that these alleged representations were in the form of a "promise." See Def. App. 217, 219, 222. No contemporaneous documentation exists memorializing a purported agreement giving Mr. Arakaki a "right to bid" on the property should HUD sell the property at auction.

On October 20, 1991, Mr. Arakaki signed a purchase agreement for Lake Mead. Def. App. 22. This agreement granted Mr. Arakaki the ability to purchase Lake Mead for $3,000,000. Id. Mr. Arakaki made an earnest money deposit of $15,000 in connection with this purchase agreement, which sum was subject to be retained as liquidated damages and consideration for execution of the agreement in the event that Mr. Arakaki failed to complete the purchase. Id. On October 22, 1991, the then-owner of Lake Mead Villas signed the purchase agreement. Id.

On October 28, 1991, the mortgage for Lake Mead Villas was assigned to HUD. Def. App. 24-25.

Prior to closing, on October 22, 1992, HUD and plaintiffs entered into an initial Provisional Workout Agreement. Def. App. 26-29. Andrew Robertson, office manager for the Las Vegas, Nevada field office, signed this agreement on behalf of HUD. Id. at 26, 29. The initial Provisional Workout Agreement contained no provisions providing plaintiffs a "right to bid" on their loan at auction. See id. at 26-29.

Closing for Lake Mead occurred on October 29, 1992, whereupon plaintiffs became the owners of Lake Mead. Def. App. 30.

HUD and the plaintiffs subsequently entered into another Provisional Workout Agreement, effective March 1, 1993 through February 29, 1996. Def. App. 31-33. Andrew Robertson, office manager for the Las Vegas, Nevada field office signed the agreement on behalf of HUD.[4] Id. at 33. This Provisional Workout Agreement also contained no provisions providing plaintiffs a "right to bid" on their loan at auction. See id. at 31-33.

On July 5, 1995, plaintiffs were made aware that HUD planned to bundle plaintiffs' loan with other loans in an upcoming multifamily mortgage loans sale. Compl. ¶ 16; Def. App. 34-35. On April 26, 1996, HUD published a notice opening the multifamily loan auction and explaining the details of that auction. Notice of Sale of HUD-Held Multifamily Mortgage Loans, 61 Fed. Reg. 18,652 (Apr. 26, 1996). The notice explained that bidders on the sale "must be eligible institutional investors." Id. at 18,652. The notice also stated that ineligible bidders

[4] Larry Little signed the March 1, 1993 workout on behalf of the plaintiffs. Def. App. 33. Mr. Little was authorized to sign for the Arakakis. Def. App. 202-203.

included "any mortgagor of any of the Mortgage Loans or an entity affiliated with any such Mortgagor." Id. at 18,653 (emphasis added).

In furtherance of the sale, plaintiffs' loan was transferred to a trust with 157 other loans. A beneficial interest in this trust, along with the responsibility for servicing the loans (the "Class A Certificate"), was placed up for auction in a partially assisted loan sale. Def. App. 210. HUD was to maintain a "Class B certificate" in the trust after the sale of the Class A certificate. Id. This Class B certificate gave HUD a passive interest in the trust, as well as a potential entitlement to a pro-rata share of a portion of the cash flow from the trust. Id. WHUDA Real Estate Limited was the successful bidder on the Class A certificate, and obtained a seventy percent interest in the trust. Def. App. 36-37. A thirty percent interest in the trust remained with HUD, as holder of the Class B certificate. Def. App. 38-39. Closing for this transaction was held on June 27, 1996. Def. App. 36-39.

In the meantime, the Provisional Workout Agreement for the subject property had expired on February 29, 1996. See Def. App. 31-33. Plaintiffs failed to make further payments upon the mortgage after this date. See Def. App. 40-42, 43.

On September 27, 1996, the administrator of the trust and holder of the class A certificate filed a foreclosure notice for Lake Mead. Def. App. 44-45. Also on September 27, 1996, plaintiffs filed for bankruptcy. Def. App. 46-47. Foreclosure was temporarily stayed by the bankruptcy; on November 28, 1997 the stay was lifted. A foreclosure sale was held, and the plaintiffs lost ownership of Lake Mead. Compl. ¶ 18.

## ARGUMENT

### I. Standards Of Review

This Court has consistently held that when there is no genuine dispute regarding a material fact, and the moving party is entitled to judgment as a matter of law, a motion for summary judgment will be granted. See Paxson Elec. Co. v. United States, 14 Cl. Ct. 634, 642 (1988) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986)); accord Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1390 (Fed. Cir. 1987). A genuine dispute exists where the Court could render a verdict in favor of the non-movant, based upon the evidence. See Anderson, 477 U.S. at 248; Sweats Fashions, Inc. v. Pannill Knitting Co., 833 F.2d 1560, 1562 (Fed. Cir. 1987).

For the United States to prevail upon its motion for summary judgment, the Government only must demonstrate its entitlement to judgment as a matter of law, and identify those portions of the record that demonstrate the absence of a genuine issue of material fact. See Anderson, 477 U.S. at 248. Here, there is no genuine dispute between the parties regarding the material facts, and upon the undisputed facts of record, the United States is entitled to judgment as a matter of law.

This Court must grant a motion to dismiss for lack of subject matter jurisdiction pursuant to RCFC 12(b)(1) when, in view of the record presented, "'it appears beyond doubt that the plaintiff can prove no set of facts in support of his [or her] claim which would entitle him [or her] to relief.'" McCauley v. United States, 38 Fed. Cl. 250, 262-63 (1997) (quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957)), aff'd, 152 F.3d 948 (Fed. Cir.) (table), cert. denied, 525 U.S. 1032 (1998). Moreover, although the non-jurisdictional factual allegations, as pled, must be

presumed true and viewed in the light most favorable to the plaintiff, the burden of establishing the Court's jurisdiction falls squarely upon the plaintiff. See McNutt v. General Motors Acceptance Corp., 298 U.S. 178, 189 (1936); Alder Terrace, Inc. v. United States, 161 F.3d 1372, 1377 (Fed. Cir. 1998); Trauma Serv. Group v. United States, 104 F.3d 1321, 1324 (Fed. Cir. 1997); Bowen v. United States, 49 Fed. Cl. 673, 675 (2001) (noting that the plaintiff bears the burden of proof upon a motion to dismiss for lack of jurisdiction), aff'd, 292 F.3d 1383 (Fed. Cir. 2002).

Pursuant to RCFC 12(b)(6), the Court may dismiss a complaint if, as a matter of law, it fails to state a claim upon which relief can be granted, even assuming the truth of its allegations. Unlike a RCFC 12(b)(1) disposition, however, "dismissal of plaintiff's complaint . . . for failure to state a claim does not have the legal effect of divesting this court of jurisdiction," and thus operates as a final adjudication, with prejudice, upon the merits. American Nat'l Bank & Trust Co. of Chicago v. United States, 22 Cl. Ct. 7, 18 (1990). As the United States Supreme Court has held, dismissal for failure to state a claim is appropriate whenever "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Scheuer v. Rhodes, 416 U.S. 232, 236 (1974).

In resolving a motion to dismiss for failure to state a claim, "[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Kinne v. United States, 21 Cl. Ct. 104, 107 (1990) (quoting Scheuer, 416 U.S. at 236). Thus, the Court "must . . . indulge in all reasonable inferences in favor of the nonmovant." Gould, Inc. v. United States, 935 F.2d 1271, 1274 (Fed. Cir. 1991). Nonetheless, the Court should not place any weight upon any assertions in the complaint other than allegations of fact,

because "legal conclusions, deduction, or opinions couched as factual allegations are not given a presumption of truthfulness." Rochman v. United States, 27 Fed. Cl. 162, 168 (1992) (citation omitted).

## II. The United States Is Entitled To Summary Judgment Because Plaintiffs Cannot Demonstrate The Elements Of A Valid Breach of Contract Claim

### A. The Elements Of A Valid Breach of Contract Claim

To state a valid breach of contract claim, plaintiffs must allege (1) the existence of either an express or implied-in-fact contract requiring HUD to allow them to bid on their mortgage loan at auction, (2) a breach of that contract, and (3) resultant damages. The general requirements for a binding contract with the United States are identical for both express and implied-in-fact contracts. Trauma Serv. Group, 104 F.3d at 1325.

To establish a valid contract with the United States, a plaintiffs must demonstrate: (1) mutuality of intent; (2) consideration; (3) lack of ambiguity in the offer and acceptance; and (4) "the Government representative 'whose conduct is relied upon [had] actual authority to bind the [G]overnment in contract.'" City of El Centro v. United States, 922 F.2d 816, 820 (Fed. Cir. 1990) (quoting Juda v. United States, 6 Cl. Ct. 441, 452 (1984)), cert. denied, 501 U.S. 1230 (1991). It is well settled that actual authority to contract is required to form a contract binding on the United States, and "anyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority." Federal Crop Ins. Corp. v. Merrill, 332 U.S. 380, 384 (1947).

Plaintiffs' complaint fails to establish the existence of a valid contract, including authority and unambiguous offer and acceptance (mutual intent), and thus does not meet the

requirements for a valid breach of contract claim. Further, plaintiffs cannot demonstrate that any breach caused them damage. Accordingly, this Court should grant summary judgment in favor of the United States.

**B. Plaintiffs Cannot Demonstrate That They Entered Into A Contract With A Government Agent With Authority To Bind The Government**

In Federal Crop Insurance Co. v. Merrill, 332 U.S. 380 (1947), the United States Supreme Court established that the Government is bound by the actions of a Government employee only to the extent that the employee in question had "actual authority" to bind the Government in contract:

> The Government may carry on its operations through conventional executive agencies or through corporate forms especially created for defined ends. Whatever the form in which the Government functions, anyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority. The scope of this authority may be explicitly defined by Congress or be limited by delegated legislation, properly exercised through the rule-making power. And this is so even though, as here, the agent himself may have been unaware of the limitations upon his authority.
>
> . . . .
>
> The oft-quoted observation . . . that "Men must turn square corners when they deal with the Government," does not reflect a callous outlook. It merely expresses the duty of all courts to observe the conditions defined by Congress for charging the public treasury.

Id. at 384-85 (emphasis added; citations omitted).

Although a Government employee acting with "actual authority" can bind the Government in contract, the concept of "apparent authority," which is generally sufficient to bind a private litigant in contract, cannot be applied against the Government:

> It is a well recognized principle of procurement law that the contracting officer, as agent of the executive department, has only that authority actually conferred upon him by statute or regulation. If, by ignoring statutory and regulatory requirements, he exceeds his actual authority, the Government is not estopped to deny the limitations on his authority, even though the private contractor may have [relied] on the contracting officer's apparent authority to his detriment, for the contractor is charged with notice of all statutory and regulatory limitations.

CACI, Inc. v. Stone, 990 F.2d 1233, 1236 (Fed. Cir. 1993), quoting Prestex, Inc. v. United States, 162 Ct. Cl. 620, 625, 320 F.2d 367, 371 (1963); see Federal Crop Ins., 332 U.S. at 384; Jascourt v. United States, 207 Ct. Cl. 955, 956, cert. denied, 423 U.S. 1032 (1975); R. NASH, JR. & J. CIBINIC, JR., FORMATION OF GOVERNMENT CONTRACTS 64 (2d ed. 1986).

Before a Government employee can be found to have express actual authority to bind the Government in contract, he must have been delegated specific authority either by Congress or regulation. City of El Centro, 922 F.2d at 820. Specifically, "[a] [G]overnment employee possesses express [actual] authority to bind the [G]overnment only when the Constitution, a statute, or a regulation grants it in unambiguous terms." Howard v. United States, 31 Fed. Cl. 297, 312 (1994). Authority cannot be "inferred" from the absence of an express limitation on authority, but instead must be explicitly delegated. City of El Centro, 922 F.2d at 820.

In the alternative to finding express actual authority to bind the Government in contract, a Government agent also may possess the authority to bind the Government if such agent is found to have implied actual authority. See H. Landau & Co. v. United States, 886 F.2d 322 (Fed. Cir.

1989). Implied actual authority, however, should not be confused with apparent authority. Authority to bind the Government in contract will only be "generally implied when such authority is considered to be an integral part of the duties assigned to a Government employee." Id. at 324 (emphasis added).

More specifically, the express and implied authority of a Government agent to enter into oral contracts may be limited by statute or regulation. See, e.g., Harbert/Lummus Agrifuels Projects v. United States, 142 F.3d 1429, 1433 (Fed. Cir. 1998), cert. denied, 525 U.S. 1177 (1999) (contracting officer's delegation of authority did not include implied authority to enter into unilateral oral contract); American Gen. Leasing, Inc. v. United States, 218 Ct. Cl. 367, 587 F.2d 54, 57-58 (1978) (holding that express oral agreement with Government agent was not binding because, among other reasons, the applicable regulations required that a contract be in writing). See also New Am. Shipbuilders, Inc. v. United States, 871 F.2d 1077, 1080 (Fed. Cir. 1989) (holding that oral assurances did not give rise to a contract implied-in-fact where all the steps in the agency's required procedure where completed, until such time there was no evidence of intent to be bound).

Plaintiffs bear the burden of demonstrating that a Government employee has the authority to bind the United States. Kania v. United States, 650 F.2d 264, 268 (Ct. Cl. 1981). Plaintiffs, however, fail to identify any specific statutory or regulatory basis for Mr. Ewing's authority to enter into the purported oral contract with HUD. To the contrary, the statute and regulations deny Mr. Ewing any such authority, whether Mr. Ewing's alleged statements constitute an oral modification to a mortgage agreement, or an oral workout agreement.

**1. HUD Field Offices Were Never Delegated Any Authority To Contract Regarding The Terms Of A Note Sale**

On October 28, 1991, HUD was assigned the mortgage for Lake Mead. The authority of the Secretary of HUD (the "Secretary") to acquire an insured mortgage in default, such as the one at issue in this case, is set forth in Section 207(g) of the National Housing Act, which provides in pertinent part:

> The failure of the mortgagor to make any payment due under or provided to be paid by the terms of the mortgage insured under this section shall be considered a default under such mortgage and, if such default continues for a period of thirty days, the mortgagee shall be entitled to receive the benefits of the insurance as hereinafter provided, upon assignment, transfer, and delivery to the Secretary, within a period and in accordance with rules and regulations to be prescribed by the Secretary, of . . . all rights and interests arising under the mortgage in default . . . .

12 U.S.C. § 1713(g).

The Secretary has broad discretion of how to sell the mortgage loans. Section 203(k)(4) of the Housing and Community Development Act of 1978, as amended by the Multifamily Property Disposition Act of 1994, states in relevant part:

> Notwithstanding any other provision of law relating to the acquisition, handling, or disposal of real or other property by the United States, the Secretary shall also have the power, for the protection and interest of The General Insurance Fund . . . to deal with, . . . or sell for cash or credit or lease in his discretion, any property acquired by him under this section.

12 U.S.C. § 1713(l). This provision provides the Secretary with the explicit authority to dispose of a mortgage note for cash or for credit.[5] This provision does not assign any authority to a loan

[5] The applicable regulations provide that HUD will sell HUD-held multifamilty mortgages on a competitive basis. See 24 C.F.R. § 290.30 (2003).

specialist in a local HUD field office, such as Mr. Ewing, to restrict the Secretary's broad discretion to dispose of a multifamily loan.

Plaintiffs cannot and do not point to any statute or regulation that grants or delegates the authority to prescribe the Secretary's broad authority to dispose of a multifamily loan, or to set the terms of the sale of such note. While there is a general housekeeping statute that generally permits the delegation of authority, 12 U.S.C. § 1702, such statute does not represent an actual delegation of any specific authority. See Schism v. United States, 316 F.3d 1259 (Fed. Cir. 2002) (en banc).

Indeed, the evidence clearly provides that such authority was never delegated to the field offices. It was the uncontradicted and consistent deposition testimony of all witnesses that HUD headquarters in Washington, D.C. possessed the sole authority to set the policy and terms of all multifamily note sales, and that this authority was never delegated to the HUD field offices. Witnesses from the Las Vegas, Nevada field office, Def. App. 126, 127-129 ("Well, basically the sale of the loan process is all handled currently at headquarters level."), 130-131 (deposition of F. Castro); Def. App. 132-135 ("We weren't involved directly with the details of loan sales. It was all done in headquarters."), 136, 137-138 (deposition of D. Manz); Def. App. 140-142 ("Multifamily properties were not handled here.") (deposition of A. Robertson); Def. App. 146-148, 149-150, 151-152, 153-154, 155-156 ("It doesn't make a difference what I think. It's what Washington wants to do with its loan portfolio"), 157, 165-166 (deposition of D. Ewing), from the San Francisco, California regional hub office, Def. App. 169-172 ("Note sales have always been handled in Washington"), 175-176 (deposition of J. Browder); Def. App. 183-184 ("We don't create the terms or conditions nor, frankly, have any input in the policy of the loan sale

program. That was created at the Washington level.") (deposition of P. Goray), and from Washington, D.C., Def. App. 187-189 ("The field office person did not have the authority to say that to Mr. Arakaki") (deposition of A. Hinton), all agreed that headquarters, and not the field offices, set the terms of each individual sale, and that the field offices had no authority to make any decisions relating to the sale of notes. See also Def. App. 207-208 (declaration of D. Manz), 209-210 (declaration of A. Robertson), 211-212 (declaration of A. Hinton). Whatever authority the field offices possessed with regards to the daily management of HUD properties, they possessed no actual authority relating to the sales of mortgages.

**2. Loan Specialists Lacked The Authority To Enter Into An Oral Contract**

Even assuming that the field offices had been granted the authority to enter into agreements setting the terms of sale of a mortgage note, any modifications to a mortgage note were required to be in writing, by statute and agency regulation. Contrary to the Court's preliminary determination that the Arakakis' alleged agreement might be characterized a wholly separate oral workout agreement, the oral agreement is better characterized as a modification to the mortgage, since the alleged agreement purported to change HUD's ability to freely dispose of the mortgage. While such modification was made prior to HUD's being assigned the mortgage, it was not made prior to HUD's acquiring an interest in the mortgage by means of mortgage insurance. Further, the Insured Project Servicing Handbook that was effective at the time of the purported oral agreement describes modifications to mortgages as those legal agreements "which permanently change the terms of the mortgage and mortgage note."[6] Def. App. 81. See also Def.

[6] The Insured Project Servicing Handbook, No. 4350.1, provided guidance to HUD employees regarding the servicing of HUD insured multifamily properties. The Court cited a later, 1995 revision to this handbook in its previous opinion. The 1995 revisions, however, could

App. 75-76, 98. By altering HUD's ability to freely dispose of a mortgage, once acquired, the oral agreement would permanently change the terms of the mortgage, which contained no such restrictions. In contrast, a workout agreement is an agreement with a limited, three year duration. Def. App. 80, 91.

If the oral agreement is characterized as a modification to a mortgage, the National Housing Act does not authorize oral contracts with regard to mortgagors as to the manner of sale of their mortgage notes. Under the National Housing Act, the Secretary is authorized to promulgate rules and regulations as necessary to carry out the provisions of the Act. 12 U.S.C. § 1715b. The National Housing Act also provides that "[t]he Secretary shall not consent to any request for an extension of time for curing a default under any mortgage covering multifamily housing . . . or for a modification of the terms of such mortgage except in conformity with regulations prescribed by the Secretary." 12 U.S.C. § 1715z-4. The regulations concerning mortgage forms state that any mortgage shall be "[e]xecuted on a form approved by the Commissioner for use in the jurisdiction in which the property covered by the mortgage is situated which form shall not be changed without the prior written approval of the Commissioner." 24 C.F.R. § 221.511 (1991) (emphasis added). See also 24 C.F.R. § 207.3 (1991) (multifamily housing). The alleged oral agreement in this case, however, was neither embodied in a mortgage form "approved by the Commissioner," nor had such a change from the approved form been approved in writing by the Commissioner. Accordingly, Mr. Ewing could not have had the authority to enter into an oral agreement requiring HUD to permit the plaintiffs to bid on their loan at auction. See also V.S. Ltd. Partnership v. Dept. Housing & Urban Dev.,

---

not address the question of scope of a loan specialist's authority to contract in 1991.

235 F.3d 1109, 1113 (8th Cir. 2000); Teitelbaum v. Dept. Housing & Urban Dev., 953 F. Supp. 326, 330 (D. Nev. 1996).

Further, the August 1991 revisions to the Insured Project servicing handbook provides, in pertinent part, that

> [a] modification of Note and Mortgage is a written agreement between HUD and the mortgagor which permanently modifies the terms of the mortgage and note secured by property. Depending on local law, modification agreements may be recorded. A Modification Agreement may provide for such actions as: recasting the principal balance of the mortgage note and establishing a new amortization schedule; changing the term of the note and mortgage; increasing the interest rate or in the case of a bond refunding, changing the interest rate on the mortgage note; adding a call provision; adding a late payment fee; or taking any other action that would modify the terms of the mortgage.

Def. App. 75-76 (emphasis added).

Even assuming that the alleged oral agreement was not a modification to the mortgage note itself, but a separate provisional workout agreement, HUD still required that workouts be in writing. The August 1991 revisions to the Insured Project Servicing Handbook explicitly states that:

> [a] provisional workout arrangement is a written agreement between the mortgagor and HUD acknowledging that the mortgagor's loan is in default, that the parties have agreed on steps to be taken to bring the loan current, and that HUD will hold the loan in default and will not begin foreclosure proceedings as long as the owner is complying with the terms agreed to in a workout.
>
> * * * *
>
> A. Workout Arrangement
> This is a formal written agreement between the project owner and HUD under which HUD agrees to hold the loan in default,

> provided the owner submits to HUD specified payments each month.

Def. App. 75, 80 (emphasis added). The Handbook continues to describe a workout as a "document" which is not effective until "signed," and provides for the distribution of "copies" to various HUD offices. Def. App. 89, 97.

Consistent with these documents, the sworn deposition testimony of HUD officials was that HUD did not and does not enter into oral agreements, and that all agreements must be in writing. See Def. App. 143 (deposition of A. Robertson); 175 (deposition of J. Browder); 180-182, 184 (deposition of P. Goray); 208 (declaration of D. Manz). Accordingly, Mr. Ewing lacked the authority to enter into an oral agreement with plaintiffs giving them a "right to bid" upon their loan, should the loan ever be sold at auction.

**3. Loan Specialists Lacked The Authority To Enter Into Workout Agreements**

Finally, the authority to enter into binding workouts was not held by Loan Specialists, such as Mr. Ewing, but rather was delegated to the Director of the Housing Management Division for each field office. August 1991 revisions to the Insured Project Servicing Handbook provide that a workout

> is not effective until signed both by the owner and the authorized HUD representative. The authorized HUD representative at the Field Office level shall be the Director, Housing Management Division.

Def. App. 89 (emphasis added). See also Def. App. 101-102. At no time did Mr. Ewing hold the position of Director, Housing Management Division. Mr. Ewing expressly testified under oath that he had no contractual authority and could not enter into workouts. Def. App. 162, 163. See also Def. App. 158-161(discussing this Court's prior decision on a loan specialist's authority and

discretion). Nor is there any evidence of a further delegation of authority to Mr. Ewing from the Director, Housing Management Divisions. See Def. App. 164, 210.

Further, consistent with the requirements of the Handbook, both written workout agreements in this case were executed by Andrew Robertson, office manager for the Las Vegas, Nevada field office. Def. App. 26-29, 31-33. At the time of the workout agreements, Mr. Robertson supervised and had authority over the field office's Director of the Housing Management Division. See Def. App. 208. Neither of these written workouts contained any mention of plaintiffs' alleged "right to bid" upon the loan.

Nor can plaintiffs rely upon the statements of Hal DeCell as a ratification of the alleged oral agreement. See Def. App. 59-62. First, the Assistant Secretary for Legislation and Congressional Relations did not possess the authority to limit HUD's ability to sell HUD-held multifamily mortgages. Mr. DeCell was involved in legislative affairs, but possessed no contracting authority. Def. App. 63-64. Second, the language of Mr. DeCell's letter is not the language of ratification. At best, Mr. DeCell's letter might constitute an admission that Mr. Arakaki was "told" that he would be permitted to bid upon his loan,[7] not that a contract had been created or that a lower level Government employee had acted in a manner sufficient to bind the Secretary. See Def. App. 59, 62. There is a substantive difference between stating that a Government employee made a representation and affirming that such Government employee had the authority to contract on behalf of the Government. See Office of Personnel Management v. Richmond, 496 U.S. 414 (1990) (incorrect advice of Government representative cannot estop

---

[7] At the same time, the letter by Mr. DeCell does not identify when or by whom such statement might have been made to Mr. Arakaki.

Government from denying an unauthorized benefit). Further, at the same time that Mr. DeCell describes the alleged statement, he also repudiates any commitment by noting that the structure of the loan sale did not permit Mr. Arakaki to bid upon his loan. Def. App. 59, 62. Rather than ratify Mr. Ewing's alleged statements, he effectively repudiates them.

Because there is no evidence that Mr. Ewing possessed the actual or implied authority to enter into a binding oral agreement with the plaintiffs granting them a "right to bid" upon their loan should it ever be sold at auction, summary judgment should be granted in the Government's favor.

### C. Plaintiffs Cannot Demonstrate An Unambiguous Offer and Acceptance, Nor Mutual Intent To Enter Into A Contract

An offer to contract is "'the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it.'" Lucas v. United States, 25 Cl. Ct. 298, 304 (1992) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 24 (1981)). An offer to contract must be definitive and sufficient to demonstrate an intent to enter into a contract. Singleton v. United States, 6 Cl. Ct. 156, 166 (1984). A mere prediction or statement of opinion cannot bind the United States in contract. See Primary Metal & Mineral Corp. v. United States, 556 F.2d 507, 509 (Ct. Cl. 1977). Further, when parties leave essential terms for future negotiations, there is a mere agreement to agree, and not a sufficiently definite contract. 1 WILLISTON ON CONTRACTS § 4:18 (4th ed. 2004); Transamerica Equipment Leasing Corp. v. Union Bank, 426 F.2d 273 (9th Cir. 1970).

There is no evidence, other than Mr. Arakaki's self-serving assertion, showing a present intent to be bound by the alleged oral agreement. There is no contemporaneous written

documentation that Mr. Ewing offered Mr. Arakaki a "right to bid" on his loan, nor are there any documents demonstrating that Mr. Arakaki claimed to have such a "right to bid" prior to the loan sale. Indeed, prior to the partially assisted loan sale, Mr. Arakaki did not seek to enforce any "right to bid" at auction, did not inform HUD that he possessed a "right to bid" at auction, and instead merely sought to "negotiate" to purchase his loan directly from HUD. Def. App. 57, 58.

Indeed, it is revealing that both of the individuals that Mr. Arakaki alleges he relied upon to negotiate an agreement with HUD, Mr. Matsuoka and Mr. Little, assert that Mr. Ewing never promised Mr. Arakaki a "right to bid" upon his loan. In his deposition, Mr. Arakaki repeatedly stressed his reliance upon Mr. Matsuoka and Mr. Little at the October 1991 meeting. Def. App. 195, 198. He noted that he thought it odd that Mr. Ewing might be able to negotiate, but noted that he relied upon Mr. Matsuoka and Mr. Little for such determinations. Def. App. 196-197. In his sworn deposition testimony, however, Mr. Matsuoka testified:

> Q: Now at the meeting with Mr. Ewing, did he give any assurances to Mr. Arakaki that if he bought the building, meaning Lake Mead Villa apartments, that he would have an assurance that if they ever sold the note at auction he could bid upon it?
> A: No.

Def. App. 222. Similarly, Mr. Little gave sworn deposition testimony stating:

> A: He was not guaranteed the right to bid on his note is my understanding.
> Q: Well, what was, what was said?
> . . . .
> A. He may have an opportunity to bid on the property should it come up for auction, and there may have been other cases where owners had bought the property when they were auctioned at a later date.
> He had no idea when that or if that might happen.
> . . . .

> A. . . . Again, the scenarios that were pointed out to us were that there may be a possibility, and that was it.
> Q. A possibility of what?
> A. That the owner may have an opportunity to bid on his note, but certainly wasn't given that, that opportunity by an agent in the local office. I don't think that decision would be made there.
> Q. You mean that Mr. Ewing wouldn't be able to make that decision?
> A. That's correct.

Def. App. 217, 219 (emphasis added). In the least, the differing testimony between Mr. Arakaki and all other participants at the October 1991 meeting preclude the finding that there was an "unambiguous" offer to give Mr. Arakaki a "right to bid."

Moreover, the alleged oral contract before this Court did not contain definite terms such as when the loan would be sold, how much the loan would be sold for, or how much of the unpaid loan amounts could accumulate before foreclosure would take place. The oral contract could not possibly contain these definite terms, because all of these terms were unknown before the date of the event. "A contract, to be enforceable, must be sufficiently definite." Chung v. Atwell, 103 Nev. 482, 484, 745 P.2d 370, 371 (Nev 1987) (quoting De Remer v. Anderson, 41 Nev 287, 301, 169 P. 737, 741 (1918); RESTATEMENT (SECOND) OF CONTRACTS § 33 (1981)). "In absence of contractual intent or sufficiently definite terms, no contractual obligations arise." Modern Systems Technology Corp. v. United States, 24 Cl. Ct. 360, 361 (1991).

**D. The Alleged Oral Agreement Is Barred By The Nevada Statute of Frauds**

While HUD's own policies bar the oral agreement, alternatively, the Nevada statute of frauds also acts to bar such an oral agreement.

The Supremacy Clause of the Constitution declares that "the Laws of the United States . . . shall be the supreme Law of the Land." U.S. CONST, art IV, cl 2. Where a conflict exists

between state and Federal law in an area properly within congressional jurisdiction, Federal law controls. There are, however, three instances in which Federal law preempts state law: "(1) express preemption – where Congress explicitly defines the extent to which its enactments preempt state law; (2) field preemption – where state law attempts to regulate conduct in a field that Congress intended to occupy and (3) conflict preemption – where it is impossible to comply with both state and federal execution of the full purposes and objectives of Congress." Williamson v. Gen. Dynamics Corp., 208 F.3d 1144, 1149 (9th Cir. 2000). See also Board of County Sup'rs of Prince William County, Va. v. United States, 23 Cl. Ct. 205 (1991).

Government contracts typically are governed by Federal law. HUD's scheme for administering real property, however, is generally different from most Government contracts. Federal housing legislation has not created a comprehensive Federal regulatory scheme for federally assisted housing. Instead, federally assisted housing is governed by both Federal and state law except when Federal preemption is necessary for a particular purpose. Courts have consistently found that state and local laws apply to federally assisted housing unless there is a clear intent to preempt them. See, e.g., Topa Equities Ltd. v. City of Los Angeles, 342 F.3d 1065, 1071 (9th Cir. 2003) (no express, field or conflict preemption of local rent control); Kargman v. Sullivan, 552 F.2d 11, 14 (1st Cir. 1977) (no conflict preemption of local rent control); Housing Authority of Everett v. Terry, 114 Wash. 2d 558, 789 P.2d 745 (1990) (state eviction notice requirement is not an express preemption, field preemption nor conflict preemption). In such cases, except in matters governed by the Federal Constitution or by acts of Congress, the law to be applied is the law of the state. Erie R. Co. v. Tompkins, 304 U.S. 64, 78 (1938). See also Klaxon Co. v. Stentor Electrical Mfg. Co., 313 U.S. 487, 496 (1941).

Here, the relevant congressionally enacted law is the National Housing Act, 12 U.S.C. § 1701 et seq. The main goal of the Act is to provide a "decent home and suitable living environment for every American family." 42 U.S.C. § 1441(a); 12 U.S.C. § 1701t. See also 24 C.F.R. §§ 290 et seq. There is no express congressional preemption in the National Housing Act, nor does the Nevada state law attempt to regulate any field that Congress intended to occupy under the National Housing Act or regulation. Finally, it is not impossible to comply with the Nevada statute of frauds and Federal execution of the full purposes and objectives of Congress under the National Housing Act and regulation. Because there is no conflict between Nevada state law and the applicable Federal law and regulations, in this instance, Nevada state law may be applied.

The entire thrust of plaintiffs' complaint is his contention that Mr. Ewing, a HUD employee, orally assured Mr. Arakaki that HUD would allow unpaid loan amounts to accumulate without foreclosing, and plaintiffs would have a right to bid on the note at auction if HUD ever sold the property. Because the alleged oral contract took place in Nevada, the applicable law is Nevada state law. The law of Nevada specifically precludes the creation of any interest in land except by a properly executed written instrument. Nev. Rev. Stat §§ 111.205(1), 111.210. An oral agreement to execute an agreement that is within the statute of frauds, is itself within the statute and unenforceable. See Cherokee Oil Co., Ltd. v. Union Oil Co., 706 F. Supp. 826, 829 (M.D. Fla. 1989). To hold otherwise would be "tantamount to taking the main contract out of the statute, though the whole transaction is oral . . ." 9 WILLISTON ON CONTRACTS, § 21:7 (4th ed. 1994). See also Orthomet, Inc. v. A.B. Medical, Inc., 990 F.2d 387, 391 (8th Cir. 1993).

Accordingly, Nevada's statute of frauds would also bar the alleged oral agreement in this case.

**E. Plaintiffs Cannot Allege A Separate Implied In Fact Contract Where There Is A Related Express Contract**

In its prior opinion, this Court treated the alleged oral agreement an independent workout agreement, rather than a modification of the mortgage agreement. However, it is well settled that "[t]he existence of an express contract precludes the existence of an implied contract dealing with the same subject, unless the implied contract is entirely unrelated to the express contract." Atlas Corp. v. United States, 895 F.2d 745, 754-55 (Fed. Cir. 1990) (citing ITT Fed. Support Services v. United States, 531 F.2d 522, 528 n.12, 209 Ct. Cl. 157 (1976)). See also Habermann v. United States, 26 Cl. Ct. 1405, 1411 n.3 (1992); Algonac Mfg. Co. v. United States, 192 Ct. Cl. 649, 673, 428 F.2d 1241, 1255 (1970). Moreover, no citation is necessary to support the vitality of the parole evidence rule: barring certain limited exceptions (e.g., fraud), a party to a written contract cannot supplement or interpret that agreement with oral or parol statements that conflict with, supplant, or controvert the language of the written agreement itself." Schism v. United States, 316 F.3d at 1278.

The deed of trust contains no restrictions upon HUD's right to sell the mortgage. Def. App. 48-56. Prior to closing on the property, HUD and the plaintiffs entered into a written preliminary workout agreement. Def. App. 26-29. Further, a second workout was executed soon after the Arakakis became the owners of the property. Def. App. 31-33. None of these documents contained any restrictions upon HUD's unrestricted right to sell the mortgage. Thus,

to the extent that plaintiffs claim that they entered into an oral, implied in fact contract, their claim must be denied.

### F. Plaintiffs Cannot Demonstrate That Any Breach By HUD Caused Them Damages

Plaintiffs bear the burden of demonstrating that an injury occurred as a result of a breach of contract. See Haynes v. United States, 61 Fed. Cl. 788, 790-91 (2004) (citing Malissa Co. v. United States, 18 Cl. Ct. 672, 674 (1989)). Further, it is well-established that a party injured by a contract breach may be awarded damages resulting from the breach only if such damages were foreseeable at the time of contracting. Hadley v. Baxendale, 9 Ex. 341, 156 Eng. Rep. 145 (1854); see also Hughes Communications Galaxy, Inc. v. United States, 271 F.3d 1060, 1066 (Fed. Cir. 2001); Bighorn Lumber Co., Inc. v. United States, 49 Fed. Cl. 768, 773 (2001). Damages are foreseeable at the time of contracting only if they were the natural and proximate result of the breach. Hughes Communications, 271 F.3d at 1066.

In the present case, HUD's alleged breach was not the natural and proximate cause of foreclosure. Foreclosure was the result of plaintiffs' failure to make mortgage payments after February 1996. Def. App. 40-42. HUD had the express right to foreclose on plaintiffs for such failure to pay, and plaintiffs apparent expectation that they would be able to withhold payment without suffering any ill consequences is not credible. Def. App. 48, 52, 53. See also Def. App. 198-199.

Further, foreclosure was not the foreseeable result of any purported breach of a right to bid. As the letter of Hal DeCell demonstrates, HUD clearly believed that foreclosure was a last resort for any lender, and that plaintiffs would be able to negotiate with any subsequent administrator of

the trust. Def. App. 60 ("While the threat of foreclosure is always a concern, good faith negotiations can result in a solution that works for all parties. Foreclosure is a last resort, used in a small percentage of cases."). Indeed, the partially assisted loan sale should have made a foreclosure less likely than if plaintiffs loan had been offered through a whole (individual) loan auction. Because the Class A certificate purchaser was only bidding upon a percentage interest in many loans (rather than a whole interest in a single loan), the cost to the purchaser of the certificate of any given individual interest in a loan was reduced. Whereas in a whole loan sale a successful bidder, having paid for the entire cost of the loan, would have greater incentive to foreclose to bring a loan to profitability, the converse should have been true in a partially assisted sale.

Even assuming that HUD had permitted the Arakakis to bid upon their loan in a separate whole loan sale, there is no guarantee that they would have been the successful bidder upon the loan. The right to bid at a public auction merely would allow the plaintiffs to be a bidder amongst the general population. And, if another buyer purchased the Arakakis' loan, the risk of foreclosure would remain. The basis of plaintiffs' entire claim for damages stems from a flawed presumption that they would have been the successful bidders in a public auction of loans. Because plaintiffs have not shown they would have been the successful bidders, nor can plaintiffs establish this fact with any degree of certainty, plaintiffs' claim for damages must fail.

## III. Ms. Arakaki's Claims For Relief Should Be Dismissed

### A. This Court Lacks Jurisdiction Over Ms. Arakaki's Claims Because Her Claims Were Filed Outside Of This Court's Six-Year Statute Of Limitations

This Court is a court of limited jurisdiction. Dynalectron Corp. v. United States, 4 Cl. Ct. 424, 428, aff'd, 758 F.2d 665 (Fed. Cir. 1984) (table). Its jurisdiction to entertain claims and to

grant relief depends upon, and is circumscribed by, the extent to which the United States has waived its sovereign immunity. United States v. Testan, 424 U.S. 392, 399 (1976). The waiver of sovereign immunity, and hence the consent to be sued, must be expressed unequivocally and cannot be implied. Id. Jurisdiction in this Court must be construed strictly and all conditions placed upon such a grant must be satisfied before the Court may accept jurisdiction. United States v. Mitchell, 445 U.S. 535, 538 (1980). As the United States Court of Appeals for the Federal Circuit has stated, "[i]n construing a statute waiving the sovereign immunity of the United States, great care must be taken not to expand liability beyond that which was explicitly consented to by Congress." Fidelity Construction Co. v. United States, 700 F.2d 1379, 1387 (Fed. Cir.), cert. denied, 464 U.S. 826 (1983).

In this Court, consent to suit is generally based upon the Tucker Act, 28 U.S.C. § 1491. Testan, 424 U.S. at 397. Pursuant to this statute, sovereign immunity is waived only with respect to "claim[s] against the United States" that are "founded either upon the Constitution or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1).

Under the Tucker Act, "[e]very claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues." 28 U.S.C. § 2501. This six-year statute of limitations "is a jurisdictional requirement attached by Congress as a condition of the government's waiver of sovereign immunity and, as such, must be strictly construed." Hopland Band of Pomo Indians v. United States, 855 F.2d 1573, 1577-78 (Fed. Cir. 1988).

To prove that her claim is not time barred, Ms. Arakaki must show that her "claim first accrued within six years of the filing of the complaint." Martinez v. United States, 48 Fed. Cl. 851, 857 (2001). "For breach of contract actions, the claim generally accrues at the time of the breach." Martinez, 58 Fed. Cl. at 857. Even under the most favorable reading of the accrual date for her claim,[8] Ms. Arakaki cannot show her complaint was filed within six years of the alleged breach of contract.

In their fourth amended complaint, plaintiffs assert that the alleged oral contract with HUD was breached on June 27, 1996. Compl. ¶ 23. As explained above, June 27, 1996 was the closing date for the Class A Trust certificate that contained the Arakakis' loan. Even assuming that this is the proper starting date for the running of the statute of limitations, Ms. Arakaki was not added as a plaintiff until March 14, 2003, approximately 9 months after the statute of limitations upon her claim had run. Def. App. 7-8.

While Mr. Arakaki had previously filed a claim with the courts, Mr. Arakaki and Ms. Arakaki were two different individuals. They are not husband and wife, nor did they enter into a partnership agreement or form a corporation when entering into the alleged oral agreement that is the basis of their claim. See Def. App. 193-194. While plaintiffs held Lake Mead as joint tenants, should this Court construe the oral agreement at issue as a separate agreement (and not a modification to the mortgage), their relationship as joint tenants would be irrelevant with regard to their claims upon a prior, separate oral contract.

---

[8] While this Court's previous opinion did not definitively determine the date from which the statute of limitations accrues, for the purposes of this motion, the Government has presumed that the proper date is the latest date identified in the Court's prior opinion. Arakaki v. United States, 62 Fed.Cl. 244, 259 (2004).

Accordingly, Ms. Arakaki's claim is not properly before this Court.

**B. Ms. Arakaki Fails To State A Claim Upon Which Relief May Be Granted**

The only parties who may maintain an action in this Court for breach of contract are those who have entered into a contract with the United States. Merritt v. United States, 267 U.S. 338, 340 (1925); see also Erickson Air Crane Co. v. United States, 731 F.2d 810, 813 (Fed. Cir. 1984) (finding that the United States consents to be sued upon contract claims only by those with whom it has privity of contract).

Even if Ms. Arakaki's claim was timely filed, she is not a party to the contract, and did not invest in the Lake Mead Villas in reliance upon the alleged representations of HUD. Mr. Arakaki stated in his sworn deposition testimony that Ms. Arakaki was not present at the October 1991 meeting with David Ewing, nor was Ms. Arakaki even informed of the alleged agreement with Mr. Ewing regarding a "right to bid." Def. App. 195, 201. Nor did Ms. Arakaki sign the initial purchase agreement, although there was space for two buyers to sign. Def. App. 22. Accordingly, as a non-party, she fails to state any claim upon which relief may be granted in this Court.

## CONCLUSION

For these reasons, the United States respectfully requests that this Court enter summary judgment in favor of the defendant and dismiss plaintiffs' complaint. In the alternative, defendant respectfully requests that the Court dismiss Helen Arakaki as a plaintiff for lack of subject matter jurisdiction and for failure to state a claim upon which relief may be granted.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

/s/ Kathryn A. Bleecker
KATHRYN A. BLEECKER
Assistant Director

/s/ Steven M. Mager
STEVEN M. MAGER
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L St. NW
Washington, D.C. 20530
Tele: (202) 616-2377

November 15, 2005

Attorneys for Defendant

CERTIFICATE OF FILING

I hereby certify that on this 15th day of November, 2005, a copy of the foregoing "MOTION FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, PARTIAL MOTION TO DISMISS" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ Steven M. Mager
Steven M. Mager
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice