R. PATRICK JARESS #1028-0
LINDA-MEI LEONG #1543-0
JARESS & LEONG
737 Bishop Street, Suite 2920
Honolulu, Hawaii 96813
Telephone: (808) 531-3151
Attorneys for Plaintiff

RECEIVED UNITED STATES ATTORNEY
'02 JUL -2 A10:17

1ST CIRCUIT COURT
STATE OF HAWAII
FILED
2002 JUN -5 PM 2:09
R. HIGA
CLERK

IN THE CIRCUIT COURT OF THE FIRST CIRCUIT

STATE OF HAWAII

| | |
|---|---|
| EDWARD T. ARAKAKI, Plaintiff, vs. MEL MARTINEZ, Secretary of the Department of Housing and Urban Development; DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT; DOE GOVERNMENTAL AGENCIES 1-10; DOES 1-10, Defendants. | Civil No. 02-1-1368-06<br>COMPLAINT; DEMAND FOR JURY TRIAL; SUMMONS |

2002 JUL -9 A 11:07

COMPLAINT

COMES NOW Plaintiff EDWARD T. ARAKAKI, by and through his undersigned counsel, and for a complaint against Defendants MEL MARTINEZ, Secretary of the Department of Housing and Urban Development; DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT; DOE GOVERNMENTAL AGENCIES 1-10; DOES 1-10, aver and allege as follows:

1. For all times relevant herein, Plaintiff EDWARD T. ARAKAKI (hereinafter "ARAKAKI") was a resident of the City and County of Honolulu, State of Hawaii. Edward T. Arakaki is the assignee of the rights and claims of Helen T. Arakaki, who is also a resident of the

I do hereby certify that this is a full, true, and correct copy of the original on file in this office.
Clerk, Circuit Court, First Circuit

State of Hawaii.

2. Defendant MEL MARTINEZ is the Secretary of the Department of Housing and Urban Development and is sued herein in his official capacity.

3. At all times relevant herein, Defendant DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT (hereinafter "HUD") was an agency of the United States and the National Housing Act waives the Federal Government's sovereign immunity under §12 U.S.C. §1702, allowing the agency to both sue and be sued in any court of state or federal competent jurisdiction, provided that a judgment can be paid only out of funds appropriated and in the control, or subject to the discretion of the Secretary of Housing and Urban Development.

4. Defendants JOHN DOES 1-10; JANE DOES 1-10; DOE CORPORATIONS 1-10; DOE GOVERNMENTAL AGENCIES 1-10; DOE ENTITIES 1-10 (collectively "DOE DEFENDANTS") are sued herein under fictitious names for the reason that their true names and identities are presently unknown to Plaintiff except that they are connected in some manner with Defendant and/or were the agents, principals, partners, officers, directors, servants, employees, employers, representative, co-venturers, co-insurers, associates, consultants, vendors, suppliers, manufacturers, subcontractors, contractors, sureties, insurers, owners, lessees, sub-lessees, lessors, guarantors, assignees, assignors, licensees, and/or licensors of Defendant and/or were in some manner presently unknown to Plaintiff engaged in the activities alleged herein and/or were in some manner responsible for the injuries and/or damages to Plaintiff and/or were in some manner related to Defendant, and Plaintiff prays for leave to certify their true names, identities, capacities, activities and/or responsibilities when the same are ascertained

5. In the month of October 1991, Defendant HUD had long been paying steep monthly deficit on a $2.4 million bank loan insured by HUD ("loan" or "delinquent loan")

6. The original borrower had used the loan proceeds to build a 76-unit apartment building in Las Vegas, Nevada for middle to lower middle class renters.

7. One third of the apartment building was dedicated to tenants whose rent was subsidized by HUD, and the payments on the bank loan to purchase the 76-unit apartment building was insured by HUD.

8. Prior to October 1991, Arakaki was contacted in Hawaii by persons working with and/or on behalf of HUD for the purpose of inducing him to purchase the 76-unit apartment.

9. Because the loan was in serious default, the HUD official who administered the insurance losses on the property was anxious to find someone to buy the 76-unit apartment building for enough money to clear up some of the arrearages owed to HUD by the present owner.

10. In October 1991, Mr. Ewing, a HUD official, met with the plaintiff and others in an attempt to persuade Arakaki to purchase the 76-unit apartment building for $3 million.

11. HUD proposed that Arakaki pay the $3 million by assuming the $2.4 million loan and paying $500,000 as a down payment.

12. Most of the cash would go to HUD to repay past debts of the present owner.

13. However, it made no business sense for Arakaki to purchase the property for the price of $3 million.

14. The gross income from rents was below the cash necessary to pay operating costs and service the debt with principal and interest payments on the delinquent loan.

15. Since HUD has had a strong financial interest in the transaction being consummated, the HUD official told Arakaki that the Secretary of Housing would adjust the interest rate down from 11 percent to 7 ½ percent, and would also not require Arakaki to pay the

negative cash flow occurring each month on the property until the interest expense was lowered. Instead, the debt would be incurred and could be paid later when the property was making money, rather than losing money every month

16. Mr. Ewing assured Arakaki that he did not have to worry about a foreclosure caused by HUD during the time it took for the interest rates to come down.

17. Mr. Ewing assured Arakaki that HUD rarely took action against the owners who were in default, and even when it did, HUD would merely auction the delinquent loan, and that Arakaki would have the opportunity to bid and purchase his loan at auction for far less than the face amount of the loan, just as many others had already done in many other properties.

18. This right to bid on the delinquent note was the safety valve for Arakaki since he would be able to bid on the note for a low amount which would be easy to finance because the rate of interest would be at market, and the lower principal balance would also reduce the amount of interest expense on the property. This would make the apartment building profitable rather than unprofitable.

19. Arakaki agreed to buy the property for $3 million and try to make the property as economically efficient as possible, and then, hopefully, get the interest rates adjusted down soon so that a fair rate of return could be made on his investment of the $500,000.

20. On October 20, 1991, Plaintiff did purchase the property, did invest over $500,000, and did take over the HUD-insured delinquent loan.

21. In 1996, HUD announced to Arakaki that amendments to the HUD Act passed in 1994 required HUD to bundle loans when they are auctioned, and that his loan was going to be bundled with many other loans and sold in a group.

22. In fact, the 1994 amendments did not require the bundling of loans.

23. Arakaki did not have the resources to bid on the entire group of loans, and was not allowed to bid on the loan, which was subsequently purchased by a commercial lender for about 70 percent of the unpaid balance.

24. HUD's promise that Arakaki could bid on his loan was made to induce Arakaki into investing more than $500,000 in the 76-unit apartment building, so that HUD could be paid a substantial amount of the money it was owed on the loan, and is good and valuable consideration for Arakaki proceeding with the acquisition.

25. When HUD sold the loan on June 6, 1966, as part of a large bundle of loans, it precluded Arakaki from bidding on the loan, and therefore, HUD was in breach of its promise that he could bid on his individual loan, if HUD ever chose to sell the loan.

26. The new owner of the loan then foreclosed and Arakaki lost all of his money.

27. HUD concedes that it gave verbal assurances to Arakaki that he could bid on his individual loan, but argues: 1) HUD could save considerable money by bundling loans together for one large auction, 2) that, since 1994, Congress required bundling of loans for auctions, and 3) nothing had been committed to writing regarding Arakaki's right to bid at the auction, and, therefore the assurances were not enforceable.

28. If HUD had told Arakaki that it could change its mind and bundle his loan with other loans or otherwise prevent him from bidding on his loan, Arakaki would not have invested the money to purchase the property, and HUD would not have received a substantial portion of the money Arakaki paid.

29. HUD substantially breached the agreement with Aralaki that he could bid n his loan, and is liable for damages arising out of said breach.

30. HUD was unjustly enriched by its actions.

31. As a direct and proximate result of HUD's actions as alleged above, Plaintiff has suffered the loss of his down payment and other compensatory, pecuniary and general damages.

WHEREFORE, Plaintiff prays:

A. The Court enter a Judgment in favor of Plaintiff and against Defendants ordering Defendants to pay over to Plaintiff the sum to be determined at trial, including without limitation, equitable relief and compensatory, special, pecuniary, consequential, and general damages;

B. The Court award to Plaintiff prejudgment interest;

C. The Court award to Plaintiff reasonable attorney's fees and costs; and

D. The Court grants Plaintiff such other and further relief as is just and proper.

DATED: Honolulu, Hawaii, June 5, 2002

R. PATRICK JARESS, ESQ.
Attorney for Plaintiff

R. PATRICK JARESS #1028-0
JARESS & LEONG
737 Bishop Street, Suite 2920
Honolulu, Hawaii 96813
Telephone: (808) 531-3151
Fax: (808) 531-6064
Email: patjaress@hotmail.com

Attorney for Plaintiffs

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| EDWARD T. ARAKAKI and HELEN ARAKAKI, | ) CIVIL NO. 02-000417 SOM-LEK |
| Plaintiffs, | ) THIRD AMENDED COMPLAINT FOR BREACH OF CONTRACT; SUMMONS; CERTIFICATE OF SERVICE |
| vs. | ) |
| UNITED STATES OF AMERICA | ) |
| Defendants. | ) |

THIRD AMENDED COMPLAINT FOR BREACH OF CONTRACT

COMES NOW Plaintiff EDWARD T. ARAKAKI and HELEN ARAKAKI, (hereinafter collectively referred to as "ARAKAKI") by and through their undersigned counsel, and for a Third Amended Complaint against Defendant UNITED STATES OF AMERICA, aver and allege as follows:

1. For all times relevant herein, Plaintiffs EDWARD T. ARAKAKI and HELEN ARAKAKI were residents of the City and County of Honolulu, State of Hawaii.

2. HELEN ARAKAKI is presently a resident of California.

3. Defendant UNITED STATES OF AMERICA is a sovereign and is responsible for the actions of the Department of Housing and Urban Development ("HUD"), an agency or department thereof.

4. The United States Court of Federal Claims has jurisdiction under 28 U.S.C. § 1491(a)(1).

5. Prior to October 1991, Plaintiff was contacted by persons working with HUD for the purpose of inducing him to purchase a 76-unit apartment building. HUD insured the loan on the building.

6. On October 17, 1991, Mr. Ewing, a HUD official, met with the Plaintiff to persuade him to purchase the 76-unit apartment building, even though the gross income from rents was below the operating expenses and money necessary to service the debt.

7. Mr. Ewing told Plaintiff that the bank would be assigning the loan to HUD, and that HUD would allow any unpaid loan amounts to accumulate without foreclosing until the building became profitable. HUD later did follow through on this promise.

8. HUD also said that if HUD ever wanted to sell the property, that Plaintiff would have the right to bid at an auction and cut his losses.

9. This right to bid on the delinquent note was the safety valve for

Plaintiff since these types of notes sold at a large discount from the unpaid balance.

10. In fact, the building note was eventually sold for only 70% of the unpaid balance.

11. The price of the loans were typically low enough that conventional financing would be available. Interest expenses would drop because of the lower principal amount of the loan and the lower interest rate. Cash needs for the principal payments would also drop. This would make the apartment profitable rather than unprofitable.

12. HUD's promise that Plaintiff could bid on his loan was made in consideration of Plaintiff investing more that $500,000 in the 76-unit apartment building.

13. After Plaintiffs purchased the apartment building, the bank did assign the building's loan to HUD. HUD did allow shortfalls on the loan payments to accumulate by way of a provisional workout agreement.

14. Then, by letter dated July 5, 1995, HUD told Plaintiff that it planned to include the mortgage loan on his property in an upcoming sale.

15. On Monday October 20, 1991, Plaintiff agreed to buy the building for $3 million.

16. Then HUD sold the loan on June 27, 1996, and precluded Arakaki from bidding on his loan, which was in breach of its promise that Arakaki could

bid on the individual loan.

17. In 1998, the new owner of the loan foreclosed and Plaintiff lost the property.

18. HUD concedes that it gave verbal assurances to Plaintiff that he could bid on his individual loan, but HUD argues: 1) HUD could save considerable money by bundling loans together for one large auction, 2) That Congress requires bundling of loans for auctions, and 3) nothing had been committed to writing regarding Plaintiff's right to bid at the auction, and, therefore the assurances were not enforceable.

19. HUD's breach was substantial because, if HUD had told Plaintiff that it could change its mind and bundle his loan with other loans or otherwise prevent him from bidding on his loan, Plaintiff would not have invested the money to purchase the property and HUD would not have received a substantial portion of the money Plaintiff paid for the property.

20. HUD was unjustly enriched by its actions and Plaintiffs are entitled to restitution.

21. As a direct and proximate result of HUD's actions as alleged above, Plaintiff has suffered the loss of his down payment, the loss of his investment in property, expenses, and interest paid, and other compensatory, pecuniary, special, and general damages.

22. Plaintiff filed the lawsuit on June 5, 2002, which is within six years of when HUD breached the agreement on June 27, 1996.

WHEREFORE, Plaintiffs pray that:

A. The Court enter a Judgment in favor of Plaintiffs and against Defendant ordering Defendant to pay over to Plaintiffs the sum to be determined at trial, including without limitation benefit of the bargain damages, restitution, compensatory, special, pecuniary, consequential, and general damages;

B. The Court award to Plaintiffs prejudgment interest;

C. The Court award to Plaintiffs reasonable attorney's fees and costs; and

D. The Court grant Plaintiffs such other and further relief as is just and proper.

DATED: Honolulu, Hawaii, March 14, 2003.

R. PATRICK JARESS, ESQ.
Attorney for Plaintiffs

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| EDWARD T. ARAKAKI and HELEN ARAKAKI, | ) | |
| Plaintiffs, | ) | |
| vs. | ) | No. 03-1874C (Judge Hewitt) |
| THE UNITED STATES, | ) | |
| Defendants. | ) | |

PLAINTIFF'S RESPONSES TO DEFENDANT'S FIRST REQUEST FOR ANSWERS TO INTERROGATORIES

Pursuant to Rules 26 and 33 of the Rules of the United States Court of Federal Claims ("RCFC"), Plaintiffs provide the following response to the first set of request for answers to interrogatories served by defendant, the United States ("defendant").

INTERROGATORY NUMBER 1

Identify each individual who participated in preparing any of the responses to these interrogatories, including but not limited to, drafting, discussing or commenting upon, or supplying information for use in any of the responses. For each such individual, identify which interrogatory response or portion of a response with which the individual was involved, and describe the extent and nature of such involvement.

RESPONSE:

Edward T. Arakaki and his attorney R. Patrick Jaress.

INTERROGATORY NUMBER 2

Identify each individual present at any meetings between Mr. David Ewing (identified as "Mr. Ewing" in paragraphs 6 and 7 of the complaint) and plaintiffs. Identify the date of any such meeting(s), describe in detail any communications, and identify all documents that substantiate your answer to this interrogatory.

ANSWER

Lake Mead Villa Apartments was badly in default, with its missed payments in the hundreds of thousands. Further, its debts were increasing due to a negative cash flow. Because the property was not performing profitably, and because of my limited personal income, I could not qualify for the property's underlying $2.4 million loan; but, I could qualify to take over the loan if I could tender sufficient down payment, and if, there was a restructuring and protection by HUD from the loan's defaulted state. I felt that a restructured debt was central to buying the property for the seller's asking price, else, the property was worth far less.

At the suggestion of Larry Little and Keith Matsuoka, my mother and I flew out to Las Vegas to look at purchasing the Lake Mead Villa Apartments. We discussed the fact that buying a property with unpaid mortgage debt is highly risky if there were no protections for the buyer as a defaulted loan can cause the property to be foreclosed upon immediately. On 18 Oct 1991, Larry Little, Keith Matsuoka, and I met with David Ewing at Ewing's office. After introductions, I explained to Ewing the purpose of my visit, though, he already seemed to know. I told him that I was seriously considering the purchase of Lake Mead Villa Apartments and assuming the underlying loan. I had flown out from Hawaii for this meeting to discuss the terms and conditions upon which I would take over the loan. I also told Ewing that I had a number of concerns about the state of the loan. Ewing appeared happy to have the meeting. Ewing said that he was interested in having new owners for the property as the current owners were not

cooperative.

In my mind, there were a number of issues that needed discussion. I did not have any original documentation, and had relied upon the information I obtained from Matsuoka and Little.

I told Ewing that the 11% interest on the property's mortgage was way too high as compared to the market interest rates. I pointed out that the current commercial mortgage rate for apartments was 8 - 8.5%. I asked him if I could refinance the property's loan into one of a lower rate. Ewing said that because HUD is taking over the loan, that I will be able to convert the loan to a government loan rate which he believed is currently about 7.5%. I told him that was acceptable. I moved the discussion on to another problem.

Matsuoka had told me that the unpaid loan delinquencies were in the many hundreds of thousands. I asked Ewing how the large amount of arrearages would be handled and avoid an immediate foreclosure. In answer, Ewing described a method whereby the arrearage would be combined with the original principal and then recomputed into a higher monthly payment. I told Ewing that this won't work. I explained, that the property is already unable to pay the current mortgage, how could it handle the monthly payments on an even larger mortgage? At that moment, I thought the deal was over. However, Ewing surprised me by initiating a new proposal. He then stated that they would simply place all arrearage at the back end of the loan. I said that sounds okay but did the property have the cash flow to pay interest on the arrearages. He said okay there would be no interest on the arrearage. I interpreted "back end" to mean that the arrearage would be paid after the original mortgage had run its course.

I pointed out to Ewing, that if I bought the property and took over the loan, what would prevent HUD from immediately foreclosing on the property. Ewing said that they would not do

that because there is a court case that makes it virtually impossible for HUD to foreclose. He said that he would establish a workout period of 15 years to allow time for the property to get healthy. He said he would work with me to restore the health of the property. I felt a 15 year grace period on the arrearages caused by the above market interest would be sufficient with a supportive HUD and considered along with the other promises which Ewing made.

I asked Ewing, what would prevent HUD from just selling my loan on the open market? I explained my concern, that if they did, then I would have to deal with someone else who might have a totally new set of expectations; and, who could guess what the new loan owners might demand. Ewing explained that if HUD ever sold the loan on Lake Mead Villa Apartments, they would sell the loan by auction, and that I will be able to bid on my note. He said that these loan auctions are rare and that even in the space of twenty years he doubted that there would be an auction. He said that if HUD ever auctioned my note, HUD would give me an opportunity for me to buy back my note for "pennies on the dollar". He then proceeded to illustrate this idea by an actual case that he was aware of. He briefly described the case of a dentist who successfully bid on his note and purchased it back for "pennies on the dollar". I wanted to clarify this, so I summarized back to Ewing what I heard him say. I asked Ewing, are you saying that 'if HUD ever sold my note then I will be able to bid on my note in the auction'? Ewing said yes. I remember the words "pennies on the dollar" exactly because it was an intriguing prospect, and one that I had never faced before. I told him that these terms were acceptable.

Ewing spoke confidently about all the terms that had been agreed to. He did not qualify his statements, or say the agreement had to be in writing, nor say that he had to further research any issues nor clear any facts with anyone else. Ewing imposed no additional conditions on the agreements at that meeting nor later, and I know for certain that I agreed to none.

In or around October 1992, we met again with Ewing. I believe Little and Matsuoka were both there. I do not recollect the exact location of the meeting but most likely it was at Ewing's office. I asked Ewing, what happened to the conversion of mortgage interest rate to a low HUD rate; had it been done yet or did I need to fill out a form or application, what is the procedure? Ewing stated that I would have to obtain a 223E conversion loan. I took Ewing's explanation on good faith even though I did not know what a conversion loan might be.

We asked Ewing for a list of the approved property managers. We asked Ewing which was the top property manager. That same month, we met with Bob McNamara of B&R Property Management, and his wife, at Little's office. We determined that they should be the new property managers.

Ewing and I then talked a number of times during 1993 about obtaining more Section 8 subsidized rentals.

Then in or around late 1994, Ewing contacted Matsuoka and called for the two of us to meet with Ewing in Las Vegas. I traveled with Matsuoka to and from that meeting. Ewing told me that HUD was planning to conduct loan auctions in the near future and that my loan would probably be included. It was a very short meeting.

In or around March 1995, I called Ewing and informed him that B&R was hiring Helen Arakaki to perform maintenance work on the property. Ewing said OK, but that she cannot do supervisory work. I agreed to Ewing's condition, and affirmed to him that we'll be careful that she do only hands on work and that she not do supervisory work. Also, he was protective of the part-time position of the young girl who he described as being able to walk very quickly through the compound to pick up trash. I assured him that Helen Arakaki would not be doing the early morning trash pickup.

Documents: The documents are voluminous. They include the binders of my correspondence with the Congressmen, Representative Abercrombie and Senator Inouye. In addition there is the report from the HUD IG; two letters from Assistant Secretary De Cell III; and two memorandums signed by Larry Little.

INTERROGATORY NUMBER 3

Identify each individual that "said that if HUD ever wanted to sell the property, that Plaintiff would have a right to bid at auction and cut his losses," as alleged in paragraph 8 of the complaint. Identify the date of any such communication(s), each individual that was present when such communications were made, describe the communications in detail, and identify all documents that substantiate your answer to this interrogatory.

ANSWER

The person that said this was Ewing. This is explained in the answer to Interrogatory Number 2.

Documents: The documents are voluminous. They include the binders of my correspondence with the Congressmen, Representative Abercrombie and Senator Inouye. In addition there is the report from the HUD IG; two letters from Assistant Secretary De Cell III; and two memorandums signed by Larry Little.

INTERROGATORY NUMBER 4

Identify the "persons working with HUD" who purportedly "contacted" the plaintiff "for the purpose of inducing him to purchase a 76-unit apartment building," as alleged in paragraph 5 of the complaint. State the date of any such communications, each individual that was present

when such communications were made, describe in detail all communications, and identify all documents that substantiate your answer to this interrogatory.

ANSWER

I was contacted by my attorney Keith Matsuoka (Matsuoka), who in turn introduced me to Larry Little (Little). Matsuoka and Little arranged for me to meet with Ewing. It was the terms and promises that Ewing gave that made it feasible to purchase the property and take over the loan. The inducements came from Ewing. The communications, meetings, etc. are discussed above in the answer to interrogatory number 2.

Documents: The documents are voluminous. They include the binders of my correspondence with the Congressmen, Representative Abercrombie and Senator Inouye. In addition there is the report from the HUD IG; two letters from Assistant Secretary De Cell III; and two memorandums signed by Larry Little.

INTERROGATORY NUMBER 5

Identify all real estate owned, purchased, sold, or managed by the plaintiffs between 1981 and the present.

ANSWER

1981 I owned a duplex at Harbor Terrace.

My mother and father owned a house at Hapaki Street.

1984 I sold the duplex at Harbor Terrace.

1985 I bought 6 cottages at Pua Lane

1986 My mother purchased a house at Middleborough Circle.

1991 I built a new apartment at Pua Lane.
I bought and disposed of a small piece of land in Oregon about 1991.
My mother and I purchased Lake Mead Villa Apartments and placed loan on Hapaki

Street home and Middleborough Circle (hereinafter "Family Property") in order to obtain the $500,000 down payment on the Lake Mead Villa Apartments.

1999 Due to bankruptcy and fallout from Lake Mead Villa Apartments, all the Family Properties owned by my mother due to the inability to make loan payments, were disposed in 1998 and 1999: These consisted of Pua lane, Hapaki Street, Middleborough Circle, and Lake Mead Villa Apartments.

Following are the addresses of the properties:

98-1746 Hapaki Street
Aiea, HI 96701

I recall that the duplex was located on Holopuni Street in Aiea, HI 96701, but I could not find a record of the street number.

1120 Pua Lane
Honolulu, HI 96817

2664 Middleborough Circle
San Jose, Ca. 95132

I could not find any record of the vacant land in Oregon.

Lake Mead Villa Apartments
2115 Winwood Street
Las Vegas, NV 89108

Documents: I could not locate the transaction records.. However, they are a matter of public record.

INTERROGATORY NUMBER 6

Identify all litigation in which plaintiffs have been involved that relate to the Lake Mead Villa Apartments or the mortgage agreement, including both civil and criminal matters.

ANSWER

Edward T. Arakaki, et. al v. Keith A. Matsuoka, et al., Civil No. 02-1-1352-06 GWBC, In The First Circuit Court of the First Circuit. (The Arakaki's law suit against Matsuoka et al for breach of contract.)

United States District Court, District of Nevada, Case #CV-S-01-0570-PMP-PAL, filed May 17, 2001. Plaintiff Helen Arakaki's discrimination law suit against B&R Property Management and

HUD.

Documents: The lawsuits are part of the public record.

INTERROGATORY NUMBER 7

Identify each payment made by you, or any other party, pursuant to the mortgage, excluding any payments transferred from the mortgage unapplied account or from the mortgage's escrow account. State the date and amount of each payment and identify all documents upon which you rely to answer this interrogatory.

ANSWER

I paid a $500,000 down payment and assumed the loan obligations and the $500,000 went mostly to HUD. The Escrow will have the details.

Documents: Escrow statement shows disbursements upon closing the purchase of the property. I do not have all property management records, but I have most; they show the monthly mortgage payments; also, HUD's financial statements show the monthly mortgage payments. I do not have a record of payments made to HUD during the bankruptcy.

INTERROGATORY NUMBER 8

To whom did plaintiffs pay the more than $500,000" that plaintiffs allege, in paragraph 12 of the complaint, was invested in Lake Mead Villa Apartments? Describe in detail the source of these funds, and identify the documents that substantiate your answer to this interrogatory.

ANSWER

The first part is answered in the answer to interrogatory 7 above. As to the second part, the source of these funds were monies belonging to Ed Arakaki and Helen Arakaki, personal funds and monies borrowed against Family Property.

Documents: Escrow statement shows disbursements upon closing the purchase of the property. I do not have all property management records, but I have most; they show the

monthly mortgage payments; also, HUD's financial statements show the monthly mortgage payments. I do not have a record of payments made to HUD during the bankruptcy.

INTERROGATORY NUMBER 9

Describe in detail and explain the basis for the damages claims contained in your initial disclosures, dated December 7, 2004, including, but not limited to, the specific calculations utilized to arrive at your damage claims and the source of the figures utilized to calculate your damages claim.

ANSWER

See the attached damage analysis by CPA.

I DECLARE UNDER PENALTY OF LAW THAT THE FOREGOING IS TRUE AND CORRECT.

Executed on this 6th day of May, 2005.

EDWARD T. ARAKAKI



May. 6. 2005 3:32PM JARESS & LEONG ATTORNEYS AT LAW No.7001 P. 11/11