1601220

# DEED OF TRUST

THIS DEED OF TRUST, made and entered into this 1st day of April, in the year 19 83, by and between LAKE MEAD VILLA APARTMENTS, a Nevada General Partnership, ~~a corporation~~ organized and existing under the laws of the State of Nevada, having its principal place of business at 3651 South Lindell Road, Suite A, Las Vegas, Nevada 89103, party hereto of the first part, hereinafter sometimes referred to as the "Grantor," and LAND TITLE OF NEVADA, INC., of 2800 W. Sahara Avenue, Las Vegas, Nevada, as Trustee, party of the second part, hereinafter sometimes referred to as the "Trustee," and SEAFIRST MORTGAGE CORPORATION, a corporation organized and existing under the laws of the State of Washington, with its principal office in the City of Seattle, State of Washington, party hereto of the third part and hereinafter sometimes referred to as the "Beneficiary" (which designations shall include the respective successors and assigns and the successors in the interest of the several parties).

WHEREAS, the party of the first part is justly indebted to the party of the third part in full sum of TWO MILLION FIVE HUNDRED THOUSAND AND NO/100----------------------------Dollars ($ 2,500,000.00 ), evidenced by its Note of even date herewith, bearing interest from date on outstanding balance at ELEVEN (11%)** per cent per annum, payable in monthly installments beginning on the first day of the month following the date hereof with a final maturity of March 1, 2014, which Note is identified as being secured hereby by a certificate thereon. Said Note and all of its terms are incorporated herein by reference; however evidenced. **See Rider "A" attach

AND WHEREAS, the Grantor desires to secure to the Beneficiary the full and punctual payment of said debt and interest thereon, and to secure the performance of the covenants herein contained, as well as any and all renewals or extensions of said Note, or of any part thereof, with interest thereon; and also to secure the reimbursement to the holder or holders of said Note and to the Trustee or substitute trustee, for all money which may hereafter be advanced for any purpose provided for by the terms of this Deed of Trust or the covenants hereof adopted by reference, and for any and all costs and expenses (including reasonable attorney's fees) incurred or paid on account of any litigation at law or in equity which may arise in respect to this trust, or to the indebtedness or to the property herein mentioned, or in obtaining possession of the premises after any sale which may be made as hereinafter provided for;

NOW, THEREFORE, THIS DEED OF TRUST WITNESSETH: That the said Grantor, in consideration of the premises and of One Dollar ($), to it in hand paid by the Trustee (the receipt of which, before the sealing and delivery of these presents, is hereby acknowledged), has granted, bargained, sold, conveyed, and confirmed and does hereby grant, bargain, sell, convey, and confirm unto the Trustee, his successors and assigns in trust forever, the following-described land and premises with the improvements thereon, together with all privileges, hereditaments, water rights, mineral rights, easements, rights, ways and appurtenances thereunto belonging, situated and lying in Las Vegas, in the County of Clark, State of Nevada, more particularly described as follows:

See Schedule "A" attached hereto and by this reference made a part hereof for legal description.

That certain Regulatory Agreement of April 1, 1983, between Grantor and the Nevada ~~Nevada Housing~~ Housing Division ~~to be recorded upon acquisition of the loan by the Nevada Housing Division~~ is incorporated in and made a part of this Deed of Trust.

Pursuant to Section 221.524(d) of 24 C.F.R. the indebtedness represented by this Deed of Trust may not be prepaid either in whole or in part prior to the final maturity date thereof without the prior written approval of the Beneficiary and the Federal Housing Commissioner.

The consent of the Beneficiary to prepay the debt, in whole or in part, will not be unreasonably withheld and may be conditioned upon payment to the Beneficiary by the Grantor of such fees and charges which are reasonable as determined by the Commissioner and which are related to the Nevada Housing Division's cost of redeeming the bonds sold to finance the loan.

The covenant of the maker to pay principal and interest is included in the Note secured hereby for the purpose of establishing and continuing the existence of the indebtedness. However, it is a condition of said covenant and those contained herein that in the event of default under the terms hereof, the holder shall take no action against the maker(s) personally except such as may be necessary to subject to the satisfaction of the indebtedness, the property described herein and any chattels appurtenant to the use thereof, PROVIDED, that nothing in this condition and no action so taken shall operate to impair any obligation of the maker under the Building Loan Agreement and the Regulatory Agreement herein referred to and made a part hereof.

TOGETHER with all of the rents, issues, and profits which may arise or be had therefrom; and all building materials and equipment now or hereafter delivered to said premises and intended to be installed therein;

TOGETHER with all buildings and improvements of every kind and description now or hereafter erected or placed thereon, and all fixtures, including but not limited to all gas and electric fixtures, engines and machinery, radiators, heaters, furnaces, heating equipment, steam and hot water boilders, stoves, ranges, elevators and motors, bathtubs, sinks, water closets, basins, pipes, faucets and other plumbing and heating equipment, cabinets, mantels, refrigerating plant and refrigerators, whether mechanical or otherwise, cooking apparatus and appurtenances, furniture, shades, awnings, screens, venetian blinds and other furnishings; and

All articles of personal property owned by the party of the first part and now or hereafter attached to or used in and about the building or buildings now erected or hereafter to be erected on the lands herein described which are necessary to the complete and comfortable use and occupancy of such building or buildings for the purposes for which they were or are to be erected, including all goods and chattels and personal property as are ever used or furnished in operating a building or the activities conducted therein similar to the one herein described and referred to, and all renewals or replacements thereof or articles in substitution therefor, whether or not the same are, or shall be attached to said building or buildings in any manner. It is hereby agreed that to the extent permitted by law all of the foregoing property and fixtures are to be deemed and held to be a part of and affixed to the realty.

TO HAVE AND TO HOLD the above granted and bargained premises, together with all the privileges and appurtenances, unto said Trustee, its successors in this trust, and assigns, forever, to its and their proper use and behoof.

AND the said Grantor does hereby covenant for itself, its successors and assigns, that it is seized of said land and premises in fee simple and has the right to convey the same to the said Trustee, that the said Trustee shall have quiet possession thereof, free from all encumbrances, and that it, the said Grantor, will execute such further assurances thereof as may be requisite.

IN AND UPON THE USES AND TRUSTS FOLLOWING, that is to say:

Until any default in payment of any matter of indebtedness hereby secured as herein provided for, or until breach of any of the covenants herein contained, to permit the said Grantor, its successors and assigns, to possess and enjoy said land and premises, and to receive the rents, issues, and profits thereof; and on full payment of said Note, and of any extensions or renewals thereof, and interest thereon, and all sums advanced or expended as herein provided, and all other proper costs, charges, expenses, commissions, and half-commissions, at any time before the sale hereinafter provided for, to release and reconvey unto and at the cost of the said Grantor, or the party or parties then claiming under it, the aforesaid land and premises.

Upon any default being made in the payment of any installment of principal and/or interest under said Note or payment of any monthly sum as hereafter provided in paragraph 9 *(a)* or *(b)* hereof, not made good prior to the due date of the next such payment, or in payment of any ground rent, tax or assessment or water rate, or hazard insurance premium (it being hereby agreed that in default thereof, the Beneficiary may pay same and that any sum so paid or paid by Beneficiary for mortgage insurance premiums not otherwise provided for, or for repairs or for any proper cost or expense of this trust, shall be secured hereby, shall bear interest at the rate specified in the Note and shall be payable on demand), or upon failure to keep or perform any covenant agreement or condition hereunder, the entire unpaid balance of the principal sum and all advances with unpaid interest to date shall immediately become due at the option of the Beneficiary and thereupon the Trustee, or his successor in this trust, shall have power and it shall be his duty, after (1) the lapse of 15 days during which the Grantor shall have failed to make good such default, (2) after due recording in the office of the recorder in the county where the property lies of notice of such default and election by the Beneficiary to cause the trust property to be sold in payment of the debt after (3) the elapse of at least 3 months and (4) after the Trustee shall have given notice by publication and /or otherwise as of the time and place of such sale, all as required by law, to sell and in case of any default of any purchaser, to resell at public auction for cash in one or more parcels, the mortgaged premises and property herein described and to convey the same in fee simple upon compliance with the terms of the sale to and at the cost of the purchaser or purchasers thereof, who shall not be required to see to the application of the purchase money; and to apply the proceeds of said sale or sales; Firstly, to pay all proper costs, charges and expenses, including all attorneys' and other fees, herein provided for, and all moneys advanced for costs or expenses of litigation as aforesaid, or taxes or assessments, water rates, or insurance or mortgage insurance with interest thereon as aforesaid, and all taxes, general and special, and assessments, due upon said land and premises at time of sale; Secondly, to retain as compensation a commission of one percentum (1%) on the gross amount of the said sale or sales; Thirdly, to pay whatever may then remain unpaid of the principal of the said Note whether same shall be due or not, and the interest thereon to date of payment; and, Lastly, to pay the remainder of said proceeds, if any, to said Grantor, or assigns, upon the delivery of and surrender to the purchaser, his, her, or their heirs or assigns, of possession of the premises as aforesaid sold and conveyed, less the expense, if any, of obtaining possession.

Party of the first part grants to the holder or holders of the note secured hereby the right and power to appoint a substitute Trustee or Trustees hereunder for any reason whatsoever by instrument of appointment duly executed and acknowledged by the holder or holders of the note and to be filed for record in the office wherein this Deed of Trust is recorded. Such power of appointment may be exercised as often as deemed necessary by the holder or holders of the note. Upon such appointment, the substitute Trustee or Trustees shall be vested with all the rights, powers, authority, and duties vested in the Trustee hereunder.

The Grantor, in order more fully to protect the security hereof, covenants and agrees as follows:

1. That Grantor will pay the Note at the times and in the manner provided therein;

2. That Grantor will not permit or suffer the use of any of the property for any purpose other than the use for which the same was intended at the time this Deed of Trust was executed;

3. That the Regulatory Agreement, if any, executed by the Grantor and the Secretary of Housing and Urban Development, acting by and through the Federal Housing Commissioner, which is being recorded simultaneously herewith, is incorporated in and made a part of this Deed of Trust. Upon default under the Regulatory Agreement and upon the request of the Secretary of Housing and Urban Development, acting by and through the Federal Housing Commissioner, the Beneficiary, at its option, may declare the whole of the indebtedness secured hereby to be due and payable;

4. That all rents, profits and income from the property covered by this Deed of Trust are hereby assigned to the Beneficiary for the purpose of discharging the debt hereby secured. Permission is hereby given to Grantor so long as no default exists hereunder, to collect such rents, profits and income for use in accordance with the provisions of the Regulatory Agreement;

5. That upon default hereunder Beneficiary shall be entitled to the appointment of a receiver by any court having jurisdiction, without notice, to take possession and protect the property described herein and operate same and collect the rents, profits and income therefrom;

6. That at the option of the Grantor the principal balance secured hereby may be reamortized on terms acceptable to the Secretary of Housing and Urban Development, acting by and through the Federal Housing Commissioner if a partial prepayment results from an award in condemnation in accordance with provisions of Paragraph 8 herein, or from an insurance payment made in accordance with provisions of Paragraph 7 herein, where there is a resulting loss of project income;

7. That the Grantor will keep the improvements now existing or hereafter erected on the deeded property insured against loss by fire and such other hazards, casualties, and contingencies, as may be stipulated by the Secretary of Housing and Urban Development, acting by and through the Federal Housing Commissioner upon the insurance of the Deed of Trust and other hazards as may be required from time to time by the Beneficiary, and all such insurance shall be evidenced by standard Fire and Extended Coverage Insurance Policy or Policies, in amounts not less than necessary to comply with the applicable Co-Insurance Clause percentage, but in no event shall the amounts of coverage be less than 80% of the Insurable Values or not less than the unpaid balance of the insured Deed of Trust, whichever is the greater, and in default thereof the Beneficiary shall have the right to effect insurance. Such policies shall be endorsed with standard Mortgagee clause with loss payable to the Beneficiary and the Secretary of Housing and Urban Development as interest may appear, and shall be deposited with the Beneficiary;

That if the premises covered hereby, or any part thereof, shall be damaged by fire or other hazard against which insurance is held as hereinabove provided, the amounts paid by any insurance company in pursuance of the contract of insurance to the extent of the indebtedness then remaining unpaid, shall be paid to the Beneficiary, and, at its option, may be applied to the debt or released for the repairing or rebuilding of the premises;

8. That all awards of compensation in connection with condemnation for public use of or a taking of any of that property, shall be paid to the Beneficiary to be applied to the amount due under the Note secured hereby in (1) amounts equal to the next maturing installment or installments of principal and (2) with any balance to be credited to the next payment due under the Note. That all awards of damages in connection with any condemnation for public use of or injury to any residue of that property, shall be paid to the Beneficiary to be applied to a fund held for and on behalf of the Grantor which fund shall, at the option of the Beneficiary, and with the prior approval of the Secretary of Housing and Urban Development, either be applied to the amount due under the Note as specified in the preceding sentence, or be disbursed for the restoration or repair of the damaged residue. No amount applied to the reduction of the principal amount due in accordance with (1) shall be considered an optional prepayment as the term is used in this Deed of Trust and the Note secured hereby, nor relieve the Grantor from making regular monthly payments commencing on the first day of the first month following the date of receipt of the award. The Beneficiary is hereby authorized in the name of the Grantor to execute and deliver valid acquittances for such awards and to appeal from such awards.

9. That, together with and in addition to the monthly payments of interest or of principal and interest, payable under the terms of the Note secured hereby, Grantor will pay to the Beneficiary, on the first day of each succeeding month after the date hereof until the Note is fully paid, the following sums:

*(a)* An amount sufficient to provide the Beneficiary with funds to pay the next mortgage insurance premium if this instrument and the Note secured hereby are insured, or a monthly service charge, if they are held by the Secretary of Housing and Urban Development, as follows:

(I) If and so long as said Note of even date and this instrument are insured or are reinsured under the provisions of the National Housing Act, an amount sufficient to accumulate in the hands of the Beneficiary one month prior to its due date the annual mortgage insurance premium, in order to provide such Beneficiary with funds to pay such premium to the Secretary of Housing and Urban Development pursuant to the National Housing Act, as amended, and applicable Regulations thereunder, or;

(II) If and so long as said Note of even date and this instrument are held by the Secretary of Housing and Urban Development, a monthly service charge in an amount equal to 1/12 of ½% of the average outstanding principal balance due on the Note computed for each successive year beginning with the first day of the month following the date of this instrument, if the Secretary of Housing and Urban Development is the Beneficiary named herein or the first day of the month following assignment, if the Note and this instrument are assigned to the Secretary of Housing and Urban Development without taking into account delinquencies or prepayment;

*(b)* A sum equal to the ground rents, if any, next due, plus the premiums that will next become due and payable on policies of fire and other property insurance covering the premises covered hereby, plus water rates, taxes and assessments next due on the premises covered hereby (all as estimated by the Beneficiary) less all sums already paid therefor divided by the number of months to elapse before one month prior to the date when such ground rents, premiums, water rates, taxes and assessments will become delinquent, such sums to be held by Beneficiary in trust to pay said ground rents, premiums, water rates, taxes, and special assessments.

*(c)* All payments mentioned in the two preceding subsections of this paragraph and all payments to be made under the Note secured hereby shall be added together and the aggregate amount thereof shall be paid each month in a single payment to be applied by Beneficiary to the following items in the order set forth:

(I) premium charges under the Contract of Insurance with the Secretary of Housing and Urban Development or service charge;
(II) ground rents, taxes, special assessments, water rates, fire and other property insurance premiums;
(III) interest on the Note secured hereby;
(IV) amortization of the principal of said Note:

10. In the event the Grantor fails to pay any sums provided for in this Deed of Trust, the Beneficiary, at its option, may pay the same. Any excess funds accumulated under (b) of the preceding paragraph remaining after payment of the items therein mentioned, shall be credited to subsequent monthly payments of the same nature required thereunder; but if any such item shall exceed the estimate therefor, or if the Grantor shall fail to pay any other governmental or municipal charge, the Grantor shall forthwith make good the deficiency or pay the charge before the same become delinquent or subject to interest or penalties and in default thereof the Beneficiary may pay the same. All sums paid by the Beneficiary and any sums which the Beneficiary may be required to advance to pay mortgage insurance premiums shall be added to the principal of the debt secured hereby and shall bear interest from the date of payment at the rate specified in the Note and shall be due and payable on demand. In case of termination of the Contract of Mortgage Insurance by prepayment of the Deed of Trust in full, or otherwise (except as hereinafter provided), accumulations under (a) of the preceding paragraph hereof not required to meet payments due under the Contract of Mortgage Insurance, shall be credited to the Grantor. If the property is sold under foreclosure or is otherwise acquired by the Beneficiary after default, any remaining balance of the accumulations under (b) of the preceding paragraph shall be credited to the principal of the Deed of Trust as of the date of the commencement of foreclosure proceedings or as of the date the property is otherwise acquired; and accumulations under (a) thereof shall be likewise credited unless required to pay sums due the Secretary of Housing and Urban Development under the Contract of Mortgage Insurance;

11. The Grantor will pay all grounds rents, taxes, assessments, water rates, and other governmental or municipal charges, fines, or impositions, for which provision has not been made by payments as hereinbefore provided, and in default thereof the Beneficiary may pay the same. That in pursuance of the provisions of Nevada Revised Statutes 361.250, the parties hereby agree and stipulate that all taxes levied and assessed under the provisions of said act or any amendment or revision thereof which shall be a lien upon the premises and property herein described shall be paid by the owner of the property and not by the Beneficiary hereunder or any subsequent owner of the debt secured hereby;

12. To keep said land and premises and the improvements now or hereafter erected thereon free from all statutory liens and claims of every kind;

13. To keep all buildings, fences, and other improvements now or hereafter erected on said land and premises in good order and repair and not to do or permit waste;

14. The Grantor will not demolish or remove any building now or hereafter erected on said land and premises, without the written consent of the Trustee;

15. That the Beneficiary under this Deed of Trust, in any action to foreclose, shall be entitled to the appointment of a receiver of the rents and profits of the mortgaged premises as a matter of right and without notice, with power to the Trustee to collect the rents, issues, and profits of said mortgaged premises, due and becoming due during the pendency of such foreclosure suit, such rents and profits being hereby expressly assigned and pledged as additional security for the payment of the indebtedness secured by this Deed of Trust, without regard to the value of the mortgaged premises or the solvency of any person or persons liable for the payment of the mortgage indebtedness. The Grantor for itself and any subsequent owner hereby waives any and all defenses to the application for appointment of a receiver as above, and hereby specifically consents to such appointment without notice, but nothing herein contained is to be construed to deprive the Beneficiary of any other right, remedy, or privilege it may now have under the law to have a receiver appointed. The provision for the appointment of a receiver of the rents and profits, and the assignment of such rents and profits, is made an express condition upon which the loan hereby secured is made. The rights and remedies provided for herein shall be deemed to be cumulative and in addition to, and not in limitation of, those provided by law;

16. The Trustee may act hereunder and may sell and convey said land and premises under the power granted by this instrument, although the Trustee has been, may now be, and may hereafter be, attorney or agent of the Beneficiary in respect to the loan made by the Beneficiary evidenced by the Note or this Deed of Trust, or in respect to any matter or business whatsoever. The Beneficiary may bid and become the purchaser at any sale under this Deed of Trust. It is further agreed that, if said property be advertised for sale as herein provided and not sold, the Trustee shall be entitled to a reasonable commission not exceeding one-half of the commission provided in case of sale, to be computed on the amount of principal then unpaid.

17. That Grantor will not voluntarily create or permit to be created against the property subject to this Deed of Trust any lien or liens superior or inferior to the lien of this Deed of Trust; and further, that it will keep and maintain the same free from the claim of all persons supplying labor or materials which will enter into the construction of any and all buildings now being erected or to be erected on said premises;

18. Any notice, demand, or request required or permitted hereunder to be given to the Grantor shall be sufficiently given if in writing and either *(a)* sent to the owner of the land and premises last appearing on the records of the Beneficiary by registered first-class mail, postage prepaid, at the address last appearing on said records; or *(b)* delivered to or served upon an officer of the owner or at the site of the mortgaged property upon the superintendent or assistant superintendent of the owner, or upon a person performing the functions of superintendent or assistant superintendent;

BOOK 1722 1681226

54

19. The Grantor covenants and agrees that so long as this Deed of Trust and the said Note secured hereby are insured under the provisions of the National Housing Act, it will not execute or file for record any instrument which imposes a restriction upon the sale or occupancy of the mortgaged property on the basis of race, color, or creed;

20. That this Deed of Trust and the Note secured hereby were executed and delivered to secure moneys advanced or to be advanced and to be used in the construction of certain improvements on the lands herein described, in accordance with a Building Loan Agreement between the Grantor and the Beneficiary dated April 1, 1983, which Building Loan Agreement (except such part or parts thereof as may be inconsistent herewith) is incorporated herein by reference to the same extent and effect as if fully set forth and made a part of this Deed of Trust, which said Building Loan Agreement Grantor hereby covenants to perform; and if the construction of the improvements to be made pursuant to said Building Loan Agreement shall not be carried on with reasonable diligence, or shall be discontinued at any time for any reason other than strikes or lock-outs, the Trustee, at the request and on behalf of the Beneficiary after due notice to the Grantor or any subsequent owner, is hereby invested with full and complete authority to enter upon the said premises, employ watchmen to protect such improvements from depredation or injury, and to preserve and protect the personal property therein, and to continue any and all outstanding contracts for the erection and completion of said building or buildings, to make and enter into contracts and obligations wherever necessary, either in its own name or in the name of the Grantor, or other owner, and in the name and for the account of the Beneficiary to pay and discharge all debts, obligations, and liabilities incurred thereby. All such sums so advanced by and for the account of the Beneficiary (exclusive of advances of the principal of the indebtedness secured hereby) shall be added to the principal of the indebtedness secured hereby and shall be secured by this Deed of Trust and shall be due and payable on demand with interest at the rate specified in the Note, per annum, but no such advances shall be insured unless same are specifically approved by the Secretary of Housing and Urban Development, acting by and through the Federal Housing Commissioner prior to the making thereof. The principal sum, with interest and other charges provided for herein shall, at the option of the Beneficiary or holder of this Deed of Trust and the Note secured, hereby, become due and payable on the failure of the Grantor, or owner, to keep and perform any of the covenants, conditions, and agreements of said Building Loan Agreement, anything contained herein to the contrary notwithstanding. This covenant shall be terminated upon the completion of the improvements to the satisfaction of the Beneficiary and the making of the final advances as provided in said Building Loan Agreement;

21. The following covenants, to wit, Nos. 3, 5, 6, 7, 8, and 9 of Section 107.030, Title 9, Chapter 107 of the Nevada Revised Statutes, as amended, are hereby adopted and made a part of this Deed of Trust. Counsel fees under covenant No. 7 shall be one (1) percent of the amount secured but not to exceed Two Thousand Dollars ($2,000.00);

22. The Grantor shall not permit or suffer: *(a)* the use of any of the mortgaged property for any purpose other than that for which the same is now agreed upon to be used; *(b)* any alteration of or addition to the buildings or improvements hereafter constructed in or upon said real property without consent of the Beneficiary.

IN TESTIMONY WHEREOF, the said party hereto of the first part has caused these presents to be executed in its partnership name by LEWIS HILDRETH, A. F. HENRIKSEN, and RAY HENRIKSEN, General Partners said partners being thereunto duly authorized, all as of the day, month, and year first hereinabove written.

LAKE MEAD VILLA APARTMENTS,
a Nevada General Partnership

By [signature]
Lewis Hildreth, General Partner

By [signature]
A. F. Henriksen, General Partner

By [signature]
Ray Henriksen, General Partner

STATE OF NEVADA ) ss:
COUNTY OF CLARK )

On this 15th day of April, A.D. 1983, personally appeared before me, LEWIS HILDRETH, A. F. HENRIKSEN and RAY HENRIKSEN, known to me to be the General Partners of LAKE MEAD VILLA APARTMENTS the partnership that executed the foregoing instrument, and upon oath did depose and say that they are the General Partners of said partnership; that the signatures to said instrument were made by Partners of said partnership as indicated after said signatures; and that the said partnership executed the said instrument freely and voluntarily and for the uses and purposes therein mentioned.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal at my office in the said County of Clark, the day and year in this certificate first above written.

GLORIA J. BARNHART
Notary Public-State of Nevada
CLARK COUNTY
My Appointment Expires Nov. 30, 1985

[signature]

My commission expires

STATE OF NEVADA

Deed Of Trust

LAKE MEAD VILLA APARTMENTS,
a Nevada General Partnership

Return TO:

SEAFIRST MORTGAGE CORPORATION
Fourth and Blanchard Building
Seattle, Washington 98121
Attention: Commercial Loan
Deptment
SMC No. T-600189-5

RIDER "A" TO DEED OF TRUST

LAKE MEAD VILLA APARTMENTS,
a Nevada General Partnership
FHA Project No. 125-35100-PM-L8

Interest at the rate of TWELVE AND SEVEN/EIGHTHS PER CENTUM (12.875%) per annum on the unpaid balance up to and including the cut-off date established or selected for cost certification purposes, and THIRTEEN PER CENTUM (13%) beginning with the date following cost certification cut-off up to and including the date of final endorsement (interim rate) or the scheduled date for commencement of amortization, whichever comes first. Thereafter, interest shall be payable at the rate of ELEVEN PER CENTUM (11%) per annum (permanent loan rate) on the unpaid balance until paid. In the event that the Secretary of Housing and Urban Development becomes the holder of this note before the interest is reduced to the said permanent loan rate, the Secretary shall have the option of reducing the interest rate to a rate no lower than the said permanent loan rate.

LAKE MEAD VILLA APARTMENTS,
a Nevada General Partnership

By ______________________
Lewis Hildreth, General Partner

By ______________________
A. F. Henriksen, General Partner

By ______________________
Ray Henriksen, General Partner

SCHEDULE "A"

Situate in the County of Clark, State of Nevada, described as follows:

That portion of the West Half (1/2) of the Northwest Quarter (NW 1/4) of Section 24, Township 20 South, Range 60 East, M.D.B.&M., described as follows:

Lot One (1) as shown by map thereof on file in file 39 of parcel maps, page 98 recorded March 10, 1983 in Book 1701 of Official Records, Document No. 1660407, Clark County, Nevada records.

82-29649 TSO

CLARK COUNTY NEVADA
JOAN L. SWIFT, RECORDER
RECORDED AT REQUEST OF
LAND TITLE OF NEVADA
APR 21 12 29 PM '83
FEE 900 DEPUTY
OFFICIAL RECORDS
BOOK INSTRUMENT
1722 1681226

Date: 19 August 1995

From: Ed Arakaki, Owner
Lake Mead Villas

To: Robin Rains, Financial Advisor
Hamilton Securities

Subj: Partially Assisted HUD-Held Multifamily Mortgages

Ref: Director, HUD Office of Multifamily Housing Management Ltr Dtd 05 July 1995

1. Referenced letter announced that HUD-held mortgage notes may be sold in a competitive auction or through negotiated transactions.

2. As we have discussed on several occassions, I am extremely interested in negotiating for the mortgage on my property. I believe that negotiations will also work to HUD's advantage as I strongly believe that the amount I will be able to offer in negotiations will be better than the average which can be obtained through an open bid process.

3. It is my understanding that we cannot proceed with negotiations until the Due Diligence studies are completed. As we have not talked in awhile, I am dropping you this line to say that I am still interested in negotiating and am prepared to begin negotiations immediately or sooner. I am available at (808)847-4776. My fax number is (808)843-0548. My mailing address is: P.O. Box 17980, Honolulu, HI 96817.

Sincerely,

Ed Arakaki

Date: 27 September 1995

From: Ed Arakaki, Owner
Lake Mead Villas

To: Albert B. Sullivan, Director, Office of Multifamily Housing Management
U.S. Department of Housing and Urban Development

Subj: Partially Assisted HUD-Held Multifamily Mortgages

Ref: Your Ltr Dtd 05 July 1995

1. I received your letter and would like to take a moment to inform you that I would be very interested in negotiating the purchase of the mortgage note on my property.

2. I believe that I would be able to offer a price much better than would be obtained through a general auction, and the negotiations could be expeditiously handled.

3. I am prepared to begin negotiations immediately or sooner. My telephone number is (808)847-4776, and my fax number is (808)843-0548. My updated mailing address is: P.O. Box 17980, Honolulu, HI 96817.

Sincerely,

Ed Arakaki

U. S. Department of Housing and Urban Development
Washington, D.C. 20410-8000

OFFICE OF THE ASSISTANT SECRETARY FOR
CONGRESSIONAL AND INTERGOVERNMENTAL RELATIONS

MAY 24 1996

Honorable Daniel K. Inouye
United States Senator
Prince Kuhio Federal Building
Room 7325
300 Ala Moana Boulevard
Honolulu, HI 96850-4975

Dear Senator Inouye:

Thank you for your letter of May 1, 1996, on behalf of Ed Arakaki, regarding the impending sale of the HUD-held mortgage on the Lake Mead Villas Apartments that Mr. Arakaki and his mother, Helen Arakaki, own in Las Vegas.

First, you may be interested in knowing that this loan was included in the Department's Structured Finance Sale of Partially Assisted Mortgage Loans on May 23, 1996.

I would like to give you some background on the Department's decision to conduct a structured financing with this loan sale. Mr. Arakaki was initially told by the Nevada State Office that if the mortgage was ever sold, he would be able to bid on it. In fact, all of the multifamily loan sales that HUD has conducted thus far have been "whole loan" sales, in which owners could bid on their loans. However, as the mortgages in the sale have project-based Section 8 subsidy, and this is the first time the market has been exposed to a product such as this, HUD reconsidered its decision to employ a whole loan sale and instead opted for a structured financing, which does not allow for the purchase of individual loans.

In a structured financing, the mortgage loans will be sold to a legal entity constituted as a trust. The cash flows from the mortgages will secure both debt and equity interest issued by the trust purchaser. HUD will receive proceeds from the sale at closing, and potentially as the troubled loans are resolved.

Structured financing will also help ensure that HUD is not penalized by the uncertainty in the market place over Section 8. This uncertainty will cause potential purchasers to discount any bid price for these mortgages. As purchasers work through the portfolio and become familiar with how Section 8 works, however,

they have a good chance of resolving the portfolio for more than their discounted price. HUD's ability to retain a passive equity interest will allow the Department to share in the equity (the upside) and mitigate the financial penalty associated with market discounting.

Most importantly, the loan sale will help ensure that HUD fulfills its obligations to tenants, because HUD's rule for this sale mandates non-discrimination against voucher holders. Additionally, it preserves the Section 8 contract for the remainder of their terms and prohibits buyers from circumventing Section 8 contracts and responsibilities, as well as ensuring tenant protections are enforced.

HUD Headquarters staff reviewed the accounting records and determined that the amount necessary to bring Mr. Arakaki's account current is $713,127.69. The unpaid principal balance is $2,377,153.59. Mr. Arakaki may be reassured in learning that borrowers in default will be able to negotiate a discounted settlement or restructure the non-performing loan into a performing loan. While the threat of foreclosure is always a concern, good faith negotiations can result in a solution that works for all parties. Foreclosure is a last resort, used in a small percentage of cases For instance the Resolution Trust Corporation's (RTC) experience was that foreclosure occurred in only 3 percent of RTC mortgages sold.

I hope this information is helpful to you in your response to Mr. Arakaki. If I can be of further assistance, please do not hesitate to contact me again.

Sincerely,

Hal C. DeCell III

Hal C. DeCell III
Assistant Secretary

U. S. Department of Housing and Urban Development
Washington, D.C. 20410-8000

OFFICE OF THE ASSISTANT SECRETARY FOR
CONGRESSIONAL AND INTERGOVERNMENTAL RELATIONS

SEP 22 1997

Honorable Daniel K. Inouye
United States Senate
Washington, DC 20510-1102

Dear Senator Inouye:

Thank you for your letter of August 13, 1997, on behalf of Ed Arakaki, regarding the mortgage on Lake Mead Villas Apartments (FHA #125-35100) in Las Vegas, Nevada. As you know, HUD included this loan in the June 27, 1996, Partially Assisted Loan Sale.

In my May 24, 1996, letter to you, I stated that "Mr. Arakaki may be reassured in learning that borrowers in default will be able to negotiate a discounted settlement or restructure the non-performing loan into a performing loan." Unfortunately, that statement was not accurate. After the loans were sold, the Department did not retain authority with respect to the loans or underlying projects. However, HUD does remain the Contract Administrator for the units covered by Section 8 project-based assistance in each project. HUD retained all of its authority under the Housing Assistance Payment (HAP) contracts for these assisted units, and the Department can take necessary actions relating to these HAP contracts. Any other actions taken after the sale, including foreclosure, compromise with the borrower, or restructuring the loan, are solely within the discretion of the purchaser of the loans. I apologize to Mr. Arakaki for the confusion.

In an August 30, 1996, letter to William H. Harrison, Director of Subsidized Property Management at Eugene Burger Management Corporation, from Audrey Hinton, Associate Director for Operations in the Office of Multifamily Asset Management and Disposition, Mr. Harrison was advised that the "....methods for liquidating the loans will probably include negotiating discounted pay-offs with borrowers, foreclosing and selling the property, or working out and selling the mortgage loans." Mr. Arakaki received a copy of this letter, and I am enclosing a copy for your information as well. WHUDA General Partners, Inc., the loan purchaser, hired J.E. Roberts and Co., Inc. (now known as Archon Group, L.P.) to service the assets and liquidate the loans. As you know, Archon Group, L.P. has commenced foreclosure on Lake Mead Villas Apartments.

Regarding the Section 8 funds that HUD withheld, some background information may be helpful. As of December 1, 1995, HUD withheld Section 8 project-based assistance funds for the 30 units in the project that are covered by a HAP contract. The Department withheld these funds because Mr. Arakaki had violated several Articles of the project's Regulatory Agreement, and had also violated an article of the Section 8 HAP contract. The most serious violation was that there was no HUD-approved management agent in place at the project. The violations have now been corrected, and I am pleased to tell you that HUD's Nevada State Office is releasing the Section 8 funds to Mr. Arakaki. The project's current HUD-approved management agent is doing a good job, and the project is in good condition.

The $713,127.69 that Mr. Arakaki refers to in his most recent letter to you is the amount that was needed to bring his mortgage loan current as of June 1, 1996. Mr. Arakaki will need to consult with his present lender to determine the amount needed to bring the mortgage loan on Lake Mead Villas Apartments current.

In my May 24, 1996 letter, I explained that Mr. Arakaki was initially told by HUD's Nevada State Office that if the mortgage loan was ever sold he would be able to bid on it. However, as [the] mortgages in the Partially Assisted Loan Sale had Section 8 [pr]oject-based subsidy, HUD opted for a structured financing sale, which does not allow mortgagors to purchase their loans.

Should Mr. Arakaki have any questions regarding the HAP contract administered by HUD, he may contact David F. Ewing, the asset manager for Lake Mead Villas Apartments, in HUD's Nevada State Office. Mr. Ewing may be reached at (702) 388-6500. Otherwise, he should contact Monte Morrow at Archon Group, L.P., at (213) 633-5871, about any other servicing questions regarding his loan.

I hope this information is helpful to you in your response to Mr. Arakaki. If I can be of further assistance to your staff, please have them contact me.

Sincerely,

Hal C. DeCell III

Hal C. DeCell III
Assistant Secretary

Enclosure

***Organization of the Department of Housing and Urban***

---

*Directive Number:* 1100.3

---

1100.3 REV 5

---

CHAPTER 11. ASSISTANT SECRETARY FOR LEGISLATION AND CONGRESSIONAL RELATIONS

11-1. ASSISTANT SECRETARY FOR LEGISLATION AND CONGRESSIONAL RELATIONS. The Assistant Secretary for Legislation and Congressional Relations advises the Secretary with respect to legislation and Congressional relations. The Assistant Secretary is responsible for:

a. Coordinating the activities of program offices in developing the Department's legislative program, in cooperation with the Office of General Counsel which provides final draft legislation, legal advice, and technical guidance.

b. Overseeing the progress of the Department's legislative program in Congress, and coordinating with the General Counsel, the expression of the Department's position on legislative proposals under consideration.

c. Reviewing draft responses prepared by the Office of General Counsel to requests for comment on proposed legislation or executive orders.

d. Coordinating the preparation of Departmental testimony by program offices.

e. Aiding in resolving intra-Departmental policy differences on legislative matters.

f. Aiding in resolving differences between the Department and Office of Management and Budget on legislative matters.

g. Maintaining liaison with Congress and serving as the point of contact for Congressional inquiries, communications and general information relating to the Department's policies and activities.

h. Keeping the Secretary fully informed on all legislative matters affecting the Department.

i. Providing functional supervision to Congressional relations activities in Regional and Field Offices of the Department.

U.S. Department of Housing and Urban Development

HOUSING

65

Special Attention of:
Regional Administrators, Regional Housing Commissioners, Directors of Regional Housing, Managers Category A and B Offices, Directors of Housing Management Divisions, Loan Management Branch Chiefs, Assisted Housing Management Branch Chiefs, Owners/Management Agents and Resident Managers of Projects Covered by this Handbook.

**Transmittal** for Handbook No.: 4350.1 CHG-54

Issued: 8/30/91

1. This Transmits

Chapter 11 to Handbook 4350.1, entitled Workouts for HUD-Held Projects.

2. Explanation of Materials Transmitted:

This Chapter:

A. Revises and combines Housing Notices H 84-34 and H 89-1.

B. Delegates responsibility for approval of Workout Arrangements from Headquarters to the Regional and Field Office levels.

C. Provides guidance to Regional and Field Office staff in:

1. preventing mortgage assignments,
2. reinstating HUD-Held mortgages,
3. determining when and under what circumstances to withhold Section 8 payments, and
4. determining the appropriate HUD authority to approve various actions that affect the status of HUD-Held mortgages.

3. Effective Date: All policies and procedures set forth in this Chapter are effective upon receipt. In cases where there are existing workouts as of the effective date of this Chapter that do not provide for bringing the mortgage current, either through owner contributions or a mortgage modification, HUD field staff should notify an owner at least 60 days prior to the expiration of the existing workout that any new workout entered into must meet the requirements of this Chapter. This means that if a mortgage is not brought current at the end of the existing workout, either through mortgage modification or cash contributions, the mortgagor will be given one more opportunity to bring the mortgage current only as required by this Chapter. **FIELD OFFICES MUST INITIATE FORECLOSURE ON MORTGAGORS WHO HAVE NOT COMPLIED WITH THE TERMS OF THE EXISTING WORKOUT.**

HMHP: Distribution: W-3-1, W-2(H),W-3(A)(H),(OGC)(ZAS),W-4(H),R-1,R-2,R-3-1,R-3-2, R-3, R-3-3,R-6-1,R-6-2,R-7,R-7-1,R-8, Special Distribution to Field Offices and State Agencies

4. <u>Filing Instructions:</u>

<u>Remove:</u>

Handbook 4350.1

Table of Contents
Pages xii(a), dated 1/91
xii(a), dated 5/91,
xiii, dated 3/89, and
xiv, dated 3/89

<u>Insert:</u>

Handbook 4350.1, CHG-54

Table of Contents
Pages xiii, xiv, xv, xvi,
and xvii.

New Chapter 11
pages 11-1 through 11-53,
dated 8/91

Arthur J. Hill
Assistant Secretary for Housing-
Federal Housing Commissioner

Paragraph | Page

SECTION 11. PROCEDURES FOR APPEALING BUDGETED RENT INCREASE ADJUSTMENTS

| | | |
|---|---|---|
| 1. | Levels of Appeal | 43 |
| 2. | Implementation | 43 |
| 3. | Tenant Notification | 43 |
| 4. | Initial Appeal to Field Office | 44 |
| 5. | Final Appeal | 44 |
| 6. | Further Appeal | 44 |

Appendix 1 - 24 CFR Part 245, Subparts D and E
Appendix 2 - Owner's Certification as to Compliance with 24 CFR, Part 245
Appendix 3 - Certification as to Purchasing Practices and Reasonableness of Expenses
Appendix 4(a) - Rent Increase Budget Sheet Instruction
Appendix 4(b) - Sample Owner Explanation of Income and Expenses
Appendix 4(c) - Rent Increase Spread Sheet
Appendix 4(d) - Schedule of Interest Rates
Appendix 4(e) - Budget Worksheet
Appendix 5 - Rent Computation Worksheet
Appendix 6 - Request to Increase Monthly Replacement Reserve Deposits
Appendix 7 - Amendment to Regulatory Agreement for Section 220 and 221(d)(4) Projects (Form 92466)
Appendix 8 - Regulatory Agreement Amendment for Mortgages Limited Distribution Project
Appendix 9 - Addendum to Regulatory Agreement and/or Corporate Charter for 207, 223(f), 608, 213 Rental, 234 Rental, 803, 810, 231(c)4 or Owners of 220 or 221(d)(4) Projects whose Owners Choose the Alternate Method
Appendix 10 - 24 CFR, Part 246 - Local Rent Control
Appendix 11 - Mortgagee Letter 83-24, 89-12
Appendix 12 - Form Letter to be Used Pursuant to Section 4, Paragraph 8(c)(3), Rents Collected in Excess of Basic Rent
Appendix 13 - Rent Schedule - Form 92458

Paragraph | Page

CHAPTER 8. ENFORCEMENT OF MORTGAGOR REQUIREMENTS

CHAPTER 9. ENFORCEMENT OF CIVIL RIGHTS REQUIREMENTS

Section 1. Introduction

1. Chapter Overview 1
2. Covered Programs 1

Section 2. Coordination Between Housing and FHEO

3. Coordination Review Procedures 2

Section 3. Temporary Postponement of a Housing Management Review

4. Temporary Postponement of Review 3

Section 4. Conducting Limited Field Reviews

5. Limited FHEO Review by Housing Management Staff 3
6. Management Review Closeout Involving FHEO Issues 4

Section 5. Housing Management Assistance in Correcting Civil Rights Related Deficiencies

7. Housing Management Assistance 4

Section 6. Sanctions

8. Housing's Program Sanctions 5
9. Sanctions Delegated to the Field 6
10. Sanctions Reserved by Headquarters 7
11. Field Office Reporting 8

Exhibit 1 - Housing's Limited FHEO Review Checklist 9

Paragraph | Page

CHAPTER 10. HUD-HELD SERVICING

CHAPTER 11. WORKOUTS FOR HUD-HELD PROJECTS

Section 1: Introduction

1-1. General 11-1
1-2. Chapter Overview 11-2
1-3. Glossary 11-3

Section 2: Preventing Mortgage Assignments, Procedures Upon Assignment

2-1. Policy 11-6
2-2. Mortgages in the Process of Being Assigned 11-7
2-3. Owner Responsibilities after Assignment 11-7
2-4. Beginning the Foreclosure Process 11-8

Section 3: Reinstating HUD-Held Mortgages

3-1. Introduction 11-8
3-2. Owner Requests for Relief 11-11
3-3. Developing the Workout Arrangement 11-12
A. Analyzing the Project
B. Analysis of Market Conditions
C. Legal Review
D. Determining Project Needs and Abilities
E. Reviewing Available Relief Tools
F. Negotiating a Specific Relief Plan
G. Capital Contributions
H. Escrows for Repairs
3-4. Preparing the Provisional Workout Arrangement 11-18
A. Format
B. Specific Dollar Amount Due
C. MIO Plans
D. Effective Date
E. Provisional Workout Arrangements--Mandatory Terms
F. Provisional Workout Arrangements--Optional Terms
3-5. Executing and Distributing Workout Arrangements 11-26

| Paragraph | Page |
|---|---|
| 3-6. Monitoring Owner Compliance | 11-26 |
| 3-7. Modifications of Notes and Mortgages | 11-27 |
| 3-8. Reinstatement Requirements During Foreclosure Proceedings | 11-28 |
| 3-9. Cash Final Settlements | 11-28 |
| **Section 4. OFFSETTING OF SECTION 8 PAYMENTS** | |
| 4-1. General Information | 11-28 |
| 4-2. Procedures for Offsetting Section 8 Payments | 11-29 |
| **Section 5: Approval and Appeal Process** | |
| 5-1. Regional Office Approval | 11-30 |
| 5-2. Field Office Director of Housing Management | 11-30 |
| **Appendices** | |
| Appendix 1 - Delinquency Alert Letter | 11-32 |
| Appendix 2 - Default Notice Letter | 11-33 |
| Appendix 3a - Letter to Owner at Default Assignment | 11-34 |
| Appendix 3b - Letter to Owner at G-4 Assignment | 11-36 |
| Appendix 4 - Sample Provisional Workout Agreement | 11-37 |
| Appendix 5 - MARS Workout Cover Sheet | 11-40 |
| Appendix 6 - Instructions for Submitting Funds by Wire Transfer | 11-44 |
| Appendix 7 - Call Provision Language | 11-46 |
| Appendix 8 - Optional Workout Terms | 11-47 |
| Appendix 9 - Notification of HUD's Intent to Offset Section 8 Payments | 11-48 |
| Appendix 10 - Memo to RAD Requesting Section 8 Offset | 11-49 |
| Appendix 11 - Information Sheet - Section 202 Reinstatement Section | 11-50 |

Paragraph | Page

## CHAPTER 12. ENERGY CONSERVATION

Section 1. Chapter Overview

1. Introduction 1
2. Purpose 1
3. Chapter Overview 1

Section 2. Energy Conservation Survey

1. Conducting an Energy Conservation Survey 2
2. Energy Conservation Plan 3
3. Computing Results of Energy Conservation Efforts 4
4. Monitoring Requirements 4
5. Tenant Cooperation 5

Section 3. Reserved for Comprehensive Technical Energy Audit

Section 4. Funding Mechanisms Available to Implement Energy Conservation Measures

1. Use of Project Funds 6
2. Alternative Funding Mechanisms 6
3. HUD Approval 8

Section 5. Energy Conservation and Tenant-Paid Utilities

1. Tenant-Paid Utilities in Multifamily Projects 8
2. Conservation Strategy 9
3. HUD Approval 11

Appendix 1 - Energy Conservation Survey
Appendix 2 - Energy Reduction Tips for Project Management
Appendix 3 - Ways the Tenants can Assist in Conserving Energy

## CHAPTER 11. WORKOUTS FOR HUD-HELD PROJECTS

### SECTION 1. INTRODUCTION

#### 1-1. GENERAL

HUD's basic objective for projects with HUD-held mortgages is to develop a workable plan to bring delinquent mortgage notes current within 36 months and maintain their current status over the remaining term of the mortgage.

The specific relief provided must be based on a thorough analysis of the project, considering the tenant mix, availability of funds to address the physical and financial needs of the project, examination of the project's market area, and the possibility of assistance from other government or private agencies, examination of the current and anticipated supply and demand conditions in the housing market area relative to the market demand for the project at the rents needed for financial viability. The Multifamily Housing Assessment Procedures for Problem Projects-A Guidebook and Spreadsheet, by Sextant Consultants, Inc., Portland, Oregon should be utilized by the Loan Specialist while assessing the project's future potential and to determine whether or not a workout is feasible. In some cases it may not be in the tenants' or HUD's best interest to enter into a workout arrangement. Workout arrangements will address all of the following objectives:

A. Curing a project's physical and financial problems to ensure that an acceptable living environment is maintained for the tenants.

B. Obtaining competent, interested owners and managers who demonstrate a willingness to resolve the project's problems, provide an improved living environment for the tenants, and keep the mortgage current.

C. Developing a reinstatement plan that, within 36 months, will protect the long term financial interest of HUD and ensure that the project can continue to be a viable operation.

D. Requiring ownership (when appropriate) to provide additional capital to address project's physical and financial problems and implement the reinstatement plan.

Foreclosure will be initiated when:

A. the mortgage cannot be brought current within 36 months;

B. the owners refuse to cooperate fully in solving the project's problems;

C. ownership with sufficient resources is not available;

D. unauthorized distributions or diverted project funds have not been returned to the project; or,

E. it is otherwise in the best interests of the Department.

1-2. CHAPTER OVERVIEW

This Chapter has five sections. A brief summary of each of these sections follows:

Section 1: Introduction

This section discusses methods for bringing delinquent mortgages current and maintaining current status over the remaining term of the mortgage. Included in this section is a glossary that defines terms used throughout the chapter.

Section 2: Preventing Mortgage Assignments

This section discusses HUD's policies designed to prevent the assignment of mortgages to the Secretary. These policies include beginning foreclosure proceedings immediately upon assignment; raising interest rates; and requiring call provisions to be inserted in mortgages.

Section 3: Reinstating HUD-Held Mortgages

This section discusses various reinstatement opportunities available to mortgagors and the requirements of each workout arrangement. Included in this section are discussions of workouts, mortgage modifications, and the prohibition on cash final settlements of less than the total debt form owners.

Section 4: Approval Authority and Review Process

This section discusses who within the HUD organization has the authority to approve various actions that affect the status of a HUD-held mortgage.

1-3. GLOSSARY

For the purposes of this Chapter, terms are used as follows:

A. HUD-Held Mortgage

HUD-held mortgages are assigned mortgages and purchase money mortgages (PMMs). These do not include direct loans under Section 202 or college housing subsidy grants.

Although authority to execute workout arrangements has not been delegated to Field Offices for Section 202, Housing for the Elderly and Handicapped Direct Loan Program, the Information Sheet - Section 202 Reinstatement (Appendix 11), outlines the information field staff should compile when developing workout proposals. The completed Information Sheet should accompany the Field Office's proposal and recommendation which should be sent to: Director, Assisted Elderly and Handicapped Housing Division, Headquarters.

B. Capital Contributions

These are funds advanced, contributed or loaned to the project by the ownership entity to fund operating deficits that have occurred since the project finally endorsed. In order for the owner to qualify for relief under this Chapter the owner's capital contributions must have the following characteristics; capital contributions cannot create a lien on the project and may only be repaid from surplus cash. Such capital contributions are in addition to those required for initial endorsement (insured advances) or final endorsement (insurance upon completion) such as an Initial Operating Deficit(IOD) Escrow. The contributions must total at least five percent of the original mortgage amount. Generally, funds advanced to

pay construction costs, to fulfill TPA requirements or fund an IOD are not considered to be capital contributions for workout purposes. Ownership must provide evidence in a form acceptable to the field office that the required capital contributions have been or will be made as required by the workout agreement. They must appear on current or future annual audited financial statements (Balance Sheet).

Note: Owner advances to meet short term project obligations are not to be treated as capital contributions for workout purposes, if they will be repaid. Repayment of such advances for non-workout projects is covered in HUD Handbook 4370.2, Chapter 2, Paragraph 8.

C. Reinstatement Plan

A reinstatement plan is any course of action agreed to between HUD as the mortgagee and the mortgagor designed to reinstate (i.e., bring current) the mortgage and to stabilize a project both physically and financially. A reinstatement plan can encompass several steps, including a workout arrangement, a mortgage modification, a physical repair plan, etc.

D. Provisional Workout Arrangement ("Workout")

A provisional workout arrangement is a written agreement between the mortgagor and HUD acknowledging that the mortgagor's loan is in default, that the parties have agreed on steps to be taken to bring the loan current, and that HUD will hold the loan in default and will not begin foreclosure proceedings as long as the owner is complying with the terms agreed to in the workout. Workouts do not change the sequence in which the funds received for a monthly payment are applied. A workout will delineate all steps to be taken by both the owner and HUD to correct any physical and other problems of the project as well as cure the financial default.

E. Modification of Note and Mortgage ("Modification Agreement")

A Modification of Note and Mortgage is a written agreement between HUD and the mortgagor which

permanently modifies the terms of the mortgage and note secured by the property. Depending on local law, modification agreements may be recorded. A Modification Agreement may provide for such actions as: recasting the principal balance of the mortgage note and establishing a new amortization schedule; changing the term of the note and mortgage; increasing the interest rate or in the case of a bond refunding, changing the interest rate on the mortgage note; adding a call provision; adding a late payment fee; or taking any other action that would modify the terms of the mortgage.

F. <u>Capitalizing Delinquent Interest and/or Recasting Unpaid Principal Balance</u>

Capitalizing delinquent interest means adding delinquent mortgage interest to the principal balance of the mortgage and recasting the new principal balance over a set term (the remaining term of the mortgage). This will create a new amortization schedule. The loan will be current at commencement of amortization under the new schedule.

Recasting the delinquent principal balance of a mortgage means amortizing the unpaid principal balance over a set term (usually the remaining term of the mortgage). This creates a new amortization schedule for a mortgage. The loan will be current at commencement of amortization under the new schedule. Capitalization of delinquent interest and the recasting of the unpaid principal balance of the mortgage are subject to the following limitations:

(1) the amount of delinquent interest and delinquent principal <u>together</u> cannot exceed ten percent of the original mortgage amount; and,

(2) the loan must be amortized over the remaining term of the mortgage;

(3) the remaining term of the mortgage must be at least fifteen years; and,

(4) there must be sufficient net operating income (NOI) to support the increased debt service at commencement of amortization under the new schedule.

G. <u>Call Provision</u>

A call provision is a term included in the Mortgage/Deed of Trust and Mortgage Note/Deed of Trust Note that gives the holder of the mortgage and note the option to declare the entire indebtedness due and payable on or after a certain future date or upon a set of circumstances or events.

H. <u>Through Interest</u>

This term means that the loan is to be brought current through interest. That is, all delinquencies in interest on advances, advances, service charge (if applicable), taxes, hazard insurance premiums (if applicable), and mortgage interest must be current.

I. <u>Through Principal</u>

Through Principal means that delinquent principal must be brought current, in addition to the delinquencies through interest.

## SECTION 2: PREVENTING MORTGAGE ASSIGNMENTS; PROCEDURES UPON ASSIGNMENT

### 2-1. POLICY

One of the Department's primary goals is to minimize mortgage assignments due to monetary and covenant defaults thereby protecting the insurance fund. HUD encourages cooperation among mortgagors and mortgagees to do what is necessary to avoid assignments. HUD however, will use administrative sanctions (limited denial of participation, suspension and/or debarment, civil money penalties,) or initiate affirmative litigation against mortgagors and management agents where there is evidence that they contributed to or caused the assignment. Action required of the Field Office staff to detect and avert potential defaults and assignment is discussed in Section 1., Prevention of Defaults, Chapter 5 of this Handbook. Enforcement of mortgagor requirements is outlined in Chapter 8 of this Handbook.

2-2. MORTGAGES IN THE PROCESS OF BEING ASSIGNED

Upon receipt of a mortgagee's election to assign an insured mortgage, the loan specialist shall use all insured mortgage servicing procedures in an effort to obtain loan reinstatement and the mortgagee's withdrawal of the election. If reinstatement does not result and the loan is assigned, the loan specialist must contact the owner, outline HUD requirements as mortgagee, and request the owner's plan for mortgage reinstatement. If the Field Office determines that an owner intentionally defaulted and precipitated assignment, the Director, Housing Management Division, must immediately forward a foreclosure recommendation to the appropriate official and must also initiate administrative sanctions, civil money penalties, or affirmative litigation as appropriate.

2-3. OWNER RESPONSIBILITIES AFTER ASSIGNMENT

The owner of a project with a newly assigned mortgage shall be notified in writing by certified mail of HUD requirements as mortgagee. The Director of Housing Management shall ensure that such notifications are sent timely. A record of the receipt of these letters must be kept by the Field Office. The letter must state that HUD expects to have a written reinstatement plan in effect within 90 days following mortgage assignment if the loan is in default. The letter must be sent to the owner within 10 working days from the date the Field Office receives notice that the assignment of the mortgage has been accepted. (See Appendix 3a or 3b, as appropriate, for a sample letter). The following are HUD's requirements:

A. Owner must pay all costs for reasonable and necessary improvements to restore and upgrade the project.

B. Each month, all remaining funds or net cash must be remitted to the lock box contracted for by the Multifamily Notes Servicing Branch of the Office of Mortgage Insurance Accounting and Servicing (MIAS) until a written reinstatement plan is executed. An owner is required to remit net cash by both the mortgage or deed of trust and the regulatory agreement. Neither Regional Offices nor Field Offices may exempt owners from this requirement. The project name and number should be clearly stated and the check should be sent to the lock box contracted for by the Multifamily Notes Servicing Branch of MIAS.

C. Owner will submit Monthly Reports for Establishing Net Income, Forms HUD-93479, HUD-93480, and HUD-93481. Copies of these forms should be enclosed with the letter the Field Office sends to the owner.

D. Owner will submit to the Field Office within 30 days from the date of the Field Office letter, a preliminary plan for mortgage reinstatement and property improvement or arrange a meeting with field office personnel to discuss reinstating the mortgage. If the owner does not submit a plan or request a meeting within 30 days of HUD's letter, the Field Office must initiate foreclosure. If the owner has a meeting with field staff to discuss reinstatement criteria, the reinstatement plan must be submitted 30 days from the date of the meeting.

## 2-4. BEGINNING THE FORECLOSURE PROCESS

The owner should be notified of HUD's foreclosure policy when HUD receives:

- a delinquency alert,
- a default notice, or,
- a notice of an election to assign a mortgage.

Therefore, upon receipt of one of these notices, HUD field staff must notify the owner as noted below in writing of the possibility of foreclosure.

- Appendix 1 - Use when HUD receives a delinquency alert.
- Appendix 2 - Use when HUD receives a default notice.
- Appendix 3a or 3b - Use when HUD receives an election to assign the mortgage.

HUD field staff should begin to work with an owner on a reinstatement plan, if feasible, immediately upon receipt of a default notice and/or an election to assign a mortgage in an attempt to prevent a full assignment of the mortgage.

# SECTION 3: REINSTATING HUD-HELD MORTGAGES

## 3-1. INTRODUCTION

Before HUD will accept a reinstatement plan, the mortgagor will have to demonstrate to HUD that the plan is in the best interests of the tenants, the project, and the Department. For a plan to be in the best interests of the Department, it must provide for all of the following:

- competent ownership and management to resolve project problems;
- resolution of the physical and financial problems of the project;
- correction of all regulatory agreement violations; and,
- reinstatement of the mortgage to current status.

HUD will evaluate each HUD-held mortgage to determine whether reinstatement is feasible and appropriate. HUD will not consider reinstating a loan or withdrawing it from foreclosure when HUD concludes that the mortgagor deliberately caused or contributed to the assignment. If the Department decides to reinstate the loan in lieu of immediate foreclosure, there are two ways the reinstatement can be effected:

A. <u>Workout Arrangement</u>

This is a formal written agreement between the project owner and HUD under which HUD agrees to hold the loan in default, provided the owner submits to HUD specified payments each month. A Workout Arrangement (or a series of Workouts calling for increasingly larger monthly payments) is designed to reinstate the loan. Workout durations vary, depending on the circumstances, but must be limited to three years or less. While the Field Office has the authority to provide mortgage relief for 36 months, the workout arrangement should be executed in 12 month increments. At the end of each 12-month term, the Field Office should reevaluate the condition of the project. At the end of the workout, the mortgage shall be current and all other terms met or foreclosure will take place. Because a Workout Arrangement does not change the loan documents, it is not recorded. The minimum monthly payments must be stated in a specific dollar amount and be based on the greater of:

(1) the amount of the net operating income (NOI); or

(2) service charge (if applicable), taxes, and at least 70 percent of monthly accruing interest. Workout arrangements calling for interest payments of less than 70 percent of monthly accruing interest must be approved by the Regional Director, Office of Housing. See 3-4.E.(16) for circumstances under which minimum payments may be less than 70 percent of monthly accruing interest.

B. <u>Modification Agreements</u>

Modification Agreements recast delinquent interest and principal if the remaining term of the mortgage is at least fifteen years. They are legal instruments which permanently change the terms of the mortgage and mortgage note. A workout arrangement should always precede a modification agreement in order that the mortgage delinquencies can be reduced to the lowest amount possible. The project's rent structure must also be analyzed to assure that the rents required to support the mortgage modification maintain the marketability of the project and that there is sufficient project income to pay the increased debt service. The Field Offices have authority to approve Modification Agreements which recast unpaid principal and delinquent interest subject to the following conditions:

(1) the amount of delinquent interest and principal <u>together</u> cannot exceed ten percent of the original mortgage amount;

(2) the loan must be amortized over the remaining term of the mortgage;

(3) the remaining term of the mortgage must be at least fifteen years; and

(4) there must be sufficient net operating income (NOI) to support the increased debt service at the end of the workout period. (See Section 1-2.F.)