3-2. OWNER REQUESTS FOR RELIEF

An owner must make a written request for financial relief and state the basis for the relief sought. The Director, Housing Management Division, is responsible for determining the cause of default and that reinstatement can be achieved within a period not exceeding 36 months.

Owners who are under any administrative sanction, including a Limited Denial of Participation, Suspension or Debarment are ineligible for reinstatement consideration.

The owner must:

A. Demonstrate that operating deficits have been funded in cash "Capital Contributions." An owner requesting financial relief must have advanced, loaned or contributed funds that have not created a lien on the project and are repayable only from surplus cash in an amount not less than five percent of the original mortgage amount. Only funds to pay reasonable and necessary operating expenses from the time of final endorsement or capital improvements previously approved by HUD that have enhanced the marketability of the project should be given credit. See 1-2.B.

B. Remit all net cash to HUD as noted in paragraph 2-3.B. Field Offices may not negotiate with owners who are holding net cash. Owners must be informed that their failure to remit net cash is cause for HUD to proceed with foreclosure.

C. Demonstrate that default is not a result of any deliberate or voluntary action. Completion of the Failing Project Checklist (HUD 5815) will assist the loan specialist in making this determination.

D. Restore to the project any funds or assets improperly withdrawn or distributed.

E. Correct any violations of the Regulatory Agreement to HUD's satisfaction.

F. Resolve any open audit findings.

G. Provide management acceptable to HUD.

H. Correct any physical deficiencies to HUD's satisfaction.

I. Prepare a Management Improvement and Operating (MIO) Plan if extensive repair work is needed or changes in management procedures are required. A copy of the MIO Plan must be attached to the Workout Arrangement and made a part of it by incorporation.

J. Prepare an Operating Budget using the standard HUD chart of accounts.

## 3-3. DEVELOPING THE WORKOUT ARRANGEMENT

The Field Office develops a Workout Arrangement from a detailed analysis of the project's problems as well as intensive discussions and negotiations with the project owner and management agent. The Workout is approved only when the owner is responsible and cooperative and provides satisfactory project management. In developing a Workout, the following analysis should be prepared:

A. Analyzing the Project

Diagnose and document the project's physical, financial, and management problems and their causes. An on-site review of project management and physical condition must be made and recorded on the Management Review Report, Form HUD-9834, and the Report of Physical Condition and Estimate of Repair Costs, Form HUD-9822. The Project Analysis Work Sheet, Form HUD-9815, parts A through G should be used to record the information gathered in this step.

B. Analysis of Market Conditions

Housing Management should request an analysis of the market conditions in the housing market area from the Field Office Economic and Market Analysis Staff (EMAS). EMAS should conduct an analysis of the current and anticipated supply and demand conditions in the market for that type of housing, i.e., elderly, congregate, general occupancy, at the rent levels necessary for financial feasibility; taking into consideration the impact of these conditions on the project's present and future occupancy and the potential for the project's to achieve the financial viability within the required time limit.

As appropriate, the EMAS review may also include an advisory opinion on aspects of the project that relate to its financial feasibility and marketability prospects such as: the project's potential annual net absorption and an estimate of the time necessary to achieve a sustained occupancy taking into account industry standards and local trends in similar projects; changes to marketing, management, operations (or support services in the case of congregate housing or residential care facilities); and the project's competitive position in the market given its location and characteristics.

The specific content of the EMAS review will vary depending on the relevant circumstances of the project and the existence of recent prior EMAS market analyses and reviews in the same market area. As circumstances warrant, EMAS has the discretion to limit its analysis to a period of less than the required 36 months.

C. Legal Review

Workout agreements are significant legal documents setting forth the contractual obligations of both HUD and the project owner under the workout. Prior to execution, the Field Office Counsel must review all Workout Agreements. All the recorded legal documents secured by the project should also be reviewed at this time to assure that the Secretary's first lien status is protected, complete, valid and enforceable so that, in case there is a default under the workout agreement, foreclosure can be instituted quickly and effectively.

D. Determining Project Needs and Abilities

Based on the information collected in step A. above, identify the project's needs and the project's ability to increase operating income. Develop a plan which reflects the long-term program for reinstating the mortgage. Review the following in order to develop an estimate of the time required to stabilize project operations:

(1) Estimate maximum permissible rentals which can be anticipated each year based on past project operations, market conditions, projected future

market changes, etc. This information may be available from Economic Market Analysis Section (EMAS), Valuation, or local industry sources.

(2) Using a certified rent roll of the project, estimate and deduct an economic vacancy rate from gross rentals. An economic vacancy reflects the project's gross potential rent by allowing for rent concessions or other items that reduce the project's income. Make judgments regarding the time required to overcome vacancies caused by marketing problems, uninhabitable units, general market conditions, concessions, etc.

(3) Estimate and deduct operating expenses. Judgment must be used with regard to increases in expenses caused by inflation, rehabilitation, increased project services, staff changes, etc. Consider decreases in operating expenses which may be the result of capital improvements or improved operations.

(4) Deduct owner escrow account payments for real estate taxes, insurance, mortgage insurance premium (MIP) or service charge and reserve for replacement.

(5) Determine cash flow available for debt service on existing mortgage.

(6) Determine amount of mortgage payment the current cash flow can support.

(7) During the on-site review, consider the location and neighborhood to determine the project's competitive position and potential for turnaround.

The results of this analysis are to be recorded in Section H of Form HUD-9815.

E. <u>Reviewing Available Relief Tools</u>

The type of mortgage relief selected must be based on a thorough analysis of the project. This analysis must consider:

- the availability of funds to address the physical and financial needs of the project at the least possible cost to HUD;

- an examination of the various factors within the project's market area which may be influencing its potential; and,

- the various types of assistance that may be available from state and local government agencies.

The loan specialist must determine the tools needed to solve, within 36 months, the project's problems and to pay the mortgage in full by its original maturity date. If additional subsidies are contemplated, the Field Office must assure that the owner certifies whether the project will participate in the Low Income Housing Tax Credit (LIHTC) program. HUD Headquarters must review all cases where the current owner or prospective owner plans to utilize LIHTC. The reinstatement plan and the budget will give estimates of the funds required to make the project viable. HUD's funds and contributions will be at HUD's option, and based on HUD review and approval. Sources available to fund cash requirements are:

(1) <u>Owner contributions</u> include owner advances, loans and capital contributions. See 1-2.B. above.

(2) <u>HUD contributions</u> include Flexible Subsidy funds, LMSA, approved Section 8 rent increases, and debt service relief.

(3) <u>Other sources may include</u> Community Development Block Grant funds, syndication proceeds including those from low income housing tax credits (LIHTC), state assistance programs, new owners, and supplemental loans including 241(a) and operating loss loans. One or more of these tools may be needed in conjunction with the owner contributions and debt service relief provided by the Workout Arrangement.

F. <u>Negotiating A Specific Relief Plan</u>

(1) <u>A Workout cannot be implemented</u> without the consent of both the owner and HUD. Both parties must agree on the amount of delinquency to be cured, the changes needed in management

procedures, the repairs needed, and a time frame for accomplishing the proposed results.

(2) Use of Income for Repairs or Delinquencies

No hard and fast rules exist regarding how much project income should be made available for repairs. The loan specialist must put the repair work cost in context with the overall reinstatement and give consideration to various possibilities. For example:

(a) Where substantial portions of net income would be necessary for repairs, the delinquency might increase to such an amount that loan reinstatement would be nearly impossible. In this case, substantial owner contributions would be required.

(b) Because an owner can obtain greater tax benefits for funds advanced for repairs than for payment of either current or accrued principal delinquencies, allocation of owner contributions might be structured to provide owner tax benefits, which should lead to increased owner's contributions.

G. Capital Contributions

(1) Capital Contributions. An owner is expected to have made cash contributions to fund operating deficits. These capital infusions may be in the form of advances, loans or contributions that have not created a lien on the project and are repayable only from surplus cash. They must total at least five percent of the original mortgage amount. Only funds to pay reasonable and necessary operating expenses or HUD approved capital improvements should be given credit. See 1-2.B. above.

(2) Additional contributions should be required of limited dividend and profit-motivated owners when the loan specialist determines that:

(a) Additional funds will be needed to make the project viable within a reasonable period of time.

(b) There are delinquencies in service charge, taxes, and late charges and project funds are not available to cure these delinquencies during the first month of the Workout.

(c) The loan cannot be brought current within 36 months.

(3) The tax consequences of foreclosure can affect the amount an owner will be willing to contribute. The loan specialist should recognize that the owner's potential loss resulting from foreclosure normally has a direct bearing on the amount of additional owner contributions. The income tax consequence of foreclosure may frequently motivate an owner to make substantial additional contributions.

(4) When there have been unauthorized distributions or repayments of advances when the project is in default, the owner must return the monies to the project before any relief is granted. These funds must be applied directly to the delinquency or used to pay for authorized repairs. Deliberate diversions will be referred to Office of Inspector General (OIG) for investigation. The return of diverted funds is not to be considered a capital contribution.

H. Escrows for Repairs

The loan specialist should require the owner to deposit the repair funds in the Reserve for Replacement Escrow or establish a special repair escrow account with an appropriate local escrow agent. The escrow agreement must provide that HUD approval is received before any funds in escrow are disbursed. The escrow must be funded by cash or a letter of credit, approved by HUD, in an amount sufficient to pay for the repairs estimated by HUD. All funds remaining in the repair escrow after repairs are completed must be transferred to the Reserve for Replacement account. If a local escrow agent is used, the escrow agreement should be reviewed by the loan specialist in consultation with Field Office Counsel for compliance with the following procedures:

(1) The owner must notify the Field Office when work has been completed and a Field Office representative must inspect the work.

(2) If an inspection reveals that the work has not been satisfactorily completed, the loan specialist will so notify the owner.

(3) For that portion of the work that has been completed satisfactorily, the loan specialist will notify the escrow agent holding the repair funds and request a release from the escrow in the following manner:

(a) If payment is to be made to the owner and/or the contractor, the Field Office should designate the payee and the payee's mailing addresses.

(b) If funds are to be applied to the mortgage, the Field Office should authorize in writing a transfer of the amount from the escrow account. The owner may adjust the following month's mortgage payment accordingly. An escrow for repairs must be accompanied by a HUD approved MIO plan or an approved schedule of repairs.

3-4. PREPARING THE PROVISIONAL WORKOUT ARRANGEMENT

The Provisional Workout Arrangement is a document requiring the agreement of parties with diverse interests. It must protect HUD's interests as mortgagee by not exposing the Department to excessive loss through unjustified leniency, yet it also must respond to both the needs of the tenants and the owner's situation. The arrangement formalizes what HUD and the owner agreed to during the negotiation process. It also serves as the focus for administrative and monitoring procedures. The Arrangement is not effective until signed both by the owner and the authorized HUD representative. The authorized HUD representative at the Field Office level shall be the Director, Housing Management Division.

A. Format

The Workout Arrangement format appears as Appendix 4. Appendix 8 also includes suggested language for

additional paragraphs which may be needed and Appendix 7 contains language for Call Provisions.

B. **Specific Dollar Amount Due**

Workout Arrangements must state a specific dollar amount to be remitted each month. For example, Arrangements calling for "net cash" or "payment to service charge, taxes, and interest" are not acceptable because they do not state a dollar amount. A typical workout will state the specific amount the owner must pay, plus any net cash.

C. **MIO Plans**

As previously noted, if a MIO Plan is used, it must be attached to the Workout Arrangement and made a part of the Arrangement by incorporation. Where no MIO Plan is required, but a repair program is part of the Workout terms, a schedule of the required repairs with costs and amounts to be spent for repairs must be appended to the Agreement.

D. **Effective Date**

When determining the effective date of the Workout Arrangement, consider the amount of time it will take for:

- preparing the Arrangement,
- mailing to the owner for signature,
- signing by the owners,
- returning to the Field Office,
- signing by the Director, Housing Management Division.
- mailing to the Multifamily Notes Servicing Branch of MIAS so it arrives no later than the 10th of the month (for posting before the 20th of the month.)

The effective date of the Arrangement should be the first day of the following month. A Workout which reaches MIAS later than the 10th of the month will not be reflected on the next month's statement. For internal HUD reporting, an executed Workout will not be counted until MIAS enters the Workout terms into its Multifamily Accounting Reporting and Servicing (MARS) System.

E. Provisional Workout Arrangements--Mandatory Terms

A workout arrangement is a plan designed to bring a mortgage current and resolve a project's physical and other problems within a 36 month period.

The basic minimum terms under which all workouts will be negotiated and written are listed below:

(1) Field Offices have the authority to provide mortgage relief for 36 months, the workout arrangement should be executed in 12 month increments. Prior to approving any second or third 12-month increment the Field Office should reevaluate the project conditions based upon a review of annual certified financial statement and a current physical inspection.

(2) All workouts must include a provision to bring the mortgage current at the end of 36 months.

(3) Workout agreements must contain an equity kicker for the Department that will be realized upon sale, conversion or refinancing of the mortgage. The equity kicker consists of: five percent of the gross sales price for a sale or conversion; or five percent of the gross proceeds from the refinancing.

(4) All workout arrangements must describe both the specific dollar amount to be paid monthly, and how the balance of any delinquencies will be addressed. These payments must be remitted to HUD by the first of each month in accordance with the note and mortgage.

(5) All workouts must provide for making all necessary repairs to the project. When repairs are required, a repair escrow must be established as outlined in paragraph 3-3.F. The provision for a repair escrow should be included in the workout. Any MIO plan developed to schedule the repairs should be attached to and made a part of the workout arrangement by incorporation.

(a) Where the owner agrees to make all necessary repairs, the Field Office may consider waiving the <u>delinquency</u> in the Reserve for Replacement account.

(b) In addition, when the owner agrees to make all necessary repairs, the Field Office may consider waiving <u>deposits</u> to the Reserve for Replacement account during the term of the workout. A provision requiring the owner to resume or increase deposits to the Reserve for Replacement account in the future should be included in the workout.

(6) Owner contributions (see paragraphs 1-2.B. and 3-3.C.(1)) during the term of the workout shall be scheduled as follows:

(a) All delinquencies through tax escrows or hazard insurance premium escrows (if applicable) must be paid at workout approval.

(b) The balance of the delinquencies may be paid in equal monthly installments during the workout or may be paid in periodic lump sum payments over the term of the workout.

(c) All owner contributions that are made as lump sum payments should be sent to the lock box and a copy of the check should be sent to the Field Office.

(7) Workouts on the following projects must provide for a mortgage modification to include a call provision. Call provision language is shown in Appendix 7.

(a) All workouts on market rate projects where the project does not receive project based Section 8 assistance shall provide for a mortgage and note modification to include a ten-year call provision.

(b) All workouts on market rate projects not subject to Title II of the Housing and Community Development Act of 1987 (Title II) or Title VI of the Cranston-Gonzalez National

Affordable Housing Act (Title VI) where the project receives project based Section 8 assistance shall provide for a mortgage and note modification to include a call provision which may be exercised at the option of the holder at any time on or after the longer of ten years, or the remaining term of the Section 8 contract (if not renewed on expiration).

(c) HUD will not require call provisions on the mortgages for the following types of projects--Section 236, Section 221(d)(3) market rate projects that are or potentially will constitute "eligible low-income housing" projects under Title II or Title VI, Section 221(d)(3) BMIR, projects that receive Rent Supplement payments, projects that receive Rental Assistance Payments (RAP), projects that have received Flexible Subsidy assistance, or projects with Use Agreements. HUD does not require call provisions on these mortgages in order that the low or moderate-income character of these projects may be maintained for at least the original term of the mortgage.

(8) If any terms of the note and mortgage will be modified at the end of the workout period (i.e., recasting the principal balance), these terms must be delineated in the workout arrangement.

(9) All workouts will provide that any net cash remaining, over a specified amount at the end of the month, after payment of all operating expenses, will be remitted to HUD in addition to the minimum monthly payment. If it is preferable to use net cash for project expenses (i.e., repairs), the workout may so provide for a specific period of time instead of requiring remittance to HUD.

(10) All workouts will provide that if the monthly payment is received after the fifteenth of the month, HUD will charge the late fee specified in the mortgage or deed of trust. If a provision for

collecting a late fee is not included in the mortgage or deed of trust, such a provision must be included as part of the mortgage modification.

(11) All workouts will require the owner to submit monthly accounting reports to HUD for each month of the workout term.

(12) All workouts will contain both an effective and expiration date. There will be no open ended workouts.

(13) All workouts will contain language informing the mortgagor that <u>HUD is holding the mortgage in default</u> and is allowing the owner an opportunity to cure the default through this reinstatement plan, and that if the owner does not perform the obligations agreed to in the workout, HUD will immediately terminate the workout and begin foreclosure proceedings.

(14) All workouts will contain a provision stating that failure of the owner to comply with the terms of the workout is basis for HUD to take administrative sanctions against the owner including, but not limited to, limited denial of participation, suspension and/or debarment from participation in HUD programs, and civil or criminal penalties as provided in the Housing and Community Development Act of 1987.

(15) All workouts will contain language stating that distributions are prohibited on mortgages or projects under workout or in default.

(16) <u>Minimum Monthly Payments</u>

(a) Field Offices may approve workout arrangements with monthly payments based on the greater of: (1) the amount of the net operating income (NOI), or; (2) service charge (if applicable), taxes, and at least 70 percent of monthly accruing interest. Workout arrangements calling for interest payments of less than 70 percent of monthly accruing interest must be approved by the Regional Director, Office of Housing. Such

workouts must be based on unusual circumstances, e.g., if the owner has contributed more than five percent of the original mortgage amount, the project has experienced temporary marketing problems, etc. No provisional workout arrangement may call for a minimum payment of less than service charge (if applicable), taxes, and a minimum of 50 percent of the monthly interest payment.

(b) Field Offices must review owners' projections of income and expenses in order to determine the maximum monthly payment which may be expected. The amount of net operating income (NOI) must be analyzed. If possible, the monthly payment must include additional payments with the objective of retiring the delinquency as soon as possible. For Section 236 projects, payments are based on the owner's share of the interest.

(c) Proposed workouts for projects with vacancies due to poor physical condition must also include rehabilitation plans and provisions for an escrow that is sufficient to pay for the estimated cost of the repairs, discussed in paragraph 3-3.F.

F. Provisional Workout Arrangements--Optional Terms

In addition to the mandatory provisions discussed above, HUD staff may want to include other provisions in workout arrangements depending upon the particular circumstances of each project and each mortgagor. Some of these optional provisions may apply only to very unusual cases, while others may be more generally applicable. The list that follows is not designed to be all-inclusive. HUD field staff may have cases where it would be appropriate to include provisions other than these in workout arrangements. Sample language which may be included in workout arrangements is shown in Appendix 8. This sample language may be revised to reflect the circumstances for the individual project for which the workout is being written.

(1) HUD may want to require an owner to post an unconditional, irrevocable letter of credit or another similar security instrument to secure lump sum payments under the workout. This may be particularly appropriate in those cases where a mortgagor had committed to providing large lump sum payments toward delinquencies during the workout. With a letter of credit, if the owner does not make the required payments at the specified time, HUD may draw on the letter of credit for the payments. If the owner makes the appropriate payments, the letter of credit may be reduced accordingly. All letters of credit should be reviewed by Field Office Counsel.

(2) HUD may, in rare cases, subject to state law requirements, want to require that an owner escrow a deed to the property with an outside agent so that if the owner defaults under the workout, HUD can, at its option, record the deed without having to go through foreclosure. It may be appropriate for HUD to require a deed placed in escrow in a situation such as a workout combined with a condominium or cooperative conversion. Deeds placed in escrow are subject to liens and judgment must be exercised before recording them. It may not be expedient for HUD to have the deed placed in escrow if the conversion plan fails. Before requiring the deed to be placed in escrow, HUD must have the mortgagor present evidence of clear title to HUD. HUD Field Office Counsel must check with an appropriate title company to ensure that a deed placed in escrow can be recorded and complies with appropriate state law. Further, Field Office Counsel must opine that if the Department accepts a deed in escrow that it will not limit HUD's future ability to take title.

(3) HUD should consider raising the interest rate on a mortgage in return for forbearance on the Department's part. Before raising the interest rate, HUD staff must make sure that project income can support the increased debt service that will result from a higher interest rate. Any change in the interest rate will require a modification of the note and mortgage. An example of where HUD may decide to raise the interest rate is on an

unsubsidized mortgage that carries a very low interest rate and the project can support the increased debt service. Raising the interest rate increases the value of the mortgage to HUD.

3-5. EXECUTING AND DISTRIBUTING WORKOUT ARRANGEMENTS

A. Field Office staff should prepare an original and at least five copies of each Workout Arrangement.

B. The original and five copies of the Arrangement should be forwarded to the owner for signature. The owner shall be instructed to return the signed original and all five signed copies to the Field Office within 15 days.

C. HUD signs the Workout Arrangement.

D. The fully executed original Arrangement and the MARS Input Data Sheet shall be sent to the Office of Mortgage Insurance Accounting and Servicing, Attention: Multifamily Notes Servicing Branch. The MARS Workout Cover Sheet Instructions and Input Data Sheet are in Appendix 5 of this Chapter. They must be received in the Multifamily Notes Servicing Branch by the 10th of the month prior to the effective date.

E. The five copies shall be distributed as follows:

- the project owner.
- the Regional Counsel, or Field Counsel, as appropriate,
- the Field Office project file,
- the Regional Director, Office of Housing,
- the Operations Division, Office of Multifamily Housing Management, Headquarters.

3-6. MONITORING OWNER COMPLIANCE

The loan specialist has full responsibility for monitoring an owner's performance under the Workout Arrangement. Monitoring activities include:

A. Detailed and timely review of monthly accounting reports to ensure that project funds are being properly disbursed and that net income, if any, above the stipulated minimum mortgage payment is being remitted.

Procedures for reviewing monthly accounting reports are set forth in Reviewing Annual and Monthly Financial Reports, HUD Handbook 4370.1.

B. Periodic on-site inspections, when repairs are required, to assure that the required work is being made and is in a manner acceptable to HUD.

C. Forwarding a written plan of action or foreclosure recommendation to the Regional Director, Office of Housing when there is a default under a workout. A default has occurred when the mortgagor has failed to make the minimum monthly payment required by the terms of the workout for two consecutive months. The Branch Chief must make this submission within ten working days from the second month's default.

D. All projects under workout arrangement are considered to be Troubled Projects and must have an annual physical inspection and management review.

## 3-7. MODIFICATIONS OF NOTES AND MORTGAGES

A Modification Agreement is a permanent change in the terms of the mortgage and note. The mortgage and note may be modified to recast the principal balance and/or capitalize delinquent interest (see Section 1-2.F.), change the interest rate, or insert a call provision. Because a Modification Agreement changes the terms of the mortgage and note, it should be recorded in accordance with State and local law. Modifications are only permitted if fifteen years of amortization remain on the note.

A. The mortgagor must demonstrate that project income can support the increased debt service on the modified mortgage or must agree to underwrite any operating deficit.

B. A Modification Agreement may be utilized in conjunction with a workout arrangement, as the final step in a plan to reinstate the mortgage provided that the conditions of Section 3-1.B. are satisfied.

C. When mortgages are modified they must be modified to include a call provision and a late charge, if appropriate. See 3-4.E.(10).

3-8. REINSTATEMENT REQUIREMENTS DURING FORECLOSURE PROCEEDINGS

Once a mortgage has been referred to OGC and a Foreclosure Commissioner appointed, the mortgagor must make a lump sum payment sufficient to bring the loan current through principal before the Department will consider withdrawing the foreclosure action. Instructions for submitting payoffs and payments of foreclosure sales proceeds are in Appendix 6.

3-9. CASH FINAL SETTLEMENTS

HUD will not accept any offer from a mortgagor that contemplates a mortgagor paying off a mortgage loan for less than the total indebtedness secured by the mortgage except in conjunction with a publicly advertised HUD project mortgage auction. If the mortgagor wants to pay off a delinquent mortgage for less than the debt, the only procedure for this is for the mortgagor to bring the loan current and bid on it in a scheduled HUD mortgage auction. Of course, HUD reserves the right to accept or reject any bid in a mortgage auction. Also, no prepayments may be accepted if they are otherwise prohibited by contract, regulation or law. Instructions for submitting payoffs and payments of foreclosure sale proceeds are in Appendix 6.

## SECTION 4: OFFSETTING OF SECTION 8 PAYMENTS

4-1. GENERAL INFORMATION

The policies and procedures stated in this section apply only to HUD-administered Section 8 contracts. The welfare of the tenants necessitates forethought before Section 8 payments are offset. Often offsetting Section 8 payments does not have the desired effect. Section 8 payments should only be offset for the amount of the monthly workout or mortgage payment and then, only if all other necessary project expenses are being paid. If it is necessary to abate Section 8 payments for some other reason (e.g. because of Section 8 contract violations, such as units not meeting the appropriate repair standard) the procedures in the Section 8 Contract Administrator's Handbook should be followed.

4-2. PROCEDURES FOR OFFSETTING SECTION 8 PAYMENTS

A. Both the Section 8 HAP Contract and Regulatory Agreement permit the exercise of remedies, including the offsetting of Section 8 payments. Prior to offsetting any Section 8 payments, Field Office Counsel must perform a legal review to assure that the applicable contract provisions have been complied with. Before HUD can begin to offset the Section 8 payments, HUD must notify the mortgagor of HUD's intent to offset the payment, reasons why the Department is offsetting the payments, and rights the mortgagor has to appeal the offsetting procedure. This notice should provide the mortgagor 30 days in which to appeal the Department's decision. (See Appendix 9 for an example of the mortgagor letter.)

B. HUD field staff should reduce the amount of Section 8 assistance being offset if there is a clear basis to show that the project could not operate at the reduced level of Section 8 payments (i.e., if there are court-ordered repairs or unpaid utility bills, etc.).

C. HUD will begin offsetting the Section 8 payments the first day of the first full month following the expiration of the 30-day period. For example, if a mortgagor is sent a notice of intent to offset Section 8 payments on July 15, the mortgagor has 30 days from July 15 to appeal the decision, i.e., August 15. If the appeal is denied, the offsetting may begin September 1. If the mortgagor exercises his/her right to review the Department's record pertaining to the offsetting the offsetting action will be stayed for no more than a 30-day period pending the outcome of the review.

D. At the same time that HUD notifies the mortgagor of the Department's intent to offset Section 8 payments, HUD Loan Management Staff must also notify the appropriate Regional Accounting Division (RAD) of the date to begin offsetting the Section 8 payments. (See Appendix 10 for a sample memorandum.) Loan Management staff must notify RAD of the identity of the project and the amount of monthly subsidy to be offset. Loan Management staff must give RAD notice by the tenth of the month prior to the month in which the offset is to occur. Loan Management staff must also notify RAD by the tenth of any month if there are any changes to the offset.

## SECTION 5: APPROVAL AND APPEAL PROCESS

### 5-1. REGIONAL OFFICE APPROVAL

The Regional Director, Office of Housing:

A. Will review all appeals of Field Office decisions regarding workout proposals. All appeals, must be presented in writing 30 calendar days from the date of the Field Office decision letter. Each request shall outline why that decision should be changed. Copies of all correspondence with the field office should be attached. All appeals, after consultation with Field Office, will be answered in writing 30 calendar days from the date of the receipt. The decision of the Regional Director, Office of Housing, is final.

B. May approve all workouts when the minimum monthly payments call for a payment less than 70 percent of monthly accruing interest (see section 3-4.E.(16)).

C. Has the authority to request waivers of the policies and procedures contained in this Handbook. When requesting a waiver, the Regional Director, Office of Housing must document that the waiver is in the best interest of HUD. Waivers will be granted by the Deputy Assistant Secretary for Multifamily Housing Programs on a case-by-case basis only. Regional Directors of Housing may not use the granting of such a waiver as precedent to establish blanket waivers which deviate from the policy guidelines contained in this Chapter.

### 5-2. FIELD OFFICE DIRECTOR OF HOUSING MANAGEMENT

The Director of Housing Management has the authority to approve the following actions:

A. All workout arrangements on mortgages not in foreclosure that will bring the mortgage completely current within 36 months and will ensure that necessary repairs are complete.

B. All mortgage modifications on projects not in foreclosure that contemplate recasting of unpaid principal and delinquent interest that meet the requirements of Section 3-1.B.

C. Recommend foreclosure on projects that are unable to reinstate their mortgage in accordance with the terms of this Chapter.