IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - -

CERTIFIED COPY

EDWARD T. ARAKAKI and HELEN ARAKAKI, Plaintiffs,

vs.

UNITED STATES OF AMERICA Defendant.

NO. 03-1874C

DEPOSITION OF

FRANK CASTRO

LAS VEGAS, NEVADA

SEPTEMBER 2, 2005

At 8:06 a.m.

ATKINSON-BAKER, INC.
COURT REPORTERS
500 North Brand Boulevard, Third Floor
Glendale, California 91203-4725
(818) 551-7300

REPORTED BY: MARGIE L. CARLSON, C.C.R. No. 287

FILE NO.: 9F074DB

gone into default on his HUD insured loan?
A. That's correct.
Q. And the lender had thereafter assigned the loan to HUD and HUD had paid off the loan, correct?
MR. MAGER: Objection, compound.
You can answer.
A. Eventually, yes.
MR. JARESS:
Q. And then HUD took the loan and disposed of the loan?
A. Yeah, they do a sale.
Q. Who does they mean?
A. Headquarters office.
Q. Was this one project that you were involved in, was it a subsidized multifamily unit or a nonsubsidized?
A. Nonsubsidized.
Q. Nonsubsidized?
A. Nonsubsidized.
Q. Were you the project manager for that multifamily unit at the time that the loan was still being paid in a timely manner?
A. No, I inherited it in default status.
Q. And I understand that HUD refers to defaulted loans as troubled projects, would that be

competence.

You can answer the question.

A. I would think I would, yes.

MR. JARESS:

Q. Okay, could you tell us what information you have that you feel may be relevant to our inquiry?

A. Probably not as old as that is. If you are saying it's back in the '90s, whenever it was, '91 or whatever.

Q. Well, the sale of Mr. Arakaki's loan took place purportedly in 1996, June, June of 1996.

MR. MAGER: For the record we disagree upon, there is some disagreement upon the date of the loan sale but 1996, we are in agreement about that.

MR. JARESS: There has been allegations of when the sale actually took place, when it was completed, and legal arguments can be made that it wasn't completed until '97, '98, who knows where, maybe 2010. Anyway, I think we are all in agreement it would be no earlier than June of 1996.

MR. MAGER: No, but we are in agreement that it's 1996. We can say that. This isn't the place for us to disagree about that, so . . .

MR. JARESS:

Q. Well, tell me what you know about the HUD

procedures for the sale of loans at any time that you feel that you have some information.

MR. MAGER: Objection, ambiguous.

You can answer.

A. Well, basically the sale of the loan process is all handled currently at headquarters level. What we do prior to that as far as a project manager would be to do the complete analysis of what has occurred as far as why is the project in default. The project manager would do an analysis of the physical needs, the financial needs, occupancy, area where the complex is, and they would do an oversite and make a recommendation as to how to take that property and make it viable. They do that through what's called kind of like a workout process that we do. The recommendations are then written, forwarded to, it would be to myself currently. I would do a review of it, and at that point any recommendations that the project manager would have made would either be concurred or not. If there is no concurrence we would send it back and work with the project manager to get a better resolution of it, again keeping in mind that the goal isn't for it to be sold or to go into default, and then from there if the project manager has made any agreements or recommendations

with the ownership those would be sent to our legal staff for review and review them against the loan, the regulatory agreement or whatever legal documents that we have.

MR. JARESS:

Q. So that's the input that the local office has into the decision as to whether the loan should be sold?

A. That's the process of getting it up there, yes.

Q. Well, in this particular case Mr. Arakaki and his mom, Mrs. Arakaki, claim that their loan was sold in 1996; you are aware of the allegation?

A. No.

Q. Oh, you didn't know that there was an allegation to that effect?

A. No.

Q. And their claim is simply this, that Mr. Arakaki invested their family's money into Lake Mead Villas, 76-unit apartment building; are you familiar with that?

A. No.

Q. And it was Section 8 subsidized, and the loan was insured by HUD, and Mr. Arakaki alleges that the project was a troubled project at the time. The

Q. Okay. So when you get to the tail end of the process, meaning when there is a troubled project and it continues all the way to conclusion, the conclusion is the actual sale of the loan, right?

A. Uh-huh (affirmative response), that's correct.

Q. And the project manager doesn't make the determination as to who it's going to be sold to?

A. No.

Q. All he does is have recommendations and input and observations and so forth, correct?

A. Right.

Q. And it's expected that the project manager give that input, correct?

A. To do the evaluation process, yes, I mean that's part of his job.

Q. And what Mr. Arakaki is concerned about is the fact that before he even spent the family money on acquiring the 76-unit apartment building that was already troubled that he was assured by Mr. Ewing if things really went bad and the loan was sold that he would have a right to bid. That's what his contention is, so, and my question is going to be to you this, that assuming that, HUD as it did, decided to sell this loan, it would be your expectation that the

project manager of Mr. Arakaki's apartment units would be making recommendations and giving input, factual input, into the headquarter's decision as to whether his loan should be sold and to whom it would be sold to.

A. I think the recommendation would be, you know, part of it is to make a recommendation to sell the property, to go to foreclosure. Whether or not who it sold to is really irrelevant, would be irrelevant to the project manager.

Q. Why is that?

A. Well, because, you know, we have done everything that we can with either the existing owner, depending on how we are looking at the Section 8 that's in there, if it is a Section 8 complex, or the physical condition of the property. The recommendation, after we did the entire analysis the recommendation may be to let it go through foreclosure.

Q. Or the recommendation may be not to let it go through foreclosure?

A. But then at that point we would have had to have developed a method of how it's going to be kept out of foreclosure, and all of that process would have been approved.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - -

CERTIFIED COPY

EDWARD T. ARAKAKI and HELEN ARAKAKI,
Plaintiffs,
vs.
UNITED STATES OF AMERICA
Defendant.

NO. 03-1874C

DEPOSITION OF

DOROTHY MANZ

LAS VEGAS, NEVADA

SEPTEMBER 23, 2005

At 8:58 a.m.

ATKINSON-BAKER, INC.
COURT REPORTERS
500 North Brand Boulevard, Third Floor
Glendale, California 91203-4725
(818) 551-7300

REPORTED BY: MARGIE L. CARLSON, C.C.R. No. 287

FILE NO.: 9F07EC0

aware of?

A. We weren't involved directly with the details of the loan sales. It was all done in headquarters.

Q. Uh-huh, but besides that?

A. I don't remember specifics.

Q. Just generally though?

A. (Witness shakes head negatively.)

Q. Don't remember anything different about those loan sales?

A. No, I don't.

Q. Well, let me ask you this, when you were a loan specialist did you have any troubled projects?

MR. MAGER: Objection, ambiguous.

You can answer the question.

A. Yes, I did.

MR. JARESS:

Q. And by troubled projects do you understand me to be asking about projects where the loans went into default and HUD paid off the lender and took over the loans?

A. We had some like that, yes.

Q. Lake Mead Villas was one of those when you were supervisor, was it not?

A. I believe so. I don't remember what date

it went into default.

Q. Sure. And after the loans went into default from time to time would those loans be sold?

A. Periodically, yes.

Q. And normally how were they sold?

A. There again the details were handled in headquarters. I don't know the details.

Q. Well, I'm not asking you for the details.

A. Well, I don't know how they were sold.

Q. When I'm asking how they were sold what I mean by that, were they sold individually or were they sold as a group?

A. I don't remember that because we were not involved with the sales.

Q. But when you were the loan specialist and you had a troubled project that came to pass from time to time, correct?

A. Uh-huh, yes, sir.

Q. And then it would be an event of some importance that HUD would be selling that loan, would it not?

A. Yes, sir.

Q. And so all I'm asking you is just generally when these important events, when they would happen in the life of a troubled project, your testimony is you

can't remember how they were sold, whether individually or as a --

A. As I said we were not involved with the sales. We would make a foreclosure recommendation, refer it to headquarters. We were not involved in the sales.

Q. Well, I'm not asking you --

A. So I don't know.

Q. I'm not asking you why you wouldn't know. I'm just asking you if you would know.

A. I don't know. I wouldn't have known at the time.

Q. Now, you are telling me here now that when you were a loan specialist and you had a troubled project where the loan had gone into default, and you were the loan specialist on that job or on that project that you wouldn't know whether that multifamily project was sold, the loan was sold individually or as a group of loans at the time?

A. At the time I may have. I do not remember that now.

Q. Okay, I'm trying to break things down into groups is what I do in my interrogations, I go through and start parceling things out and get down to details, but I start out generally and go down to the

MR. JARESS:

Q. And did that puzzle you as to why he would want to bid at the loan sale?

A. No.

Q. Well, because you knew that at the loan sale he would have a chance to acquire his own loan for less than he owed on the loan on the face amount; isn't that true?

A. Anytime you go to a loan sale I would presume you would have that opportunity, but I don't know the details of this loan sale.

Q. Okay, but on loan sales generally at HUD you do know that generally the loans sold at substantially below the unpaid balance, correct?

A. I would imagine that, yes.

Q. Well, not only imagine that, you know that because you were the supervisor of this --

A. We were not involved with the sales.

Q. Okay, we understand that. We understand your position on that. You have made the record on that five, six, seven times, so you don't have to say that again.

A. Okay.

Q. All you have to do is answer my questions, not make, give me reasons as to why you may not have

THE WITNESS: Would you rephrase the question? I don't understand it.

MR. JARESS: Yeah.

Q. Were you aware that HUD has conceded that such an assurance was made?

MR. MAGER: Same objection.

You can answer the question.

A. I'm not aware of that.

MR. JARESS:

Q. Well, let me ask you this, if such an assurance was made, if Mr. Arakaki could bid on his loan, do you think that HUD should have followed up and abided by its earlier assurance?

A. Mr. Ewing wouldn't have had the authority to make that promise, whatever word you want to use. This office didn't have that authority.

Q. Well, I understand that HUD took the position back in 1996 that HUD merely changed its mind about allowing Mr. Arakaki to bid on the loan; would that be correct or incorrect?

A. We did not make those policies here. They were made in headquarters, and I have no idea what was behind the decisions, how they made their policy who could bid and who could not.

Q. Well, as a loan specialist and then as a

supervisor of loan specialists and being thoroughly conversant with the regulations and laws, are you aware of any regulation or law that prohibited someone like Mr. Arakaki from bidding on his own loan if it was auctioned?

A. We did not make those policies here. That was not part of the delegation where I would have knowledge of those regulations.

Q. Well, are you confusing knowledge of a regulation with authority to change the regulation?

A. No.

Q. I thought from looking at your job description as a loan specialist that you were to be conversant with the rules and regulations that related to multifamily units that were under HUD.

A. Things within our delegation of authority. We weren't knowledgeable of things that headquarters did that were above our responsibility.

Q. Had you ever had a situation where a multifamily unit loan was sold at an auction?

A. Yes.

Q. Once or twice or many times?

A. I don't remember how many different loan sales there were.

Q. Were any of them individual sales?

DEFENDANT COPY



UNITED STATES COURT OF FEDERAL CLAIMS

No. 03-1874-C

EDWARD T. ARAKAKI and HELEN ARAKAKI, )
Plaintiffs, )
vs. )
THE UNITED STATES, )
Defendant )

DEPOSITION OF DR. ANDREW ROBERTSON
(Taken on behalf of the Plaintiffs)

TIME: 4:20 o'clock p.m.

DATE: Thursday, September 22, 2005

PLACE: Department of Housing and Urban Development
Suite 2900
300 Las Vegas Boulevard South
Las Vegas, Nevada 89101

APPEARANCES:

For the Plaintiff: JARESS & LEONG
737 Bishop Street
Suite 2920, Mauka Tower
Honolulu, HI 96813
BY: R. PATRICK JARESS, ESQUIRE

For the Defendant: UNITED STATES DEPARTMENT OF JUSTICE
Civil Division
1100 L Street N.W.
Washington, D.C. 20530
BY: STEVEN M. MAGER, ESQUIRE
and

REPORTED BY: STELLA BUTTERFIELD, CCR No. 7

were.

Q Do you know who does have access?

A No.

Q Well, is that the only document you looked at in preparation for the deposition?

A That is the only document I looked at having to do with this. I don't see the last name but whatever his name is.

Q Well –

MR. MAGER: Can we clarify for the record what the man's name might have been?

A I said I don't recall what the man's name is. Could we clarify what name is – his name is not on here.

MR. MAGER: Would you know if that would be Mr. Arakaki?

A Yes.

MR. MAGER: Just to make it clear.

Q Did you, were you aware of HUD selling its loans that went to default?

A I never sold any loans.

Q No, I know you didn't. But you knew that that was what would happen from time to time with default loans?

A Yes, I can only guess about that. I don't know what

happened. We didn't have any. Sometimes the loans were bid. Most of the cases they were bid, sold to the highest bidder.

Q Makes sense, doesn't it?

A Yes.

Q Were you aware that Mr. Arakaki testified that he wasn't allowed to bid on his loan?

A No, I wasn't aware of that.

Q Would you ever prevent any person from bidding on their own loan?

A I can't answer that. That is kind of hypothetical, like -

Q Well, you were the manager.

A Well, we weren't - Multifamily properties were not handled here.

Q Okay.

A Single Family properties, we posted them in the property. We used bids and on a certain date we opened the bids. They were all closed bids. And we did that here, not multifamily.

Q So you don't know much about that property?

A No.

Q And you also don't know much about what role that

Dorothy Mantz or David Ewing or anybody up in San Francisco played in the proceeding?

MR. MAGER: Objection. Compound.

You can answer the question.

A Well, Dorothy Mantz wouldn't have been in the bidding process. Neither would Dave because that was done out of San Francisco.

Q Well, what was being done?

A I don't know. I handled Single Family bids.

Q Well, that's my point. If you don't know you are not really in a position to testify about that from any personal knowledge, would you?

MR. MAGER: Objection. He is not competent to answer.

You can answer if you can.

A I can't.

Q Well, you see my point, don't you?

A I see what you are saying but I can't really answer.

Q What's your background before you went to HUD, generally?

A Before I went to HUD I was in the military.

Q What branch?

A Air Force and the Navy.

Q Exhibit 3.
A I don't ever remember reading that before. I never memorized the handbook.
Q Well, that's hard to do.
A Well, it is impossible to do.
Q Well, you mentioned a moment ago there was problems by the time you left and there was defaults and workout agreements. There was the oral agreements that were purportedly made from time to time -
A I don't remember any oral agreements, nor anyone informing me about oral agreements.
Q Or that any were being negotiated?
A Or that any were being negotiated.
Q In fact, you don't know of any workout agreements until the one that you signed?
A And I didn't remember that until I saw it.
Q Did you ever talk to Mr. Arakaki or Mr. Ewing about agreements he was making with people?
A No. I didn't know he was making oral agreements, or that he was -
Q Or that he was not?
A Or that he wasn't. I was never informed of that.
Q So you never worked as an Asset Manager for sure,

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - -

CERTIFIED COPY

EDWARD T. ARAKAKI and HELEN ARAKAKI, Plaintiffs,

vs.

UNITED STATES OF AMERICA, Defendant.

NO. 03-1874C

DEPOSITION OF

DAVID F. EWING

LAS VEGAS, NEVADA

SEPTEMBER 1, 2005

At 10:00 a.m.

ATKINSON-BAKER, INC.
COURT REPORTERS
500 North Brand Boulevard, Third Floor
Glendale, California 91203-4725
(818) 551-7300

REPORTED BY: MARGIE L. CARLSON, C.C.R. No. 287

FILE NO.: 9F074DA

get the amount of money that they had loaned out.

MR. JARESS: I see.

Q. So to get dollar for dollar you have to go directly to the insurer?

A. Correct.

Q. And say "This is in default under our agreement. You have to buy it or I'll foreclose," correct, or "You have to buy it"?

A. Correct.

Q. And force the sale. In fact the bank wouldn't want to foreclose because they may not get dollar for dollar, is that what you say?

A. In those days, correct.

Q. So the outcome almost always when a loan went into default and the lender decided it was time to liquidate that loan he would come to HUD, tender it to HUD, and take the insurance payment in those days?

A. In those days, correct.

Q. And that's what happened in the 76-unit apartment complex of Lake Mead Villas, correct?

A. The mortgage was assigned to HUD, correct.

Q. And HUD made a one-time payment, correct?

A. I'm assuming; that's not my department, but I'm assuming it. They don't make monthly payments to them.

Q. Whose department is it?

A. Again I don't know.

Q. Is it within Las Vegas office?

A. No, HUD Central.

MR. JARESS: Why don't we take a lunch break.

MR. MAGER: Right now?

THE WITNESS: Can we go another half hour, do you mind?

MR. JARESS: I don't mind going another half hour.

MR. MAGER: If we could go off the record.

(Discussion off the record.)

(Whereupon, a recess was taken from 12:27 p.m. to 1:40 p.m.)

MR. JARESS:

Q. Witness, returning our attention to Plaintiffs' Exhibit 1 for identification, looking at paragraph 8, thinking about it over lunch, do you recall discussing anything with Mr. Arakaki about HUD either getting the Lake Mead 76-unit apartment building or having, meaning the loan, and taking that over from the bank or getting it assigned from the bank, anything of that nature?

A. I'm sure we talked about it.

Q. But you don't have any recollection of it at this time?
A. Not exact comments that would have been made.
Q. Okay. So you have sort of a general understanding of what took place?
A. Correct.
Q. Well, so it must have come up in the conversation about the bank assigning the loan to HUD?
A. I'm sure it did come up in conversation.
Q. And at that time back on October 17, 1991, in fact the bank was considering or actually had decided to assign the loan over to HUD, correct?
A. I don't know.
Q. Well, do you have any reason to believe that that's not true?
A. No, I don't have any reason to believe it's not true, but I don't, I can't say for a fact that at that particular time the bank was considering assigning the mortgage.
Q. Well, let me ask it this way, on October 17, 1991, had the bank actually decided that it would be assigning the loan over to HUD?
A. I don't know that.
Q. If that were happening would there be

paperwork that would be associated with it?

A. Not from this office.

Q. What office would generate some paperwork?

A. Central office.

Q. Where is that located?

A. HUD central, Washington, D.C.

Q. Did you go back in your preparation for this deposition and review any of the paperwork associated with the assigning of the loan from the bank to HUD?

A. I haven't seen any paperwork on this complex for years.

Q. Okay, so is the answer to my question no, you haven't --

A. The answer to your question is no.

Q. Do you believe that if you were to go back and review the assignment of the loan from the bank to HUD that that may refresh your memory as to the circumstances surrounding Mr. Arakaki's meeting with you?

A. Doubtful.

Q. Why is that, sir?

A. Because a lot of the meetings that we had were strictly informal. They would knock at the front door and say we want to have a meeting.

Q. How long has that been?
A. Several years.
Q. Oh, since the real estate boom?
A. A little longer than that.
Q. Okay. Back at one time when it wasn't boom times HUD had accumulated a large number of loans through the assignment process.
A. Several.
Q. Correct?
A. Several.
Q. Several what?
A. Loans had been assigned.
Q. You mean to all HUD or just to this office?
A. This office had several loans whose mortgages had been assigned to headquarters.
Q. What does that mean, this office assigned it to headquarters or do you mean that the --
A. The mortgages that we were servicing in this office whose lenders assigned the mortgages assigned the mortgages to HUD central because that's not one of our functions.
Q. Okay, well, after the mortgage has been assigned to central does this office, and in particular you, serve in any function, further function for that loan?

A. Basically our functions do not change that much from when it's a secretary-held mortgage to being an insured mortgage.

Q. Why is that?

A. Well, the tenants still have to have safety and sanitary housing. They still have to have the financial requirements. They still have to keep their property up.

Q. So you do much the same thing, you go out and drop in on the properties, check them out?

A. Correct.

Q. And that's whether the bank is holding the loan or HUD central office is holding the loan?

A. Correct.

Q. Do you play any role in the subsequent sale of a loan by HUD?

A. No.

Q. Okay, let me ask that again and let me get it out before you answer. Do you, meaning you sitting there, play any role in the subsequent sale of the loan by HUD?

A. No.

Q. You are though up until the responsibility for the property is transferred to another lender, you still service the property in the same way that you