the answers. I don't know what conclusions she came up with.

Q. Okay. She came and interviewed you, correct?

A. As far as I remember, yes.

Q. And took down notes as you talked or did she tape-record it?

A. I don't recall.

Q. Did you go back and review that to refresh your memory for today's deposition?

A. I never, I don't remember ever seeing a copy of it.

Q. Of her notes or of the --

A. We don't have any files on Lake Mead Villa in this office.

Q. It doesn't mean you never saw it though.

A. I don't recall if she wrote it. I may not have seen it. I may have seen it. I don't recall seeing it.

Q. Have you ever asked anybody to see it?

A. No, and the reason being unless we had to answer some other questions I may not have ever seen it after she wrote it.

Q. Let me ask you this, what is the HUD policy today on an owner of a multifamily property bidding on

the loan if it's sold by HUD?

A. I have no idea. That's not done out of the local office.

Q. Did you ever have an idea of what the policy was?

A. Just general ideas. We had no input into anything concerning the sale of the mortgages.

Q. Have you ever talked to anybody about an owner of the property's right to bid on his own loan?

A. No.

Q. You don't recall ever discussing that one way or the other?

A. It's not something I would discuss because I don't have anything to do with the policy.

Q. Well, what is your responsibility, making sure that the properties were, what do you say, safe, decent, and sanitary?

A. And protecting the interest of the secretary.

Q. Meaning protecting his money?

A. Correct.

Q. Now, is it your understanding that loan specialists and asset managers must be real estate generalists, and I'm reading here --

A. I don't know what a real estate generalist

A. With what respect?
Q. In any respect.
A. The only disagreement I can remember having with Mr. Teitelbaum was the condition of one of his properties.
Q. His properties were in bad condition?
A. One was in poor physical condition.
Q. And did you withhold his money for that?
A. I don't remember.
Q. Do you remember the structured sale that took place in 1996?
A. Was that the note sale?
Q. Yes.
A. No, I have no knowledge of the note sale.
Q. Had anybody ever come to ask you to pull a loan out of a bad note sale?
A. I don't recall that ever happening.
Q. Can you deny that it happened?
A. I wouldn't have the authority to pull a mortgage out of a note sale.
Q. Who did have the authority?
A. Central office.
Q. Huh?
A. Central office.
Q. Could you recommend something to central

office?

A. I couldn't personally, but I suppose somebody could recommend.

Q. Well, as I understand it back in 1996 that there was the central office and then there was the, if you want to call them branch offices, correct? There was no intervening layer?

A. You have central office. You have regional offices. You have local offices.

Q. Okay. Was that the case back in 1996?

A. Correct.

Q. And now you have something called hubs; you have 13 hubs; is that correct?

A. Well, essentially those are the old regional offices.

Q. Oh, I see. So they just renamed them, correct?

A. Correct.

Q. But you as a loan specialist and an asset manager, do you report directly to the regional office or hub as you call it now and then they report to the central office, or in your particular work line is there a direct line from the central office down to you, meaning loan specialists down in the local offices?

making either more money or less money?

MR. MAGER: Objection, ambiguous.

You can answer the question.

A. The only way that we would make more money on a property is if we sold it, if we owned it and sold it at auction and made more money than was due on the mortgage.

MR. JARESS:

Q. So if you thought that a loan could be sold to somebody that would, say Mr. X is going to pay more for a piece of property than Mr. Y, you would rather have the loan sold to Mr. X, right, because you are going to make more money?

A. That's not a decision I would ever have.

Q. You might have an influence on it.

A. None.

Q. You have never had an influence on something like that?

A. None, never.

Q. So as far as you are concerned your actions or inactions as a loan specialist and asset manager won't make a dime's worth of difference after you are dead and gone?

MR. MAGER: Objection, ambiguous.

You can answer the question.

A. It doesn't make a difference what I think. It's what Washington wants to do as far as the loan portfolio.

MR. JARESS:

Q. Earlier this morning you were telling me about you had this job to oversee the multifamily properties that were under your direction, and I thought there that you had an amount of discretion. For example, you had discretion as to whether to approve the payments of large sums of money to people that own property that have Section 8 housing, correct?

A. Well, we have the approval or disapproval to make the payments providing the property is run correctly or not correctly.

Q. But you decide, right?

A. But that's not profit for the government.

Q. Well, they don't get the money? If the government doesn't have to pay the money they get to keep the money, right?

A. Would you restate that question?

Q. Yeah, if you say, "Well, we are not going to pay this month," and you don't approve payment and say that you save, oh, maybe $21,000, you have just saved the government $21,000, correct?

speaking, right?

A. I know that there were several loans sold at the note sale, but I had no knowledge of how many.

Q. You knew they were in the hundreds, didn't you?

A. I had nothing to do with the sale. I have no, any idea what the round figure would be.

Q. Are you saying that you are just guessing that you didn't know because here you are in an office, and you are having this big sale of a hundred and seventy-some loans and you are saying you weren't interested or didn't know or didn't hear about it?

MR. MAGER: Objection, ambiguous, compound.

You can answer the question.

A. It was not a function I was involved with in any way so there was no point in hunting for information I could do nothing with.

MR. JARESS:

Q. Well, you mentioned earlier in your testimony earlier today about some communication to HUD by a senator from Hawaii. Do you recall that testimony?

A. Mr. Arakaki, is that the one Mr. Arakaki complained to somebody and the Inspector General's

A. Yes.
Q. And when did you become familiar with them?
A. Years ago.
Q. Well, I want to find out your best estimate as to when. Was it back in St. Louis?
A. I don't think we did any -- I'm not aware of any that we did in St. Louis. I am aware that we have done some in Las Vegas.
Q. Okay. And these are for multifamily properties?
A. Correct.
Q. How about in single family properties?
A. I'm not familiar with single family properties that have defaulted mortgages.
Q. Ever?
A. Ever.
Q. Have you read the handbook over the years?
A. 4350.1?
Q. Yeah.
A. Yes.
Q. And go down to the next paragraph. It states, here is what Judge Hewitt says, "HUD apparently endows field asset managers - such as Mr. Ewing - with a broad authority to design workout-type arrangements to stabilize still insured

but troubled or potentially troubled projects." Do you see that language there, sir?

A. Uh-huh (affirmative response).

Q. Is the judge correct?

A. No.

Q. Now, did she quote that incorrectly?

A. This is a quote from a handbook?

Q. Well, it says id so it goes back up to --

MR. MAGER: I'll take the liberty to explain to the witness. Id refers to the prior citation, or, in other words, id refers back up to the 1995 revision of the loan handbook, so anytime you see id on the paper in refers back to the previous handbook.

THE WITNESS: Okay, thank you.

MR. JARESS:

Q. Do you see that, sir?

A. Correct.

Q. So my question was did the judge misquote the handbook?

A. No, that's what a workout is supposed to do.

Q. Then she goes on to state that these workouts are short arrangements meant to avoid default and reflect HUD's basic objective of developing a

workable plan to stabilize the property, both financially and physically, and to minimize losses to the department. Is that your understanding --

A. Correct.

Q. -- what a workout is supposed to do?

A. Correct.

Q. And then it states, This objective is commonly met by 'providing the borrower with debt service relief.'" Do you see that, sir?

A. Correct.

Q. Is that true also?

A. Yes.

Q. Then the judge goes on and states, "Asset managers are empowered - by way of workouts - to make arrangements meant to stabilize a project's financial problems, secure 'competent, interested owners,' and develop a 'reinstatement plan that will protect the long-term financial interests of HUD and ensure the project can continue to be a viable operation.'" Do you see that, sir?

A. Correct.

Q. And is that true?

A. Yes.

Q. Then she states, "These duties could be consistent with the existence of contracting

authority." Do you see that, sir?

A. I see that.

Q. Is she correct?

MR. MAGER: Objection, calls for a legal conclusion.

A. I don't have, as a loan specialist ever had contracting authority.

MR. JARESS:

Q. The statement here "These duties could be consistent with the existence of contracting authority."

A. And what I'm saying is I've never had contracting authority in this office.

Q. That's not my question that I asked. See, we'd go along a lot faster if you answer my questions. Your attorney can ask you whatever question --

A. Well, excuse me, but I'm looking at contracting authority as able to do certain things that I can't do or haven't been able to do. I'm sorry I'm not understanding your question.

Q. Well, listen to my question. The judge says, "These duties," the ones that we went over in detail, "could be consistent with the existence of contracting authority." Either they could be

MR. JARESS: Then why don't I stop now and let you ask your questions.

MR. MAGER: All right, let me take a break and talk to agency counsel.

Off the record.

(Whereupon, a recess was taken from 4:54 p.m. to 5:01 p.m.)

MR. MAGER: I'm just going to have a few follow-up questions for you.

EXAMINATION

BY MR. MAGER:

Q. As a loan specialist in 1991 did you have authority to enter into contracts on behalf of HUD?

A. Generally, no.

Q. Could you sign contracts --

A. Generally, no.

Q. -- as a loan specialist.

Could you enter into workout agreement contracts?

A. No.

Q. Could you sign a workout agreement as a loan specialist?

A. No.

Q. Well, and did you have to have supervisory

approval for workout agreements when they would be worked out? Who would have the authority to approve a workout agreement?

A. The approval was done by the chief of loan management and at that time office manager.

Q. And who was the chief of loan management at that time?

A. Dottie Manz.

Q. And who was the, you said office manager at that time?

A. I believe Andrew Robertson.

Q. You talked a lot about Section 8 funds and withholding of Section 8 funds. Would you do that on your own without any approval or any supervision or is that your decision alone to --

A. No, we would always talk about something of that type of situation.

Q. Did you have to go to speak with Dottie about withholding Section 8 funds?

A. I'm sure we talked about it.

Q. Now, there was a reference to a disciplinary action in your file.

A. Correct.

Q. Is that correct? What ultimately happened with that?

A. Well, the owner has never been able to in recent times bid on his own property.

Q. Then why would they have that as the very first thing is the right of first refusal if he can't even bid in the first place?

A. I guess they are just making sure what the policy is.

Q. Well, does it say anything in here about the owner being forbidden to bid on his own loan?

A. No, I don't see where it says that.

MR. JARESS: I have no further questions.

EXAMINATION

BY MR. MAGER:

Q. Does it say anywhere -- turn back to the dos page, US0256. Does it say anywhere that you are allowed to offer --

A. It does not, excuse me.

Q. Did you ever receive any specific delegation of authority allowing you to offer owners the right to bid on their loans?

A. Never.

Q. Did you ever receive the delegation of authority to allow Mr. Arakaki to bid on his loans?

A. Never.

MR. MAGER: No further questions.

EXAMINATION

BY MR. JARESS:

Q. The right of an owner to bid on a loan doesn't cost HUD any money, does it?

A. I don't know.

Q. Can you think of any way, shape, or form that it would?

A. I don't know. Again we had nothing to do with the note sale in this office. It was all handled in Washington. What their thinking was we were not privy to.

Q. But my question was do you have any reason that harm would come to HUD if the owner were allowed to bid on his own loan along with anybody else in the world?

A. I don't know of any, but again I'm not a policy maker in Washington.

Q. But you do see that not allowing some owner to bid on his own loan would be a way of punishing the owner, correct, for breach --

A. Not necessarily.

Q. Well, it could be though for breaching another agreement or doing something that HUD thought

was improper in some other way?

A. No, I don't think punishment is a term that we ever used.

Q. Well, what term would you use for it if you were to disallow a person from bidding on his own loan, it wouldn't be a form of punishment, what possible reason would there be for that?

A. I always like to use violation of the regulatory agreement.

Q. I see. So it would be a punishment. It violated an agreement, broke the law, and therefore the punishment is they can't bid on their own loan and possibly salvage an investment of their life's savings?

MR. MAGER: Objection, ambiguous, lack of foundation.

You can answer the question.

A. The reason that Mr. Arakaki wasn't able to bid on his own loan was that was policy in Washington, D.C., and it applied to everyone, so it didn't make any difference whether the property was in good condition or bad condition or we had a good owner or a bad owner, no one was allowed to bid on their own mortgages.

/ / /