IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

| | | |
|---|---|---|
| EDWARD T. ARAKAKI and HELEN ARAKAKI | ) | |
| Plaintiffs, | ) | |
| vs. | ) | No. 03-1874C |
| UNITED STATES of AMERICA, | ) | |
| Defendant, | ) | |

CERTIFIED COPY

DEPOSITION OF
JANET BROWDER
San Francisco, California
August 19, 2005

ATKINSON-BAKER, INC.
COURT REPORTERS
180 Montgomery Street, Suite 800
San Francisco, California 94104
(415) 288-9000
REPORTED BY: LISA P. GALLI, CSR NO. 12351
FILE NO.: 9F06E4E

JANET BROWDER,

having first been duly sworn, was

examined and testified as follows.

EXAMINATION BY MR. JARESS

MR. JARESS: Q. Would you state your full name please.

A. Janet L. Browder.

Q. And I understand that you're the director of the San Francisco multifamily hub?

A. That's what I am currently, yes; that's correct.

Q. And how long have you held that position?

A. Since February of 1998.

Q. And in your current position, what are, basically, your job duties?

A. I'm responsible for the multifamily operation, production, management for Northern California, State of Hawaii, Arizona, and Nevada.

Q. And when you use the phrase "multifamily," is that like an apartment building?

A. Multifamily is defined as five units or more.

Q. A building that has five residential units?

A. Five residential units or more; anything less

opinion, per se, of anything that is written there.

Q. Well, did you -- for example, did you wonder why Mr. Ewing and HUD wouldn't allow Mr. Arakaki to bid on his loan?

A. The department sets the parameters and rules for note sales. I have no control, influence, or authority over the loan-sale process. It's not something that -- it's not policy that is set by me in the field, or in any capacity that I have ever been in.

Q. Who -- you participated in those loan sales in some form or fashion?

A. Well, "participating," I'm not sure what you mean by that. I've been within the department for a long time, and during that time there has been various loan sales conducted.

Q. And it was Mr. Arakaki's understanding that back prior to, I believe it was 1996, that the loans were sold. They were sold on an individual basis; is that --

A. There have been different ways that HUD has sold the loans over time. Again, directed by headquarters in terms of their process of selling the loans, types of loans, how to sell them.

Q. Today we're going to be focusing on merely having a bundled sale where one sells -- meaning HUD

sells -- a group of loans, and a bidder bids on a group of loans rather than on each individual loan.

And also we will be focusing on who does -- who has the right to bid on the loan, and who doesn't have the right to bid on the loan.

With that preface, it's my understanding that prior to 1996 that the loans were sold on an individual basis rather than on a bundled basis; is that your recollection?

A. It's my recollection that they did that at one time. I don't recall which loan sales were done which way.

Q. And you know that they changed the process?

A. I know they have done them in various ways.

Q. As far as the bundling and nonbundling, they're either going to be bundled or not bundled.

A. I suppose.

Q. And today does HUD engage in the sale of loans?

A. HUD still engages in the sale of loans.

Q. And do they do it on a bundled basis or unbundled basis?

A. You know, I haven't read the -- I believe there was just an advertisement put out, and I don't know -- I'm not involved in the day-to-day process, so

it's not one of the things I know for sure. So I don't know how the current loan sale is being handled.

Q. Does that fall within your jurisdiction and authority?

A. When HUD advertises a note sale and determines which HUD-held notes, which types, how, then I will be aware that within my jurisdiction there may be a loan that is in the note sale, or loans.

Q. Can loans still be pulled out of the bundle sale?

A. Headquarters has authority to determine which loans are in and which loans are not.

Q. And when you say "headquarters," who do you mean by that?

A. That would be multifamily housing in Washington, D.C.

Q. They are the ones that make the call as to which loans go in?

A. Headquarters Washington, management makes the calls which loans are in and which aren't.

Q. And when you say "management," that means management back in Washington?

A. Correct.

Q. Do the hubs have any input into which loans are pulled and which ones aren't?

A. They would ask us to review the list to see if it was correct in terms of the data system it was pulled from to determine if, in fact, it is a HUD-held mortgage, it is of this type that they're selling, and that there are no other actions in place, such as foreclosure, that might mean it would or wouldn't be sold in the foreclosures -- in the note sale.

Q. Do any of the clients ever come to you and say, you know, "My loan is going to be sold, and I don't want it to be sold. Could you see if you could get it pulled"?

A. I've never had anyone come to me and ask me that.

Q. Now, does anybody ever come to HUD and ask them that?

A. I don't know. If I got the call, I would have them contact Washington.

Q. Directly?

A. Because I have no authority.

Q. And has that been the situation as long as you can recall?

A. As long as I can recall. Note sales have always been handled in Washington.

Q. Is there a name of a department back there, or individual?

A. My contact with an owner on a default mortgage is to bring the loan current, enter into a workout. If they choose to sell the property, then my involvement would be to review their submission, if they wanted to go that route of a transfer of physical assets.

You would look at that new owner and the situation and the terms of that, will the department approve.

Q. And what would you look for as far as the new possible buyer?

A. Well, follow all the handbook requirements of a submission of a transfer of physical assets, which is a legal and administrative transaction.

Q. When you were a loan specialist, did you ever meet with the prospective buyer?

A. You're talking about if an owner wanted to sell a property to a purchaser?

Q. Yes.

A. I don't recall that I had ever met personally with a purchaser. Our transaction is with the seller who is providing the owner with all the various documents and requirements that they're proposing with this transfer.

Q. Sometimes it would be pretty hard to get people to buy a HUD property, HUD-insured property,

wouldn't it?

A. We do transfer of physical assets all the time.

Q. Yes, but then in some situations, such as when the interest rates are too high, sometimes it's difficult to find a buyer.

MR. MAGER: Objection. Calls for speculation. Answer the question.

THE WITNESS: It's not my job to find a buyer for the seller. The seller owns the property. The seller is obligated under the terms of the agreements to operate the property in good financial physical condition.

If they no longer want to continue as the owner of the property, they have the ability under the regulatory agreement to sell. And if that is their choice to sell, then the obligation then is to submit to HUD all the proper documentation for us to determine if we will allow the sale to take place.

MR. JARESS: In the case of Mr. Ewing, he met with Mr. Arakaki when Mr. Arakaki was considering purchasing the Lake mead Apartments.

MR. MAGER: Just so we can be clear for the record. Mr. Arakaki alleges that they met.

So that you don't get an objection from me

management or the office management for that particular office.

Q. Would anyone in HUD have the authority to enter into an oral agreement?

A. I don't believe so.

Q. Why don't you believe so? Have you ever --

A. In my experience at HUD, agreements are contractual agreements, HUD documents, business agreements, and those are in writing.

Q. What about -- we spoke a little bit about note sales. Who determines the terms of a note sale? How does that work?

A. That would be determined by, to my knowledge, some of the highest levels in the Washington office: Staff in multifamily, directors, deputy assistant secretaries.

Q. Is there anyone in particular you know who works in that area?

A. Currently?

Q. Yes.

A. Currently in that area, and probably for some time, Audrey Hinton had a lot of responsibilities to carry out the note sales from a process standpoint. And I would believe terms of note sales and that such thing would be done by others above her.

Q. Now, who's -- what would the field office's involvement be in a note sale? For example, the Las Vegas office, what would they be doing in terms of a note sale?

A. We would get notice from headquarters that the following projects are in the note sale. And if you have one of those, then there would be certain requirements that documents be duplicated that in the field in the project-servicing files. So we would get requests for documents for due-diligence purposes. We would get requests to verify certain informations about the project. But generally the document duplication, they would be sent to headquarters.

Q. Generally do you recall HUD ever entering into an agreement with any owner giving them the right to bid on their loan?

A. I can't recall any specifically -- specific ones where that occurred.

Q. How would you know if an owner had the right to bid on the loan?

A. I would know by whatever the terms of the note sales being advertised for any particular period of time, public-notice type.

Q. In order to allow an owner to bid on their loan, are there any prerequisites to bid on your loan?

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

| | | |
|---|---|---|
| EDWARD T. ARAKAKI and HELEN ARAKAKI | ) | |
| Plaintiffs, | ) | |
| vs. | ) | No. 03-1874C |
| UNITED STATES of AMERICA, | ) | |
| Defendant, | ) | |

CERTIFIED COPY

DEPOSITION OF
PATRICK GORAY
San Francisco, California
August 19, 2005

ATKINSON-BAKER, INC.
COURT REPORTERS
180 Montgomery Street, Suite 800
San Francisco, California 94104
(415) 288-9000
REPORTED BY: LISA P. GALLI, CSR NO. 12351
FILE NO.: 9F06E4E

PATRICK GORAY,

having first been duly sworn, was

examined and testified as follows.

EXAMINATION BY MR. JARESS

MR. JARESS: Q. State your name, please.

A. Pat Goray.

Q. And presently employed by HUD?

A. Yes, I am.

Q. And in what capacity are you employed?

A. Currently I am the director of operations for the San Francisco multifamily hub.

Q. And could you explain very briefly what your duties are as the operations officer?

A. Sure. I head up a team of program specialists who did funding coordination activity for your hub area. Also information specialists who manage some of our database information systems, and two individuals that, basically, coordinate our performance-based contract administration program, and several senior property managers that deal with troubled properties. And I also act as the acting hub director in her absence.

Q. And who would that be?

A. That would be Janet Browder.

A. As long as I've been involved with multifamily housing, basically the two main players would be what was historically called "project managers," currently called -- I'm sorry. Historically called "asset managers," currently called "project managers," would be responsible for what I characterize as day-to-day servicing activities of the multifamily insured and assisted portfolio that would be under their responsibility: responding to correspondence or inquiries from owners and agents, reviewing rent increases, reviewing requests for releases from the reserve for replacement account, processing transfers of physical assets, doing periodic management occupancy reviews on site.

And the supervisor or the branch chief of those individuals would have approval authority over those actions and would be responsible for training -- the normal management functions: Training, supervising, motivating the staff that worked for them.

MR. JARESS: Well, let me have this marked as Plaintiff's Exhibit 1 for identification.

MR. MAGER: Just so you're aware, when documents get passed, the lawyers review it first, so you may eventually get to see this.

These are two different documents. I don't

waiver letter that you're aware of that anybody had to sign prior to a workout back when you did your workout?

A. No, I'm not.

Q. Now, it states on the second page here that the parties acknowledge and agree -- there is an agreement now -- that there will be no agreement, basically, until it has all been signed up, and no oral agreements will be allowed.

We're going to get into this oral agreement here in a minute.

Are you aware of any requirement, except what may be contained in this Exhibit 2, that prohibits the parties from entering into an oral agreement?

A. I know it's -- as a supervisor, HUD does not recognize oral agreements. We strive to put agreements in writing.

Q. Okay. Since sometime in 1995, I suppose, because there is a date down at the bottom there.

A. Uh-huh.

Q. Would it be fair to state from what you see there, that before 1995 you didn't have this type of waiver letter?

A. Again, I'm not familiar with this particular waiver letter. And actually, I'm not quite sure what the waiver letter -- its intent.

There is a workout letter, and I don't know what a pre-workout waiver letter is. I have never, frankly, heard of that.

Q. Well, did you ever hear that, down in Las Vegas, that Mr. Ewing would go out and make a lot of oral agreements with people, and then when it came time for Mr. Ewing to perform, he would say, "Oh, these are just oral agreements. They're not enforceable"?

MR. MAGER: Objection. Counsel is testifying. Compound and ambiguous.

You can answer the question.

THE WITNESS: No, I have not heard that.

MR. JARESS: Q. This is the first time you ever heard of anything like that?

A. Yes.

Q. Ever heard anybody at HUD ever doing that, giving oral assurances to people, and then later on reneging on them, claiming that it was just an oral agreement; it's not effective?

A. I can't think of anything specifically at this moment, no.

Q. Doesn't sound like a good practice, does it?

MR. MAGER: Objection. Calls for an opinion that is not necessary within the scope of the witness's competence.

You can try to answer the question.

THE WITNESS: As I said, HUD's agreements are in writing. And the one workout that I was involved with, I mean, there was -- it involved a property in Guam, and it had a lot of complexities to it, and there was a lot of discussions and negotiations. And their agreement -- we didn't consider the agreement reached until both parties signed it and it was reviewed by legal counsel.

Q. So that's no different than usual contract law. Parties intend to have a written agreement, and express that they only want a written agreement; there won't be any agreement until it's in writing, right?

MR. MAGER: Objection. Witness is not a lawyer.

Try to answer the question.

THE WITNESS: I would guess that is why HUD requires agreements to be in writing, approved by approving officials.

MR. JARESS: Q. But you don't know of any particular rule or law in the 1990s that required that?

A. I don't have that specific knowledge.

Q. Are you expecting to try to acquire that specific knowledge before trial, and then go in and testify on that?

happened in this case. Generally speaking, I am not aware of HUD staff operating in the way that you have described.

We don't, again, focus on speculating or making -- purchasing the property any more attractive or less attractive than what the facts are.

We basically perform the role of processing the transaction between the current owner and the prospective purchaser. If they want information that is in HUD's hands, we provide it in terms of what the program is, what the delinquency is.

Typically most of the information is in the current owner's hands in terms of pro forma information.

Q. But the information about HUD's intent, if in the future it decides to have a sale of the loan, that would be in HUD's hands, not the owner's hands, correct?

A. HUD has control over the mortgage sales.

Q. And they know what their intent is; not the owner?

MR. MAGER: Objection. Ambiguous to the extent you're asking for legal definition.

You can answer the question.

THE WITNESS: It wouldn't be an employee in a field office, or even myself in the regional office, that would have knowledge of future loan sales. We

don't create the terms or conditions nor, frankly, have any input in the policy of the loan-sale program. That was created at the Washington level.

MR. JARESS: Q. Well, they could speak to what the present intent was.

A. Again, I don't know exactly the facts of this particular --

MR. MAGER: Objection. Just generally, the use of the word "intent."

THE WITNESS: But if the transaction occurred in 1991, and the first loan sale was in '94, I don't think the field office -- and I certainly had no recollection of the note sale program at that point in time.

MR. JARESS: Q. Well, it comes down to this: You think that if HUD gets into an agreement with somebody, that they can just change the agreement later on, say, "We don't like the agreement. We're not making enough money in the agreement. We're going to change it"?

A. Again, our agreements are in writing and subject to contract law.

Q. Let's assume that the judge says that oral agreement is fine here. Say the judge tells you that oral agreement is fine here. Don't bother yourself with

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

\- - - - - - - - - - - - - - - - - x

EDWARD T. ARAKAKI and HELEN :
ARAKAKI, :
Plaintiffs, :
v. : No. 03-1874C
THE UNITED STATES, :
Defendant. :

\- - - - - - - - - - - - - - - - - x

Washington, D.C.
Thursday, August 25, 2005

Telephone Deposition of AUDREY HINTON, a witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness being duly sworn by PENNY M. DEAN, a Notary Public in and for the District of Columbia, taken at the offices of U.S. Department of Housing and Urban Development, 451 Seventh Street, SW, Washington, D.C., at 3:14 p.m., Thursday, August 25, 2005, and the proceedings being taken down by Stenotype by PENNY M. DEAN, RPR, and transcribed under her direction.

P R O C E E D I N G S

Whereupon,

AUDREY HINTON,

business address at U.S. Department of Housing and Urban Development, 451 Seventh Street, SW, Washington, D.C., was called as a witness by counsel for Plaintiffs, and having been duly sworn by the Notary Public, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR PLAINTIFFS

BY MR. JARESS:

Q. Would you state your name, please?
A. Audrey Hinton.
Q. And where are you employed, Ms. Hinton?
A. The Department of Housing and Urban Development in Washington, D.C.
Q. And how long have you worked for that agency?
A. Thirty-two years.
Q. And I understand you are going to be a witness in this case for the government; is that true?
A. I don't know, maybe.
Q. Oh --
MR. MAGER: She's actually reference -- I'll take some time on the record to explain

Q. Oh, okay. Let me see if I can clarify a little bit more by prefacing it with the allegations in the complaint. Mr. Arakaki and his mother allege that they invested their life savings in a HUD apartment building based upon a HUD official stating that if his loan was ever sold, that he and his mom could bid on the loan in a whole loan sale. And the government has come back and claimed that the person that gave that assurance to Mr. Arakaki didn't have the authority to agree to that.

And what I'm asking you is on that dispute, would you have any testimony regarding whether that person did or did not have a delegation of authority to enter into such an assurance to Mr. Arakaki and his mother?

MR. MAGER: Objection, ambiguous, compound, the witness is not qualified to testify to that material -- what she's going to testify to or the questions I'm going to ask her. You can still answer the question, of course.

THE WITNESS: The field office person did not have the authority to say that to Mr. Arakaki.

BY MR. JARESS:

Q. You're asking me if that's what I'm asking or is that what you're saying?

A. That's what I'm saying.

Q. Okay. So do you know who that field person was?

A. I know his name.

Q. What is his name?

A. His last name is Ewing.

Q. And on what basis do you come to the conclusion that Mr. Ewing did not have the authority to give Mr. Arakaki and his mom that assurance?

A. Because as I said, the policy for loan sales are set in headquarters and that is not what the policy was for that sale. So he cannot give an assurance that had not been established by headquarters' loan sale authorities.

Q. Well, except for this one structured sale, haven't all other sales of loans been whole loan sales?

A. Yes, they had.

Q. So prior to that sale and after that sale in 1996 of the Arakaki loan, headquarters must have had a policy that whole loan sales were allowed, correct?

MR. MAGER: Objection, ambiguous. You can answer the question.

THE WITNESS: Yeah, whole sale -- whole

loan sales were allowed.

BY MR. JARESS:

Q. Okay.

A. Yes. We decided at the time of each sale what the structure of -- what type sale it will be.

Q. When you made that decision, don't you also make an exception for those particular loans in which there has been an agreement to the contrary prior to your decision?

A. But there are no decisions -- no decisions should have been made prior -- no.

Q. No assurance?

A. No assurance -- what I'm saying is that field office people are not authorized to make such assurances to any project owner about the disposition of a mortgage on their project.

Q. Is that a written policy?

A. And the policy in particular that you are asking me about right now -- is what a written policy?

Q. That no one in a field office has the authority to give an assurance that the loan will be sold as a whole loan sale rather than a structured sale?

A. You're asking me whether that's in writing