UNITED STATES COURT OF FEDERAL CLAIMS

EDWARD T. ARAKAKI and ) NO. 03-1874C
HELEN ARAKAKI, )
Plaintiffs, )
vs. )
THE UNITED STATES OF )
AMERICA, )
Defendant. )
________________________________)

DEPOSITION OF EDWARD ARAKAKI

Taken on behalf of Defendant at the Law Offices of R. Patrick Jaress, Jaress & Leong, Pacific Guardian Center, Mauka Tower, Suite 2920, 737 Bishop Street, Honolulu, Hawaii 96813, commencing at 9:09 a.m., on Thursday, September 15th, 2005, pursuant to Notice.

BEFORE: PATRICIA ANN CAMPBELL, CSR 108
Certified Shorthand Reporter
Notary Public, State of Hawaii

Q. Which agency?
A. That was for the Navy.
Q. And do you remember what your position title was?
A. Carpenter helper.
Q. Is that part-time or full-time?
A. That was full-time.
Q. How long did you stay in that position?
A. Maybe four to six months.
Q. What did you do after that?
A. I moved to personnel management.
Q. Was that also with the Navy?
A. Yes.
Q. How long were you in that position?
A. That and similar kinds of positions, maybe 27 years.
Q. What was your final grade and step?
A. GS 11.
Q. Do you know what step?
A. 10.
Q. What were your duties in personnel management?
A. They were various. I pretty much did all the major -- major components, classification, staffing, employee relations, a little bit of

training. Oh, and systems management, personnel systems management.

Q. What is personnel systems management?

A. It's the computer system for the personnel, federal personnel offices.

Q. Okay. When you say classification, what do you mean by classification?

A. That's I think more properly position classification. You asked me what grade I was. The position classification people, one of the things they do is establish grade.

Q. So you said you did that for 27 years.

A. Those things, yes.

Q. When did you finish working with the Navy personnel?

A. Several years ago. Gee, it's headed toward five years, almost.

Q. Time flies. Did you retire or --

A. I'm on what's called worker's comp.

Q. Okay. Is that a -- there are several --

Was it disability retirement, or was it a straight worker's comp? Were you --

A. Straight worker's comp.

Q. Okay. Since leaving the Navy, have you held any other jobs or positions?

head.

Q. Okay.

A. Okay. Countrywide, Safety Loan, and Ford Credit.

Q. Okay.

A. But I know there's at least one more. I just can't think of that name.

Q. Was this the first property that you purchased with your mother?

A. Well, I mentioned that the house on Hapaki Street I had a small interest in, but beyond that, yes.

Q. How did you work things out with your mother? Did you start a company or form a partnership to do this, or were you both just working together to make the investment?

A. Well, we -- we just worked together as family.

Q. So you didn't form a --

A. No.

Q. -- company?

A. No.

Q. And you didn't form a partnership?

A. No.

MR. JARESS: Objection to the competency

to answer whether he formed a partnership.

Q. (By Mr. Mager) Generally when we make objections, we will go back and forth about objections. If your lawyer tells you not to answer the question, you are not to answer the question. Otherwise, they are questions with regards to form and to the evidentiary nature a lot of our -- a lot of the discussions that we are having.

You mentioned a couple of other properties you have invested in. After purchasing or prior to purchasing Lake Mead Villas, after purchasing Lake Mead Villas, did you invest in any other properties?

A. No.

Q. Did any of your other real estate transactions involve an oral contract?

A. No. Well -- no. As far as I can tell, no.

Q. Okay. You mentioned your trip out to Las Vegas. What did you do on that trip?

A. Oh, the first thing we did was to meet with Mr. Ewing.

Q. When was this?

A. That was I think the 18th of October, '91.

Q. You didn't view the property first or meet with Mr. Little prior to this?
A. Not really. There was no point in looking at the property if the loan component of the deal wasn't going to work.
Q. And who was present for that meeting with Mr. Ewing?
A. Okay, Mr. Little, Mr. Matsuoka, Mr. Ewing, and myself.
Q. Did your mother attend this meeting?
A. Originally, she was going to, but no.
Q. Did she fly out to Las Vegas on that trip?
A. Yes.
Q. Do you know why she didn't attend the meeting?
A. Yeah. Mr. Little thought that it would be too technical.
Q. What do you mean by too technical?
A. It would just get into a lot of real estate about the loan. In fact, at the time I myself, I knew very little about defaulted loans.
Q. Did either Mr. Little or Mr. Matsuoka, to the best of your knowledge, know about defaulted loans, have any experience with that?

A. They appeared to know about that loan.
Q. So when you say Mr. Little thought the discussions would be too technical for your mother, do you mean that he thought it would be too difficult for her to understand what was going on with the transaction, or do you mean something else?
A. I think he thought that it would be difficult for anybody to understand.
Q. What was discussed at the October 18th, 1991, or thereabouts meeting?
A. Well, the reason why I am able to pin down the 18th of October date is because of a plane ticket which I located, the charge slip that bought the plane ticket. But there was a lot of things that were discussed, nearly all of it about the loan.
Q. Okay. I am going to have to start working our way through that.
A. Yeah.
Q. Specifically, could you describe some of the matters that were discussed at the October 18th meeting?
A. Well, we were looking at taking over a bad loan, so I wanted to find out the terms under which I would take over the loan, and at first

having worked in a government office myself, I thought maybe he could even hand me a sheet of paper that said here's the terms, but I found out almost from the beginning that Mr. Ewing had the power, at least in that meeting, to negotiate on the terms, and so we -- I covered the major problems.

It was a bad defaulted loan, and I asked Mr. Ewing, well, if I bought this loan today, what would keep you from turning around tomorrow and foreclosing on the property? And he said that HUD doesn't do it, HUD doesn't do that, and in particular, it's very easy for an owner to block a foreclosure by declaring bankruptcy. I asked Mr. Ewing that if I took over the note, what is to prevent HUD from just selling the note? I was aware that banks commonly sell notes to each other as a part of the business of notes and mortgages, and he said that they don't -- HUD wouldn't sell the notes. If they ever -- they don't sell notes the way I was asking.

If they ever sold the note, what they would do is to auction it, and he said that if they ever auctioned the note, that I would be able to bid on it, and it would be an actual opportunity to buy the note back for pennies on the dollar, and I had

I think I forgot to mention that when I met with him, I told him I am seriously considering buying the property and taking over the loan, so we knew we were having a business meeting, and he had told me that they were looking for a new owner because they were having problems with the current owner. Little did he know that he would be having problems with me, but -- so it was serious on both sides, and he seemed happy, and I -- I was happy, so then it was time to go look at the property.

Q. How did you find out that he had the power, that Mr. Ewing had, in your words, the power to negotiate?

A. I didn't at the time. I took it on good faith because Matsuoka and Little had set up the meeting, and I trusted Matsuoka, and through him I trusted Little.

Q. All right. You said that you were surprised. I mean, was it usual to have a government employee negotiate like that?

A. Yeah, I didn't -- I didn't know that could be done. In my business, there's rules and regs, and this is how the rules and regs are.

Q. We talked about foreclosure, and you said he said HUD doesn't do that. Did he promise

that HUD wouldn't foreclose?
A. No, that was more of an explanation, yeah. Because if I had to do anything along those lines, it would be my responsibility to take it to court, although it -- it didn't seem like there would ever be any problem in that area.
Q. When you said he used the phrase pennies on the dollar, did he give any more specific figure about what the buy back would be?
A. No, but when he told the story, it seemed like a fraction of the original price.
Q. You mentioned that the interest rate at the time you had this meeting was, and correct me if I am wrong because I may have this written down wrong, 8, 8-and-a-half percent, that was the market rate. Do you know what the market rate was at the time that you closed on the property?
A. No.
Q. Did he give you any paperwork at this meeting, flyers, handouts, brochures?
A. No.
Q. Everything was verbal?
A. Yes.
Q. Did you take any notes at the time or write anything down yourself?

A. No. I started to, and I looked over at either Little or Matsuoka, one of them was taking notes, so I -- I stopped because I was -- this was all new to me, so I was trying to concentrate on the -- the discussion.

Q. You said the right to bid was characterized as something fairly important. Why was it important to purchase the property?

A. Actually, I was concerned that they might sell the loan. That's all I knew about. They might just take the loan, sell it to somebody, and then I have to deal with the new owner of the loan, and it's a bad loan, and it was Ewing that said that I would have the right to bid or will have the right to bid.

Q. Had any of your previous loans been sold?

A. I think one was, but I can't recall which one.

Q. And would you know what time frame that would have occurred?

A. No.

Q. On that October, 1991, trip, did you meet with Dottie Manz at all?

A. I didn't meet with her. I don't know if

I met her. I don't think I met her.

Q. What about Andrew Robertson?

A. No, I definitely didn't see him at all.

Q. What did you do after meeting with Mr. Ewing?

A. The meeting was in the late afternoon, so after the meeting, we went back to the hotel.

Q. Did you discuss the meeting with your mother at that time?

A. No, we didn't discuss it with her.

Q. When did you discuss this meeting with your mother, if you did?

A. I didn't explain all of these details of the loan, auctions and loan conversions. I had all I could do to understand all of this myself.

Q. Did you do anything else with regard to Lake Mead Villas on that trip?

A. Yes. We -- I went out and looked at the property since the loan assumption looked very feasible and very good. I looked at the property and then that same weekend ended up making an offer on the property. We also looked at other properties to compare.

Q. Sort of like comps or --

A. Yeah, comparisons.

Q. -- on October 22nd, 1992.

A. Right.

Q. Did you sign it at different times? In other words, were you present when he signed the document?

A. No. I -- I haven't met Andrew Robertson as far as I can remember.

Q. All right.

A. I think this one was mailed. And like I mentioned, what I was told was that this wasn't a work out. It was a money balancing instrument.

Q. And what about the second work out, Exhibit 2 marked beginning with NEV 000887?

A. This is the actual work out, although it is strangely -- one of the things I thought when I saw it was that it doesn't have any of the oral agreements in it. But this was the work out.

Q. It was signed by Larry Little as a general partner. Do you know why it was signed by Larry Little?

A. I asked Larry Little to sign it for me.

Q. Okay.

A. But I don't know why he signed it as a general partner. I -- I don't know what that means.

Q. What was your relationship with Larry

Little?
A. He was my real estate representative.
Q. Okay.
A. And he also had authority to sign this.
Q. How did he have authority to sign?
A. I gave him the authority. Keith Matsuoka drafted the authorization document, and it was mailed off to Larry.
Q. By authorization document, and you may not know this, but would you know if that would be a power of attorney?
A. Possibly.
Q. And when you said general partner, you don't know of any partnership agreement that you entered into with Larry Little?
A. No, I never entered into a partnership with Larry.
Q. Did Larry Little have any financial stake in the property --
A. No.
Q. -- Lake Mead Villas?
A. No.
Q. You said that when you looked at this, it didn't have the oral agreements in this. When did you first look at it?

A. Well, I think my right to bid would also be mentioned in the negotiation.

Q. So just so I understand this, the right to bid encompassed a right to negotiate or a requirement to negotiate with you first?

A. No. I'm just making an offer here --

Q. Okay.

A. -- that I'm interested in negotiating, and I believe that the negotiation will also work to HUD's advantage, and at the time I don't think I had thrown out the idea of pennies for the dollar, and I could offer more than pennies for the dollar. Those kinds of things were running through my mind. As it turns out, numbers could be worked out where higher amounts could be offered, and it would still come out to HUD's advantage --

Q. How much --

A. -- as well as mine. You know, why do things a harder way and break promises and create problems when you don't have to?

Q. How much could you offer HUD? Did you have arrangements in place at this time?

A. Well, I wouldn't, you know, tell HUD ahead of time because --

MR. JARESS: The question was did you

have arrangements ahead of time?
THE WITNESS: No.
Q. (By Mr. Mager) How much cash on hand did you have to pay for the loan at this time?
MR. JARESS: At what time?
MR. MAGER: At the time of the letter we are talking about of August 19th, 1995.
A. Very, very little cash.
Q. (By Mr. Mager) How did you or did you have a plan to raise the cash required to purchase the loan?
A. Well, yeah, at some point in time after this letter and as HUD's plans on how they would auction became evident, I contacted a mortgage broker, and the amounts that he and I were talking about were over 100 percent of the principal balance. We could cover beyond 100 percent if we needed to.
Q. Who was the mortgage broker?
A. A gentleman named David Armstrong, and I could have talked to others, but he seemed very interested.
Q. Where was David Armstrong located?
A. I don't know.
Q. Do you know who he or what he --

A. I don't know off the top of my head. I have little notes and things from him.

Q. Do you know who or what institution he may have been affiliated with?

A. I don't recall what his company was.

Q. What were you using, if anything, for capital in this transaction? Was it the Lake Mead Villas property itself or --

A. Yes, because, of course, just talking now, it's not what I negotiated or planned to negotiate. The property was worth 3,000,000 or more, and the loan amount, if we were going to pay the whole 100 percent of the loan, the whole loan amount was 2.3 million, so I didn't have to come up with 3,000,000. I had to come up with 2.4 million or less or a little more, but who knows? That's a hypothetical now.

Q. Looking into US 0022, a letter dated September 27th, 1995, purporting to be from Ed Arakaki to Albert P. Sullivan, the director of Office of Multifamily Housing, have you seen this document before today?

A. Yes.

Q. What is it?

A. It's a letter that I signed and

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| EDWARD T. ARAKAKI and HELEN ARAKAKI,<br>Plaintiffs,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 03-1874C<br>(Judge Hewitt) |

**DECLARATION OF DOROTHY A. MANZ**

I, Dorothy A. Manz, declare as follows:

1. From September 24, 1989 through October 20, 1991, I served as a GS-12 Loan Specialist (Realty) in the Las Vegas, Nevada field office of the United States Department of Housing and Urban Development ("HUD" or the "Department").[1] On October 20, 1991, I was reassigned to the position of GS-12 Supervisory Loan Specialist (Realty). On November 1, 1992, I was promoted to Supervisory Loan Specialist (Realty), GM-13. Due to a reorganization of the Office of Housing, on February 19, 1995, my position was changed to Chief, Asset Management Branch, GM-13. I served as Chief, Asset Management Branch until my retirement at the end of December 1997.

2. The Supervisory Loan Specialist (Realty) position was also titled Loan Management Branch Chief. In 1991, the Director of the Housing Management Division, Benjamin Davis, supervised the Supervisory Loan Specialist (Realty) and the Office Manager, Andrew Robertson, supervised the Director of the Housing Management Division.

[1] Between September 23, 1990 and November 16, 1990, however, I served in a temporary position as the Supervisory Loan Specialist (Realty) for the Las Vegas, Nevada field office. Subsequent to this temporary duty, I was returned to the position of Loan Specialist (Realty).

3. I supervised David Ewing in my capacity as a Supervisory Loan Specialist (Realty) and as Chief, Asset Management Branch.

4. A provisional workout agreement ("workout agreement") was a formal written agreement between HUD and a mortgagor providing for steps to make a defaulted loan current. HUD did not permit oral workouts agreements.

5. I do not recall ever delegating any authority to enter into workout agreements to David Ewing.

6. Further, when I served as a Loan Specialist (Realty), GS-12, from September 24, 1989 through October 20, 1991, I had no authority to enter into workout agreements. Loan Specialists (Realty) were not authorized to enter into workout agreements at the time.

7. At no time while I was employed by HUD did I have the authority to enter into contracts or agreements giving an owner or potential purchaser of a multifamily project the "right to bid" upon their loan. The terms and conditions of all loan sales were handled by HUD headquarters in Washington, DC, and not by the Las Vegas, Nevada field office.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 9th day of November 2005 in Las Vegas, Nevada.

Dorothy A. Manz
DOROTHY A. MANZ

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| EDWARD T. ARAKAKI and HELEN ARAKAKI, Plaintiffs, | ) | |
| v. | ) | No. 03-1874C (Judge Hewitt) |
| THE UNITED STATES, Defendant. | ) | |

**DECLARATION OF ANDREW ROBERTSON, DC**

I, Andrew Robertson, declare as follows:

1. From December 2, 1990 through April 30, 1994, I was employed by the United States Department of Housing and Urban Development ("HUD" or the "Department") as the GS-14 Office Manager for the Las Vegas, Nevada field office.

2. As Office Manager for the Las Vegas, Nevada field office, I never possessed the authority to enter into a contract or agreement giving an owner or potential purchaser of a multifamily project the "right to bid" upon their loan. All authority to set and conduct the sale of multifamily assets resided in Department headquarters in Washington, DC.

3. When I was the Office Manager in the Las Vegas, Nevada field office, I had the authority to execute provisional workout agreements ("workouts") on behalf of HUD. A workout was a formal written agreement between HUD and a mortgagor designed to make a defaulted loan current within a set period of time. I sought and received the approval from Regional Counsel in the San Francisco, California HUD office before signing any workout agreements that I executed.

4. I never delegated my authority to execute workout agreements to David Ewing, nor would I have delegated any of my authority to a loan specialist.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 11th day of November 2005 in Las Vegas, Nevada.

ANDREW ROBERTSON, DC

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| EDWARD T. ARAKAKI and HELEN ARAKAKI,<br>Plaintiffs,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) ) ) ) ) ) ) ) ) | No. 03-1874C<br>(Judge Hewitt) |

**DECLARATION OF AUDREY HINTON**

I, Audrey Hinton, declare as follows:

1. I am the HUD Senior Housing Project manager in the Office of Asset Management. I served as the Associate Director for Operations in the Office of Multifamily Asset Management & Disposition from September 1995 to approximately October 1997.

2. Prior to the 1996 Partially Assisted Loan sale, multifamily project owners generally were allowed to bid on their loans. During this time, loans were not bundled, they were sold individually in what is termed "whole loan sales."

3. Owners were not allowed to bid on their individual loans in the 1996 Partially Assisted Loan Sale. In this sale, approximately 158 multifamily loans were transferred to a trust. A beneficial interest in this trust, along with the responsibility for servicing the loans (the "Class A Certificate"), was placed up for auction. HUD maintained a "Class B certificate" in the trust after the sale of the Class A certificate. This Class B certificate gave HUD a passive interest in the trust, as well as a potential entitlement to a pro-rata share of a portion of the cash flow from the trust.

4. Presently, owners can only bid on their loans if their loan is not in default, the required audited financial statements are submitted and they are not in violation of any regulatory or business agreements with HUD.

5. The terms and policy of every individual loan sale are set prior to the sale by Headquarters, Office of Housing, located in Washington, DC.

6. Field and Regional Offices do not and have never had the authority to set the terms or policy of loan sales, and they have never held the authority to enter into agreements regarding the terms of a loan sale.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 10th day of November 2005 in Washington, DC.

Audrey Hinton

AUDREY HINTON