# DEPOSITION OF LARRY JIM LITTLE TAKEN ON 4-08-03

***Page 1 to Page 68***

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

RALPH ROSENBERG COURT REPORTERS, INC.
1001 Bishop Street
2460 Pacific Tower
Honolulu, HI 96813
Phone: (808) 524-2090
FAX: (808) 524-2596

Page 1

IN THE CIRCUIT COURT OF THE FIRST CIRCUIT
STATE OF HAWAII

---

EDWARD T. ARAKAKI, et al.,

Plaintiffs,

vs. CIVIL NO. 02-1-1352-06

KEITH A. MATSUOKA, et al.,

Defendants.

---

DEPOSITION OF LARRY JIM LITTLE
Taken on behalf of the Plaintiffs, at the Ritz Carlton Hotel, 904 Iberville Street, New Orleans, Louisiana, commencing at 1:02 p.m., on April 8, 2003, pursuant to Notice.

**BEFORE:** DENNIS J. YANKEE, CSR NO. 285
Certified Shorthand Reporter

Page 2

**APPEARANCES:**

For Plaintiffs (Telephonically):
R. PATRICK JARESS, ESQ. and
JOHN RAPP, ESQ.
Jaress & Leong
737 Bishop Street, Suite 2920
Honolulu, Hawaii 96813

For Defendants Matsuoka, Harrison & Matsuoka, and William A. Harrison (Telephonically):
WILMA SUR, ESQ.
Miller Tokuyama Kralik & Sur LLP
Pacific Tower, Suite 2800
1001 Bishop Street
Honolulu, Hawaii 96813

For Defendant Larry Little:
JEFFREY S. PORTNOY, ESQ.
Cades Schutte Fleming & Wright
Suite 1500
1000 Bishop Street
Honolulu, Hawaii 96183

-oOo-

Page 3

INDEX


| EXAMINATION BY: | PAGE |
|---|---|
| MR. JARESS | 4 |
| MR. PORTNOY | 66 |


-oOo-

INDEX OF EXHIBITS


| | PAGE |
|---|---|
| Exhibit A: T.S. Nevada, Inc. Corporate Info | 4 |
| Exhibit B: Mid-Pac Nevada Development Corp. Corporate Info | 4 |
| Exhibit C: Department of Housing and Urban Development Provisional Workout Arrangement document | 4 |
| Exhibit D: Resume of Terry & Karen Rosenquist | 4 |
| Exhibit E: Third Amended Complaint; Summons; Certificate of Service | 4 |


-oOo-

Page 4

**(Deposition Exhibits A-E marked.)**

LARRY JIM LITTLE,
having been first duly sworn,
testified upon his oath as follows:

DIRECT EXAMINATION

**BY MR. JARESS:**

Q. Mr. Little, would you state your full name?
**A. Yes. Larry Jim Little.**
Q. And it's not Lawrence or James?
**A. It is not.**
Q. Mr. Little, what is your occupation?
**A. I am a real estate agent in the city of Las Vegas, Nevada.**
Q. And are you involved in any businesses besides real estate?
**A. No -- well, my wife and I are members of a small network marketing group, but we are not active in that now. We just use it as, to use the products, basically.**
Q. Are you an officer or director of any company or corporation, limited liability company, partnerships?
**A. I am an officer in two corporations that are located in Nevada. Secretary/treasurer of those corporations.**

Page 37

Q. Now, I understand that this meeting was a key meeting in the decision by Mr. Arakaki to make that offer.

MR. PORTNOY: Is that a statement of testimony or a question?

MR. JARESS: That's a question.

BY MR. JARESS:

Q. Am I right?

**A. To make, to make sure I'm clear, are you saying he made the offer as a result of the meeting?**

Q. Yeah. That was a key input into his making the offer.

**A. I would say that it was.**

Q. It was.

**A. I would say, yes, what he heard allowed him to conclude that he was prepared to make an offer.**

Q. Okay, and what did he hear from Mr. Ewing that made the offer attractive?

MR. PORTNOY: Well, I'm going to object. You're asking this witness to say what Mr. Arakaki's thought process and his state of mind is.

MR. JARESS: No, I'm just asking him what was said during that meeting that would make Mr. Arakaki or any other reasonable person find this property attractive.

Page 38

MR. PORTNOY: Well, I object again because it's calling for Mr. Little to assume what Mr. Arakaki's thought process was. But you can answer it to the extent you can respond.

**A. No, I, I don't know. I could not pinpoint the reasons why Mr. Arakaki felt like that this would be an investment that he would want to pursue.**

**As to what were the most important things, I, I couldn't tell you that.**

BY MR. JARESS:

Q. Well, just tell me some of the important things.

**A. Well, as you indicated, possibly that it could, it's an investment that he could make money, make a profit on over a period of time. That may have been a key factor.**

Q. Did Mr. Ewing tell him that?

**A. No.**

Q. No? Okay. So that wasn't what helped. What else did Mr. Ewing say?

**A. As I indicated, they discussed the note that was in place. They discussed the possibilities of working out the defaulted payments.**

**And those two things I know for sure in that meeting, and they may have been the things that**

Page 39

**put Mr. Arakaki over. I, I do not know that.**

Q. So working out the default on the note, that means that there was money that was unpaid and overdue, correct?

**A. Yeah, if it was defaulted, yes, it was back payments due.**

Q. Okay, so Mr. Arakaki walked into the meeting knowing the property was losing money, he knows that there was a large unpaid arrearages, correct?

**A. I don't know if it was large in his estimation or not.**

Q. But there were arrearages?

**A. That's correct.**

Q. Delinquencies?

**A. He was aware of all of this.**

Q. And so Mr. Ewing said, well, we'll do a workout with you.

MR. PORTNOY: Are you asking again or are you testifying?

MR. JARESS: I'm saying that, is that fact correct?

MR. PORTNOY: Is what fact correct? That he made that statement?

MR. JARESS: Yes.

Page 40

**A. Well, a provisional workout was discussed. That's as much as I can tell you.**

BY MR. JARESS:

Q. Yeah. And that was discussed by Mr. Ewing?

**A. Yes, but it wasn't in detail. It was just the fact that there would have to be a provisional workout arrangement made, and that's about as far as it went, because that was developed later.**

Q. Okay. So, basically, Mr. Ewing said the property looks like an ugly duckling now, but in the future we can make that property look attractive?

**A. Oh, I don't know that that was what he said or indicated. I think that Mr. Arakaki felt like that would be a possibility or he wouldn't have proceeded.**

Q. I see. What did you think?

**A. I thought the same thing.**

Q. That it was a good deal because there might be a provisional workout agreement?

**A. Oh, I wouldn't say just because there's a provisional workout agreement. I think you --**

Q. But that'd be a material --

MR. PORTNOY: Wait, wait, wait. Let him the answer question. Go ahead.

MR. JARESS: Go ahead.

Page 41

A. That that may be, that may be a factor, but there would have to be other factors involved, too.
BY MR. JARESS:
Q. Such as lowering the interest rate?
A. Such as, such as --
Q. Lowering the interest rate?
A. The potential for increasing rents, changing the management of the property, all the things that an experienced investor like Mr. Arakaki already had knowledge of and the ability to do.
Q. And how about lowering the interest rate?
A. That would, that may be a, certainly, a consideration, too.
Q. And Mr. Ewing said that HUD would lower the interest rate?
A. No, he did not. He did not.
Q. Are you denying that he said that?
A. I am denying that he said that. I would not say that it wasn't discussed. There was never any promise that the interest rate would be lowered on that note at that meeting.
Q. And what's the strongest thing that Mr. Ewing said about the interest rate that would entice Mr. Arakaki?
A. That in cases as a scenario that it has

Page 42

happened and that they would have to see after it was put in place, but that he would definitely have to buy the property at the existing interest rate.
Mr. Arakaki knew that from the very first meeting with Mr. Ewing.
Q. Okay. So he, Mr. Arakaki knew at that meeting that after he bought the property that HUD said that they would get into a provisional workout agreement?
A. They said that one would be necessary, yes, sir.
Q. One would be necessary?
A. That's, that's correct.
Q. And that's the agreement that you got into?
A. No, sir, I did not. I signed it, but I did not help write it or, or produce it. I have a, I have a record here indicating a fax from Mr. Arakaki to the property management company saying that they're in receipt of a fax transmittal dated December 21st, 1992.
I have read the terms and conditions of the provisional workout agreement, a copy of which I have signed and transmitted herewith, and authorize you to have the original signed by Larry Little, as our attorney-in-fact, and transmitted to HUD for further

Page 43

processing. Thank you for your assistance. Sincerely, Edward T. Arakaki.
Q. Now, so that Mr. Ewing talked about the provisional work out agreement and he talked about the lowering of the interest rate. Your testimony is no promises were made on the interest rate?
A. That's correct.
Q. Now, in your mind were these two statements about a future provisional workout agreement and the possibility of lowering the interest rates with no promise, were those strong enough inducements that you would recommend to Mr. Arakaki that he buy that property?
A. They would have been, but at that point we needed no further inducement. Mr. Arakaki made this decision on his own, in his own mind, to go ahead with the purchase of the property at that point.
Q. Was this before the meeting or after the meeting?
A. Well, I think the meeting substantiated what he felt.
MR. PORTNOY: Let me just interrupt for a second as the timekeeper. We're one hour into the depo, so there's a maximum of 30 minutes left on the two issues of the statute of limitations and the

Page 44

Prudential relationships.
I've kind of allowed the last several minutes to go on, which I think go to something else. But it's your time, Pat, and you've got 30 minutes.
MR. JARESS: Okay, I appreciate that.
BY MR. JARESS:
Q. Did Mr. Ewing say anything about Mr. Arakaki being able to buy the loan?
MR. PORTNOY: At this first meeting?
MR. JARESS: Yes.
A. In our discussion Mr. Ewing indicated, again, various scenarios. And he indicated that upon occasion an owner was able to buy the loan if it were put up for auction. That, that was Mr. Ewing's statement.
BY MR. JARESS:
Q. Did you understand that to be a fairly common practice at HUD?
A. I just heard what Mr. Ewing said at the time, sir, that's -- I didn't know what the common practice at HUD was. I don't know that with HUD that there was a common practice.
Q. What advantage would being able to bid on the loan be to Mr. Arakaki?
A. What advantage would it be?

Page 45

Q. Yes.
A. That he would be able to bid on the loan.
Q. Yes.
A. That he would be able to retain ownership of the loan, of the property.
Q. Okay. And normally these purchases of loans went at a discount?
A. I don't know.
Q. You never heard that?
A. I, I don't know that they normally went at a discount. No one, no one said what, what a discount would be or if there would be one.
There had been cases, again, that were described where there had been discounts by owners of the property when they bought them.
But in terms of Mr. Arakaki being told again that there would be, that he would be able to buy it at a discount or how much that would be, that was not the case.
Q. No, he was told, he was told that he could bid on the loan. And my question was, isn't it common knowledge that most of those loans that are bid on are purchased at a discount?
A. That, that may have been. I'm not aware.
Q. Even today?

Page 46

A. Even today.
Q. Did you wonder why Mr. Ewing bought that up?
A. Brought that up?
Q. Yeah. Why bring that point up if it's not going to be any big advantage to anybody?
A. Well, I assume that he brought it up because he may have felt that it would have been an advantage or something that Mr. Arakaki would want to use in making his decision on the property.
Q. Okay, but you didn't know how it fit into the transaction as an advantage?
A. Oh, I could see it when he mentioned the fact that that may happen, but it wasn't stated as such that this will happen, at a certain point you will have an opportunity to bid on this and, and buy it at a discount, because that wasn't said.
Q. No, what he said was that if we do sell it you have a right to bid on it?
MR. PORTNOY: Again, are you testifying or asking?
MR. JARESS: I'm asking him a question and a statement.
BY MR. JARESS:
Q. Is it true or not?

Page 47

A. He was not guaranteed the right to bid on his note is my understanding.
Q. Well, what was, what was said?
MR. PORTNOY: Other than what he's --
A. He may have an opportunity to bid on the property should it come up for auction, and there have been other cases where owners had bought the property when they were auctioned at a later date.
He had no idea when that or if that might happen.
BY MR. JARESS:
Q. Besides the information that you've told me now of what Mr. Ewing said at this meeting, was there anything else said that you perceived as being an inducement for a buyer such as Mr. Arakaki to acquire this property?
A. Only in relation to the provisional workout, which would have to be done over a period of time because they had to see what they would be able to do with the current owners, the sellers at that point, in terms of getting their problems worked out with HUD, and that would change the workout as far as Mr. Arakaki was concerned.
And that, as I said, would come at a much later time. And that was basically, those were

Page 48

basically the important issues, in my recollection.
Q. Well, let me ask you this. Was it your responsibility to find the property for Mr. Arakaki and close the deal?
A. It was to try to find, yes, possible properties that he would, that he might be interested in to fit his parameters.
Q. And to close the deal?
A. If he picked -- that, that would be up to him. I don't ever close a deal unless the buyer is ready to do just that.
Q. Okay, but you're instrumental in giving him the advice, input?
A. Not advice. I'm giving him opportunities, I'm giving him choices, solutions. He makes the decisions as to whether he goes ahead or not, just as all my clients do.
Q. Well, isn't it true, though, that it's part of your job to get that deal closed?
A. No, it's my job to present him with alternatives and to show him opportunities, and then he decides which way it goes.
If we get it into escrow, that's when I, it's my job to make sure the paperwork is done and the, my buyer gets the deal closed.

Page 49

Q. So you're basically a paper shuffler?
MR. PORTNOY: Well, I object. It's argumentative and it's a question that's really not worth answering. I'm going to instruct him not to answer as asked.
BY MR. JARESS:
Q. Let me ask, was HUD's David Ewing, was he in the driver seat on this transaction?
MR. PORTNOY: Well, I'll object on the question as vague and ambiguous by "driver seat." Go ahead, you can answer.
A. **He knew more about the property, and that's why we went there was to find out HUD's position on this particular property, and to give us as much information so that Mr. Arakaki could make an educated decision.**
BY MR. JARESS:
Q. And you were confident that when you were going to that meeting you were going to the right person?
A. **I had no reason to think otherwise.**
Q. Well, let me ask you this. Did the issue of Mr. Arakaki having the opportunity to buy the property -- or not buy the property, but buy the loan, was it discussed in detail?

Page 50

A. **No, sir, it wasn't.**
Q. Was anything discussed in detail?
A. **Just in terms of the condition, the property as it was at the time that the sellers had it, a little bit of background on it, which Mr. Ewing provided, some of the problems that they had had with the current owners, and it was an information meeting as much as anything.**
Q. With Mr. Ewing providing the information?
A. **I would say he provided most of it, because he had the most knowledge.**
Q. Okay. So, basically, you went to the meeting to hear about what HUD had to say about the property, Mr. Arakaki listened to him, and that meeting was instrumental, and then you prepared an offer and submitting it to the property on behalf of Mr. Arakaki?
A. **Well, I think it certainly, it contributed to it, a visit to the property by Mr. Arakaki, a look around, discussions with HUD certainly helped in that, and the current, or the potential property management company. There were several inputs before he made the decision to write the offer.**
Q. Now, let me ask you this. Is there anything that you didn't tell Mr. Arakaki about the

Page 51

property or the transactions before you wrote up the October 10th -- or October 20th offer?
A. **No. There's nothing I concealed from him or kept from him.**
Q. Later on is there anything that you concealed from him?
A. **No.**
Q. Is there anything that you failed to disclose to him later on that you should have disclosed?
A. **No, sir.**
Q. Well, let me ask you this about this foreclosure. At the meeting with Mr. Ewing did he say that HUD rarely forecloses?
A. **If he did, I do not recall that.**
Q. Did you become aware later on that Mr. Arakaki had an issue with HUD about being able to bid on that loan?
A. **I did.**
Q. And that's when you recommended him to Mr. Thompson?
A. **That's when he called me and asked me for the name of an attorney in Las Vegas that would help him, and that's when I did that.**
Q. Now, in the process of talking to

Page 52

Mr. Arakaki about his issues with HUD, you understood that HUD was planning on selling the loan?
A. **No, sir, I did not. It was a matter of years that I had no contact with how he was doing in regard to his loan, the property. It had closed two or three years earlier, and I'd, I was out of the loop as far as that. He, he chose to contact me when he saw fit. I did not call him in this regard.**
Q. So you didn't know anything about Mr. Arakaki finding out about the loans going to be sold?
A. **Not until he called me and told me, again, years later.**
Q. This was in 1996?
A. **It may have been.**
Q. 1996, okay. Now, did you know what happened after talking to Mr. Thompson?
A. **I -- no, no time frame. I didn't even know if Mr. Thompson even contacted him. I, I didn't know, I don't know to this day. I don't know right now whether Mr. Thompson contacted him or not.**
Q. Is that what was supposed to happen, Mr. Thompson was supposed to contact him?
A. **I gave, I gave him, Mr. Thompson, the fact that he was a client and he needed help with HUD here**

Page 53

in Las Vegas, and to make the, make contact if he was interested in following up.
Q. Do you know what happened to Mr. Arakaki's property?
A. I see through material that I received from you folks that that was put in foreclosure, I think, in finally in 1998. Didn't know until that time 'til I received that that that's what had happened.
Q. Were you surprised?
A. Surprised? Based on the conversations with Ed I knew it was a, Mr. Arakaki, I knew it was a possibility. But I didn't know the outcome of it.
Q. Did you ever wonder why he wasn't able to bid on the loan?
A. No, because I didn't know until he called me that he wasn't able, that he was not going to be able to bid on the loan.
Q. Did you know that HUD was selling a bunch of loans?
A. Only when he called me and told me.
Q. And you don't deal in HUD property, I take it?
A. That's correct.
Q. And you don't deal in HUD loans?
A. No.

Page 54

Q. And so you didn't know that HUD was selling, had gone from selling loans individually to putting them in a group and selling them?
A. I did not.
Q. That practice sounds different from what they were talking about in 1991, isn't it?
A. It may have been different. I, I don't know what their total practice was in 1991. Again, the scenarios that were pointed out to us were that there may be a possibility, and that was it.
Q. A possibility of what?
A. That the, that the owner may have an opportunity to bid on his note, but certainly wasn't given that, that opportunity by an agent in a local office. I don't think that decision would be made there.
Q. You mean that Mr. Ewing wouldn't be able to make that decision?
A. That's correct.
Q. How about the decision on the provisional workout, did he have the right to do that?
A. Was Mr. Ewing's signature on there?
Q. Yeah.
A. Oh, I thought Mr. Robertson was on there.
Q. No. I'm talking about Mr. Ewing.

Page 55

A. Okay, Mr. Ewing, the provisional workout, I don't know who within HUD's office.
Q. No, no. I'm asking you, sir, back in when you met with Mr. Ewing, Arakaki and Matsuoka.
A. Okay.
Q. I'm just trying to find out how much authority you thought that Mr. Ewing had. You didn't think he had enough authority to, to make any assurances on a, that he could bid on the loan.
Do you think he had any, enough authority to give assurances that he could say that HUD would get into a provisional workout agreement?
A. I think that that has already been, had been determined on the loan that whoever bought it would have to get into some form of provisional workout unless --
Q. That wasn't my question. My question was, did you think that Mr. Ewing had enough authority to assure somebody that HUD would get into a provisional workout?
A. Yes, sir. Yes, I'm sorry.
Q. He had enough for that?
A. I'm sorry, yeah.
Q. But not enough authority that Mr. Arakaki could bid on the loan?

Page 56

A. That's correct.
Q. And what about, do you think that Mr. Ewing had enough authority to give assurances that the interest rates would be lower?
A. Not at all. I don't know how he would know what the interest rates would be over a period of time.
Q. But he, he wouldn't even have enough authority to say that, well, we'll lower them but we don't know how much?
A. I would -- I don't know how, no, I don't know that he'd had that authority.
Q. Okay. Now, after the meeting did you confer with Mr. Arakaki?
A. Yes, we did.
Q. And what did you advise Mr. Arakaki?
A. I didn't advise him. We just went over what was said in the meeting, what his options were. I don't recommend, I don't advise. I, again, I just present him with what's out there, what the opportunities are, and he makes the decision.
Q. So he never asked you what you thought?
A. If he had, I don't recall if he did or not, but if he had, I would have not told him that this is the one for you, or whatever. That would be his

# DEPOSITION OF KEITH A. MATSUOKA TAKEN ON 5-1-03

***Page 1 to Page 85***

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

RALPH ROSENBERG COURT REPORTERS, INC.
1001 Bishop Street
2460 Pacific Tower
Honolulu, HI 96813
Phone: (808) 524-2090
FAX: (808) 524-2596

Page 5

KEITH A. MATSUOKA,
called on behalf of Plaintiff, was first duly sworn to tell the truth, the whole truth, and nothing but the truth, and testified as follows:

EXAMINATION

BY JARESS:

Q. Would you state your name, please?
A. **Keith Matsuoka, M A T S U O K A.**
Q. And, Mr. Matsuoka, you are an attorney?
A. **That's correct.**
Q. Okay. This is going to be a deposition that is going to be on the statute of limitations in this case. Did you know that before coming in here that it is going to be limited?
A. **Yes.**
Q. I am going to ask you some questions about different people before we start so we don't have to stop in the deposition and have you identify them at the time, so I will just be going through a list of names, and you just tell me if you know who people are or not --
A. **All right.**
Q. -- and if I need some additional identification, I will ask.
Okay, first of all, do you know Edward

Page 6

Arakaki?
A. **Yes.**
Q. And how long did you know Mr. Arakaki?
A. **I'm not real certain.**
Q. Could you give me an estimate?
A. **Probably since about 1984 or '85.**
Q. And do you know his mother, Helen Arakaki?
A. **If I can recall correctly, I met her once.**
Q. I see, and when was that?
A. **I have no idea.**
Q. Okay. Was it in Hawaii or Las Vegas?
A. **I don't recall.**
Q. Did you fly to Las Vegas with her once?
A. **No.**
Q. Do you know Larry Little?
A. **Yes.**
Q. Okay, and how do you know Mr. Little?
A. **He used to be in a golf club that I belonged to. He was the University of Hawaii basketball coach. Subsequently, he was executive director of the Hula Bowl. He moved to Las Vegas and became a realtor.**
Q. Do you know of a project called Canyon Gate?
A. **Yes.**

Page 7

Q. And what is that?
A. **It was a housing project.**
Q. You answered some interrogatory questions about attending meetings there for about a year on the project. Do you recall those interrogatories?
A. **Yes.**
Q. Okay. What year was that?
A. **I'm not real certain.**
Q. Could you give us an estimate?
A. **Maybe 1989.**
Q. This was in Nevada, wasn't it?
A. **Canyon Gate?**
Q. Yes.
A. **Canyon Gate is in Nevada, yes.**
Q. Do you know a man by the name of Ken Gragson?
A. **Yes.**
Q. And who do you know him to be?
A. **Ken Gragson was one of the principals of the real estate firm that Larry worked in.**
Q. Okay, this was the Prudential firm?
A. **Again, I don't recall exactly. It was a long time ago, but I think they had a different name when I first met him, and they subsequently became Prudential something or other realty.**

Page 8

Q. And what about a man by the name of Pete Silivagni?
A. **Pete Silivagni was also a principal.**
Q. Now, you have met these fellows face to face, Ken Gragson and Pete Silivagni?
A. **Yes.**
Q. And did you have business dealings with them or just a meeting?
A. **I don't understand what you mean by meeting.**
Q. Well, did you have some sort of business dealings with them, or did you just meet them in passing to shake hands and be introduced to them?
A. **Well, I think we had a few meals with them.**
Q. But I guess what I was getting at is did you conduct any business with them of any sort?
MS. SUR: I object as vague.
A. **Again, I'm not real sure. You have to define business for me. Business is a whole lot of things.**
Q. (By Mr. Jaress) Well, let me ask you it this way. When you sat at the meals, did you discuss only social things, or did you discuss anything of a business nature?
MS. SUR: Same objection, vague and

Page 53

to what I am talking about. I mean, do you have any expertise at all on any type of HUD transactions?
A. **No, I do not.**
Q. Now, at the meeting with Mr. Ewing, did he give any assurances to Mr. Arakaki that if he bought the building, meaning the Lake Mead Villa apartments, that he would have an assurance that if they ever sold the note that he could bid on it?
A. **No.**
Q. That was never mentioned?
A. **No.**
Q. Now, when you said that the property looked nice, I'm not sure if that's exactly how you phrased it, does that mean from a business standpoint that it would be a profitable venture to purchase it?
A. **No.**
Q. What does that mean?
A. **From a physical standpoint.**
Q. It looks nice?
A. **It looks nice.**
Q. Okay.
A. **Visually.**
Q. Visually?
A. **Yes.**
Q. Did you have any idea of what the financial

Page 54

statements on the apartment building looked like?
A. **No.**
Q. Did you feel that you would be in a position to be able to advise him that the purchase of that apartment building would be either better or worse than the apartment building he was thinking about buying in Sacramento?
A. **No.**
Q. You never gave him any advice on that?
A. **No.**
Q. Did Mr. Little ever give him any advice on that, to your knowledge?
A. **I don't know.**
Q. To your knowledge, when you went over to Las Vegas with Mr. Arakaki, was that apartment building losing money for the current owners?
MR. HORNER: I'm sorry.
Q. (By Mr. Jaress) Do you know that?
MR. HORNER: I'm sorry. Court reporter, would you repeat the question?
MR. JARESS: Let me just rephrase it.
MR. HORNER: Okay.
MR. JARESS: There is no sense in having her repeat it.
Q. (By Mr. Jaress) When you went over with

Page 55

Mr. Arakaki to Las Vegas, did you know during that trip at any time that that apartment building was losing money under the then current owners?
A. **Well, losing money can be defined in any variety of ways, but I know that the then current owners were not performing under the loan which is why HUD got it back.**
Q. And they weren't performing because it was losing money --
MS. SUR: Objection, misstates the testimony.
Q. (By Mr. Jaress) -- is that right?
MS. SUR: Objection, misstates the testimony, calls for speculation.
MR. JARESS: Look, my questions are obviously to get some answers, and you keep saying that they are misstating the testimony.
MS. SUR: Well, you are, you are misstating the testimony.
A. **Are you an accountant?**
MS. SUR: You are misstating the testimony, and you are calling for speculation, because you don't seem to have an idea as to how the lay the proper foundation for your question, so I am obligated to object.

Page 56

MR. JARESS: This is a deposition. This isn't the trial testimony, young lady.
MS. SUR: Young lady?
MR. JARESS: Yes.
MR. HORNER: Say thank you.
MR. JARESS: Yes.
MS. SUR: I will let that pass. Continue on with your question.
Q. (By Mr. Jaress) Yes, you knew that the apartment building was losing money?
A. **It wasn't performing.**
MS. SUR: Calls for speculation.
Q. (By Mr. Jaress) Because it was losing money?
MS. SUR: Calls for speculation.
A. **I am not going to answer that**
Q. (By Mr. Jaress) I just want to know your state of mind, that's all I am asking. I am not asking an accountant or anything, but when you went over there, are you denying that you knew that the present owners were losing money on that apartment? Are you denying it? Are you saying, oh, I don't know that they were losing money; is that what you are telling me?
A. **It's -- you want to -- you want to stick the square peg in the wrong hole, and it's not gonna**