IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| EDWARD T. ARAKAKI and HELEN ARAKAKI, Plaintiffs, | ) | |
| v. | ) | No. 03-1874C (Judge Hewitt) |
| THE UNITED STATES, Defendant. | ) | |

**DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACT**

Pursuant to Rule 56(d)(1), of the Rules of the United States Court of Federal Claims ("RCFC"), defendant, the United States, respectfully submits the following proposed findings of uncontroverted fact:

1. On June 5, 2002, Mr. Edward T. Arakaki filed an action in the Hawaii state court against Mel Martinez, then-Secretary of the United States Department of Housing and Urban Development ("HUD" or the "agency"), and HUD itself. Def. App. 1-6.[1]

2. Ms. Helen Arakaki was not listed as a separate plaintiff on the June 5, 2002 complaint. Id.

3. Ms. Helen Arakaki was first listed as a separate plaintiff on the third amended complaint, filed on March 14, 2003 with the United States district court. Def. App. 7-8.

4. Ms. Helen Arakaki is the mother of Mr. Edward Arakaki.

5. On or about October 18, 1991, Mr. Arakaki, Mr. Larry Little, and Mr. Keith Matsuoka met with a HUD employee, David Ewing (the "October 1991 meeting"). Compl. ¶ 6; Def. App. 13, 195.

---

[1] "Def. App. __" refers to the appendix attached to defendant's motion for summary judgment, or, in the alternative, partial motion to dismiss.

6. Ms. Arakaki did not attend the October 1991 meeting. Def. App. 195.

7. Mr. Arakaki attended the October 1991 meeting in connection with possible purchase of a 76-unit apartment building in Las Vegas, Nevada, known as Lake Mead Villas ("Lake Mead"). Compl. ¶ 6.

8. At the time of the October 1991 meeting, HUD did not own Lake Mead Villas.

9. At the time of the October 1991 meeting, HUD did not own the mortgage for Lake Mead Villas.

10. At the time of the October 1991 meeting, HUD insured the mortgage on Lake Mead Villas.

11. At the time of the October 1991 meeting, a number of units at Lake Mead Villas were subsidized through HUD's section 8 program.

12. At the time of the October 1991 meeting, the mortgage loan for Lake Mead was in the process of being assigned to HUD.

13. Mr. Arakaki alleges that Mr. Ewing made oral representations at the October 1991 meeting to Mr. Arakaki that if HUD ever wished to sell the mortgage loan after assignment, plaintiffs would have the "right" to bid on the loan at an auction. Compl. ¶ 8.

14. David Ewing does not admit that he made oral representations at the October 1991 meeting to Mr. Arakaki that if HUD ever wished to sell the mortgage loan after assignment, plaintiffs would have the "right" to bid on the loan at an auction.

15. Mr. Little denies that Mr. Ewing made oral representations at the October 1991 meeting to Mr. Arakaki that if HUD ever wished to sell the mortgage loan after assignment, plaintiffs would have the "right" to bid on the loan at an auction. Def. App. 217, 219.

16. Mr. Matsuoka denies that Mr. Ewing made oral representations at the October 1991 meeting to Mr. Arakaki that if HUD ever wished to sell the mortgage loan after assignment, plaintiffs would have the "right" to bid on the loan at an auction. Def. App. 222.

17. No documentation (from the period October 1991 through October 1992) exists memorializing a purported agreement giving Mr. Arakaki a "right to bid" on the property should HUD sell the property at auction.

18. On October 20, 1991, Mr. Arakaki signed a purchase agreement for Lake Mead ("Purchase Agreement"). Def. App. 22.

19. The Purchase Agreement granted Mr. Arakaki the ability to purchase Lake Mead for $3,000,000. Id.

20. Mr. Arakaki made an earnest money deposit of $15,000 in connection with the Purchase Agreement, which sum was subject to be retained as liquidated damages and consideration for execution of the agreement in the event that Mr. Arakaki failed to complete the purchase. Id.

21. On October 22, 1991, the then-owner of Lake Mead Villas signed the Purchase Agreement. Id.

22. On October 28, 1991, the mortgage for Lake Mead Villas was assigned to HUD. Def. App. 24-25.

23. On October 22, 1992, HUD and plaintiffs entered into an initial Provisional Workout Agreement ("October 1992 provisional workout"). Def. App. 26-29.

24. Andrew Robertson, office manager for the Las Vegas, Nevada field office, signed October 1992 provisional workout on behalf of HUD. Id. at 26, 29.

25. The October 1992 provisional workout contained no provisions expressly providing plaintiffs a "right to bid" on their loan at auction. Id. at 26-29.

26. Closing on Lake Mead occurred on October 29, 1992, whereupon plaintiffs became the owners of Lake Mead. Def. App. 30.

27. HUD and the plaintiffs entered into another Provisional Workout Agreement, effective March 1, 1993 through February 29, 1996 ("March 1993 provisional workout"). Def. App. 31-33.

28. Andrew Robertson, office manager for the Las Vegas, Nevada field office signed the March 1993 provisional workout on behalf of HUD. Id. at 33.

29. Mr. Larry Little signed the March 1993 provisional workout on behalf of the plaintiffs. Id. at 33.

30. Mr. Arakaki reviewed the March 1993 provisional workout prior to Mr. Little's signing the document. Def. App. 216.

31. Mr. Little was authorized to sign the March 1993 provisional workout on behalf of the plaintiffs. Def. App. 202-203, 216.

32. The March 1993 provisional workout contained no provisions expressly providing plaintiffs a "right to bid" on their loan at auction. Def. App. 31-33.

33. On July 5, 1995, plaintiffs were made aware that HUD planned to bundle plaintiffs' loan with other loans in an upcoming multifamily mortgage loans sale. Compl. ¶ 16; Def. App. 34-35.

34. On April 26, 1996, HUD published a notice opening the multifamily loan auction and explaining the details of that auction. Notice of Sale of HUD-Held Multifamily Mortgage Loans, 61 Fed. Reg. 18,652 (Apr. 26, 1996).

35. As part of the partially assisted sale, plaintiffs' loan was transferred to a trust with 157 other loans (the "Trust"). Def. App. 210.

36. A beneficial interest in the Trust, along with the responsibility for servicing the loans (the "Class A Certificate"), was placed up for auction in a partially assisted loan sale. Id.

37. HUD was to maintain an interest in the Trust (the "Class B Certificate") after the sale of the Class A Certificate. This Class B Certificate gave HUD a passive interest in the Trust, as well as a potential entitlement to a pro-rata share of a portion of the cash flow from the Trust. Id.

38. WHUDA Real Estate Limited was the successful bidder on the Class A certificate, and obtained a seventy percent interest in the Trust. Def. App. 36-37.

39. A thirty percent interest in the Trust remained with HUD, as holder of the Class B Certificate. Def. App. 38-39.

40. Closing for the partially assisted sale was held on June 27, 1996. Def. App. 36-39.

41. The March 1993 provisional workout expired on February 29, 1996. Def. App. 31-33.

42. Plaintiffs failed to make further payments upon the mortgage to HUD after February 29, 1996. Def. App. 40-42, 43.

43. On September 27, 1996, the administrator of the trust and holder of the Class A Certificate filed a foreclosure notice for Lake Mead. Def. App. 44-45.

44. On September 27, 1996, Mr. Arakaki filed for Chapter 11 bankruptcy. Def. App. 46-47. See In re: Edward Arakaki, Case No. 96–02147 (Hawaii Bankruptcy Ct. 1996).

45. Foreclosure was temporarily stayed by the bankruptcy. See In re: Edward Arakaki, Case No. 96–02147 (Hawaii Bankruptcy Ct. 1996).

46. On November 28, 1997 the stay of foreclosure was lifted. See In re: Edward Arakaki, Case No. 96–02147 (Hawaii Bankruptcy Ct. 1997).

47. A foreclosure sale was held, and the plaintiffs lost ownership of Lake Mead. Compl. ¶ 18.

48 HUD Headquarters in Washington, D.C. possessed the sole authority to set the policy and terms of all multifamily note sales. Def. App. 126-31, 132-38, 140-42, 146-57, 165-66, 169-72, 175-76, 183-84, 187-89, 207-08, 209-10, 211-12.

49. The authority to set the policy and terms of all multifamily note sales was never delegated to the HUD field offices. Id.

50. The August 1991 revisions to the Insured Project servicing handbook states:

> [a] modification of Note and Mortgage is a written agreement between HUD and the mortgagor which permanently modifies the terms of the mortgage and note secured by property. Depending on local law, modification agreements may be recorded. A Modification Agreement may provide for such actions as: recasting the principal balance of the mortgage note and establishing a new amortization schedule; changing the term of the note and mortgage; increasing the interest rate or in the case of a bond refunding, changing the interest rate on the mortgage note; adding a call provision; adding a late payment fee; or taking any other action that would modify the terms of the mortgage.

Def. App. 75-76.

51. The August 1991 revisions to the Insured Project Servicing Handbook states that:

> [a] provisional workout arrangement is a written agreement between the mortgagor and HUD acknowledging that the mortgagor's loan is in default, that the parties have agreed on steps to be taken to bring the loan current, and that HUD will hold the loan in default and will not begin foreclosure proceedings as long as the owner is complying with the terms agreed to in a workout.

Def. App. 75.

52. The August 1991 revisions to the Insured Project Servicing Handbook states that:

> A. Workout Arrangement
> This is a formal written agreement between the project owner and HUD under which HUD agrees to hold the loan in default, provided the owner submits to HUD specified payments each month.

Def. App. 80.

53. The August 1991 revisions to the Insured Project Servicing Handbook describe a workout as a "document." Def. App. 89.

54. The August 1991 revisions to the Insured Project Servicing Handbook states that a workout is not effective until "signed." Def. App. 89.

55. The August 1991 revisions to the Insured Project Servicing Handbook provide for the distribution of "copies" to various HUD offices. Def. App. 97.

56. August 1991 revisions to the Insured Project Servicing Handbook provide that a workout

> is not effective until signed both by the owner and the authorized HUD representative. The authorized HUD representative at the Field Office level shall be the Director, Housing Management Division.

Def. App. 89.

57. At no time did Mr. Ewing hold the position of Director, Housing Management Division, HUD.

58. Mr. Ewing was not delegated the authority to enter into a workout. See Def. App. 164, 210.

59. Hal DeCell, III was the Assistant Secretary for Legislation and Congressional Relations, HUD. See Def. App. 59-62.

60. The Assistant Secretary for Legislation and Congressional Relations, HUD possessed no express contracting authority. Def. App. 63-64.

61. Prior to the partially assisted loan sale, Mr. Arakaki did not inform HUD that he possessed a "right to bid" on his loan at auction. Def. App. 57, 58.

62. Prior to the partially assisted loan sale, Mr. Arakaki sought to "negotiate" to purchase his loan directly from HUD. Id.

63. Mr. Arakaki thought it odd that Mr. Ewing would be able to negotiate, but relied upon Mr. Matsuoka and Mr. Little in this regard. Def. App. 196-197.

64. In his sworn deposition testimony, Mr. Matsuoka testified:

> Q: Now at the meeting with Mr. Ewing, did he give any assurances to Mr. Arakaki that if he bought the building, meaning Lake Mead Villa apartments, that he would have an assurance that if they ever sold the note at auction he could bid upon it?
> A: No.

Def. App. 222.

65. Mr. Little provided sworn deposition testimony stating:

> A: He was not guaranteed the right to bid on his note is my understanding.
> Q: Well, what was, what was said?
> . . . .

A. He may have an opportunity to bid on the property should it come up for auction, and there may have been other cases where owners had bought the property when they were auctioned at a later date.
He had no idea when that or if that might happen.
. . . .
A. . . . Again, the scenarios that were pointed out to us were that there may be a possibility, and that was it.
Q. A possibility of what?
A. That the owner may have an opportunity to bid on his note, but certainly wasn't given that, that opportunity by an agent in the local office. I don't think that decision would be made there.
Q. You mean that Mr. Ewing wouldn't be able to make that decision?
A. That's correct.

Def. App. 217, 219.

66. HUD had the express right to foreclose on plaintiffs for such failure to pay. Def. App. 48, 52, 53.

67. HUD never promised that it would not foreclose, in the event of default. Def. App. 198-99.

68. Mr. Arakaki did not inform Ms. Arakaki of the alleged agreement with Mr. Ewing regarding a "right to bid" prior to signing the Purchase Agreement. Def. App. 195, 201.

69. Mr. Arakaki did not inform Ms. Arakaki of the alleged agreement with Mr. Ewing regarding a "right to bid" prior to November 1992. Def. App. 195, 201.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

/s/ Kathryn A. Bleecker
KATHRYN A. BLEECKER
Assistant Director

/s/ Steven M. Mager
STEVEN M. MAGER
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit, 8th Floor
1100 L St. NW
Washington, D.C. 20530
Tele: (202) 616-2377

Of Counsel:
BATINA R. WILLS
Office of Litigation
Department of Housing and
Urban Development

November 15, 2005

Attorneys for Defendant

CERTIFICATE OF FILING

I hereby certify that on this 15th day of November, 2004, a copy of the foregoing "Defendant's Proposed Finding of Uncontroverted Facts" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ Steven M. Mager
Steven M. Mager
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice