No. 03-1874C
Judge Hewitt

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

EDWARD T. ARAKAKI and HELEN ARAKAKI

Plaintiffs

v.

THE UNITED STATES

Defendant

PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT FILED ON NOVEMBER 15, 2005

DECLARATION OF EDWARD ARAKAKI
APPENDEX

CERTIFICATE OF FILING

R. PATRICK JARESS
JARESS & LEONG
737 BISHOP ST. SUITE 2920
HONOLULU, HI 96813

Attorney for Plaintiffs

# TABLE OF CONTENTS

STATEMENT OF THE ISSUES . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . 1

I. Nature of the Case . . . . . . . . . . 1

II. Statement of Facts . . . . . . . . . . 4

III ARGUMENT . . . . . . . . . . 4
- A David Ewing had Implied Actual Authority. . . . . . . . . . 4
- B The Alleged Oral Agreement was a valid Work out Agreement . . . . . . . . . . 7
- C. David Ewing Made the Alleged Oral Promise . . . . . . . . . . 10
- D. The Alleged Oral Promise Had the Elements of a Contract . . . . . . . . . . 12
- E. The Nevada Statute of Frauds Does Not Bar the Alleged Oral Agreement . . . . . . . . . . 14
- F Mrs. Arakaki's Claims For Relief Should Not Be Dismissed . . . . . . . . . . 16
- G HUD's Breach of the Oral Agreement Caused Damages to Plaintiffs . . . . . . . . . . 18.

IV CONCLUSION . . . . . . . . . . 19

# TABLE OF AUTHORITIES

## CASES

*Alpark Distributing, Inc. v. Poole, 95 Nev. 605, 607-* 608 (1979) ........................16

*Bernkrant v. Fowler* 55 Cal. 2d 588 (1961) ...............................................15

*Cherokee Oil Co., Ltd. v. Union Oil Co.*, 706 F. Supp. 826, 829 (1989) ............... 14

*Hanu v. Yamaichi, 30 Haw. 959* (1929) ....................................................17

## STATUTES

§634-1HRS ....................................................................................17

Nev. Rev. Statutes 111.205(1) ................................................... ....... 14

Nev. Rev. Stat § 111.210 ............................................................... 14

Nev. Rev. Statute 111.220 ............................................. ............14, 15

## RULES

Rule 17 (b) of the Rules of the Court ..................................................17, 18

## TREATISES

**9 *Williston on Contracts*, § 21:7** (4th ed. 1994) ........................................ 14

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| EDWARD T. ARAKAKI and HELEN ARAKAKI, | ) | PLAINTIFF'S REPONSE MEMORANDUM TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT |
| Plaintiffs, | ) | |
| vs. | ) | |
| THE UNITED STATES, | ) | No. 03-1874C<br>(Judge Hewitt) |
| Defendants. | ) | |

PLAINTIFF'S REPONSE MEMORANDUM TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## I Nature of the Case

This is a breach of contract case. Plaintiffs allege Defendant HUD promised Plaintiffs[1] if HUD became the owner of a loan on a financially troubled apartment building, HUD would not re-sell the loan without letting Plaintiffs bid on it. This was a crucial right since the apartment building was worth substantially less than the face amount of the seriously delinquent loan and had a negative cash flow.

Plaintiffs purchased the apartment and assumed the seriously delinquent loan ("the loan") secured by the Lake Meade Villas. Six days later the original lender the assigned the problem loan to HUD, as the Plaintiffs and HUD had anticipated.

Despite the earlier assurance given to Plaintiffs while considering investing the $500,000 in cash, HUD later auctioned the loan and *did not let Plaintiffs bid*.

[1] Mrs. Arakaki is a 77-year-old native of Okinawa who only came to the U.S, in her later years. Her son and co-investor represented her in most of the investment matters since she speaks limited English. App-63

The facts behind HUD's surprising decision to renege on its earlier promise were investigated twice before this lawsuit was filed; with the exact same findings each time: HUD assured Plaintiffs they could bid on the loan if offered for resale. Then, after Plaintiffs paid the $500,000 and assumed the loan, HUD changed its mind and broke the agreement to make more money.

The first investigation was conducted in May 1996 by Under Secretary of Housing Decell, in response to a legislative inquiry[2]. The Under Secretary conceded that HUD made the promise and said that HUD had changed its mind because a 1994 law gave HUD the additional option of selling a large group of loans at once rather than one at a time as before. Perhaps because this breach by HUD was about to happen, the Under Secretary gave a new assurance, that Plaintiffs would have the same rights to work out the trouble loans as before. App-47, 48

But this didn't happen. Instead the new assignee of the note, who bought it at a great discount off of it face value, foreclosed against Plaintiff for the full amount. Plaintiff lost everything, since the value of the property at that time was less than the amount owed on the loan. App-63-65 Later HUD admitted it "had no control over the new owners" and that "in general the new owners were in it to make money in the short term not the long term." Therefore they foreclosed "across the board." App-54 The Under Secretary again wrote to the legislator who had inquired about Plaintiffs' unfortunate loss, repeating his admission and apologizing for the "inaccurate" assurance he gave the year before. App- 49, 50

In 1999, Plaintiffs asked the Inspector General ("IG") for more information, and the IG interviewed HUD personnel and confirmed Plaintiffs' allegations about the promise. HUD again cited the new law in 1994 that allowed HUD to sell bundles of loans as the reason HUD changed its mind, and explained that HUD's decision was simply economically motivated:

"Owners were not allowed to bid on their individual loans.

[2] This was discussed in the Court's memorandum on the Defendant's first motion.

> This method was expected [by HUD] to maximize proceeds and provide better returns to the benefit of the taxpayers."

App-

Plaintiff Edward Arakaki[3] then filed a complaint in Hawaii Circuit Court on June 5, 2002 claiming the government cannot renege on its promises merely to make money. The case then moved to the federal district court and then to the Court of Claims.

Last year, HUD moved for summary judgment arguing that the auction took place prior to June 5, 1996, putting it past the six year statute of limitations.

The court ruled there was conflicting evidence on this point: Some documents suggested the sale closed before June 5, 1996 which would time bar the suit, but other documents, some produced by Defendants, showed the sale closed after June 5, 1996.

In its present motion for summary judgment, HUD no longer claims the auction closed before June 5, 1996, and cites June 27, 1996 as the operative date. However:

- HUD does raise a new statute of limitations against Mrs. Arakaki, and for reasons discussed later, Plaintiffs urge the court that HUD's motion is not well taken.

- HUD also renewed its argument that HUD's Loan Specialist/Asset Manager (David Ewing) lacked the authority to promise Plaintiffs the right to bid on the loan if it were acquired and later auctioned off.

- HUD also claimed that Nevada law controls and does not allow an oral contract be enforced against a contracting party—even though Plaintiffs performed by the payment of $500,000, (much of which went to pay HUD for the prior owner's delinquency).

- Finally, HUD argues even if the Court finds that David Ewing did have the authority to make the promise to Plaintiffs, that the Court should disregard all the prior HUD admissions and grant summary judgment that Ewing didn't promise the right to bid because now Ewing claims he can't remember, and HUD offers two new witnesses with surprisingly different testimony given in another case.

Plaintiffs believe these points are not well taken and the motion should be denied.

---

[3] Mrs. Arakaki was very reluctant to file a case against the U.S. government and assigned her claim to her son who filed the claims. App-4 The possible effect of this will be discussed in the memorandum.

## II. Statement Of Facts

In 1991, Edward Arakaki and his mother Helen Arakaki ("Plaintiff") were considering the purchase of real estate for the investment of their savings. An attorney in Hawaii by the name of Keith Matsuoka had represented Mr. Arakaki in an earlier divorce and volunteered that he knew of a 76-unit apartment building for sale in Las Vegas that would be a good investment. He said that a real estate broker who could represent Mr. Arakaki was a man named Larry Little, a well-known former basketball coach for the University of Hawaii who had moved Las Vegas. App 63-65

Mr. Matsuoka, Mr. Arakaki and his mother went to Las Vegas to look at the building. The sale price was $3 million, with $500,000 down. The apartment building, called the Lake Meade Villas, had a large number of vacancies and provided section 8 housing whereby HUD subsidizes the rental payments of certain low income renters. The loan on the apartment building of $2.5 million had an interest rate of 11% as opposed to the market rate of about 7%. There was a negative cash flow every month and the loan payments were seriously in default. The loan was about to be transferred to HUD. App 63-65

During the Las Vegas trip, Mr. Arakaki and Mr. Matsuoka met with Larry Little and David Ewing. Mr. Little and Mr. Matsuoka reassured Mr. Arakaki that HUD would be willing to convert the loan to a lower rate and to accrue back payments. Mr. Ewing also gave a specific assurance that if Plaintiffs bought the property, and if HUD sold the loan, Plaintiffs would be able to bid on the loan at auction. App 63-65

Plaintiffs purchased the Apartment and paid the $500,000. App-56

## III ARGUMENT

### A. David Ewing Had Implied Actual Authority

Many of the arguments made in the renewed motion were decided, touched upon, or anticipated in the Order denying the first summary judgment motion. The facts were found then to be in dispute, and remain in dispute:

> [A]uthority need not have been explicitly delegated to Mr. Ewing, but may have been implicit in his duties. H. Landau & Co., 886 F.2d at 324; see also Zoubi v. United States, 25 Cl. Ct. 581, 587 (1992) (holding that the "nature of the duties assigned . . . must be examined to determine whether [the federal employee] had the implied authority to bind the [government]"). . . Mr. Ewing apparently had the authority to devise workout agreements for "troubled" HUD mortgages and projects. . .
>
> Asset managers are empowered—by way of workouts—to make arrangements meant to stabilize a project's financial problems, secure "competent, interested owners," and develop a reinstatement plan that will protect the long term financial interest of HUD and ensure that the project can continue to be a viable operation." [citation omitted] These duties could be consistent with the existence of contracting authority.
>
> Drawing inferences in plaintiffs favor, Mr. Ewing's duties might indicate the implied actual authority to enter into the alleged oral agreement on behalf of the United States. Landau & Co. 886 F. 2nd . 324.

Order P 32

In 1991, HUD was facing a mounting problem of HUD-insured loans that went into default and were then assigned by the lenders to HUD. The August 30, 1991 revision to the HUD Handbook delegated "responsibility for approval of Workout Arrangements from Headquarters to the Regional and Field Office levels." Def. app. 65. David Ewing confirmed is his deposition that part of his job was to enter into workout agreements:

> Q. I see. You do workouts, and mortgage modifications may be done by somebody else?
>
> A. Right.

Ewing depo 169:1-13

> Q. Then the judge [in the Order on the first summary judgment motion] goes on and states, "Asset managers are empowered - by way of workouts - to make arrangements meant to stabilize a project's financial problems, secure 'competent, interested owners,' and develop a 'reinstatement

> plan that will protect the long-term financial interests of HUD and ensure the project can continue to be a viable operation.'" Do you see that, sir?
>
> A. Correct.
>
> Q. And is that true?
>
> A. Yes.

App- 8 Ewing depo 135:13-23

HUD expected asset managers to make workout agreements which imposed obligations on HUD. In a later letter dated February 27, 1995, HUD reminds its Asset Managers of the self-evident fact that anything it bargains away in a workout agreement may affect the future sale of the loan:

> Be aware that alterations to the standard workout terms may affect the bid price of a particular note in a future asset sale. Managers need to always balance the effect of special provisions in workouts against the benefits to HUD and the potential impact on asset value. Ex---

Nevertheless, HUD now argues, in its motion, that while Ewing may have had the implied actual authority to entice interested buyers in assuming troubled loans by offering "special provisions," if the agreed to provisions impacted the future auction of the loan, the asset manager would have exceeded his authority. Def Motion 13-25. This argument flatly contradicts what HUD understands the bargaining process to be. Headquarters occasionally reminded the asset managers to consider the impact of their workouts on asset value.

Although many witnesses disclaimed any involvement in the process of setting up loan sales, the evidence shows that asset managers naturally could make workout agreements that might affect the attractiveness of a loan in some future sale. HUD even realizes that work outs could have a *major* impact on the ability to sell a loan at all:

> We have been informed of workout terms which are highly unusual and could significantly affect the price the Department could receive for the loan or actually make the loan unmarketable. . . if there are any non-standard workout terms, we need to know which loans and what these terms are.

> Again, some provisions could have a major effect on the price the Department could receive in a loan sale or could make it impossible to sell the loan. Please check with all of your staff, review the terms of any workout in place and determine whether or not you have any which fall into this category. App-45

Again, HUD is reminding its employees to be careful with authority that Defendant now claims they never had.

Mr. Ewing admitted that he was responsible for protecting the financial interests of the HUD secretary (App-7 Ewing depo 94:15-21) and that the secretary *did benefit financially* when Mr. Arakaki put new money into the property (App-9 Ewing depo 166:22-167:11) due to Ewing's negotiations with Plaintiffs. The problem is that HUD thinks it can make profitable agreements, and then commit profitable breaches.

Moreover, this fact is *undisputed*: Ewing did not negotiate a "highly unusual" work-out term when he assured Plaintiffs that they could bid on their own loan if it were ever auctioned. This was done all the time. This agreement would seem almost mandatory if HUD wanted to attract a new buyer to take over a seriously delinquent loan. Such a problem loan requires a long term work-out. Why would a potential buyer want to strip him- or herself of the right to salvage his or her position if HUD wanted to re-sell the loan?

The whole loan sale with the owner having the right to bid was the generally accepted practice in 1991. In fact, it was only way to sell a loan until later legislation in 1994, when HUD was allowed to sell loans in bundles and save administrative costs. It's undisputed, and HUD admits, that the 1994 law prompted it to change its mind about letting Plaintiffs bid on their own loan.

**B. The Alleged Oral Agreement was a Valid Workout Agreement**

In its Motion, Defendant argues that the alleged oral agreement was not a workout agreement because it "purported to change HUD's ability to freely dispose of the mortgage." Def. Motion 15. Yet the HUD Handbook revision cited by Defendant

describes a workout as "a formal written agreement between the project owner and HUD under which HUD agrees to hold the loan in default." Def app. 80

Defendant further argues that the alleged oral agreement cannot be a workout agreement because the Handbook revision describes workouts as written agreements. Def. Motion 17. The Handbook, however, is not a statute or regulation that defines types of agreements[4]. The Handbook revision containing that description came with a cover letter describing it as "guidance to Regional and Field Offices staff" which lays out "policies and procedures." Def app. 65. The Handbook is evidence regarding implied actual authority because it shows the nature of an asset manager's job, but that authority is not limited to rote execution of the exact words in the Handbook.

Later revisions explicitly acknowledged this:

> HUD Field Asset Management staff are reminded that they may waive handbook or other directives **whenever a waiver is economically prudent** and/or furthers the goal of providing decent, safe, and sanitary housing**, so long as the requirement is not regulatory or statutory in nature**.

App- 39 7/18/95 revision. Emphasis added.

Mr. Ewing admitted that he was responsible for protecting the financial interests of the HUD secretary (App 7 Ewing depo 94:15-21) and that the secretary benefited financially when Mr. Arakaki put new money into the property (App-9 Ewing depo 166:22-167:11)

Defendant also claims in its Motion that any workout agreement which would limit HUD's ability to sell a loan is invalid because asset managers did not have the authority to restrict loan sales. Def Motion 13-25. Although many witnesses disclaimed any involvement in the process of loan sales, the evidence shows that asset managers could make workout agreements that restricted sales:

> We have been informed of workout terms which are highly

[4]Defendant's Motion cites statutes, regulation, and case law to support the argument that mortgage modifications must be in writing, but not to support its argument that workouts must be in writing. Def Motion 15-18.

> unusual and could significantly affect the price the Department could receive for the loan or actually make the loan unmarketable. . . if there are any non-standard workout terms, we need to know which loans and what these terms are. Again, some provisions could have a major effect on the price the Department could receive in a loan sale or could make it impossible to sell the loan. Please check with all of your staff, review the terms of any workout in place and determine whether or not you have any which fall into this category.

App-45

> Be aware that alterations to the standard workout terms may effect the bid price of a particular note in a future asset sale. Managers need to always balance the effect of special provisions in workouts against the benefits to HUD and the potential impact on asset value.

App- 40

**C. David Ewing Made the Alleged Oral Promise**

Plaintiff's testimony is straightforward:

> And I asked him, so are you saying that if the loan was ever sold that I would be able to bid on it? And he said yes.

App-2, 3 Arakaki depo. p31

Defendant is not correct that three of the four people present at the October 18, 1991 meeting agree that Arakaki was not promised the right to bid, if the note was sold. [Defendant's motion at pp 20-22]

1. <u>As to Ewing</u>: Notes of an April 20, 1999 internal HUD interview establish that Ewing admitted that "it is very possible" that he had so promised Arakaki. App- 53 The interview was conducted expressly to investigate Arakaki's allegation that the promise had been made by Ewing. As the internal HUD interview notes reflect, "David Ewing provided the following answers to our questions." The HUD interviewers asked Ewing:

> Were the following verbal assurances given to Arakaki by David Ewing when they met to discuss the property, [to wit, that] it was unlikely that the note would ever be sold, but if it was, Arakaki could participate in the bidding.

As recorded in the internal record of the interview, Ewing himself provided the following response:

> Answer: It is very possible Ewing told this to Arakaki. . . . App-53

The HUD interviewers summarized by adding the following handwritten notation:

> Note: This allegation [of Arakaki] was true. App- 53

[The HUD Record of Interview is App-52, 53 hereto.]

More recently, in a September 1, 2005 deposition, Ewing claims now to have no recollection. Ewing's deposition includes the following:

> Q. How do you know that Mr. Arakaki actually came out and met with you then?
>
> A. Because he was in the office several times with his people.
>
> Q. So you have a recollection of him being here?
>
> A. Correct.
>
> Q. But you just don't have a recollection of what transpired during the meetings; is that correct?
>
> A. Correct.

App- 6 Page 40 of Ewing's

Perhaps Ewing's memory has faded with the passing of years. In any event, he does not repudiate his 1999 admission. His present lack of recollection is a far cry from Defendant's assertion that Ewing denies making the promise.

2. As to Larry Little: In a signed March 9, 2000 "memorandum for record" Little states as follows:

> Based on statements made by Mr. Ewing at the meeting, Mr. Ewing made it clear that if HUD auctioned the note, then Mr. Arakaki will be able to actively bid on the property's note in the auction. Mr. Ewing explained that note auctions do not happen very often. The discussion of this topic was straight forward. Mr. Ewing provided no elaborate explanation; and set no conditions, pre-conditions, caveats, qualification requirements nor any other requirement or bar to Mr. Arakaki's participation in an auction of the note.

App-23

A fair reading of Little's April 8, 2003 deposition[5] is consistent. Little testified that Ewing did not promise an auction would take place and could not predict whether there would ever be an auction.

> A. Oh, I could see it when he mentioned the fact that that may happen, but it wasn't stated as such that this will happen, at a certain point you will have an opportunity to bid on this and, and buy it at a discount, because that wasn't said.
>
> Q. No, what he said was that if we do sell it you have a right to bid on it?
>
> Q. Is it true or not?
>
> A. He was not guaranteed the right to bid on his note is my understanding.
>
> Q. Well, what was, what was said?
>
> A. He may have an opportunity to bid on the property should it come up for auction, and there have been other cases where owners had bought the property when they were auctioned at a later date. He had no idea when that or if that might happen.

App-14-15 Pages 47-48

3. As to Matsuoka: At deposition, Matsuoka went to great lengths to avoid being taken as the definitive word of what was said between Mr. Ewing and Mr. Arakaki.

---

[5] I should be noted that the testimony by Mr. Little and Mr. Matsuoka cannot be viewed as disinterested testimony, since both men were being sued for malpractice for their role in representing the plaintiffs. Mr.

Matsuoka testified:

> I only met him [Ewing] very briefly, and I don't know about you, but I – at least initially with respect to anything federal, I am – I am not fully aware of what everybody is talking about. They use codes, and they use acronyms, and – and to the extent that he [Ed Arakaki] is a federal employee, he seemed quite comfortable using those codes and acronyms.

[App- 18-20 Page 25 from Matsuoka's deposition

> A. So whatever dealings I had, I was like Ed's [Arakaki's] secretary.
>
> Q. Okay, and all I am trying to do is just place that at a time where it commenced, and then I am going to ask you when it terminated?
>
> A. Like I told you, it commenced sometime after Ed made the offer.

App- 17

> I recall this very specifically because we – we caught a red eye … and we must have arrived at about six in the morning, and we checked into a hotel, and I banged my head. It was like really early in the morning, and we went off to see the people at HUD shortly thereafter.

App- 19

Thus, contrary to Defendant's assertion, in fact three of the four participants (Ewing, Little and Arakaki) agree that Ewing promised Arakaki would have the right to bid if the note was auctioned.

**D. The Alleged Oral Promise Had the Elements of a Contract**

The formation of a contract requires "a manifestation of mutual assent to the

---

Matsuoka claimed that he was not representing plaintiffs, but could not explain why his trust fund was used for the transfer of money. Mr. Little admits he was acting as both the seller's broker and the buyer's broker.

exchange and a consideration." Restatement 17(1) The manifestation "ordinarily takes the form of an offer or proposal by one party followed by an acceptance by the other party or parties." Restatement 22(1)

It's clear that HUD received consideration from Mr. Arakaki in the form of money that he paid, much of which went to HUD. Mr. Arakaki has testified that David Ewing made an unambiguous, specific proposal, which he accepted:

> If they ever sold the note, what they would do is to auction it, and he said that if they ever auctioned the note, that I would be able to bid on it, and it would be an actual opportunity to buy the note back for pennies on the dollar.

App- 2,3

It is also possible to have a manifestation of mutual assent "even though neither offer nor acceptance can be identified." Restatement 22(2) Although Mr. Ewing does not remember making the offer, there is a wealth of evidence that HUD intended to be bound by it at the time.

HUD has admitted that it changed its mind by subsequently deciding not to allow Mr. Arakaki to bid on the note after all:

> Mr. Arakaki was initially told . . . that if the mortgage was ever sold, he would be able to bid on it. In fact all of the multifamily loan sales that HUD has conducted thus far have been "whole loan" sales, in which the owners could bid on their loans. . . HUD reconsidered its decision to employ a whole loan sale and instead opted for a structured financing.

App-47, 48

Mr. Ewing never asked Arakaki to sign a HUD form 4350.1, or any similar form, agreeing that he could not rely on verbal promises, nor to sign an integration clause. Mr. Ewing never indicated his commitments would be made binding only if they were in writing or if they were approved by some other person, nor any other conditions.

Mr. Ewing promised Plaintiff that if he purchased the property, HUD would not foreclose and would allow Plaintiffs to bid on the loan if it was subsequently sold by HUD.

The Arakakis paid approximately $500,000 down on the property, and much of the money went to HUD to pay off the existing default. The rest of the money went to Mr. Little's company, which was both the seller's broker and the Plaintiffs' broker, and to Mr. Matsuoka through a trust account.

**The Nevada Statute of Frauds Does Not Bar the Alleged Oral Agreement**

Defendant characterizes the Nevada statute of frauds as precluding "the creation of any interest in land except by a properly executed written instrument," citing this Court to Nev. Rev. Statutes 111.205(1) and 111.210. [Defense Motion at p. 24] But then Defendant concludes that the Nevada statute of frauds "bars the alleged oral agreement in this case." [Id. at p. 25] but never explains why or cites a case to that effect. HUD also claimed that Nevada law controls and does not allow an oral contract be enforced against Defendant even though Plaintiffs performed by the payment of $500,000, (much of which went to pay HUD for the prior owner's delinquency).

The law of Nevada specifically precludes the creation of any interest in land except by a properly executed written instrument. Nev. Rev. Stat §§ 111.205(1). But Defendant did not create an interest land by promising to allow Plaintiffs to bid on the loan under Section 111.205(1) and cite no law that it does. Instead, an agreement is under scrutiny, not a conveyance in the strict sense and Nevada has a second statute that addresses a contract for the sale of land. Section 111.210.[6] Here there is no sale of land or any sale of any interest in land by Defendant to Plaintiffs so the statute would not apply.

Defendant argues "an oral agreement to execute an agreement that is within the statute of frauds, is itself within the statute and unenforceable." and cites *Cherokee Oil Co., Ltd. v. Union Oil Co*., 706 F. Supp. 826, 829 (M.D. Fla. 1989) for that proposition along with 9 *Williston on Contracts*, § 21:7 (4th ed. 1994). See also *Orthomet, Inc*. v. *A.B. Medical, Inc.,* 990 F.2d 387, 391 (8th Cir. 1993).

---

[6] ***NRS 111.210*** 1. Every contract for the leasing for a longer period than 1 year, or for the sale of any lands, or any interest in lands, shall be void unless the contract, or some note or memorandum thereof, expressing the consideration, be in writing, and be subscribed by the party by whom the lease or sale is to be made.

In fact, the correct Nevada statute is Nev. Rev. Statute 111.220, which by its express terms applies only if and *when the contract "by its terms is not to be performed within one year."* Even assuming that HUD's oral promise that Arakaki would be permitted to bid is tantamount to an oral promise of Arakaki's ultimate success, an auction could have been held within one year. Accordingly, the Nevada statute of frauds does not bar the alleged oral agreement.

Moreover, Defendant's argument assumes that the alleged oral agreement in this case created an interest in land. The argument assumes this Court has already made such a finding, Defendant has failed to establish this. This Court's Opinion entered September 1, 2004, includes the following [at p. 28, citations omitted]:

> Defendant claims that the alleged contract can only be interpreted as a purported modification of plaintiff's mortgage, while plaintiff claims the alleged contract was a separate and distinct agreement… Plaintiff's arguments are not effectively rebutted by defendant.

The agreement at issue here is not the sale of an interest in land, but the right to bid at an auction which would be simply an ancillary right to a loan agreement. In 1961, applying the rules relating to the conflict of laws, the California Supreme Court interpreted the two statutes Defendant relies upon, in a somewhat similar situation, that no land or interest in land was sold by an oral agreement. Instead, the court found there was an alleged ancillary agreement between two parties for the pay down of a real property mortgage by the debtor that in that case actually changed the terms of the agreement. Defendant cites no case to the contrary. The Court held as follows:

> Nevada would follow the general rule in other jurisdictions, that an oral agreement providing for the discharge of an obligation to pay money secured by an interest in real property is not within the real property provision of the statute of frauds, on the ground that the termination of the security interest is merely incidental to and follows by operation of law from the discharge of the principal obligation. (Citation omitted)

*Bernkrant v. Fowler* 55 Cal. 2d 588 (1961)

In the present case, no interest in land was, per se sold by the Defendant, instead only the right to bid on a loan was agreed upon. The fact that the loan was secured by a

mortgage was merely incidental to the transaction because it was the probable ability to purchase a loan for substantially below the face amount that was of value.

In any event, even if the statute of frauds was deemed applicable defendant would be subject to an estoppel under Nevada law that mitigates the effects of the statute of frauds. In a case from the Nevada Supreme Court the court held as follows relating to the statutory sections Defendant presently relies upon:

> It is uncontested that the agreement between the parties to this lease was made orally and was for a period of time in excess of one year and, therefore, the agreement fell within the statute of frauds. NRS 111.205; NRS 111.210; NRS 111.220; *Zunino v. Paramore*, 83 Nev. 506, 435 P.2d 196 (1967). However, contracts otherwise unenforceable because of the statute frauds may be enforced under the doctrine of estoppel. *See Zunino v. Paramore*, *supra.* This doctrine is properly invoked, according to Justice Roger J. Traynor of the California Supreme Court, whenever "unconscionable injury . . . would result from denying enforcement of the contract after one party has been induced by the other seriously to change his position in reliance on the contract. . . ." *Monarco v. Lo Greco*, 220 P.2d 737, 739 (Cal. 1950).

***ALPARK DISTRIBUTING, INC. v. POOLE, 95 Nev. 605, 607-* 608 (1979) 1852 1858**

In that case, two people were awarded substantial contract damages after they moved to the place of the business and worked for six months on an oral contract that included a lease that was by its terms over one year in length. The Nevada Supreme Court said it was a question of fact for the jury to determine whether estoppel was applicable to make the Nevada statute of frauds inapplicable.

Likewise in this case Plaintiffs have lost $500,000 plus years of time trying to rehabilitate the apartment. Clearly this would be a question of fact for trial.

## I. Ms. Arakaki's Claims For Relief Should Not Be Dismissed

On October 18, 1991 Helen Arakai's son, Edward, negotiated on her behalf for the purchase of the Lake Meade Villas. On October 29, 1992 the title vested in the names Helen Arakaki and her son Edward Arakaki as joint tenants. On October 19, 1992, Larry

little negotiated on Mr and Mrs, Arakaki's behalf for the Provisional workout agreement relating to accruing overdue payments Mr. Little signed on both her behalf and Mr. Arakaki's behalf. App-59

When it came time to file a lawsuit Mrs. Arakaki was too afraid to sue the federal government so she assigned her claim to her son for him to litigate along with his identical claim. App-4 This is a common procedural and pleading practice in Hawaii that allows an assignment of a chose in action for litigation. Thus, by the assignment, the son may sue in the assignor's name (his mother, Helen Arakaki) or the assignee's name Edward Arakaki), and do so under the common law rule. (see, e.g., *HANU v. YAMAICHI*, *30 Haw. 959* (1929)) or by statute:

> **§634-1HRS Assignee; nonnegotiable chose.** The assignee of any nonnegotiable chose in action, assigned in writing, may maintain thereon in the assignee's own name any action which, but for the assignment, might be maintained by the assignor; subject, however, to all equities and setoffs existing in favor of the party liable against the assignor and which existed at the time of the assignment or at any time thereafter until notice thereof was given to the party liable, except as otherwise provided.

This statute avoids the technicality of bringing additional people into a case when there really is no need. After obtaining the assignment, Plaintiff originally sued HUD in State Circuit court and even though the case has now ended up in the Court of Claims, its rules still recognize the procedural correctness of the pleading by the son under the assignment. Rule 17 (b) of the Rules of the Court of Claims covers capacity to sue or be sued:

> The capacity of an individual, other than one acting in a representative capacity, to sue . . . shall be determined by the *law of the individual's domicile*

In this case, Mrs. Arakaki's son has an identical claim and can pursue Mrs. Arakaki as was done by way of the assignment. The defendant is fully protected because all Hawaii law defenses are preserved, which is why negotiable instruments are not included because once they are properly negotiated to someone else all defenses but real defense are cut off

as against the assignee. Therefore the statute of limitations argument against the claims, insofar as they pertain to Mrs, Arakaki, are not well taken.

After the law suit found its way into the Court of Claims, Counsel for Mr. Arakaki did suggest that Mrs. Arakaki ask his mother if her name could be attached to the pleadings and pointed out that there was a special court that allows only lawsuits against the government and it may become necessary or convenient depending upon how the court views the real-party-in –interest rules under Rule 17 and other local rules of Pleading. She consented. It also allowed an easy mechanism for the government to notice her deposition and obtain other documents of a party if it so wishes.

**J. HUD's Breach of the Oral Agreement Caused Damages to Plaintiffs**

HUD ignores the clear damages suffered by Plaintiffs by their inability to bid on their loan in a "whole loan" sale. It is odd that damages would be raised in this motion on liability when at the scheduling conference the Defendant was insistent that liability question be dealt with first before damage discovery would be done.

Here are the bare bones facts on damages. There was $3 million owed on the loan when it was sold by HUD. The Buyer paid 73% of the face amount due, or $ 1.75 million and then turned around and foreclosed on Plaintiffs for $3 million. HUD got to share in that profit.

Ewing told Arakaki that if he and his mother assumed the loan (which they all knew was overpriced at the time because of its high interest rate and high vacancy rate for the apartments), and HUD then did sell the loan, he could bid and buy it for "pennies on the dollar." Everyone assumed that Mr. Arakaki would submit the highest bid because he was the property owner, and that HUD had no reason to stop him from doing so. When HUD became able to bundle loans, it decided to sell the bundles to institutional investors. These investors would not bid as much per loan as the owners, but they would give HUD part of the foreclosure profits. To accomplish this, owners were simply excluded from bidding.

The connection between this decision and the foreclosure is simply a question of fact to be addressed at trial.

## IV CONCLUSION

At first, the case appears to be the essence of simplicity. HUD had a serious inventory of problem loans that it had insured and then were assigned to it. This is an undisputed fact. Prior to 1994 HUD allowed the owners of the defaulted loans to bid on them and usually buy them for "pennies on the dollar' before 1994. That is an undisputed fact.

Until this motion was filed, Plaintiffs believed it was also an undisputed fact that HUD told Plaintiffs (to Mr. Arakaki, and through him his mother) that if they assumed the loan and it was resold they could bid on it and probably buy it for "pennies on the dollar." Now, apparently, the HUD employee has lost his memory and HUD is now disputing concessions made by HUD about this made a number of times over the years that his was true. But, this doesn't form the basis for a summary judgment motion being granted under Rule 56.

It is still undisputed that after Plaintiffs assumed the loan, that in 1994 a new law allowed HUD to sell loans in bundles of loans, and HUD would not let Plaintiffs bid on their own loan because it would make more money by selling it to a third party with a group of other loans.

It is still undisputed that the loan sold to a third party for substantially less than the unpaid balance of the loan and Plaintiffs ended up losing their full investment of $500,000.

Ongoing disputed facts are whether Mr. Ewing was authorized to promise that Plaintiffs could bid on their loan as an inducement to invest in a seriously delinquent loan soon to be assigned to HUD; whether the promise of the right to bid had was the type that had to be in writing under the controlling Nevada statute of frauds; whether the losses to the Plaintiff were of the character and amount that would create an estoppel under Nevada law; and whether Plaintiffs loss of all their investment arose out of the decision by HUD not to allow Plaintiffs to sue for breach of contract.

All these issues appear to be ones that need to be resolved at trial.

Respectfully submitted,

______________________________
Patrick Jaress Esq.
Attorney for Helen Arakaki
and Edward Arakaki

CERTIFICATE OF FILING

I hereby certify that on this 15th day of January 6 2006, a copy of the foregoing RESPONSE TO MOTION FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, PARTIAL MOTION TO DISMISS" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ Patrick Jaress
Trial Attorney
Jaress & Leong
Attorney for Plaintiffs