UNITED STATES COURT OF FEDERAL CLAIMS

EDWARD T. ARAKAKI and ) NO. 03-1874C
HELEN ARAKAKI, )
Plaintiffs, )
vs. )
THE UNITED STATES OF )
AMERICA, )
Defendant. )
________________________________)

DEPOSITION OF EDWARD ARAKAKI

Taken on behalf of Defendant at the Law Offices of R. Patrick Jaress, Jaress & Leong, Pacific Guardian Center, Mauka Tower, Suite 2920, 737 Bishop Street, Honolulu, Hawaii 96813, commencing at 9:09 a.m., on Thursday, September 15th, 2005, pursuant to Notice.

BEFORE: PATRICIA ANN CAMPBELL, CSR 108
Certified Shorthand Reporter
Notary Public, State of Hawaii

having worked in a government office myself, I thought maybe he could even hand me a sheet of paper that said here's the terms, but I found out almost from the beginning that Mr. Ewing had the power, at least in that meeting, to negotiate on the terms, and so we -- I covered the major problems.

It was a bad defaulted loan, and I asked Mr. Ewing, well, if I bought this loan today, what would keep you from turning around tomorrow and foreclosing on the property? And he said that HUD doesn't do it, HUD doesn't do that, and in particular, it's very easy for an owner to block a foreclosure by declaring bankruptcy. I asked Mr. Ewing that if I took over the note, what is to prevent HUD from just selling the note? I was aware that banks commonly sell notes to each other as a part of the business of notes and mortgages, and he said that they don't -- HUD wouldn't sell the notes. If they ever -- they don't sell notes the way I was asking.

If they ever sold the note, what they would do is to auction it, and he said that if they ever auctioned the note, that I would be able to bid on it, and it would be an actual opportunity to buy the note back for pennies on the dollar, and I had

never heard the term pennies on the dollar presented to me. You know, I had heard the term but not presented to me, so I remember that phrase, and he went on to tell the story of an actual person who was able to buy his note back for pennies on the dollar very cheaply, so then I -- somewhere in there, he mentioned that, but he doubts that no auction would ever happen, even within fifteen years, if ever. And I asked him, so are you saying that if the loan was ever sold that I would be able to bid on it? And he said yes.

Another problem with the loan was that it had a 11 percent interest rate, so I asked him if there was any way I could -- the market rates at that time were about 8, 8-and-a-half, and I thought I was asking a fairly simple thing, is there any way to refinance the 11 percent rate down to 8, 8-and-a-half? And he said that I'd actually be able to convert the interest rate to a government rate of about 7-and-a-half, and I thought, whoa, I don't want to be greedy about this. So I told him, you know, that 8 to 8-and-a-half is pretty fair, and he said, no, the government rate is around 7-and-a-half, and I said okay.

So I was pretty happy with the answer on

ASSIGNMENT

1. HELEN ARAKAKI and EDWARD T. ARAKAKI previously were the purchasers of certain property in Las Vegas, Nevada.

2. HELEN ARAKAKI and EDWARD T. ARAKAKI may have certain claims arising out of the purchase.

3. In return for $10.00, receipt of which is acknowledged, HELEN ARAKAKI hereby assigns and transfers to EDWARD T. ARAKAKI any and all claims that she has arising out of the purchase by HELEN ARAKAKI and EDWARD T. ARAKAKI of said property, including any and all claims against KEITH MATSUOKA and any of his partners or law firms, and including any and all claims against the DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT or any of its agents and representatives.

Dated: Honolulu, Hawaii, June 3, 2002.

HELEN ARAKAKI
Assignor

EDWARD T. ARAKAKI
Assignee

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - -

| | |
|---|---|
| EDWARD T. ARAKAKI and HELEN ARAKAKI,<br>Plaintiffs,<br>vs.<br>UNITED STATES OF AMERICA<br>Defendant. | ) NO. 03-1874C |

DEPOSITION OF

DAVID F. EWING

LAS VEGAS, NEVADA

SEPTEMBER 1, 2005

At 10:00 a.m.

ATKINSON-BAKER, INC.
COURT REPORTERS
500 North Brand Boulevard, Third Floor
Glendale, California 91203-4725
(818) 551-7300

REPORTED BY: MARGIE L. CARLSON, C.C.R. No. 287

FILE NO.: 9F074DA

drafted referring to that meeting?

A. No.

Q. No?

A. (Witness shakes head negatively.)

Q. You have to answer audibly. You have no memoranda --

A. No.

Q. -- and you don't recall anything that happened at the meeting?

A. No.

Q. How do you know that Mr. Arakaki actually came out and met with you then?

A. Because he was in the office several times with his people.

Q. So you have a recollection of him being here?

A. Correct.

Q. But you just don't have a recollection of what transpired during the meetings; is that correct?

A. Correct.

Q. When you say with his people, what did you mean by that?

A. His broker, his management company, and his attorney.

Q. And who was his attorney?

the loan if it's sold by HUD?

A. I have no idea. That's not done out of the local office.

Q. Did you ever have an idea of what the policy was?

A. Just general ideas. We had no input into anything concerning the sale of the mortgages.

Q. Have you ever talked to anybody about an owner of the property's right to bid on his own loan?

A. No.

Q. You don't recall ever discussing that one way or the other?

A. It's not something I would discuss because I don't have anything to do with the policy.

Q. Well, what is your responsibility, making sure that the properties were, what do you say, safe, decent, and sanitary?

A. And protecting the interest of the secretary.

Q. Meaning protecting his money?

A. Correct.

Q. Now, is it your understanding that loan specialists and asset managers must be real estate generalists, and I'm reading here --

A. I don't know what a real estate generalist

https://[illegible]/document/download_version?version_...

workable plan to stabilize the property, both financially and physically, and to minimize losses to the department. Is that your understanding --

A. Correct.

Q. -- what a workout is supposed to do?

A. Correct.

Q. And then it states, This objective is commonly met by 'providing the borrower with debt service relief.'" Do you see that, sir?

A. Correct.

Q. Is that true also?

A. Yes.

Q. Then the judge goes on and states, "Asset managers are empowered - by way of workouts - to make arrangements meant to stabilize a project's financial problems, secure 'competent, interested owners,' and develop a 'reinstatement plan that will protect the long-term financial interests of HUD and ensure the project can continue to be a viable operation.'" Do you see that, sir?

A. Correct.

Q. And is that true?

A. Yes.

Q. Then she states, "These duties could be consistent with the existence of contracting

A. Mortgage payments.
Q. Or mortgage payments, correct. And with Mr. Arakaki buying the property his payment would go to pay HUD, correct?
A. Correct.
Q. And that's consistent with the goal that you had of making sure that HUD and the government made money as much as possible, correct?
MR. MAGER: Objection, ambiguous.
You can answer the question.
A. Our objective was protecting the interests of the secretary and making sure that the tenants had safe, decent, and sanitary housing.
MR. JARESS:
Q. And in addition to get as much income in as you could from the property?
A. We wanted to recoup our moneys that we had to put out at the insurance.
Q. Sure, government doesn't have money to burn, right, true?
A. Not that I'm aware of.
Q. And so seeing somebody like Mr. Arakaki coming in and putting new money into a project is a positive step for the government, at least at that point, correct?

A. Could be, yes.
Q. And it was, correct? You don't have any knowledge that the payment of Mr. Arakaki's money was a negative for the government, was it?
A. No.
Q. And so that's a situation that if you had any input into it you would want to encourage, correct?
A. Encourage what?
Q. Encourage Mr. Arakaki to put in new money.
A. If he is able to, yes.
Q. Because that's consistent with the goals of your employer and consistent with your goals as an asset manager, correct?
A. Correct.
Q. Do you know the brokerage company that Mr. Little works for?
A. It was Prudential something or other.
Q. Had you ever done business with that brokerage company before?
A. No.
Q. Now, under your job description here, we are talking about the 4350.1, as I understand it, and you tell me if this is right, that you are responsible for servicing the mortgages?



MR. MAGER: Objection, mischaracterizes the document.

MR. JARESS: Okay, I was just asking him here.
MR. MAGER: Just for the record it's not his job description.
MR. JARESS: Oh, it's not, okay.
Q. Loan specialist is responsible for servicing mortgage; is that true?
A. Right.
Q. Including a variety of HUD-held mortgages, right?
A. Correct.
Q. The majority of the employees' time will be spent servicing troubled projects, correct?
A. Possibly.
Q. And these are projects with problems such as litigations, workouts or mortgage modifications, right?
A. Correct.
Q. What's the difference between a workout and a mortgage modification?
A. I'm not quite certain what a mortgage modification is. It's not something that we would be able to do in this office.



Q. I see. You do workouts, and mortgage modifications may be done by somebody else?
A. Right.
Q. Now, you also are responsible for

administering all aspects of the department's mortgage servicing policies as they relate to multifamily insured and secretary-held projects?

A. Yes.

Q. Are you supposed to exercise innovative techniques when you encounter problems?

A. Occasionally.

Q. Have you?

A. Yes.

Q. And I take it it's within the parameters of trying to save money or bring money in to HUD to keep the property safe, decent, and sanitary, correct?

A. At times.

Q. And as times change you have to innovate with them, correct?

A. Correct.

Q. Do you know what an SF50 is?

A. A personal action form.

Q. Do you have any of those in your file?

A. Uh-huh (affirmative response).

Q. What are they for?

IN THE CIRCUIT COURT OF THE FIRST CIRCUIT

STATE OF HAWAII

----------------------------------------

EDWARD T. ARAKAKI, et al.,

Plaintiffs,

vs. CIVIL NO. 02-1-1352-06

KEITH A. MATSUOKA, et al.,

Defendants.

----------------------------------------

DEPOSITION OF LARRY JIM LITTLE

Taken on behalf of the Plaintiffs, at the Ritz Carlton Hotel, 904 Iberville Street, New Orleans, Louisiana, commencing at 1:02 p.m., on April 8, 2003, pursuant to Notice.

BEFORE: DENNIS J. YANKEE, CSR NO. 285
Certified Shorthand Reporter

A. Even today.
Q. Did you wonder why Mr. Ewing bought that up?
A. Brought that up?
Q. Yeah. Why bring that point up if it's not going to be any big advantage to anybody?
A. Well, I assume that he brought it up because he may have felt that it would have been an advantage or something that Mr. Arakaki would want to use in making his decision on the property.
Q. Okay, but you didn't know how it fit into the transaction as an advantage?
A. Oh, I could see it when he mentioned the fact that that may happen, but it wasn't stated as such that this will happen, at a certain point you will have an opportunity to bid on this and, and buy it at a discount, because that wasn't said.
Q. No, what he said was that if we do sell it you have a right to bid on it?
MR. PORTNOY: Again, are you testifying or asking?
MR. JARESS: I'm asking him a question and a statement.
BY MR. JARESS:
Q. Is it true or not?





A. He was not guaranteed the right to bid on his note is my understanding.

Q. Well, what was, what was said?

MR. PORTNOY: Other than what he's --

A. He may have an opportunity to bid on the property should it come up for auction, and there have been other cases where owners had bought the property when they were auctioned at a later date.

He had no idea when that or if that might happen.

BY MR. JARESS:

Q. Besides the information that you've told me now of what Mr. Ewing said at this meeting, was there anything else said that you perceived as being an inducement for a buyer such as Mr. Arakaki to acquire this property?

A. Only in relation to the provisional workout, which would have to be done over a period of time because they had to see what they would be able to do with the current owners, the sellers at that point, in terms of getting their problems worked out with HUD, and that would change the workout as far as Mr. Arakaki was concerned.

And that, as I said, would come at a much later time. And that was basically, those were

16



IN THE CIRCUIT COURT OF THE FIRST CIRCUIT

STATE OF HAWAII

EDWARD T. ARAKAKI, ) CIVIL NO. 02-1-1352-06
Plaintiff, )
vs. )
KEITH A. MATSUOKA; HARRISON )
& MATSUOKA; PRESTON A. GIMA; )
WILLIAM A. HARRISON, and )
DOES 1-10, )
Defendants. )
________________________________)

DEPOSITION OF KEITH A. MATSUOKA

Taken on behalf of Plaintiff at the Law Offices of Jaress & Leong, Pacific Guardian Center, Mauka Tower, Suite 2920, 737 Bishop Street, Honolulu, Hawaii 96813, commencing at 1:42 p.m., on Thursday, May 1st, 2003, pursuant to Notice.

BEFORE: PATRICIA ANN CAMPBELL, CSR 108
Certified Shorthand Reporter
Notary Public, State of Hawaii
RALPH ROSENBERG COURT REPORTERS, INC.

17



MR. JARESS: The pseudo secretary relationship.
A. You were asking me what my dealings were with Mr. Michaud.
Q. (By Mr. Jaress) Okay.
A. So whatever dealings I had, I was like Ed's secretary.
Q. Okay, and all I am trying to do is just place that at a time where it commenced, and then I am going to ask you when it terminated?
A. Like I told you, it commenced sometime after Ed made the offer.
Q. Okay.
A. And it terminated at or about the time of the closing.
Q. Okay, and what were you two communicating about?
MS. SUR: Objection, vague.
MR. JARESS: What?
MS. SUR: What two?
MR. JARESS: Him and Mr. Michaud.
MS. SUR: Okay, well, you have Arakaki mixed in there.
MR. JARESS: I'm sorry.
Q. (By Mr. Jaress) Are you clear on the

David Ewing?

A. Yes.

Q. And who is Mr. Ewing?

A. A man who worked for the Las Vegas Housing Department and Development Office.

Q. And what do you remember about him? Is he old or young or smart or dumb?

MS. SUR: Calls for speculation.

MR. HORNER: Calls for possible slander.

MR. JARESS: We are protected by a court proceeding here.

A. He was a lot older than me and fairly affable.

Q. (By Mr. Jaress) Did he seem knowledgeable?

MS. SUR: Objection. That calls for speculation, vague.

A. About what?

Q. (By Mr. Jaress) About HUD matters.

A. I only met him very briefly, and I don't know about you, but I -- at least initially with respect to anything federal, I am -- I am not fully aware of what everybody is talking about. They use codes, and they use acronyms, and -- and to the extent that he is a federal employee, he seemed quite comfortable using those codes and acronyms.

it was just a few days later that Mr. Arakaki made the offer on the property?

A. No. Mr. Arakaki made the offer before we went.

Q. You mean before you went to Las Vegas --

A. That is correct.

Q. -- he made the offer on the Lake Mead Villas?

A. Yes.

Q. Okay, and did you have any part in that?

A. Not particularly.

MS. SUR: On what? Vague and ambiguous.

A. He told me that he was going to do that, but that there were many contingencies, and he wasn't locked in yet, and he would like to see the property.

Q. (By Mr. Jaress) Well, had he signed an offer or not?

A. My understanding was that he had signed an offer and that it was accepted.

Q. Before he even left?

A. That is correct.

Q. Did he tell you that, or did somebody else?

A. Well, at least it was signed before I went because they weren't going to let him see the property unless he had made an offer.

to what I am talking about. I mean, do you have any expertise at all on any type of HUD transactions?

A. No, I do not.

Q. Now, at the meeting with Mr. Ewing, did he give any assurances to Mr. Arakaki that if he bought the building, meaning the Lake Mead Villa apartments, that he would have an assurance that if they ever sold the note that he could bid on it?

A. No.

Q. That was never mentioned?

A. No.

Q. Now, when you said that the property looked nice, I'm not sure if that's exactly how you phrased it, does that mean from a business standpoint that it would be a profitable venture to purchase it?

A. No.

Q. What does that mean?

A. From a physical standpoint.

Q. It looks nice?

A. It looks nice.

Q. Okay.

A. Visually.

Q. Visually?

A. Yes.

Q. Did you have any idea of what the financial