21

Ed-

This information is to the best of my recollection. Please return after you have completed the final draft for my signature.

1. Mr. Keith Matsuoka, Mr. Ed Arakaki and I met with Mr. David Ewing of the HUD Las Vegas Office prior to Mr. Arakaki's purchase of the property. The purpose of the meeting was to discuss the terms under which Mr. Arakaki would assume the defaulted note should he decide to move forward in this transaction. Mr. Arakaki, who was serious regarding this purchase, and Mr. Matsuoka flew to Las Vegas from Hawaii for this prearranged meeting and to have another meeting with current owners of the property.

2. Mr. Ewing spoke confidently regarding HUD's position in this potential sale and expressed no uncertainties that HUD was genuinely interested in having this property change ownership. He assured Mr. Arakaki that he and his office would work with a new ownership to bring the project back to good health. Mr. Ewing further stated that he would be happy to work with a new owner as their relationship with the current ownership had been very difficult.

3. Mr. Arakaki was concerned that the property owed money and was losing money every month. He asked if HUD might foreclose on the property. Mr. Ewing said no, it is legally difficult for HUD to foreclose and easy for owners to block HUD attempts through legal action. Mr. Arakaki asked if HUD might auction the note to dispose of it; and if HUD did this, would he be able to bid on his own note? Mr. Ewing made it clear that if HUD auctioned the note, then Mr. Arakaki would be able to actively bid on the property's single note in the auction. Mr. Ewing illustrated this HUD method with the story of a gentleman whose note was auctioned in a single note auction and who was able to buy his note back for "pennies on the dollar". Mr. Ewing provided no other examples nor possibilities in this matter. Mr. Ewing closed the topic saying that HUD does not conduct note auctions very often. The discussion of this topic was very clear between the parties. Mr. Ewing provided no elaborate explanation; and set no conditions, pre-conditions, caveats, application procedures, qualification requirements nor any other requirement or bar to Mr. Arakaki's participation in the single note auction of his note.

4. The property was not generating enough rental income to pay its' monthly mortgage and was accumulating debt (arrearage). The interest rate on the mortgage, 11%, was far above the existing market rate. Mr. Arakaki asked if the note could be refinanced, to which Mr. Ewing replied that since HUD was taking the note back, Mr. Arakaki would be able to convert the note into a government interest rate, perhaps as low as 7.5%. Later, when Mr. Arakaki tried to make the conversion, the San Francisco regional office of HUD informed him that the note could not be converted because of the existence of arreages (accumulation of unpaid monthly payments). Mr. Ewing did not inform Mr. Arakaki of this being a condition prior to his purchasing the property.

5. Mr. Arakaki continued to pursue the arrearage discussion as it was accumulating at more than $10,000 per month. Mr. Arakaki asked how HUD commonly handled arrearages. Mr. Ewing said that at the end of the workout (15 years), the arrearage would be rolled in with the existing principal and a new monthly payment rate would be calculated. Mr. Arakaki immediately rejected this method of handling the arreages since the property cannot cover the interest on the original principal, it would not be able to cover interest on a new LARGER amount which combined the arrearage and the principal. Mr. Ewing immediately responded with a proposal to simply backend the arrearage, to place it at the backend of the mortgage. Mr. Arakaki agreed to Mr. Ewing's proposal to backend the arrearage.

6. With regard to the above terms, representations and promises, Mr. Ewing was concise and forthright. He set no conditions, pre-conditions, caveats, application procedures, qualification requirements, nor any other requirements nor bars to Mr. Arakaki's participation. Mr. Ewing had ample opportunity to set a follow-up meeting or to send additional clarifying information, but to my knowledge, he did not.

7. Some time later, when the workout agreement was drafted, Mr. Ewing insisted upon being the sole author of the agreement. Mr. Ewing deleted the negotiated oral terms from the agreement and rejected Mr. Arakaki's protests. I was certainly not aware of Mr. Ewing's intention to delete any of those previously negotiated terms between he and Mr. Arakaki.

Respectfully submitted,

Larry Little

23

# MEMORANDUM FOR RECORD

DATE: 09 March 2000

SUBJ: Lake Mead Villas Apartments
HUD Note Auction

1. Mr. Keith Matsuoka, Mr. Ed Arakaki and I met with Mr. David Ewing of the HUD Las Vegas Office prior to the commencement of escrow. My recollection is that this was the first meeting with Mr. Ewing. The purpose of the meeting was to discuss the terms under which Mr. Arakaki would take over the defaulted note if Mr. Arakaki decided to purchase the property.

2. Based on statements made by Mr. Ewing at the meeting, Mr. Ewing made it clear that if HUD auctioned the note, then Mr. Arakaki will be able to actively bid on the property's note in the auction. Mr. Ewing explained that note auctions do not happen very often. The discussion of this topic was straight forward. Mr. Ewing provided no elaborate explanation; and set no conditions, pre-conditions, caveats, qualification requirements nor any other requirement or bar to Mr. Arakaki's participation in an auction of the note.

Larry Little

LARRY LITTLE

24

# MEMORANDUM FOR RECORD

DATE: 06 May 2000

SUBJ: Lake Mead Villas Apartments
HUD Note Terms

1. Mr. Keith Matsuoka, Mr. Ed Arakaki and I met with Mr. David Ewing of the HUD Las Vegas Office prior to the commencement of escrow. My recollection is that this was the first meeting with Mr. Ewing. The primary purpose of the meeting was to discuss the terms under which Mr. Arakaki would take over the defaulted note if Mr. Arakaki decided to purchase the property.

2. Mr. Ewing was asked how the arrearage would be handled. Mr. Ewing proposed to backend the arrearage. Mr. Arakaki agreed to this method for handling the arrearage. Mr. Arakaki stated that the property could not afford to pay interest on the arrearage.

Larry Little

LARRY LITTLE

U.S. Department of Housing and Urban Development

HOUSING

Special Attention of:

All Secretary's Representatives
All State Coordinators;
All Area Coordinators; All Housing Directors
All Directors of Multifamily Housing; All Chiefs of Asset Management; Contract Administrators; Owners and Management Agents of HUD-Insured and HUD-assisted Properties

# Transmittal

for Handbook No.: 4350.1 REV-1 CHG-8

Issued: 7/18/95

1. This Transmits technical amendments to outstanding handbook procedures covering workouts and accompanies the release of the related **Job Aid** on "Loss Mitigation: Educational Supplement to Outstanding Handbook Procedures." The latter product is an important part of the Multifamily Asset Management Strategy and provides Asset Managers with a valuable tool for identifying and addressing the troubled insured inventory using a systematic portfolio-wide approach to Loss Mitigation. It is written in a user friendly, plain language format which should prove readily accessible. In addition to the main document itself, Asset Managers will find a score of interesting and useful instructional materials in the Appendices.

This **Handbook Change** emanates from a reevaluation of what has been done in the past, incorporates changes on how to improve workout policy based on suggestions from both Headquarters and Field personnel as well as private sector financial advisors working with the Department, revises policy in light of changing market circumstances and events, and provides a new section on the integration between workouts and the on-going MF HUD-Held note sales initiative.

The two directives taken together represent a comprehensive and integrated approach to policy development.

2. **Explanation of Materials Transmitted:** Significant Developments:

Workout-type arrangements may be utilized in order to stabilize still insured but troubled or potentially troubled projects in order to avoid a default/assignment in the first place. *The practice of this art form is referred to as "loss mitigation."* Previously, workouts were used only in the context of the HUD-Held portfolio (i.e., after default/assignment when an insurance claim is paid and HUD becomes the mortgagee). Extending the availability of workouts to insured assets is a proactive asset management tool and an important strategy in the Department's continuing efforts to mitigate losses.

An earlier change to the workout policy permitting longer term arrangements beyond the traditional 36-months was devised in light of changing market circumstances at the time reflecting (1)

HMHP Distribution: W-3-1, W-2(H), W-3(A)(OGC)(ZAS), W-4(H), R-1, R-2, R-3-1, R-3-2, R-3-3, R-6, R-6-2, R-7, R-7-2, R-8

EXHIBIT C

the difficulty in generating syndications which is still the case today (the proceeds of which made it possible to bring the loan current) and (2) the fact that the Department did not have an active note sales program at the time. Now that such a program exists, and HUD is selling rather than holding onto and servicing HUD-Held notes, **workout agreements should once again be construed as short term arrangements, for instance 36 months or sooner depending on when the next applicable note sale is planned, and should not contemplate future actions like extensions of the workout or modifications to the loan documents.** A Mortgage Modification is separate from a Workout. Although the Department may decide that it is in its best interests to enter into a Modification following a Workout, no Workout should obligate the Department to do so.

Paragraph 11-2 makes clear that, while each workout must have a specified term and, as explained below, be cancellable by a note purchaser, the length of term should be tailored to each individual case.

Paragraph 11-3 shows the interrelationship between workouts and note sales and, in particular, the effect that a workout may have on the value of a mortgage note. Expanded handbook narrative instructs Asset Managers to consider the potential adverse effect a workout can have on a note and sets forth important new guidelines and requirements which are to be followed for notes likely to be offered for sale. Please read this section carefully.

*Appendix 3a - Format Letter to Owner at Default Assignment;* the provision for fines, penalties and imprisonment for using project funds for purposes other than actual and necessary operating expenses while the project is in default has been strengthened to reflect changes in the law. The use of such funds is considered to be a form of equity skimming. All applicable statutory references are now fully cited. An insurance provision has also been added.

*Appendix 4 - Sample Workout;* **a new sample form Provisional Workout Agreement (PWA) has been developed which meets all of the requirements of Paragraph 11-12 - "mandatory terms of PWAs." It is strongly recommended that all Workout Agreements be in the form of Appendix 4.** Important new elements include the following:

- Workout Agreements must expressly state that they represent the <u>entire</u> workout arrangement between the parties. If the Workout Agreement is not all-inclusive, owners and HUD may later disagree about

terms and this can lead to disputes or litigation. For this reason an "integration" clause has been added as a standard provision to the document.

- An insurance clause has also been added as a standard provision.

- Clarifying language regarding the 60-day cancellation period has also been incorporated into the Workout Agreement. The cancellation language states that workouts run on a year to year basis until their expiration and are subject to cancellation on any anniversary upon notice given within the 60-day period prior to such anniversary should there be a change in the holder of the note.

However, the cancellation language will be required only for unsubsidized mortgages. A mortgage in the HUD portfolio is considered "unsubsidized" if: (i) it was not insured under the Section 236 or Section 221(d)(3) BMIR mortgage subsidy programs; AND (ii) fifty (50) percent or fewer of the units in the property securing the mortgage receive a federal project-based rent subsidy. Please note that these instructions are in accordance with Deputy Assistant Secretary Helen Dunlap's memorandum dated February 27, 1995, which supersedes any earlier memoranda on this subject, and has now been codified into the handbook.

- The Paragraph regarding "penalties" has been changed to reflect changes in the law: fine of not more than $250,000 and imprisonment of not more than five (5) years.

- Clarifying language regarding the Department's rights due to the default and that the expiration provisions of the Provisional Workout Agreement (PWA) apply only to the forbearance afforded the borrower has also been added.

3. **Effective Date:** Upon Receipt.

4. **Filing Instructions.**

| **Remove:** | **Insert:** |
|---|---|
| Table of Contents, 4350.1 Rev-1 pages 11-14 dated 9/92 or 6/93 | Table of Contents, 4350.1 Rev-1 pages 11-14a dated 7/95 |

| | |
|---|---|
| Chapter 11, 4350.1 Rev-1 issued 9/92 | New Chapter 11 issued 7/95 as CHG-8 pages 11-1 thru 11-75 |
| Section 6 to CH. 11, 4350.1 Rev-1, issued 6/93 (as CHG-4) | |

5. **Information Contact.**

For the next 60 days, questions from State or area office staff pertaining to this Handbook Change or the accompanying Job Aid may be directed to James S. Cruickshank, Multifamily Housing Management Planning and Procedures Division at (202) 708-4162, ext. 2641. Mr. Cruickshank may also be reached on cc:mail through FHCPOST3. Thereafter, questions should be directed to the designated Desk Officer in the Operations Division. Owners and managers should direct their questions to HUD's local office in their area (who in turn should call on their behalf to Headquarters should further guidance be necessary).

[signature]

Assistant Secretary for Housing-
Federal Housing Commissioner

PARAGRAPH

PAGE

SECTION 5. SERVICING PARTIAL PAYMENT OF CLAIMS MORTGAGES

10-19. General 10-11
10-20. Owner Requirements 10-11
10-21. Field Office Responsibilities 10-12

SECTION 6. SECTION 202 AND 202/8 LOANS AND ADVANCES

10-22. General 10-12
10-23. Definitions 10-13
10-24. Basic Documents 10-13
10-25. Required Accounts 10-14
10-26. Rent Increase Requests and Annual Operating Budgets 10-15
10-27. Annual Financial Statements 10-15

SECTION 7. DEFAULT SERVICING OF SECTION 202 PROJECTS

10-28. General 10-15
10-29. Defaults and Adverse Trends 10-15
10-30. Waiver of Reserve Deposits and Scheduled Payments 10-15
10-31. Relief and Reinstatement of Defaulted Section 202 Loans 10-16
10-32. Partial Release of Security 10-16

EXHIBITS

Exhibit-1. Projects with Assigned Mortgages 10-17
Exhibit-1A. Instructions for Owners of Projects With Assigned Mortgages 10-18
Exhibit-2. Income Chart for Projects with Assigned Mortgages 10-19
Exhibit-3. Tenant Income Survey 10-20
Exhibit-4. Privacy Act Notice Statement 10-21

APPENDICES

Appendix-1. Letter to Owner Upon Receipt of the Lender's Election to Assign 10-22
Appendix-2a. Format - Letter to Owner at Default Assignment 10-23
Appendix-2b. Format - Letter to Owner at G-4 Assignment 10-25

| PARAGRAPH | | PAGE |
|---|---|---|
| CHAPTER 11. | **WORKOUTS FOR HUD-HELD PROJECTS** | |
| SECTION 1. | INTRODUCTION | |
| 11-1. | General Workout Philosophy | 11-1 |
| 11-2. | New Term Length Flexibility | 11-3 |
| 11-3. | Understanding the Impact of Workouts on Note Sales | 11-6 |
| 11-4. | Glossary | 11-8 |
| SECTION 2. | PREVENTING MORTGAGE ASSIGNMENTS; PROCEDURES UPON ASSIGNMENT | |
| 11-5. | Loss Mitigation | 11-12 |
| 11-6. | Mortgages in the Process of Being Assigned | 11-13 |
| 11-7. | Owner Responsibilities after Assignment | 11-13 |
| 11-8. | Beginning the Foreclosure Process | 11-14 |
| SECTION 3. | REINSTATING HUD-HELD MORTGAGES | |
| 11-9. | Introduction | 11-15 |
| | A. Workout Agreement | 11-16 |
| | B. Mortgage Modifications | 11-17 |
| 11-10. | Owner Requests for Relief | 11-18 |
| 11-11. | Developing the Workout | 11-19 |
| | A. Analyzing the Project | 11-19 |
| | B. Analysis of Market Conditions | 11-20 |
| | C. Legal Review | 11-20 |
| | D. Determining Project Needs and Abilities | 11-20 |
| | E. Reviewing Available Relief Tools | 11-22 |
| | F. Negotiating a Specific Relief Plan | 11-23 |
| | G. Capital Contributions | 11-23 |
| | H. Escrows for Repairs | 11-24 |
| | I. Pre-Workout Waiver Letter | 11-25 |
| 11-12. | Preparing the Provisional Workout Arrangement | 11-26 |
| | A. Format | 11-26 |
| | B. Specific Dollar Amount Due | 11-26 |
| | C. MIO Plans | 11-26 |
| | D. Effective Date | 11-27 |
| | E. Provisional Workout Arrangements--Mandatory Terms | 11-27 |
| | F. Provisional Workout Arrangements--Optional Terms | 11-32 |
| 11-13. | Executing and Distributing Workout Arrangements | 11-32 |
| 11-14. | Monitoring Owner Compliance | 11-33 |

| PARAGRAPH | | PAGE |
|---|---|---|
| 11-15. | Modifications of Notes and Mortgages | 11-34 |
| 11-16. | Reinstatement Requirements During Foreclosure Proceedings | 11-35 |
| 11-17. | Cash Final Settlements | 11-35 |
| SECTION 4. | OFFSETTING OF SECTION 8 PAYMENTS | |
| 11-18. | General Information | 11-36 |
| 11-19. | Procedures for Offsetting Section 8 Payment | 11-36 |
| SECTION 5. | APPROVAL AND APPEAL PROCESS | |
| 11-20. | HUD State or Area Office Approval | 11-37 |
| 11-21. | Asset Management Branch | 11-37 |
| 11-22. | Waiver of Handbook Directives | 11-38 |
| SECTION 6. | LONGER WORKOUT ARRANGEMENTS | |
| 11-23. | General Information | 11-38 |
| 11-24. | Applicability | 11-39 |
| 11-25. | Alternative Methods of Workout Agreements | 11-39 |
| 11-26. | No Workout in Excess of 9 Years | 11-41 |
| APPENDICES | | |
| Appendix 1 | Delinquency Alert Letter | 11-42 |
| Appendix 2 | Default Notice Letter | 11-43 |
| Appendix 3a | Letter to Owner at Default Assignment | 11-44 |
| Appendix 3b | Letter to Owner at G-4 Assignment | 11-47 |
| Appendix 4 | Sample Provisional Workout Agreement | 11-48 |
| Appendix 5 | MARS Workout Cover Sheet | 11-56 |
| Appendix 6 | Instructions for Submitting Funds by Wire Transfer | 11-59 |
| Appendix 7 | Call Provision Language | 11-62 |
| Appendix 8 | Optional Workout Terms | 11-63 |
| Appendix 9 | Notification of HUD's Intent to Offset Section 8 Payments | 11-64 |
| Appendix 10 | Memo to Accounting Division Requesting Section 8 Offset | 11-65 |
| Appendix 11 | Information Sheet - Section 202 Reinstatement Section | 11-66 |
| Appendix 12 | Form of Pre-Workout Waiver Letter | 11-70 |

PARAGRAPH PAGE

CHAPTER 12. ENERGY CONSERVATION

SECTION 1. CHAPTER OVERVIEW


12-1. Introduction 12-1
12-2. Purpose 12-1
12-3. Applicability 12-1


SECTION 2. MULTIFAMILY ENERGY SURVEY FOR HUD-INSURED PROPERTIES


12-4. Conducting the Survey 12-3
12-5. Development of an Energy Conservation Plan 12-5
12-6. Follow-up Study of Energy Conservation Efforts 12-5
12-7. Monitoring Requirements and Compliance 12-5
12-8. Tenant Involvement 12-6


SECTION 3. COMPREHENSIVE TECHNICAL ENERGY AUDIT


12-9. Introduction 12-6
12-10. Purpose 12-7
12-11. Conducting the Comprehensive Technical Energy Audit 12-7
a. Purpose 12-7
b. Funding 12-8
c. Audit Preparation 12-8
d. Audit Guidelines 12-8
12-12. Requirements for the Capital Improvement Loan Program 12-15
12-13. The Energy Conservation Plan (ECP) 12-16
12-14. Evaluation Audit Results 12-16
a. Technical Aspects of the Audit 12-21
b. Renewable Energy and Energy Management Systems 12-22
c. Financial, Technical and Informational Assistance


SECTION 4. FUNDING MECHANISMS AVAILABLE TO IMPLEMENT ENERGY CONSERVATION MEASURES


12-15. Use of Project Fund 12-23
12-16. Alternative Funding Sources 12-23
12-17. HUD Approval 12-25

Paragraph | Page

SECTION 5. CONVERSION FROM MASTER METERED UTILITIES TO INDIVIDUALLY METERED (TENANT PAID) UTILITIES


| | | |
|---|---|---|
| 12-18. | Background and Purpose | 12-25 |
| 12-19. | Tenant Paid Utilities | 12-26 |
| 12-20. | Practicality of Conversion to Tenant Paid Utilities | 12-26 |
| 12-21. | Submitting the Conversion Request | 12-27 |
| 12-22. | Tenant Input | 12-28 |
| 12-23. | HUD Approval of the Plan | 12-29 |


APPENDICES


| | | |
|---|---|---|
| Appendix 1. | Form HUD-9614, Multifamily Walk-Through Energy Survey and Energy Conservation Measures | 12-34 |

# CHAPTER 11. WORKOUTS FOR HUD-HELD PROJECTS

## SECTION 1. INTRODUCTION

11-1.* GENERAL WORKOUT PHILOSOPHY

HUD's basic objective for projects with HUD-held mortgages is to develop a workable plan to stabilize the property, both financially and physically, and to minimize losses to the Department. One way in which HUD tries to accomplish this objective is by providing the borrower with debt service relief for a limited period of time. This type of arrangement is referred to as a provisional workout arrangement ("Workout" or "Workout Agreement").

Since the sale of HUD-held notes provides an efficient resolution for the assigned inventory of properties, it is generally contemplated that a Workout will be a short-term arrangement, for instance 36 months or sooner depending on when the next applicable note sale is planned. Longer term Workout Agreements may be permitted upon the receipt of prior approval of the State Director of Housing or, if the office has none, then the Director, Multifamily Housing Division, where sufficient economic rationale exists for taking such an action. Longer term options, however, are expected to be used less frequently in the future when taking into account the effect of longer workout terms on mortgage values in note sales (see Paragraph 11-3) and the Department's debt collection goals. In most instances shorter workout terms will make the most economic sense in light of current market conditions and the new cancellation language that is required in all Workouts Agreements for unsubsidized mortgages. Additionally, no Workout should contemplate or contain agreements regarding future actions by the Department. Specifically, no Workout should contain an agreement or imply that the Department will modify a mortgage or extend the term of the Department's forbearances after the Workout is completed. While a mortgage or note modification ("Modification") might be appropriately agreed to by the Department after the Workout is successfully completed, no decision to modify a loan should be made until the Workout is completed and the required analysis to ensure the ability of the owner to pay under the Modification is performed.

Though workout durations vary, depending on the circumstances, and may run for a number of years, the workout should be terminable at the end of each 12 month increment. At the end of each 12 month increment, the HUD office should reevaluate the physical and financial condition and management of the project. Though there is less likelihood that the loan can be brought fully current by the end of the workout term, particularly under short-term arrangements, since the syndication market is not generating as many proceeds as in years past, progress toward stabilizing the project is expected to be made from year to year. This could be measured in any number of ways including but not limited to: a decrease in account payables; an increase in occupancy at the project; or needed repairs being made. The Workout should be terminated if it is determined that it is not in the best interests of the Department to continue to forbear from enforcement of the note and mortgage terms.

Owners, understanding the financial consequences of their actions, will continue to be motivated to enter into Workout Agreements with HUD offices. In an event of default under the loan documents, HUD may seek to foreclose upon the project. Foreclosure can lead to costly tax consequences for the owner and partners. In order to prevent that from happening, owners seek forbearance from HUD in the form of a Workout Agreement.

The specific relief provided in a Workout must be based on a thorough analysis of the project, considering the tenant mix, availability of funds to address the physical and financial needs of the project, examination of the project's market area, and the possibility of assistance from other government or private agencies, examination of the current and anticipated supply and demand conditions in the housing market area relative to the market demand for the project at the rents needed for financial viability. Such thorough project analysis will aid the Asset Manager in determining whether or not a workout is feasible. In some cases it may not be in the tenants' or HUD's best interest to enter into a Workout. Workouts will address all of the following objectives:

A. Stabilizing a project's physical and financial problems to ensure that an acceptable living environment is maintained for the tenants.

B. Obtaining competent, interested owners and managers who demonstrate a willingness to resolve the project's problems, provide an improved living environment for the tenants, and keep the mortgage current.

C. Developing a reinstatement plan that will protect the long term financial interest of HUD and ensure that the project can continue to be a viable operation.

D. Requiring ownership (when appropriate) to provide additional capital to address project's physical and financial problems and implement the reinstatement plan.

Foreclosure may be considered when:

A. the owners refuse to cooperate fully in solving the project's problems;

B. ownership with sufficient resources is not available;

C. unauthorized distributions or diverted project funds have not been returned to the project; or,

D. it is otherwise in the best interests of the Department. *

11-2.* <u>NEW TERM LENGTH FLEXIBILITY</u>

A. The old handbook provision which required that all Workouts have terms of 3, 6 or 9 years is hereby rescinded. Section 6 to this Chapter, originally issued 6/93, extended the fixed term for workouts from the original 3 years to permit longer terms of 6 and 9 years. Experience to date and a reevaluation of procedures have shown that, while most Workouts will be short-term arrangements, term length options are needed which field Asset Mangers can employ on an individual project basis. The Office of Multifamily Housing Management has thus moved away from the idea of only 3, 6 and 9 year Workout term options. What the Office hopes to foster is an environment in which creative, individually designed strategies and solutions are encouraged.

B. This Chapter focuses on Workouts for HUD-held projects, i.e., post default/assignment when HUD becomes the mortgagee. For identifying and addressing the needs of still insured troubled or potentially troubled projects, and what can be done to stabilize the financial and physical condition of troubled real estate before the event of default/assignment takes place, while at the same time mitigating future losses to the FHA Insurance Fund, **readers are referred to the accompanying Job Aid, "Loss Mitigation Job Aid: Educational Supplement to Outstanding Handbook Procedures."** Applying workout-type arrangements to still insured assets with the intention of avoiding a default/assignment in the first place (the practice of which is commonly referred to as "loss mitigation") is a proactive asset management tool and a fitting component of sound portfolio management.

C. Under the new Field leadership and front line empowerment inherent in the Department's reorganization plans, the Field now has the ability to consider and design more flexible approaches to Workouts by providing for terms ranging from 1 to 9 years. **The bottom line is to devise a Workout that makes good economic sense and restores troubled real estate to sound financial and physical condition while protecting and enhancing the quality of life for residents.** Any serious proposals, creative financing or sale to resolve mortgage delinquencies may be considered that would further the objectives of sound portfolio management.

D. As a guiding principal, a Workout is not a science but rather an art form that does not lend itself easily to a prescribed or normative pattern because each circumstance is different and must be carefully thought out. That is why it is imperative that each transaction be analyzed on its own merits.

E. The concept of flexibility is something that has been evolving over time. This revision builds upon earlier efforts and thinking in this area. The old Paragraph 11-25 of the Handbook caused considerable interest, debate and discussion when first introduced in 1993, and hopefully raised a new way of thinking with its call to consider alternative approaches to Workouts that were deemed acceptable but could not be easily

transposed to fit the strict 3, 6 or 9 year framework. The old paragraph 11-25 was Multifamily Housing Management's attempt to remind everyone that there may be other solutions to a property's problems than those suggested in the Handbook.

F. Readers will note that the longer term Workout options have not been completely removed from the Handbook and may continue to be used as appropriate where sufficient economic rationale exits for taking such an action. These options, however, are expected to be used less frequently in the future given the experiences learned from the on-going multifamily HUD-held note sales being conducted by the Department around the country.

G. Potential bidders/mortgage purchasers generally prefer to acquire mortgages that are not encumbered with long-term Workout Agreements. Note purchasers generally prefer the flexibility to reach whatever agreement he/she can negotiate with the owner. Thus, Workout Agreements, particularly long-term ones, lower the value and, as a result the sales price, of mortgage notes held for sale. See Paragraph 11-3 for a discussion of the effect that Workouts can have on note sales.

H. As an additional tool in meeting workout/loss mitigation objectives, HUD Field Asset Management staff are reminded that they may waive handbook or other directives whenever a waiver is economically prudent and/or furthers the goal of providing decent, safe and sanitary housing, so long as the requirement to be waived is not statutory or regulatory in nature. Asset Managers are reminded that any and all such handbook waivers must include the bases or justification for taking such action along with concurrences by Field counsel, to ensure that the request for waiver of handbook directive does not conflict with any statutory or regulatory provision, and the Manager/Housing Director, to ensure supervisory review, proper coordination and sound management control practices. Specially designed form HUD-2 may be used for this purpose.
*

11-3.* UNDERSTANDING THE IMPACT OF WORKOUTS ON NOTE SALES.

A. The guidelines and requirements contained in this Paragraph are derived from the experience gleaned and lessons learned from the various note sales being conducted by the Department around the country. They are presented with an eye toward maximizing the return to HUD in future sales while not discouraging Workout Agreements and Modifications necessary for the protection of the health and safety of the residents. The key is to think through the process and ask the following questions as Workouts are being negotiated - "Is a Workout Agreement necessary to protect the health or safety of the residents?" "How would this term, provision or condition affect the potential price HUD would get at a future sale of this note?"

B. The terms of a Workout Agreement and/or Modification have a significant impact on the value of a loan and thus on the price the Department receives for that loan upon its sale. Once a Workout Agreement or Modification is executed, the mortgage purchaser is bound by its terms. Prospective purchasers, particularly those interested in non-performing loans, want to acquire loans unencumbered by Workout Agreements, particularly long-term ones. The existence of any Workout Agreement or Modification obligation limits the flexibility of the loan purchaser to negotiate with the property owner. The requirement that all Workout Agreements for unsubsidized loans include "cancellation language" permitting the loan purchaser to cancel the Workout Agreement on any anniversary by providing the borrower with notice within 60 days prior to such year anniversary mitigates but does not eliminate this effect. Therefore, the impact of a Workout Agreement or Modification must be carefully considered and weighed against its need before entering into negotiations.

C. Since non-standard language and provisions in a Workout Agreement can confuse potential purchasers unfamiliar with them and, therefore, lower the price the Department could hope to receive, make sure that all terms, provisions and conditions are consistent with the sample Workout Agreement in Appendix 4 and