with normal, standard procedures designed to assure that the loan will be brought current. The following are some additional requirements which have been established and must be followed with respect to Workout Agreements and Modifications considered or entered into with respect to loans likely to be offered for sale:

1. As individual auction sales are conducted around the country based on geographical locale, the DAS for Multifamily Housing shall establish by policy memorandum a date after which no Workout negotiations may begin and a cut-off date by which time all negotiations relating to a Workout of a mortgage must be concluded and the agreement executed by all parties. If the agreement is not signed by all parties by the time of the cut-off date, discussions must cease and no Workout Agreement may be executed.

2. HUD local office staff will be asked to review all projects included in a sale to determine if any Modification obligations exist. If so, a title endorsement insuring HUD's first priority lien status for the entire amount of the outstanding indebtedness (after being increased by the Modification) must be obtained simultaneously with recording the Modification. If the Department cannot obtain first lien status, then a default should be declared and any Modification (if it has been prepared) must be marked void and not recorded.

3. For projects in which first lien status is assured to HUD, the HUD Office should have the borrower for that project execute and return to HUD the Modification. HUD Office personnel should record those Modifications (assuming HUD continues to have a first lien status at the time of recordation) prior to the cut-off date for the sale. Otherwise, the Modification executed by the borrower should be forwarded to Headquarters.

4. Because HUD may apply funds in replacement reserves to the indebtedness prior to a loan's sale, outstanding requests for disbursements from

replacement reserve and similar accounts (i.e., Form 9250) must be processed by the date that is 2 weeks in advance of the sale. If there remain any unprocessed requests after that time and there is either a life threatening emergency or a written agreement requiring HUD to make disbursements, then such unprocessed requests must be sent to Headquarters.

5. Copies of all executed Workout Agreements and Modifications must be sent to Headquarters prior to the loan sale so they can be included in the Project Loan Information Files. *

## 11-4. GLOSSARY

For the purposes of this Chapter, terms are used as follows:

### A. HUD-Held Mortgage

HUD-held mortgages are assigned mortgages and purchase money mortgages (PMMs). These do not include direct loans under Section 202 or college housing subsidy grants.

Although authority to execute Workout Agreements has not been delegated to local HUD offices for Section 202, Housing for the Elderly and Handicapped Direct Loan Program, the Information Sheet - Section 202 Reinstatement (Appendix 11), outlines the information field staff should compile when developing Workout proposals. The completed Information Sheet should accompany the HUD Office's proposal and recommendation which should be sent to: Director, Assisted Elderly and Handicapped Housing Division, Headquarters.

### B. Capital Contributions

These are funds advanced, contributed or loaned to the project by the ownership entity to fund operating deficits that have occurred since the project finally endorsed. In order for the owner to qualify for relief under this Chapter the owner's capital contributions cannot create a lien on the project and may only be repaid from surplus cash. Such capital contributions

43

U.S. Department of Housing and Urban Development
Washington, D.C. 20410-8000

OFFICE OF THE ASSISTANT SECRETARY
FOR HOUSING-FEDERAL HOUSING COMMISSIONER

FEB 27 1995

DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT FEDERAL HOUSING ADMINISTRATION
MAR 06 1995
RECEIVED
LAS VEGAS, NEVADA

DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT FEDERAL HOUSING ADMINISTRATION
MAR 2 1995
RECEIVED
RENO, NEVADA

MEMORANDUM FOR: All Directors of Housing
All MF Housing Division Directors
All MF Loan Management Branch Chiefs

FROM: Helen Dunlap, ~~Deputy Assistant Secretary~~ for Multifamily Housing Programs, HM

SUBJECT: Workout Policy and the Sale of Unsubsidized Mortgages

This memorandum supersedes memoranda of July 16, 1994, August 3, 1994, and January 20, 1995, addressing workout policy issues which impact the Department's HUD-held note sale initiative.

Effective as of the date of this memorandum, all workouts executed by owners for unsubsidized[1] loans must contain the following language if they are for periods longer than one year regardless of when negotiations began:

> "Although this Agreement is projected to last for ____ years, it is on a year-to-year basis and is subject to cancellation in a sixty (60) day period at the end of any twelve month period running from the date of execution should there be a change in the holder of the note."

DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT FEDERAL HOUSING ADMINISTRATION
MAR - 6 [illegible]
RECEIVED
LAS VEGAS, NEVADA

[1] A mortgage in the HUD portfolio is considered "unsubsidized" if:

- It was not insured under the Section 236 or Section 221(d)(3) BMIR mortgage subsidy programs; AND
- 50 percent or fewer of the units in the property securing the mortgage receive a federal project-based rent subsidy.

A memorandum dated January 20, 1995, stated "ALL WORKOUTS" still in the negotiation process prior to July 1, 1994, and which have not yet been finalized, must contain the identical language as stated above. An earlier memorandum indicated that if a workout was in the final stages of being negotiated on July 1, 1994, this "Blow-up Clause" would not be required. The intent of this concession was to provide a reasonable amount of time to conclude a workout agreement that was in the final stages of approval. It was not intended to provide for the continuation of negotiations over a protracted period. Now that approximately eight months have lapsed, all parties have had more than sufficient time to finalize any workouts that were in negotiation on or about July 1, 1994. Therefore, all workouts approved as of the date of this memorandum, for unsubsidized loans will contain this "Blow-up" language.

A recent review of approved workout agreements for non-performing, unsubsidized notes, revealed terms that could be counterproductive to achieving the best results (i.e., highest return to HUD) for the note sale. Examples include, long term reserve deposit suspensions (9-10 years), use of reserves for capital improvements, term extensions, etc. Be aware that alterations to the standard workout terms may effect the bid price of a particular note in a future asset sale. Managers need to always balance the effect of special provisions in workouts against the benefits to HUD and the potential impact on asset value. As an example, unspent reserves will be captured by HUD prior to an asset sale and applied to outstanding debt.

discretion

Finally, just as a reminder, an original copy of every workout agreement must be forwarded to the Office of Multifamily Housing Operations Division in Headquarters.

If you have any questions concerning this matter, please contact Leonard L. Nowak at (202)-708-0547 ext.2604.

45

U. S. Department of Housing and Urban Development
Washington, D.C. 20410-8000

OFFICE OF THE ASSISTANT SECRETARY
FOR HOUSING-FEDERAL HOUSING COMMISSIONER

JAN 20 1995

DEPARTMENT OF HOUSING
AND URBAN DEVELOPMENT
FEDERAL HOUSING ADMINISTRATION
JAN 27 1995
RECEIVED
LAS VEGAS, NEVADA

MEMORANDUM FOR: All Directors of Housing
All Directors of Multifamily Housing

FROM: Albert B. Sullivan, Director, Office of Multifamily Housing Management, HMH

SUBJECT: HUD-held Mortgages - Workout Rules and Requirements

As all of you are aware, the Department is undertaking an ambitious program involving the sale of multifamily mortgages in its HUD-held portfolio. Experience to date in this latest mortgage sale effort has shown that there are a number of situations and circumstances related to the inventory which could affect this effort, not necessarily in a positive manner. We have been informed of workout terms which are highly unusual and could significantly affect the price the Department could receive for the loan or actually make the loan unmarketable. Some Field Offices do not have the current name or address of the property owner (partnership and general partner) or management agent (firm and principal contact) or both. In addition, we are aware of workouts entered into subsequent to July 1, 1994, which do not contain the mandatory termination language. Accordingly, this memorandum is to serve as an important reminder regarding these issues.

1. ALL WORKOUTS entered into subsequent to July 1, 1994, MUST contain the following specific language conveyed to all Field Offices last year. "Although this agreement is projected to last for ___ years, it is on a year to year basis and is subject to cancellation in a sixty (60) day period at the end of any twelve month period running from the date of execution should there be a change in the holder of the note."

2. ALL WORKOUTS which were in the negotiation process prior to July 1, 1994 and which have not yet been finalized, MUST contain the language identical to that in 1., above. In an earlier memorandum, we had indicated that, if the workout was in the final stages of negotiation on July 1, 1994, and introduction of the new language would jeopardize the arrangement or create the impression of failing to negotiate in good faith, it was not required. The intent of that language was

US0260

46

to provide a reasonable amount of time in which to conclude a workout that was basically in final form, not to provide an open door for the continuation of negotiations for months or years. Since more than six months has passed from that point, any still ongoing workout negotiations have continued far beyond the language's intent and must, therefore, include this clause in the final workout agreement.

3. Please make sure that your office knows the name and address of the owner and management agent for EVERY loan in your HUD-held inventory. It is important to the Department that we respond positively and knowledgeably to the due diligence contractors when they request such basic information.

"check with all staff" "these terms" could be oral? doesn't just ask for copy

4. Finally, if there are loans in your HUD-held inventory which have any non-standard workout terms, we need to know which loans and what these terms are. Again, some provisions could have a major effect on the price the Department could receive in a loan sale or could make it impossible to sell the loan. Please check with all of your staff, review the terms of any workout in place and determine whether or not you have any which fall into this category. If your office is NOT in the Southeast and if you find that any workouts with non-standard terms, please identify the property, FHA Number, and the non-standard terms and send the information to Lessley D. Wiles, Room 6176 or via cc:MAIL at FHCPOST3, as soon as possible, but no later than Thursday, February 2, 1995.

If you are located in the Southeast Area , please follow the instructions in the cc:MAIL message of January 20, 1995, requesting not only this information, but also specific documentation.

47

U. S. Department of Housing and Urban Development
Washington, D.C. 20410-8000

OFFICE OF THE ASSISTANT SECRETARY FOR
CONGRESSIONAL AND INTERGOVERNMENTAL RELATIONS

MAY 24 1996

Honorable Daniel K. Inouye
United States Senator
Prince Kuhio Federal Building
Room 7325
300 Ala Moana Boulevard
Honolulu, HI 96850-4975

Dear Senator Inouye:

Thank you for your letter of May 1, 1996, on behalf of Ed Arakaki, regarding the impending sale of the HUD-held mortgage on the Lake Mead Villas Apartments that Mr. Arakaki and his mother, Helen Arakaki, own in Las Vegas.

First, you may be interested in knowing that this loan was included in the Department's Structured Finance Sale of Partially Assisted Mortgage Loans on May 23, 1996.

I would like to give you some background on the Department's decision to conduct a structured financing with this loan sale. Mr. Arakaki was initially told by the Nevada State Office that if the mortgage was ever sold, he would be able to bid on it. In fact, all of the multifamily loan sales that HUD has conducted thus far have been "whole loan" sales, in which owners could bid on their loans. However, as the mortgages in the sale have project-based Section 8 subsidy, and this is the first time the market has been exposed to a product such as this, HUD reconsidered its decision to employ a whole loan sale and instead opted for a structured financing, which does not allow for the purchase of individual loans.

In a structured financing, the mortgage loans will be sold to a legal entity constituted as a trust. The cash flows from the mortgages will secure both debt and equity interest issued by the trust purchaser. HUD will receive proceeds from the sale at closing, and potentially as the troubled loans are resolved.

Structured financing will also help ensure that HUD is not penalized by the uncertainty in the market place over Section 8. This uncertainty will cause potential purchasers to discount any bid price for these mortgages. As purchasers work through the portfolio and become familiar with how Section 8 works, however,

**EXHIBIT C**

they have a good chance of resolving the portfolio for more than their discounted price. HUD's ability to retain a passive equity interest will allow the Department to share in the equity (the upside) and mitigate the financial penalty associated with market discounting.

Most importantly, the loan sale will help ensure that HUD fulfills its obligations to tenants, because HUD's rule for this sale mandates non-discrimination against voucher holders. Additionally, it preserves the Section 8 contract for the remainder of their terms and prohibits buyers from circumventing Section 8 contracts and responsibilities, as well as ensuring tenant protections are enforced.

HUD Headquarters staff reviewed the accounting records and determined that the amount necessary to bring Mr. Arakaki's account current is $713,127.69. The unpaid principal balance is $2,377,153.59. Mr. Arakaki may be reassured in learning that borrowers in default will be able to negotiate a discounted settlement or restructure the non-performing loan into a performing loan. While the threat of foreclosure is always a concern, good faith negotiations can result in a solution that works for all parties. Foreclosure is a last resort, used in a small percentage of cases. For instance, the Resolution Trust Corporation's (RTC) experience was that foreclosure occurred in only 3 percent of RTC mortgages sold.

I hope this information is helpful to you in your response to Mr. Arakaki. If I can be of further assistance, please do not hesitate to contact me again.

Sincerely,

Hal C. DeCell III
Assistant Secretary

U.S. Department of Housing and Urban Development
Washington, D.C. 20410-8000

49

OFFICE OF THE ASSISTANT SECRETARY FOR
CONGRESSIONAL AND INTERGOVERNMENTAL RELATIONS

SEP 22 1997

Honorable Daniel K. Inouye
United States Senate
Washington, DC 20510-1102

Dear Senator Inouye:

Thank you for your letter of August 13, 1997, on behalf of Ed Arakaki, regarding the mortgage on Lake Mead Villas Apartments (FHA #125-35100) in Las Vegas, Nevada. As you know, HUD included this loan in the June 27, 1996, Partially Assisted Loan Sale.

In my May 24, 1996, letter to you, I stated that "Mr. Arakaki may be reassured in learning that borrowers in default will be able to negotiate a discounted settlement or restructure the non-performing loan into a performing loan." Unfortunately, that statement was not accurate. After the loans were sold, the Department did not retain authority with respect to the loans or underlying projects. However, HUD does remain the Contract Administrator for the units covered by Section 8 project-based assistance in each project. HUD retained all of its authority under the Housing Assistance Payment (HAP) contracts for these assisted units, and the Department can take necessary actions relating to these HAP contracts. Any other actions taken after the sale, including foreclosure, compromise with the borrower, or restructuring the loan, are solely within the discretion of the purchaser of the loans. I apologize to Mr. Arakaki for the confusion.

In an August 30, 1996, letter to William H. Harrison, Director of Subsidized Property Management at Eugene Burger Management Corporation, from Audrey Hinton, Associate Director for Operations in the Office of Multifamily Asset Management and Disposition, Mr. Harrison was advised that the "....methods for liquidating the loans will probably include negotiating discounted pay-offs with borrowers, foreclosing and selling the property, or working out and selling the mortgage loans." Mr. Arakaki received a copy of this letter, and I am enclosing a copy for your information as well. WHUDA General Partners, Inc., the loan purchaser, hired J.E. Roberts and Co., Inc. (now known as Archon Group, L.P.) to service the assets and liquidate the loans. As you know, Archon Group, L.P. has commenced foreclosure on Lake Mead Villas Apartments.

**EXHIBIT D**

50



Regarding the Section 8 funds that HUD withheld, some background information may be helpful. As of December 1, 1995, HUD withheld Section 8 project-based assistance funds for the 30 units in the project that are covered by a HAP contract. The Department withheld these funds because Mr. Arakaki had violated several Articles of the project's Regulatory Agreement, and had also violated an article of the Section 8 HAP contract. The most serious violation was that there was no HUD-approved management agent in place at the project. The violations have now been corrected, and I am pleased to tell you that HUD's Nevada State Office is releasing the Section 8 funds to Mr. Arakaki. The project's current HUD-approved management agent is doing a good job, and the project is in good condition.

The $713,127.69 that Mr. Arakaki refers to in his most recent letter to you is the amount that was needed to bring his mortgage loan current as of June 1, 1996. Mr. Arakaki will need to consult with his present lender to determine the amount needed to bring the mortgage loan on Lake Mead Villas Apartments current.

In my May 24, 1996 letter, I explained that Mr. Arakaki was initially told by HUD's Nevada State Office that if the mortgage loan was ever sold he would be able to bid on it. However, as [illegible]e mortgages in the Partially Assisted Loan Sale had Section 8 [illegible]oject-based subsidy, HUD opted for a structured financing sale, which does not allow mortgagors to purchase their loans.

Should Mr. Arakaki have any questions regarding the HAP contract administered by HUD, he may contact David F. Ewing, the asset manager for Lake Mead Villas Apartments, in HUD's Nevada State Office. Mr. Ewing may be reached at (702) 388-6500. Otherwise, he should contact Monte Morrow at Archon Group, L.P., at (213) 633-5871, about any other servicing questions regarding his loan.

I hope this information is helpful to you in your response to Mr. Arakaki. If I can be of further assistance to your staff, please have them contact me.

Sincerely,

Hal C. DeCell III

Hal C. DeCell III
Assistant Secretary

Enclosure

51

Atkinson·Baker
Court Reporters

November 19, 2005

R. Patrick Jaress, Esq.
Jaress & Leong
737 Bishop Street
Suite 2920, Mauka Tower
Honolulu, Hawaii 96813

RE: ARAKAKI VS. UNITED STATES OF AMERICA
CASE NO.: 03-1874C
ABI FILE NO.: 9F074DA
DEPOSITION OF: DAVID F. EWING,
taken on September 1, 2005

Dear Mr. Jaress:

Enclosed please find the original transcript in the above-referenced deposition. It is in a sealed envelope.

The witness was notified with a copy on September 15, 2005, that the original transcript would be available at our office for reading and signature. The time period given the witness to respond has expired.

The original is being forwarded to you unsigned.

If you have any questions, please contact our Customer Service Department.

Sincerely,

Atkinson-Baker, Inc.
Glendale Office

Enclosure
cc: S. Mager
B. Wills
file

52

Lake Mead Villa Apartments
Assignment 1850-9-008-SF

# RECORD OF INTERVIEW

DATE: April 20, 1999

TIME: 10:00 AM

LOCATION: Las Vegas HUD Office(702) 388-6500 X 1820

PARTICIPANTS: Dave Ewing, Multifamily Project Manager
Dave McCargar, ADIGA
Jody Kitazono, Auditor

PURPOSE: To obtain information from HUD's perspective on the Arakaki complaint.

RESULTS:

We explained to Dave Ewing that Ed Arakaki had written a complaint against HUD to his Congressman in Hawaii in which he claimed that HUD officials had given him verbal and written assurances which led him to invest his and his mother's life savings in a HUD project, which was subsequently lost when HUD broke its promises. The Congressman contacted our IG and requested we look into it. Dave Ewing provided the following *answers* to our questions:

1. What was the situation at the time Arakaki purchased the project and what were the terms/conditions? What were the actual written agreements for payments on the defaulted loan at the time of the sale? Was the mortgage brought current or was a workout approved at the time of the TPA? How did the purchase relate to the March 1993 workout agreement?

   *Answer: Ed Arakaki, his real estate agent, and his attorney met with Ewing to discuss the purchase of the defaulted property. Ewing believed the former owner placed the property for sale on the market, and that's how Arakaki found out about it. Ewing does not know what Arakaki paid the former owner for the property. The mortgage was most likely under a workout agreement between HUD and the former owner (since it was Secretary held), which Arakaki would have assumed at the time of purchase. The March 1993 workout agreement between HUD and Arakaki probably replaced the former one. An approval of a TPA (transfer of physical assets) would have had to taken place, showing the agreements for payments, etc. This should be in the project files.*

2. Were the following verbal assurances given to Arakaki by Dave Ewing when they met to discuss the property?

   - The workout period would be 15 years, with 3 years being approved at a time.

     *Answer: The workout agreement would have been for 3 years only. It is possible that HUD would have extended it past the 3 years* (if Arakaki was in compliance)

   - The arrearage, caused by the former owner, would be placed at the back end of the note without interest accruing.

     *Answer: No. This was never promised.*

   - The original 11% loan would be converted to a 7.5% government rate loan.

     L-3-1 *Answer: No. This was never promised. HUD cannot reduce interest rates. HUD has a 223 F program for refinancing a HUD loan. But refinancing is done in HQs. Arakaki could have done a 223 F at the time of the TPA to lower the interest rate, but he didn't. He just assumed the 11% loan.*

   - It was unlikely that the note would ever be sold, but if it was, Arakaki could participate in the bidding.

Lift any exhibit

Prepared by Kitazono 4/21/99
Reviewed by McCargar 4/22/99
Reviewed by

Dave Ewing, HUD MF Meeting

E-2.1

1/3

53



_Answer:_ *It is very possible Ewing told this to Arakaki. HQs was at one time entertaining the idea of allowing owners to bid on their loans, but then they decided against it.* Note: This allegation was true. J.L.K.

- HUD would work with Arakaki to restore his property to financial health.

  _Answer:_ *HUD agreed to workouts with the intention of restoring defaulted properties with owners who remained in compliance..*

3. Arakaki believes you (Ewing) added language to the standard workout form in order to incorporate the above negotiations into the alternative option clause, which stated, "We propose that, as an alternative option, HUD simply extend the note for the number of months necessary to fully amortize the amount deferred." Did you include the alternative option in the workout agreement with the intention of following through on your promises to Arakaki?

   _Answer:_ *The clause would have certainly allowed the workout period to be extended if Arakaki had played by the rules. If he had not taken money, or let his mother live rent-free, and had otherwise followed the rules and regulations, HUD would have extended it.*

4. Did this clause place HUD under any legal obligation to extend the payment period?

   _Answer:_ *The workout would have continued if the owner was in compliance. Since he was not in compliance, all bets were off. I cannot do things when there are violations.* (pg. 8 & pg. 9) (t-5 p. 4)

5. Did being in-compliance or not-in-compliance with a workout agreement have any bearing on a project being in the note sale?

   _Answer:_ *No. This had no bearing on the note sale. Workout agreements had no effect on sales. Even if Arakaki was in compliance, his note would have still been sold. He got caught in a shifting of gears. Decisions regarding note sales were made entirely at HQs. Local offices had no control on the sales. HQs first bundled unsubsidized Secretary-held notes, then bundled partially assisted projects. Arakaki's was a partially assisted project. Some notes were removed from the sale if the project was tied up in bankruptcy or other court actions. Inquire about note sales at HQs with Alta Wilson (202) 708-0614 X 2601.*

6. Was Arakaki's mortgage delinquent when included in the note sale? (24 CFR Ch. II Part 290 says delinquent mortgages will not be sold if HUD believes that foreclosure is unavoidable.)

   _Answer:_ *I don't remember. Payments for Secretary-held mortgages were handled at HQs. Inquire with Audrey Hinton.*

7. Were other owners (besides Arakaki) upset about their notes being included in this sale?

   _Answer:_ *Some owners were asking to buy their notes, but this never came about. This was a HQs decision.*

8. Arakaki says the note sale was announced (in July 95) prior to his being informed of any violations on his part. Was Arakaki informed of his violations as they occurred? Any documentation?

   - Managing without HUD approval. Regs say the owner can manage in an emergency, including the resignation of the management agent.

     _Answer:_ *Yes, the project files will show he was informed. This wasn't an emergency situation. B & R gave 30 days notice before they left. Arakaki could have had an approved management agent in place by that time. He himself did not have the experience to manage. He made some arrangements with Stout (a HUD-*

84



*approved management agent), but Ewing was not happy with them. Ewing did a management review and found they were appeasing Arakaki's mother. Money was also missing while Stout was there (thinks mother took it), and Arakaki wrote checks to himself. Stout walked out because of the money discrepancies and because Ewing didn't want them there. Debra Stout can be reached at (702) 227-0444*

Note: We need to ask about whether there was an on-site manager other than Arakaki's mother during this period. see stout interview E-5

- Late payments. Regs say default is failure to make minimum monthly payment required by the terms of the Workout for 2 consecutive months, not merely late. (May need definitions of late, delinquent, and default.)

  Answer: *I don't remember. Payments for Secretary-held mortgages were handled at HQs. Inquire with Audrey Hinton.*

- Mother working on-site and living in rent-free unit. Why wasn't she approved to work on-site?

  Answer: *B & R didn't want to hire the mother. She didn't speak English. She was too old to be hired to do maintenance work. She was not paying rent for her unit, so that was an improper distribution to an owner. Bob McNamara of B & R can be reached at (702) 454-7730.*

9. How did HUD justify stopping the Section 8 payments?

   Answer: *The Section 8 payments were stopped because of the owner managing without HUD approval, causing a violation of the HAP contract. Stopping the Section 8 payments is the best way to get the owner's attention and force compliance.*

10. Did EBMC ever ask you for approval for his mother to work?

    Answer: *No. EBMC didn't want to hire the mother either. Talk to Bill Harrison.*

11. Why did HUD keep assuring Arakaki he could negotiate new terms with the new note owner?

    Answer: *HUD didn't. HUD had no control over the new owners. In fact, in general, new owners foreclosed on notes across the board, and sold them for a little more than they bought them for. They were in it to make money in the short term, not the long term.*

Conclusion - HUD was within its authority to terminate the WO agreement since Arakaki was not in compliance. D McCanga

Lift any exhibit

Prepared by____________

E-2.1

Reviewed by ____________

Reviewed by ____________

55

October 20 1991

RECEIVED FROM Edward T. Arakaki , as Buyer(s),
the sum of Fifteen thousand and------------------------------no/100 (dollars) ($ 15,000.00 )
receipt of which is hereby acknowledged in the form of ☐ Cash, ☒ Personal Check, ☐ Certified Check, ☐ or other, explain
as earnest money to be deposited into ☐ Broker's Trust Account ☒ Escrow, ☐ other, explain
UPON THE ACCEPTANCE OF THIS OFFER and to be applied to the purchase price on the property described as: Parcel Map File 39 Page 98 Lot 1 PT SW4 NW4 SEC 24-20-60 Assessor Parcel Number: 01A-310-010
commonly known as 2115 Winnwood (a 76 unit apartment building) " located in the
City of Las Vegas , County of Clark , State of Nevada
FOR THE TOTAL SUM OF $ Three Million and no/100------------------------------ (dollars) ($3,000,000.00 )
hereinafter referred to as the purchase price. The balance of the purchase price to be paid as follows:
$3,000,000 payable as follows: (See attached addendum)

THIS OFFER SUBJECT TO: 1) Physical inspection and approval of each and every unit. 2) Approval of all income and expense records for the past 12 months. 3) Approval of any and all existing contracts that go with the property. 4) All appliances, heating and air conditionin electrical, plumbing to be in good repair and working order at close of escrow. 5) Roof to be in good repair. 6) Seller to deliver the property free of existing management contract. 7) Any and all warrantees to be transferred to Buyer at close of escrow.
The Buyer to review and approve existing loan agreement. Seller to furnish the Buyer an ALTA policy on the property. Buyer to approve preliminary title report. Seller not to enter into any new contracts with the exception of rental or lease agreements without expressed approval of the Buyer. All rents to be prorated to close of escrow. All deposits

SEE ATTACHED:

BOTH PARTIES FURTHER AGREE TO THE FOLLOWING:

1. CLOSING AND POSSESSION. Close of escrow shall be on or before 12/20/91 or sooner and date of possession shall be closing
Any rental prior to or after the close of escrow, by either Buyer or Seller, shall be by separate agreement.
2. VESTING. Title to be vested in to be determined (Show Marital Status and Tenancy).
3. PRORATIONS. Insurance premiums, taxes, interest, association fees, sewer fees, and other expenses shall be ☐ prorated ☐ not prorated, to close of escrow.
4. FHA MORTGAGE INSURANCE PREMIUM (MIP). Should the subject property have an FHA loan, the Mortgage Insurance Premium should be ☐ prorated ☐ not prorated to close of escrow.
5. ASSESSMENTS. Special assessments, namely none that are not delinquent, shall be assumed by the Buyer unless stated otherwise herein or made a requirement of the lender.
6. ESCROW HOLDER. On acceptance of this offer an escrow shall be expeditiously opened with Eileen Bechtol of Chicago Title , who shall act as escrow agent. All necessary funds and instruments shall be deposited into the escrow from time to time as required. At the request of the escrow agent, the Buyer and the Seller shall execute escrow instructions not inconsistent with this instrument. Cost of escrow, title insurance and necessary recording fees and document and transfer taxes shall be paid by the parties as follows: Buyer and seller to pay their own closing costs as customary in the State of Nevada.
7. EVIDENCE OF TITLE. Title conveyed is subject to easements, encumbrances, zoning, rights of way, restrictions, covenants, and conditions of record, unless stated otherwise herein. Seller agrees to deliver at his expense, good and marketable title as evidenced by a policy of title insurance furnished by Chicago Title . The undersigned parties hereby acknowledge that the real estate Brokers do not represent the quality or the extent of coverage of the title insurance, and further agree to hold the Brokers harmless for any deficiency in the policy.
8. DISCOUNT POINTS. If the Buyer is to obtain new FHA or VA financing, Seller shall pay the necessary discount points effective at the close of escrow for securing said Loan not to exceed N/A points. However, the Seller, at his option, may pay more than the maximum points stated herein. In the event new Conventional financing is a part of this transaction, loan fees and/or loan discount points will be paid as follows: N/A
9. LOAN APPLICATION. If Buyer is to obtain new financing, or if required by lender, buyer further agrees to make application for said loan within five ( 5 ) days from acceptance of this offer and furnish all necessary documentation for securing said loan. Otherwise, the Buyer will be in default of this contract and the Seller may seek any available remedy provided herein or by law.
10. APPRAISAL CONDITIONS. If the Buyer is to obtain new financing, the Seller agrees to obtain the appropriate appraisal ... appurtenances, offers and agrees to purchase said property on the terms and conditions herein stated and acknowledges receipt of a copy of this Agreement from the Agent named below.

PLETED THIS IS A BINDING CONTRACT. IF NOT FULLY

EXHIBIT 6

56

he Prudential
Hallmark Realty

# SALES CONTRACT ADDENDUM

:e: Contract for the sale and purchase of real property known as 2115 Winwood

between Edward T. Arakaki (Purchaser)

and Lewis Hildreth (Seller),

and dated October 20 19 91.

is agreed that the following provisions are included in the aforesaid contract:

Continued:

1. All deposits to become the property of the buyer at close of escrow.
2. An inventory of personal property to be furnished to the Buyer prior to the close of escrow.
3. Pool and pool equipment to be in good working order at close of escrow.

Any and all inspections requested by buyer to be the sole responsibility of the buyer and or his agents.

All approvals or disapprovals to be in writing and furnished to the escrow company within 15 days of inspections by buyer and or his agents.

Payable as follows: $500,000.00 cash down to include aforementioned earnest money at close of escrow. $90,000.00 an approximate amount by Seller carrying a second trust deed payable monthly at 9% annual interest only with balance in full due at end of 36 months with payments to be approximately $675.00 (or more) a month with no prepayment penalty. There is a due on sale clause on this second trust deed. $2,410,000.00 by purchaser assuming and qualifying for the existing first trust deed. Purchaser to approve existing first trust deed and apply for such upon acceptance of offer.

Purchaser 20 Oct 91 Date

BROKER: Prudential Hallmark

Purchaser Date

By: Terry + Karen Rosenquist

57

Arakaki Depo Exhibits

DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

PROJECT NO. 125-35100-PM-L8 EFFECTIVE DATE January 1, 1993

PROJECT NAME Lake Mead Villas Apartments EXPIRATION DATE December 31, 1995

LOCATION 2115 Winwood St. Las Vegas, NV 89108

PROVISIONAL WORKOUT ARRANGEMENT

The undersigned mortgagor hereby expressly acknowledges that the mortgage and note secured by the above project is in default. To afford an opportunity to effect reinstatement, the mortgagor requests the Secretary, Department of Hous and Urban Development, to hold the defaulted note and mortgage on the subject project under the terms and condiditons stated herein:

1. Possession. The mortgagor acknowledges that the default entitles HUD to assume possession of the encumbered premises, but that possession has not been demanded. As an inducement for HUD approval of this Arrangement, the mortgagor agrees that it will not oppose or interefere in any way should HUD demand possession by reason of subsequent default under the terms of this arrangement.

2. Junior Obligations. The mortgagor agrees that project revenues will not used to repay either interest or principal for any project obligation (ot than reasonable and necessary operating expenses) that is junior to the Secretary's lien.

3. Payment Provision.

* a. Beginning 01/01/93 and continuing through 12/01/95 the mortgagor will remit by the first of the month a minimum payment sufficient to cover full monthly mortgage payments through principal, plus $6,210.86 This payment will be $ 33,806.54 per month.

b. Past delinquency, if any, in the Reserve for Replacement is hereby forgiven. Payments into the Reserve for duration of this workout period are hereby waived.

c. Any funds remaining in the operating account each month after payment of project operating expenses will be remitted in addition to the minimum monthly payment. This item is N/A due to payments in item 3a.

d. A two percent late charge may be assessed against payments not recei by the fifteenth of the month.

EXHIBIT 1

US0319

58

e. At no time will the owner permit any delinquency to accrue in either the service charge due HUD or tax escrow as billed by HUD each month.

4. Lump Sum Payments. The mortgagor agrees to make the following lump sum payments, to be applied to mortgage delinquencies, on the dates indicated:

At ____________ $ N/A
At ____________ $ N/A
At ____________ Payment in an amount to bring the mortgage current through (interest) (principal) (approximately $ ____________)

5. Repairs. The mortgagor agrees to escrow $ N/A for repairs upon (TPA approval) (execution of this Workout Arrangement). The monies will be escrowed in a separate repair fund. All disbursements from this fund may be made only with the prior approval of HUD. (The attached MIO plan is incorporated and made part of the terms of this Workout arrangement.)

6. Mortgage Modification.

a. If the mortgagor has fully complied with the terms of this Arrangement, as of N/A HUD agrees to recast any delinquent principal at _____ percent interest amortized over the remaining term of the mortgage.

b. The mortgagor agrees to modify the note and mortgage to insert a call provision. The call provision gives the holder the option to declare the entire indebtedness due and payable at or after (ten years) (the longer of ten years or the remaining term of the Section 8 contract) from the date of the mortgage modification.

7. Accounting Reports. During the term of this Arrangement, the mortgagor shall submit Monthly Reports for Establishing Net Income (Forms HUD-93479, 93480 and 93481) for all project receipts, disbursements and accounts payable. The first report shall be for the month of January 1993. The original copy of each report is to be mailed to the Department of Housing and Urban Development, Office of Multifamily Housing Management, 451 7th Street, SW, Washington, DC 20410-8000.

8. Distribution. The mortgagor agrees not to take any distributions while the mortgage is being held in default under the terms of this arrangement and of the original Note, Mortgage and Regulatory Agreement.

9. Cancellation Clause. This Arrangement is on a month-to-month basis. The Secretary agrees to take no action because of the existing monetary default, provided that the mortgagor remits the required minimum monthly payment and satisfactorily performs the other requirements of this arrangement. Failure of the mortgagor to meet the terms of this Arrangement will be sufficient cause for the Secretary to immediately terminate this Arrangement and to commence foreclosure action. Failure of the mortgagor to meet the terms of the arrangement is also grounds to the Department to consider taking administrative sanctions against the mortgagor including, but not limited to, suspension or debarment from participation in HUD programs.

US0320

59

10. Criminal Sanctions for Misuse of Project Funds. The mortgagor acknowledges that the use of project funds derived from the project covered by this arrangement for any purpose other than to meet actual and necessary project expenses is a criminal offense punishable by a fine of not more than $5,000 and imprisonment of not more than three (3) years or both.

APPROVED:

ASSISTANT SECRETARY FOR HOUSING-FEDERAL HOUSING COMMISSIONER

BY: Andrew Robertson

TITLE: Office Manager

10/22/92

MORTGAGOR: Lake Mead Villas Apartments

BY:

TITLE: Owner

DATE: October 19, 1992

** ACKNOWLEDGED:

MORTGAGOR-SELLER:

BY: N/A

DATE:

60



DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

PROJECT NO: 125-35100 EFFECTIVE DATE: March 1, 1993

PROJECT NAME: Lake Mead Villas EXPIRATION DATE: February 29, 1996

LOCATION: 2115 Winwood Street
Las Vegas, Nevada

PROVISIONAL WORKOUT ARRANGEMENT

The undersigned Mortgagor hereby expressly acknowledges that the mortgage (Deed of Trust) and note secured by the above project is in default. To afford an opportunity to effect reinstatement, the Mortgagor requests the Secretary, Department of Housing and Urban Development, to hold the defaulted note and mortgage on the subject property under the terms and conditions stated herein:

1. Possession. The Mortgagor acknowledges that the default entitles HUD to assume possession of the encumbered premises, but that possession has not been demanded. As an inducement for HUD approval of this Arrangement, the Mortgagor agrees that it will not oppose or interfere in any way should HUD demand possession by reason of subsequent default under the terms of this Arrangement.

2. Junior Obligations. The Mortgagor agrees that project revenues will not be used to repay either interest or principal for any project obligation (other than reasonable and necessary operating expenses) that is junior to the Secretary's lien.

3. Payment Provision.

Beginning March 1, 1993, and continuing through February 29, 1996, the mortgagor will remit by the first of the month a minimum payment sufficient to pay seventy percent (70 %) of interest. This payment is currently $21,790.57 per month. We propose that the monthly mortgage payments be calculated as follows:

| | |
|---|---|
| First Year | 70% of Accruing Interest ($15,253.40) |
| Second Year | 75% of Accruing Interest ($16,342.93) |
| Third Year | 80% of Accruing Interest ($17,432.46) |

b. Past delinquency, if any, in the Reserve for Replacement is hereby forgiven. Payments in the Reserve for the duration of this workout period are hereby waived.

EXHIBIT 2

ENCL (

NEV 000887