c. Any funds over $24,034.27 (approximately one month's principal and interest) remaining in the operating account each month after payment of project operating expenses will be remitted in addition to the minimum monthly payment.

d. A two percent late charge may be assessed against payments not received by the fifteenth of the month.

e. At no time will the Owner permit any delinquency to accrue in either the service charge due HUD or tax escrow as billed by HUD each month.

4. Lump Sum Payments. The mortgagor agrees to make the following lump sum payments, to be applied to mortgage delinquencies, on the dates indicated:

$0.00 on or before March 1, 1993

5. Repairs. The mortgagor agrees to escrow $0.00 for repairs upon execution of this Workout Arrangement.

6. Mortgage Modification.

a. If the Mortgagor has fully complied with the terms of this Arrangement, and HUD has determined that it is financially feasible, as of March 1, 1996 HUD agrees to recast any delinquent principal at eleven percent (11%) interest amortized over the remaining term of the mortgage. We propose that, as an alternative option, HUD simply extend the note for the number of months necessary to fully amortize the amount deferred.

b. The mortgagor agrees to modify the note and mortgage to insert a call provision. The call provision give the mortgagee the option to declare the entire indebtedness due and payable at or after ten years.

7. Equity Kicker. Mortgagor agrees to pay to HUD five percent of the gross sales price for a sale or conversion; or five percent of a refinancing (the amount needed to payoff or refinance the mortgages securing the real estate plus any equity "pulled"). This paragraph is not applicable to this situation and no "equity kicker" is due the Secretary.

8. Accounting Reports. During the term of this Arrangement, the Mortgagor shall submit Monthly Reports for Establishing Net Income (Forms HUD-93479, 93480 and 93481) for all project receipts, disbursements and accounts payable. We will continue to submit these reports monthly.

The original copy of each report is to be mailed to the Department of Housing and Urban Development, Office of Multifamily Housing Management, 1500 East Tropicana Avenue, Suite 205, Las Vegas, NV 89119-6516.

62



9. Distributions. The mortgagor agrees not to take any distributions while the mortgage is being held in default under the terms of this arrangement and of the original Note, Mortgage and Regulatory Agreement.

10. Cancellation Clause. This Arrangement is on a month-to-month basis, based on a three year plan. The Secretary agrees to take no action because of the existing monetary default, provided that the Mortgagor remits the required minimum monthly payment and satisfactorily performs the other requirements of this Arrangement. Failure of the Mortgagor to meet the terms of this Arrangement will be sufficient cause for the Secretary to immediately terminate this Arrangement and to commence foreclosure action. Failure of the Mortgagor to meet the terms of the Arrangement is also grounds to the Department to consider taking administrative sanctions against the Mortgagor including, but not limited to, suspension or debarment from participation in HUD programs.

11. Criminal Sanctions for Misuse of Project Funds. The Mortgagor acknowledges that the use of project funds derived from the project covered by this Arrangement for any purpose other than to meet actual and necessary project expenses is a criminal offense punishable by a fine of not more that $5,000 and imprisonment of not more than three (3) years or both.

APPROVED:
MORTGAGOR: LAKE MEAD VILLAS

BY: Larry Little

TITLE: General Partner

DATE: JAN 26 1993

ASSISTANT SECRETARY FOR HOUSING-FEDERAL HOUSING COMMISSIONER

BY: [signature]

TITLE: Office Manager

DATE: 2/2/93

63

# DECLARATION OF EDWARD ARAKAKI

I, Edward Arakaki, swear under penalty of perjury that the following statements are true and correct:

1. I am a plaintiff in this lawsuit and former owner of the Lake Meade Villa Apartments in Las Vegas.
2. In 1991, I was looking for a real estate investment for my mother and I and could raise about $500,000 if we liquidated most of our other holdings consisting of cash and personal residences.
3. Presently, my mother is 77 years old and was born in Okinawa, and didn't move to the United States until late in her life. Japanese is her native language and doesn't speak English that well.
4. After we lost everything in the investment in the HUD project, and the Inspector General collected the facts of what happened it appeared that the only chance to recoup the losses would be to sue the real estate broker (Larry Little), the attorney who we thought was advising us (Matsuoka) and HUD that made the promises that were not kept.
5. My mother was very worried about filing any lawsuit and was afraid to and wouldn't agree to file a lawsuit against the U.S. government, but our lawyer said she could assign her claim to me under Hawaii law and I could file both my claim and the identical claim of my mother as the assignee in my own name.
6. My mother agreed to do that and the assignment is attached as Exhibit 1.
7. The attorney in Hawaii by the name of Keith Matsuoka who had represented me in an earlier divorce had volunteered that he knew of a 76-unit apartment building for sale in Las Vegas that would be a good investment.
8. He said that a real estate broker who could represent me who was a man named Larry Little, a well-known former basketball coach for the University of Hawaii who had moved to Las Vegas.
9. Mr. Matsuoka, my mother, and I went to Las Vegas to look at the building.
10. The sale price was $3 million, with $500,000 down. The apartment building, called the Lake Meade Villas, had a large number of vacancies and provided section 8 housing whereby HUD subsidized the rental payments of certain low income renters. The loan on the apartment building of $2.5 million had an interest rate of 11% as opposed to the market rate of about 7%. There was a negative cash flow every month and the loan payments were seriously in default. The loan was about to be transferred to HUD.
11. During the Las Vegas trip, Mr. Matsuoka and I met with Larry Little and David Ewing.
12. Mr. Little and Mr. Matsuoka reassured me that even though it didn't look like a good deal on paper, that actually it was because once HUD was assigned the loan, it would be willing to convert the loan to a lower interest rate and to accrue back delinquent payments, until we lower the vacancy rate and get the apartment building back to financial health.
13. I met with Mr. Ewing about purchasing the building, and Mr. Ewing promised me that if I purchased the property, HUD would not foreclose and would allow Plaintiffs to bid on the loan if it was subsequently sold by HUD.

64

14. My mother and I purchased the Apartment and paid the $500,000, by putting a second mortgage on her house and other residence and using my savings.
15. Much of the money went to HUD to pay off the existing default that arose before we purchased the apartment. The rest of the money went to Mr. Little's company, which was both the seller's broker and my broker, and to Mr. Matsuoka through his lawyer's trust account. I was surprised to learn later that he didn't believe he was acting as my attorney in the transaction but rather was the attorney for Mr. Little as the broker.
16. Later HUD did acquire the delinquent loan as we expected and then after that HUD sold the note at an auction but did not allow me to bid.
17. The new assignee of the note, who bought it at a great discount off of it face value, foreclosed for the full amount. We lost everything, since the value of the property at that time was less than the amount owed on the loan.
18. Agreeing that I could bid and subsequently not allowing me to bid, and then letting a stranger purchase the loan for far less than the face amount and foreclose on me for the full amount of the loan is clearly wrong. It is a breach of contract and a failure of my rightful expectations under the agreement.
19. Mr. Ewing never asked me to sign an integration agreement such as found in HUD HB 4350.1, or any similar form, agreeing that I could not rely on verbal promises. Mr. Ewing never indicated his commitments would be made binding only if they were in writing or if they were approved by some other person, nor any other conditions.
20. Both Mr. Little and Mr. Matsuoka were being sued for malpractice for their role in representing me at the time they gave their deposition. Presently, the state court dismissed the case against them on statute of limitations ground since the state judge said that the anticipatory repudiation by HUD was sufficient to trigger the time running under state law even if it is not under federal law under the *Franconia* case.
21. Mr. Matsuoka claimed that he was not representing me, but could not explain why his trust fund was used for the transfer of my money in the name of the Lake Meade Villas.
22. Mr. Little admits he was acting as both the seller's broker and the buyer's broker.
23. Attached to this declaration is Exhibit A which is the assignment of Claim from my mother. After we ended up in the Court of Claims I explained to my mother this is a special court that allows people to sue the federal government and that even though I could proceed with the assignment and press her claim it might help, according to the lawyers for her to be named if her presence was deemed necessary or indispensable by the judge.
24. This appendix contains:
    a. My deposition at 1-3
    b. The assignment of claims at 4
    c. The deposition of David Ewing at 5-12
    d. The deposition of Larry Little at 13-15
    e. The deposition of Keith Matsuoka at 16-20
    f. A memo from Larry Little at 21-24
    g. The 7/18/95 transmittal of HUD handbook revision 4350.1 REV-1 at 25-42
    h. Two HUD directives at 43-46
    i. Two letters from Hal DeCell to Senator Daniel Inouye at 47-50
    j. A letter from Atkinson-Baker, Inc. (court reporters) indicating that David Ewing did not sign the transcript of his deposition at 51

k. A “Record of Interview” from the Inspector General’s investigation, recording an interview with David Ewing at 52-54
l. The offer and sales contract from the purchase of Lake Meade Villas at 55-56
m. Two provisional workout agreements between myself and HUD at 57-62

Edward Arakaki

January 6, 2006

66

U.S. Department of Housing and Urban Development
**Office of Inspector General**
Pacific/Hawaii District
450 Golden Gate Avenue, Box 36003
San Francisco, California 94102-3448

August 3, 1999

GWarner 8/5/99

MEMO TO: Glenn S. Warner, District Inspector General for Audit, 9AGA

FROM: David A. McCargar, Assistant Inspector General for Audit, 9AGA

SUBJECT: Citizen Complaint
Lake Mead Villa Apartments
Las Vegas, Nevada

## INTRODUCTION

We reviewed the issues raised by the complainant in correspondence to Congressman Neil Abercrombie regarding allegations of wrongdoing by HUD officials over the purchase of Lake Mead Villa Apartments in 1991. The congressman wrote the Inspector General on February 12, 1999 requesting a review of the allegations. The complainant (hereafter called owner) alleged that HUD officials made false assurances and gave misleading information which persuaded the owner to purchase the project and assume the HUD-insured mortgage, which was in default at the time. The owner further alleged that HUD broke those verbal agreements by not lowering his interest rate as promised and not allowing him to bid on his note when HUD sold it and broke written contractual agreements by improperly terminating his workout agreement and withholding his Section 8 subsidies, resulting in the loss of the project and his and his mother's life savings.

## SUMMARY

We concluded the allegations, except the one regarding the withholding of Section 8 subsidies, were unsupported or did not constitute a violation of laws, regulations or HUD requirements. In the case of the Section 8 subsidies, HUD withheld the subsidies without first providing the required written notice to the owner explaining (1) that he was in default of his Section 8 (HAP) contract, (2) the nature of the default, (3) the actions necessary to cure the default, and (4) the time within which the owner had to complete the corrective actions.

67

We found no validity to the allegation that HUD made false assurances and provided misleading information to the owner prior to his purchase of the project, except with regards to the possible bidding on the note. HUD staff may have said the note would not be sold or, if it was, the owner would have the opportunity to bid on the note. However, these statements were based on HUD's policy at that time. Those policies changed, however, after Congress passed the Multifamily Housing Property Disposition Reform Act of 1994, and the note was subsequently included in a note sale pool with other notes. The owner was not permitted to bid on the note based on HUD's revised policy for pooled notes.

Also, while HUD's actions to terminate the workout agreement may have contributed to the ultimate foreclosure of the note and the owner's loss of the project, we concluded that HUD was within its authority to terminate the agreement based on its determination the owner was not in compliance with its terms. Moreover, the foreclosure of the note was by the purchaser of the note, not HUD. Once the note was sold, HUD no longer had any say in whether to foreclose. This action was at the sole discretion of the note purchaser.

## RECAP OF ALLEGATIONS AND REVIEW RESULTS

The owner alleged that during the period of negotiations beginning October 1991, HUD officials gave verbal assurances that made the purchase of the property seem like a viable investment, specifically:

**Allegation No. 1 - The owner alleged that HUD promised to provide a 15-year workout period to provide the owner time needed to cure the debt.**

We found this to be at least partially true in that HUD included language in the workout agreement to extend the workout period at least beyond the initial three years; however, the extensions were conditioned on the owner's compliance with the workout agreement terms. The HUD official who negotiated the agreement said HUD would have extended the period except the owner violated the terms of the agreement (see discussion under allegation number 5).

**Allegation No. 2 - The owner alleged that HUD promised to place the arrearage without interest at the back end of the note.**

We did not find any evidence that HUD promised to do so. The owner provided no documentation to support this allegation and officials in the HUD field office said this was not promised. Moreover, the workout agreement (which the owner signed) did not indicate any relief from accruing interest. It only proposed to extend the time needed to fully amortize the debt deferred.

**Allegation No. 3 - The owner alleged that HUD promised to lower the interest rate of the note from 11% to a government rate of about 7.5%. The owner called attention to various HUD regulations that gave HUD the authority to do so.**

We found no evidence that HUD promised to lower the interest rate on the loan. The owner purchased the note at the 11 percent rate and did not provide any documentation that a promise of a lower rate was made. Further, the workout agreement, which the owner signed, indicated it may recast any remaining delinquency at the end of the workout at eleven percent, but did not mention any possibility of a lower rate.

**Allegation No. 4 - The owner alleged that HUD made verbal assurances that it was unlikely that HUD would ever sell the Lake Mead Villa note, but if it did, the owner would be allowed to bid on it.**

We found this allegation to be true, but not a violation of any law or regulation. Rather, HUD's priorities and methods of selling notes changed from the time when the owner signed a purchase agreement in October 1991until his note was sold in June 1996. The changes were the result of the Multifamily Property Disposition Reform Act of 1994. With passage of the Act, HUD began to sell pools of mortgage notes to accredited investors only. Therefore, HUD acted within its authority in selling the note and the method in doing so, and earlier statements by field office officials regarding note sales methods did not obligate HUD to any specific method.

**Allegation No. 5 - The owner alleged that, after he purchased the note, HUD made false accusations that he had violated HUD rules, and used this as a reason to improperly end his workout agreement and withhold Section 8 subsidies. The owner claimed that the lack of protection from the workout agreement and the loss of the Section 8 funds led directly to the foreclosure of the property and the loss of his investment.**

We concluded that HUD acted within its authority to terminate the workout agreement due to noncompliance with its terms. Violations cited by HUD included occupancy of a rental unit by the owner's mother (co-owner) without paying rent, various maintenance deficiencies, unauthorized cash distributions, and failure to hire a professional management agent acceptable to HUD after the owner terminated the prior agent. Although the owner disputed HUD's charges of noncompliance, we believe there were sufficient indications of noncompliance and HUD acted within its authority in terminating the workout agreement.

HUD may have also been justified in withholding the Section 8 subsidies based on the same violations; however, HUD did not first provide written notice to the owner explaining (1) that he was in default of his Section 8 (HAP) contract, (2) the nature of the default, (3) the actions necessary to cure the default, and (4) the time within which the owner had to complete the corrective actions. This written notice is specifically required by the contract. HUD may take several actions, including withholding Section 8 payments and terminating the contract if an owner fails to take the necessary corrective actions, within the prescribed time frames, or to HUD's satisfaction. However, in Lake Mead's case, HUD withheld the Section 8 payments without having first provided the required notice of default and the opportunity to cure the default. As a result, although HUD believed it had valid reasons for withholding the payments and that the owner was aware of the reasons, there was no documentation available clearly linking the withholding of the payments to any specific actions taken or needed by the owner.

The withholding of the Section 8 subsidies, totaling over $110,000, certainly would have added to the project's deteriorating finances; nonetheless, we cannot conclude the withholding of those funds caused the foreclosure. One can only speculate whether, had HUD provided proper written notice of default prior to withholding the Section 8 subsidies, the owner would have taken sufficient corrective actions in time to prevent the withholding; or, even if having the access to these funds would have been enough to keep the project from financial default or foreclosure. Evidence is stronger to conclude that the project was not able to make full mortgage payments even with the Section 8 subsidies. The owner, the management agent, and the bankruptcy attorney each said the project, even with the monthly Section 8 subsidies, could not make the full mortgage payment of the 11% loan.

## BACKGROUND

Lake Mead Villa Apartments is a 76-unit housing development located in Las Vegas, Nevada. The project's mortgage was insured pursuant to section 221(d)(4) of the National Housing Act. In consideration of the insurance, the owner agreed to be subject to HUD regulations over project operations. These requirements are contained or referenced in a contract known as a regulatory agreement. Requirements include HUD approval of property management, restrictions on distribution of assets, and provisions for proper upkeep and maintenance.

In addition, the project received subsidies from HUD for 30 of its low-income tenants under the Section 8 program. Under this program, the mortgagor is contractually obligated to assure the tenants receiving assistance are eligible, that assistance amounts are proper, and that the housing is safe, decent and sanitary.

In December 1990, Lake Mead Villa Apartments defaulted on its mortgage payments under a prior owner, and the note was assigned to HUD in October 1991. On October 18, 1991, the complainant owner met with HUD officials at the Nevada State Office to discuss the purchase of the HUD-held project. On October 20, 1991, the new owner entered into a purchase agreement with the prior owner, which provided for a purchase price of $3,000,000 on an unpaid principal balance of $2,377,153. In February 1992, the new owner submitted to HUD an application for a transfer of physical assets (TPA), which HUD approved more than a year later in June 1993. The TPA was delayed while Inspector General audit recommendations were being resolved, including the recovery of project funds taken improperly by the prior owner. In January 1993, the new owner signed a workout agreement for a three-year term which began March 1, 1993, when the delinquency was $332,827. Under the workout agreement, the owner agreed not to take any distributions while the mortgage was being held in default.

## SCOPE OF REVIEW

To conduct our review, we reviewed documents submitted by the owner, relevant HUD laws and regulations, the project files for Lake Mead Villa Apartments, files maintained by HUD Office of General Counsel, and interviewed the owner, HUD officials in Las Vegas and in Washington,

D.C., the project management agents, the loan servicer for the note purchaser, and the owner's bankruptcy attorney.

## RESULTS OF REVIEW

**Allegation No. 1 (Workout Agreement)** - The owner alleged that HUD promised to provide a 15-year workout period to provide the owner time needed to cure the debt. We found this to be at least partially true in that HUD included language in the agreement to extend the workout period at least beyond the initial three years; however, the extended time was conditional on the owner's compliance with the workout agreement terms. The HUD official who negotiated the agreement said HUD would have extended the period except the owner violated the terms of the agreement.

The workout agreement allowed the owner to make minimum monthly payments for a three-year period, after which the agreement proposed to either recast the loan or extend the workout period. The workout agreement stated:

> "If the mortgagor has fully complied with the terms of this arrangement, and HUD has determined that it is financially feasible, as of March 1, 1996 HUD agrees to recast any delinquent principal at eleven percent (11%) interest amortized over the remaining term or the mortgage. We propose that, as an alternative option, HUD simply extend the note for the number of months necessary to fully amortize the amount deferred."

The first portion of the above was generally standard language in workout agreements, where the date and the interest percentage would be filled in. The second portion, the "alternative option" clause, was special language added by the HUD official who negotiated the agreement. The official said HUD intended to extend the workout to allow the owner the time necessary to bring the mortgage current and cure any deferred debt, and that HUD would have done so if the owner had not been in violation of HUD rules. (See discussion under Allegation No. 5 below.)

**Allegation No. 2 (The Arrearage)** - The owner alleged that HUD promised to place the arrearage without interest at the back end of the note. We did not find any evidence that HUD promised to do so. Two officials in the field office said this was not promised and the workout agreement (which the owner signed) did not indicate any relief from accruing interest. It only proposed to extend the time needed to fully amortize the debt deferred. The three-year workout required a minimum monthly payment of 70% of accruing interest in the first year, 75% in the second, and 80% in the third, plus the service charge and tax escrow as billed each month. What was not being paid in interest and principal each month was increasing the delinquency. The monthly mortgage billing statements sent to the project listed the delinquent amount. When the workout began in March 1993, HUD records showed the delinquency was $332,827. At the time of the sale in June 1996, HUD records showed the delinquency was $713,128.

Any relief in debt or adjustment in interest rate would have required a modification of the note, which the workout agreement indicated might occur at the end of the three-year term. However,

71

the workout included stipulations. The workout agreement said HUD would agree to recast any delinquent principal at 11% interest amortized over the remaining term of the mortgage **if** the mortgagor fully complied with the terms of the arrangement **and** HUD has determined that it is financially feasible. Recasting the mortgage in this way creates a larger monthly payment which the project must be able to handle. Regardless, the Las Vegas field office said that the owner did not comply with HUD rules during his workout period and so the workout ended. (See discussion under Allegation No. 5 below.)

**Allegation No. 3 (Interest Rate).** The owner alleged that HUD promised to lower the interest rate from 11% to a government rate of about 7.5%. The owner called attention to various HUD regulations that gave HUD the authority to do so. However, we found no evidence that HUD promised to lower the interest rate on the loan, although HUD had the discretion to do so. The workout agreement indicated it may recast any remaining delinquency at the end of the workout at eleven percent, but did not mention the possibility of a lower rate.

We found that while HUD retains the authority to reduce interest rates of HUD-held loans, it was not HUD's policy to do so. HUD officials in Las Vegas said lowering the interest rate could only be done through a modification of the note, which only Headquarters could approve. Headquarters multifamily officials said interest rate reductions were not done on HUD-held loans. HUD Office of General Counsel (OGC) said HUD had the authority to refinance HUD-held loans, but to do so was at HUD's discretion. OCG said that recasting loans at lower interest rates has monetary consequences that HUD must consider, and that HUD has been criticized in general for being too generous with workouts at taxpayers' expense.

The Las Vegas field office official who negotiated the workout said he never promised to reduce the interest rate on the Lake Mead loan, but provided the owner with information on Section 223F of the National Housing Act, which allows existing multifamily projects with HUD-insured mortgages to refinance their loans. The HUD official explained that the refinancing through Section 223F must be found through private lenders, not HUD itself. We note, however, that private lenders generally do not refinance delinquent loans. Had the loan been brought current through the modification at 11% suggested in the workout at the end of the three years, the owner may then have found refinancing; but HUD terminated the workout. (See discussion under Allegation No. 5.)

**Allegation No. 4 (Note Sale).** The owner alleged that HUD made verbal assurances that it was unlikely that HUD would ever sell the Lake Mead Villa note, but if it did, the owner would be allowed to bid on it. We found the owner's allegations regarding note sales to be true; however, HUD's priorities and methods of selling notes changed from the time when the owner signed a purchase agreement in October 1991until his note was sold in June 1996. These changes were a result of the Multifamily Housing Property Disposition Reform Act of 1994. This act facilitated HUD's ability to dispose of the growing number of properties in its inventory. The objective of the Act was to reduce the number of defaulted properties that had ended up in HUD's inventory, which would reduce holding costs and allow HUD to devote more of its asset management staff and resources to monitoring its insured mortgage portfolio and preventing defaults. Prior to the 1994 Act, HUD conducted "whole loan" sales, in which owners could bid on their loans.

Subsequent to the Act's passage, HUD designed sales in which mortgages were pooled into bundles on which only accredited investors could bid. Owners were not allowed to bid on individual notes. This method was expected to maximize proceeds and provide better returns to the benefit of taxpayers.

The owner of Lake Mead Villa was notified in July 1995 that his note was placed in a pool of partially assisted projects (meaning that less than 50% of the units had Section 8 assistance). He contacted both HUD and HUD's contractor handling the note sale to indicate his interest in negotiating the purchase of his note. As noted above, HUD's policies had changed in that owners could no longer bid on their individual notes. Therefore, the owner was caught in a time of changing policy on HUD's part. In our opinion, however, HUD was under no legal obligation to allow the owner to bid on the note (even though that might have occurred under HUD's previous policy) and acted within its authority in selling the note in a pool with other notes.

The decision to place notes in sales was made at HUD headquarters. In general, HUD intended to sell all notes that had been in the HUD-held inventory for more than one year. In January 1995, HUD headquarters requested field offices to inform them of any loans in their inventory that had any non-standard workout terms, indicating that such provisions could have a major effect on the price and marketability of the loan. At that time, the field office did not inform headquarters of the nonstandard terms in the Lake Mead workout agreement, even though HUD records dated March 1995 deemed Lake Mead current under its workout agreement. Although the field office should have informed headquarters at that time of the extension clause in the agreement, it appears HUD terminated the workout agreement prior to the sale, as will be explained in No. 5 below. We do not know whether headquarters was aware that the Section 8 subsidies were being withheld from this project beginning December 1995 pending correction of violation of HUD rules. We did not review headquarters' criteria to determine what special circumstances may have kept notes from being sold.

As the pooled sales were announced, HUD published notices to owners that, although HUD would no longer entertain loan restructuring proposals, owners may be able to negotiate a discounted settlement or restructure the debt with the purchasers. The owner complained that HUD was making rosy predictions without any legal provisions to protect owners. In actuality, purchasers had a variety of strategies, including foreclosure, none of which HUD could restrict. In September 1997, the Assistant Secretary of the Office of Intergovernmental Relations apologized to the owner for this reassurance, saying that once the loans were sold, HUD did not retain any authority with respect to the loans, and any actions taken after the sale were solely at the discretion of the purchaser. The owner's workout agreement, if in effect at the time, would have bound the note purchaser to its terms and provided some protection, but HUD terminated the agreement prior to the sale. (See discussion under Allegation No. 5.)

**Allegation No. 5 (Contractual Agreements)** The owner alleged that HUD made false accusations that he had violated HUD rules, and used this as a reason to improperly end his workout agreement and withhold Section 8 subsidies. We found that HUD acted within its authority to immediately terminate the workout agreement due to noncompliance with its terms. Although HUD withheld Section 8 subsidies based on the same noncompliances, we noted that

HUD did not provide written notice of default as required by the Section 8 contract prior to withholding Section 8 subsidies, which left the door open to speculation as to what might have been had the owner been properly notified.

*Termination of the Workout Agreement.* HUD found the owner to be in violation of the workout agreement due to a rent-free unit supplied to the owner's mother, who was also part owner, beginning in the summer of 1995. HUD deemed this an improper distribution of project funds while the project was in default. The workout agreement required the owner not to take any distributions while HUD held the mortgage in default. The workout agreement contained a Cancellation Clause which allowed HUD to immediately terminate the agreement if the mortgagor had not fully complied with its terms. It stated, "Failure of the Mortgagor to meet the terms of this Arrangement will be sufficient cause for the Secretary to immediately terminate this Arrangement and to commence foreclosure action." The agreement did not require any written notice prior to termination. Therefore, upon the distributions to the owner in the form of free rent, HUD had the authorization to immediately terminate the workout agreement.

HUD said, in addition to the rent-free unit supplied to the mother, the owner violated the regulatory agreement by having no approved management agent in place and taking other unauthorized cash distributions. The owner argued he was managing under an emergency situation at the departure of the former management agent while seeking HUD's approval to self-manage or other HUD-approved management, and his mother was performing maintenance work for which she was not being paid. The owner said that if she was paid, she would have paid rent. The owner argued that any distributions they took were less than what was owed to his mother and himself for performing management and maintenance work.

Regarding the HUD-approved management agent, the project files showed the owner was making some effort to resolve the management issue. The files showed that the owner initially requested to self-manage, that he had opened negotiations with a HUD-approved management agent by October 1996, that HUD was still considering the owner to self-manage in March 1996, and that he did have a HUD-approved management agent in place by June 1, 1996. We did not confirm or disprove the other mentioned distributions (four checks totaling $17,440 plus an unidentified amount of missing rent receipts), except to note that one of the four checks in the amount of $10,000 was apparently written to the owner in August 1996 after the note was sold in June 1996 when the regulatory agreement no longer applied; nor did the HAP contracts, which remained in effect, require any limitations on distributions for partially assisted projects. Even so, HUD sent notice in September 1996 requiring the owner to repay the $10,000 or face double damages. Therefore, only $7,440 plus any missing rent receipts plus the amount of free rent may have been at issue.

Although HUD had made the owner aware that he was in violation of HUD rules through verbal discussions and four written letters during the time period December 1995 to February 1996, HUD did not connect these violations with the termination of his workout until after the sale was completed. Rather, just prior to his workout agreement's expiration in February 1996, the field office told the owner that his workout could not be extended because his note was up for sale. The field office believed that being in or out of compliance was irrelevant; rather, the workout

could not have been extended due to the note sale. However, this wasn't entirely true. HUD headquarters said that, generally speaking, it was true that HUD did not renew workout agreements once properties were placed in note sales because HUD did not want to make financial arrangements that would be binding on the note purchasers. Additionally, HUD believed workout agreements reduced the price HUD could get for the note. Thus, if the workout clearly ended, HUD would take no further action to renew it. However, if the workout contained language that allowed it to be extended, HUD would determine on a case by case basis whether the agreement was binding on HUD and/or the note purchaser. In this case, the added clause, which proposed to extend the months as necessary to fully amortize the debt, would have obligated the note purchaser to do so, if the agreement was still in effect at the time of the sale.

After the note sale closed at the end of June 1996, HUD told the owner his workout agreement was terminated because he had violated its terms. Since HUD had not made it clear when and why the workout agreement was terminated, the owner still had expectations of its renewal once any noncompliances were corrected. The HUD-approved management agent which took over on June 1, 1996 immediately requested HUD to reinstate the workout agreement and assured HUD that noncompliances were corrected and its provisions would be adhered to. The management agent called attention to the precarious position the owner would be placed in with the mortgage buyer if the workout period was not extended by HUD according to the workout agreement's terms.

HUD headquarters replied to the management agent's request for reinstatement of the workout in August of 1996 (after the note was sold) that the workout agreement had been terminated because the owner had violated its terms, including failure to submit timely monthly payments, no approved management agent in place, owner's mother living rent-free, unauthorized distributions of project funds, inadequate swimming pool maintenance, and no contact for emergency maintenance problems. (HUD mortgage billing records showed that the owner was current under the workout agreement through the end of its 3-year term.) In the same letter, HUD headquarters indicated that although some of these issues may have been resolved, the status of the workout agreement was irrelevant since it "expired" in February 1996 and the note was sold in June 1996. Therefore, by first telling the owner the workout could not be extended due to the sale, and then later telling the owner he had defaulted on the agreement, HUD did not make it clear to the owner when and why the workout was terminated.

Nonetheless, while the owner may have been confused as to why his workout was not extended, we believe that HUD acted legally in terminating it. In November 1996, HUD developed policy which advised HUD asset managers to cancel workout agreements in writing in the event of monetary or non-monetary default.

*No Written Notice Prior to Withholding of Section 8 Subsidies.* The owner had entered into two Housing Assistance Payment (HAP) contracts with HUD which provided Section 8 subsidies for a total of 30 units. Any violations to the regulatory agreement also caused a default under the HAP contracts. HUD determined the owner to be in default of the HAP contracts due to not having an approved management agent in place. However, HUD did not follow proper notification procedures prior to withholding Section 8 subsidies due to the default.

Sanctions for default under the HAP contract include suspending or withholding Section 8 payments after providing proper written notice. HUD Handbook 4350.5 Chapter 9, "Subsidy Contract Administration and Field Monitoring," as well as the contracts themselves, indicate that if a default occurs, the contract administrator must notify the project owner, by certified mail, of the nature of the default, the corrective actions needed to cure the default, including the time frame in which the owner must complete the corrective actions. If the owner does not implement the required corrective actions within the prescribed time frame, the contract administrator may take corrective actions including suspending or withholding housing assistance payments.

In this case, HUD withheld Section 8 subsidies to the property without providing such written notice. The Las Vegas field office called the Accounting Division in San Francisco and verbally told them to withhold the Section 8 subsidies, which amounted to approximately $15,000 a month, beginning December 1, 1995. The HUD official said this was done to get the owner's attention and send a message that HUD was serious about getting HUD-approved management in place. The HUD official believed nothing was being accomplished through phone conversations and the owner was ignoring his requests.

The prior management agent had terminated his agreement effective November 1, 1995 after giving 30-days notice. The field office wrote a letter on December 5, 1995 (after the withholding began) informing the owner that he was in violation of HUD rules due to no HUD-approved management agent in place and his mother living rent-free. The letter indicated that HUD would not approve the owner's request to self-manage and required that rent be paid for the mother. However, no mention of the withheld Section 8 subsidies was made.

The withholding of Section 8 payments continued for eleven months, totaling $165,449. In May 1996, the management agent, which HUD-approved effective June 1, 1996, wrote to HUD pledging compliance and requesting receipt of the Section 8 funds. When HUD sent its letter of approval in August 1996 for the management agent (approving them effective June 1, 1996), HUD stated it would forward the management certification to the field accounting division so that the Section 8 funds that had been on hold (for nine months at that time) may be released. However, none were released. The field office doesn't remember why they were not. Finally, in October 1996, HUD released payments for the four months following the June 1996 sale (July through October 1996), and the months to follow, to the new note servicer, but continued to withhold the seven months from December 1995 to June 1996, totaling $110,424. The management agent claimed the withheld Section 8 payments deprived the owner from the needed funds to make mortgage payments on a timely basis, which, in effect, triggered the monetary default.

After the note sale closed in June 1996, the purchaser issued a notice of foreclosure due to the mortgage delinquency. The owner filed for bankruptcy in September 1996. Both the management agent and bankruptcy attorneys wrote numerous letters to the field office saying that the withheld Section 8 funds must legally be remitted to the bankruptcy court receiver. In November 1996, the field office requested guidance from HUD Office of General Counsel on the issue. Although we found no formal written response, email dated January 1997 from the Office

of General Counsel advised the field office that the withholding of the $110,424 in Section 8 subsidies was proper based on the HUD headquarters' August 1996 letter which listed the various violations.

In August 1997, the bankruptcy attorney again informed the field office that it was required to remit the $110,424 as an essential component of the reorganization plan. The field office contacted HUD's Office of General Counsel a second time indicating it now had no problem releasing the funds since all health and safety problems and certain money due to the project had been taken care of by the management agent. (The reason for the withholding given verbally to the owner initially was no approved management agent.) The Office of General Counsel then recommended the release of the 7 months of withheld payments, saying it acted based on the recommendations of the field office. However, HUD released the $110,424 to the note purchaser, as, according to the field office, directed by HUD headquarters. The bankruptcy attorney said this was illegal; but, by that time, the owner did not have the monetary means to pursue any more legal recourse.

The owner and management agent both claimed the stoppage of the Section 8 subsidies depleted the project reserves and forced the property to stop making mortgage payments, which led to the foreclosure notice from the note purchaser, and the owner to file bankruptcy. This seems a plausible effect of the stoppage. HUD records show that the owner was current under his workout until it ended in February 1996, but then made no payments March through June 1996. (HUD records end June of 1996 when the note was sold. Additional records from the purchaser were not available.)

The owner and management agent also said that the withholding of the $110,424 led to the failure of the reorganization plan. The bankruptcy attorney said that had the project had the $110,424 from the beginning of the proceedings, the reorganization plan would have been funded, units would have been refurbished, and security issues addressed. Instead, the bankruptcy protection was set aside a year later because too much debt had accrued making the reorganization plan unfeasible and funding unavailable to build a security fence to deal with drug-related problems. When the attorney for the note purchaser called attention to an on-site shooting, the judge decreed that the owner did not have the resources to protect the tenants, and set aside the bankruptcy protection in November 1997. The note purchaser recommenced foreclosure proceedings and took title in March 1998.

Although the withholding of the $110,424 Section 8 subsidies would logically have contributed to the financial difficulties of the project, we cannot conclude that the withheld funds would have been enough to avoid the foreclosure, especially in the absence of a workout agreement or reorganization of debt. The owner, the management agent, and the bankruptcy attorney each said the project, even with the monthly Section 8 subsidies, could not make the full mortgage payment of the 11% loan. Therefore, a reorganization of debt and refinancing at a lower interest rate was essential to the project's cure. Still, one can only speculate whether the withheld funds caused the failure of the reorganization plan.

The management agent said this project was marginal to begin with, and the owner purchased it with too much debt and needed repairs. The management agent believed HUD was wrong to allow the prior owner to walk away with profit instead of curing the delinquency and the deferred maintenance that he had caused. In addition, the management agent believed HUD incorrectly analyzed the project's ability to generate sufficient cash to pay the increased debt service once the workout ended. Therefore, poor planning, bad business deals, and a series of misunderstandings led to the project's downfall.

## CONCLUSIONS

We concluded the allegations, except the one regarding the withholding of Section 8 subsidies, were unsupported or did not constitute a violation of laws, regulations or HUD requirements. In the case of the Section 8 subsidies, HUD withheld the subsidies without first providing the required written notice to the owner explaining (1) that he was in default of his Section 8 (HAP) contract, (2) the nature of the default, (3) the actions necessary to cure the default, and (4) the time within which the owner had to complete the corrective actions.

We found no validity to the allegation that HUD made false assurances and provided misleading information to the owner prior to his purchase of the project, except with regards to the possible bidding on the note. HUD staff may have said the note would not be sold or, if it was, the owner would have the opportunity to bid on the note. However, these statements were based on HUD's policy at that time. Those policies changed, however, after Congress passed the Multifamily Housing Property Disposition Reform Act of 1994, and the note was subsequently included in a note sale pool with other notes. The owner was not permitted to bid on the note based on HUD's revised policy for pooled notes.

Also, while HUD's actions to terminate the workout agreement may have contributed to the ultimate foreclosure of the note and your constituent's loss of the project, we concluded that HUD was within its authority to terminate the agreement based on its determination that the owner was not in compliance with its terms. Moreover, the foreclosure of the note was by the purchaser of the note, not HUD. Once the note was sold, HUD no longer had any say in whether to foreclose. This action was at the sole discretion of the note purchaser.

## RECOMMENDATION

We have prepared and recommend the following draft correspondence be sent to Headquarters for signature:

1. For the Inspector General's signature - a draft letter to Representative Abercrombie summarizing the results of our review.

2. For the signature of the Assistant Inspector General for Audit - a draft memorandum to the Assistant Secretary for Housing pointing out HUD's failure to give the owner proper notification of the planned suspension of Section 8 payments. A copy of the Inspector

General's letter to Representative Abercrombie should be enclosed. The draft memorandum recommends the Assistant Secretary provide the Office of General Counsel with the information.

After your review/approval of the attached draft correspondence, the word files can be sent to the AIGA's secretary by lotus notes. Please see me if you have any questions.

Attachments:

1. Draft letter to Representative Abercrombie
2. Draft memorandum to the Assistant Secretary for Housing

**DRAFT**

Honorable Neil Abercrombie
Member, United States House of Representatives
Room 4104, 300 Ala Moana Blvd.
Honolulu, HI 96850

Dear Representative Abercrombie:

In response to your letter of February 12, 1999, we reviewed allegations made by your constituent, Mr. Ed Arakaki, concerning possible wrongdoing by HUD officials in connection with Mr. Arakaki's purchase of Lake Mead Villa Apartments in 1991.

Mr. Arakaki alleged that HUD officials made false assurances and gave misleading information which persuaded him to purchase the project and assume the HUD-insured mortgage, which was in default at the time. Mr. Arakaki further alleged that HUD broke those verbal agreements by not lowering his interest rate as promised and not allowing him to bid on his note when HUD sold it and broke written contractual agreements by improperly terminating his workout agreement and withholding his Section 8 subsidies, resulting in the loss of the project and his and his mother's life savings.

We concluded the allegations, except the one regarding the withholding of Section 8 subsidies, were unsupported or did not constitute a violation of laws, regulations or HUD requirements. In the case of the Section 8 subsidies, HUD withheld the subsidies without first providing the required written notice to Mr. Arakaki explaining (1) that he was in default of his Section 8 (HAP) contract, (2) the nature of the default, (3) the actions necessary to cure the default, and (4) the time within which Mr. Arakaki had to complete the corrective actions.

We found no validity to the allegation that HUD made false assurances and provided misleading information to Mr. Arakaki prior to his purchase of the project. HUD staff may have said the note would not be sold or, if it was, Mr. Arakaki would have the opportunity to bid on the note. However, these statements were based on HUD's policy at that time. Those policies changed, however, after Congress passed the Multifamily Housing Property Disposition Reform Act of 1994, and the note was subsequently included in a note sale pool with other notes. Mr. Arakaki was not permitted to bid on the note based on HUD's revised policy for pooled notes.

Also, while HUD's actions to terminate the workout agreement may have contributed to the ultimate foreclosure of the note and your constituent's loss of the project, we concluded that HUD was within its authority to terminate the agreement based on its determination that Mr. Arakaki was not in compliance with its terms. Moreover, the foreclosure of the note was by the purchaser of the note, not HUD. Once the note was sold, HUD no longer had any say in whether to foreclose. This action was at the sole discretion of the note purchaser.

The specific allegations and our comments thereon are set forth below.