No. 03-1874C
Judge Hewitt

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

EDWARD T. ARAKAKI and HELEN ARAKAKI,

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

---

# DEFENDANT'S REPLY TO PLAINTIFFS' RESPONSE TO MOTION FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, PARTIAL MOTION TO DISMISS (WITH SUPPLEMENTAL APPENDIX)

---

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

KATHRYN A. BLEECKER
Assistant Director

STEVEN M. MAGER
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L St. NW
Washington, D.C. 20530
Tele: (202) 616-2377

February 9, 2006

Attorneys for Defendant

# TABLE OF CONTENTS

PAGE

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I. Plaintiffs Fail To Demonstrate That They Entered Into A Contract With A Government Agent With Authority To Bind The Government . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II. Plaintiffs Fail To Demonstrate An Unambiguous Offer and Acceptance, Nor Mutual Intent To Enter Into A Contract . . . . . . . . . . . . . . . . . . . 10

III. The Nevada Statute Of Frauds Bars The Alleged Oral Contract . . . . . . . . . . . . . 13

IV. Plaintiffs Fail To Respond To Our Argument That Any Breach By HUD Would Not Have Caused Foreseeable Damages . . . . . . . . . . . . . . . . . . . . . . . . . 18

V. Ms. Arakaki's Claims For Relief Should Be Dismissed . . . . . . . . . . . . . . . . . . . 19

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

## TABLE OF AUTHORITIES

**FEDERAL CASE LAW:** **PAGE(S)**

Anderson v. Liberty Lobby, Inc.,
477 U.S. 242 (1986) . . . . . . . . . . 19

Celotex Corp. v. Catrett,
477 U.S. 317 (1986) . . . . . . . . . . 18, 19

Federal Crop Ins. Corp. v. Merrill,
332 U.S. 380 (1947) . . . . . . . . . . 5

Finch v. Hughes Aircraft Corp.,
926 F.2d 1574 (Fed. Cir. 1991) . . . . . . . . . . 19

Fireman's Fund Ins. Co. v. England,
313 F.3d 1344 (Fed. Cir. 2002) . . . . . . . . . . 19

Heckler v. Community Health Servs. of Crawford County, Inc.,
467 U.S. 51 (1984) . . . . . . . . . . 15

JANA, Inc. v. United States,
936 F.2d 1265 (Fed. Cir. 1991) . . . . . . . . . . 15

Kania v. United States,
650 F.2d 264 (Ct. Cl. 1981) . . . . . . . . . . 2-3

Mingus Contractors, Inc. v. United States,
812 F.2d 1387 (Fed. Cir. 1987) . . . . . . . . . . 18

Office of Personnel Management v. Richmond,
496 U.S. 414,
reh'g denied, 497 U.S. 1046 (1990) . . . . . . . . . . 15

Paragon Podiatry Lab., Inc. v. KLM Labs., Inc.,
984 F.2d 1182 (Fed. Cir. 1993) . . . . . . . . . . 10

Plantation Landing Resort, Inc. v. United States,
30 Fed. Cl. 63, 68 (1993),
aff'd, 39 F.3d 1197 (Fed. Cir. 1994),
cert. denied, 514 U.S. 1095 (1995) . . . . . . . . . . 10

New Am. Shipbuilders, Inc. v. United States,
871 F.2d 1077 (Fed. Cir. 1989) . . . . . . . . . . 5

**FEDERAL CASE LAW (continued):** **PAGE(S)**

Raitport v. United States,
33 Fed. Cl. 155 (1995),
aff'd, 74 F.3d 1259 (Fed. Cir. 1996) . . . . . . . . . . 10

Southern Nev. Shell Dealers Assoc. v. Shell Oil Co.,
725 F. Supp. 1104 (D. Nev. 1989) . . . . . . . . . . 19

Waters v. Seyerhaeuser Mortg. Co.,
582 F.2d 503 (9th Cir. 1978) . . . . . . . . . . 15

Westinghouse Elec. Corp. v. United States,
41 Fed. Cl. 229 (1998) . . . . . . . . . . 15

**FEDERAL STATUTES:**

31 U.S.C. § 3727 . . . . . . . . . . 19

41 U.S.C. § 15 . . . . . . . . . . 19

**FEDERAL REGULATIONS:**

60 Fed. Reg. 36336 (July 14, 1995) . . . . . . . . . . 17

61 Fed. Reg. 18652-01 (April 26, 1996) . . . . . . . . . . 17

**STATE CASE LAW:**

American Savings and Loan Assoc. v. Stanton,
85 Nev. 350, 455 P.2d 39 (1969) . . . . . . . . . . 15

Bernkrant v. Fowler,
55 Cal. 2d 588 (1961) . . . . . . . . . . 13

Mahban v. MGM Grand Hotels, Inc.,
100 Nev. 593, 691 P.2d 421 (1984) . . . . . . . . . . 15

Pink v. Busch,
100 Nev. 684, 691 P.2d 456 (1984) . . . . . . . . . . 15

Summa Corp. v. Greenspun,
96 Nev. 247, 607 P.2d 569 (1980) . . . . . . . . . . 17

Zunino v. Paramore,
83 Nev. 506, 435 P.2d 196 (1967) . . . . . . . . . . 15

**STATE STATUTES:** **PAGE(S)**

NEV. REV. STAT. § 111.205 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

NEV. REV. STAT. § 111.210 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

NEV. REV. STAT. § 111.220 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

**MISCELLANEOUS:**

RCFC 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

RCFC 7.1(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

RESTATEMENT (SECOND) OF CONTRACTS (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| EDWARD T. ARAKAKI and HELEN ARAKAKI, | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 03-1874C |
| | ) | (Judge Hewitt) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S REPLY TO PLAINTIFFS' RESPONSE TO MOTION FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, PARTIAL MOTION TO DISMISS**

Pursuant to Rule 7.1(c) of the Rules of the United States Court of Federal Claims ("RCFC"), defendant, the United States replies to plaintiffs' response to our motion for summary judgment or, in the alternative, partial motion to dismiss.

In our initial motion, we established that David Ewing possessed no actual authority to enter into an oral workout agreement regarding how HUD would handle the sale of the mortgage note on Lake Mead Villas. Further, even assuming that Mr. Ewing possessed adequate authority to enter into an oral contract with plaintiffs, we established that plaintiffs cannot demonstrate an unambiguous offer or the clear mutual intent to contract, that the Nevada Statute of Frauds would bar the purported oral agreement, and that any damages alleged by plaintiffs would not have been foreseeable at the time of contracting or have been caused by any alleged breach. Finally, we established that Mrs. Arakaki is not a proper plaintiff in this suit. Plaintiffs' response fails to successfully rebut these arguments.

Accordingly, we respectfully request that this Court grant the United States' motion for summary judgment, or, in the alternative, motion to dismiss Mrs. Arakaki from the litigation.

## ARGUMENT

### I. Plaintiffs Fail To Demonstrate That They Entered Into A Contract With A Government Agent With Authority To Bind The Government

In their response, plaintiffs fail to demonstrate that David Ewing, the Government employee with whom they purport to have entered into an oral contract, possessed the express or implied actual authority to enter into an oral contract with the plaintiffs regarding how HUD would handle the sale of their note. In our motion, we established that HUD headquarters possessed the sole authority to set the policy and terms of all multifamily note sales, and that this authority was never delegated to the field offices. Further, we demonstrated that, whether the purported contract is characterized as a modification to a mortgage or a workout, HUD required that such agreements must be in writing. Finally, even assuming that the Las Vegas, Nevada field office was able to enter into an oral workout agreement setting the terms of the future sale of a mortgage, we established that a loan specialist, such as Mr. Ewing, lacked the authority to enter into workout agreements.

In their response to our motion, plaintiffs adopt the inherently contradictory positions of relying upon HUD's Insured Project Servicing Handbook[1] to provide a basis for David Ewing's alleged authority to enter into a workout, but repudiating any language in the Handbook that restricts the exercise of such authority. See Pl. Resp. 8-9, 11. Plaintiffs bear the burden of demonstrating that a Government employee has the authority to bind the United States. Kania v.

[1] Despite the Government's production of the Handbook that was effective in October 1991, along with the relevant revisions, plaintiffs generally continue to cite to a later 1995 revision to establish Mr. Ewing's authority in October 1991. Def. App. 25-42. Citation to a subsequently promulgated revisions, however, cannot support that Mr. Ewing had authority in 1991. The Government has appended the relevant August 1991 Handbook revisions to its motion for summary judgment. See Def. App. 65-124.

United States, 650 F.2d 264, 268 (Ct. Cl. 1981). Plaintiffs identify no foundation other than the Handbook for Mr. Ewing's purported implied authority. Plaintiffs require that the Court generally note that the field offices had the authority to enter into workout agreements, while ignoring the express writing requirement of the Handbook and that such delegation of authority was made to the field office director of housing management, not to loan specialists. See Def. App. 65-124. Plaintiffs produce no evidence that these limitations were waived, or that Mr. Ewing was delegated the independent authority to enter into workout agreements without such approval. Plaintiffs cannot both rely upon the Handbook to establish Mr. Ewing's authority, and disclaim the requirements and limitations upon any such authority contained therein.

Plaintiffs not only attempt to ignore those sections of the Handbook that contradict their argument, but they also argue that the Handbook merely provided a "guidance" of "policy and procedures" that apparently may be waived at will. Pl. Resp. 11. There is no indication in the record, however, that HUD personnel may ignore the "policy or procedures set forth" in the Handbook. Def. App. 65. Indeed, the Handbook uses "may" to highlight any flexible provisions, but "is" or "shall" to describe requirements. Compare Def. App. 75 ("[a] provisional workout arrangement is a written agreement between the mortgagor and HUD acknowledging that the mortgagor's loan is in default, that the parties have agreed on steps to be taken to bring the loan current, and that HUD will hold the loan in default and will not begin foreclosure proceedings as long as the owner is complying with the terms agreed to in a workout") (emphasis added) and 89 ("The authorized HUD representative at the Field Office level shall be the Director, Housing Management Division") (emphasis added) with 75-76 ("Depending on local law, modification agreements may be recorded. A Modification Agreement may provide for such actions as:

recasting the principal balance of the mortgage note and establishing a new amortization schedule; changing the term of the note and mortgage; increasing the interest rate or in the case of a bond refunding, changing the interest rate on the mortgage note; adding a call provision; adding a late payment fee; or taking any other action that would modify the terms of the mortgage.") (emphasis added).

Nor does plaintiffs further citation to the 1995 revisions assist their claim that the 1991 Handbook contains no actual requirements. In a July 18, 1995 revision (which is not directly relevant for the purposes of a 1991 claim), HUD expressly allowed for the waiver of some Handbook requirements, but only after following a clear, detailed procedure. Specifically, the July 18, 1995 revision provided that

> any and all handbook waivers must include the bases or justification for taking such action along with concurrences by Field counsel, to ensure that the request for waiver does not conflict with any statutory or regulatory provision, and the Manager/Housing Director, to ensure supervisory review, proper coordination and sound management control practices.

Pl. App. 39 (emphasis added). The authority to waive any provision was not vested with individual loan specialists, but with the Manager/Housing Director, with the input of legal counsel. There is no evidence that Mr. Ewing sought the review of field counsel or authority from any director regarding a purported oral agreement to grant plaintiffs a right to bid on their mortgage. In any event, such limited flexibility does not mean that the Handbook's limitations could be ignored by the field office's loan specialists. Indeed, "[o]ral assurances do not produce a contract implied-in-fact until all the steps have been taken that the agency procedure requires;

until then, there is not intent to be bound." New American Shipbuilders, Inc. v. United States, 871 F.2d 1077, 1080 (Fed. Cir. 1989).

Plaintiffs also attempt to rely upon a mischaracterization of the deposition testimony of David Ewing to support their claims. Specifically, they assert that Mr. Ewing "confirmed in his deposition that it was his job to enter into workout agreements." Pl. Resp. 8. However, even if "the agent himself may have been unaware of the limitations upon his authority," the Government is not estopped from denying his actual authority. Federal Crop Insurance Co. v. Merrill, 332 U.S. 380, 384-85 (1947).

In any event, the text quoted by the plaintiffs does not support this conclusion. Specifically, plaintiffs note that Mr. Ewing stated:

> Q. I see. You do workouts, and mortgage modifications may be done by somebody else?
> A. Right.

Pl. App. 11. This short response, however, is taken out of the full context of the question. A review of the transcript reveals that the above referenced statement was made in response to a question about whether the Las Vegas HUD field office (not Mr. Ewing, personally) prepared mortgage modifications and/or workout agreements. Mr. Ewing indicated that, in his experience, the Las Vegas office only prepared workout agreements, not modifications. Put in proper context, Mr. Ewing's testimony provides:

> Q: What's the difference between a workout and a mortgage modification?
> A: I'm not quire certain what a mortgage modification is. It's not something that we would be able to do in this office.
> Q: I see. You do workouts, and mortgage modifications may be done by somebody else?
> A. Right.

Id. (emphasis added).

Nor does the other deposition testimony cited by plaintiff support the contention that Mr. Ewing "confirmed in his deposition that it was his job to enter into workout agreements." Pl. Resp. 8. Plaintiffs quote the portion of the deposition where Mr. Ewing noted that:

> Q. Then the judge [in the Order on the first summary judgment motion] goes on and states, "Asset managers are empowered - by way of workouts - to make arrangements meant to stabilize a project's financial problems, secure 'competent, interested owners,' and develop a 'reinstatement plan that will protect the long-term financial interests of HUD and ensure the project can continue to be a viable operation.'" Do you see that, sir?
> A. Correct.
> Q. And is that true?
> A. Yes.

See Def. App. 160. However, Mr. Ewing's additional testimony also must be put in its proper context. First, Mr. Ewing's testimony was focused upon this Court's citations to the 1995 version of the Handbook, not any questions of his authority in 1991. Further, the question transposes quotations from the 1995 Handbook and the Court's opinion here underlying factual questions, leaving much ambiguity in Mr. Ewing's response. Indeed, immediately after being asked about the language quoted by plaintiffs, Mr. Ewing further clarified his testimony:

> Q: Then she states, "These duties could be consistent with the existence of contracting authority." Do you see that, sir?
> A: I see that.
> Q: Is she correct?
> MR. MAGER: Objection, calls for a legal conclusion.
> A. I don't have, as a loan specialist ever had contracting authority.
> MR. JARESS:
> Q. The statement here "These duties could be consistent with the existence of contracting authority."

A. And what I'm saying is I've never had contracting authority in this office.

Def. App. 160-161. Prior to the above referenced statements, Mr. Ewing had provided:

Q: And go down to the next paragraph. It states, here is what Judge Hewitt says, "HUD apparently endows field asset managers – such as Mr. Ewing – with a broad authority to design workout-type arrangements to stabilize still insured but potentially troubled projects." Do you see that language there, sir?
A. Uh-huh (affirmative response).
Q. Is the judge correct?
A. No.

Def. App. 158-159. This is not to say that Mr. Ewing played no role in the generation of a workout agreement. Mr. Ewing's testimony does provide that he was involved in the workout process. However, Mr. Ewing also noted that it was the chief of loan management who had the actual authority to enter into and sign off upon workout agreements.

Q: Could you enter into workout agreement contracts?
A: No.
Q: Could you sign a workout agreement as a loan specialist?
A: No.
Q: Well, and did you have to have supervisory approval for workout agreements when they could be worked out? Who would have the authority to approve a workout agreement?
A: The approval was done by the chief of loan management and at that time office manager.
Q: And who was the chief of loan management at that time?
A: Dottie Manz.
Q: And who was the, you said, office manager at that time?
A: I believe Andrew Robertson.

Def. App. 162-163. Accordingly, it is clear from Mr. Ewing's testimony, consistent with the Handbook and the testimony of other witnesses, that he did not have the authority to enter into

workout agreements on behalf of HUD, let alone the authority to enter into an oral workout agreement that limited HUD's ability to dispose of a mortgage note.

Plaintiffs further cite to a "February 27, 1995" letter from HUD's Deputy Assistant Secretary of Multifamily Housing Programs to HUD's directors, multifamily directors, and loan management branch chiefs[2] in support of the proposition that Mr. Ewing possessed the authority to enter into a workout restricting HUD's ability to dispose of the mortgage. Pl. App. 43-44. The language cited by plaintiffs, however, does not support the conclusion that a loan specialist had the authority to enter into an oral workout agreement in violation of the Handbook. Nor can it be read to support the conclusion that HUD had permitted the field offices to enter into workouts that limited headquarter's ability to dispose of such mortgages in the manner that it desired. While the memorandum does express a concern that "non-standard" terms exist in some workout agreements, none of the terms listed in the memorandum had limited HUD's ability to set the policy and terms of a mortgage note sale. Instead, the letter notes that some terms are "counterproductive to achieving the best result (i.e., highest return to HUD) for the note sale." Pl. App. 44. In other words, while non-standard workout terms might affect HUD's ability to get the best price for the sale of a note, the memorandum does not indicate that the field offices might be able to enter into workout agreements that effect headquarter's ability to dispose of a note.

---

[2] Plaintiffs' brief fails to list an appendix citation for this document, however, the language appears to be taken from a memorandum received by the Las Vegas, Nevada office on March 6, 1996, and located at pages 43-44 of the plaintiffs' appendix. The document filed by plaintiffs has been highlighted and has notes upon it, presumably made by plaintiffs' counsel. Accordingly, a clean copy of the document is being filed with this reply. Def. Supp. App. 1-2.

Further, the memorandum does not discuss workouts made contrary to the Handbook, only the addition of "non-standard" terms. In many regards, this memorandum supports the Government's contentions regarding the basic requirements of a valid workout agreement. First, the memorandum reminds the directors and branch chiefs that "an original of every workout agreement must be forwarded to the Office of Multifamily Housing Operations Division in Headquarters," emphasizing the written nature of any workout agreement. Pl. App. 44. Second, the memorandum is addressed to the directors and branch chiefs, who possessed the authority to enter into workout agreements, rather than loan specialists, such as Mr. Ewing. Pl. App. 43.

Finally, plaintiffs assert that it is "undisputed" that the purported oral workout agreement giving them a right to bid was not "highly unusual." Pl. Resp. 10. Plaintiffs have no support for this contention, and cite to none. Indeed, given the unanimous testimony of all HUD officials regarding who handled the terms and policy of mortgage sales, and the explicit language of the Handbook, an oral workout agreement restricting HUD's ability to dispose of a mortgage note would be necessarily unusual. Counsel is unaware of any evidence that HUD has ever granted a buyer or potential multifamily buyer a "right to bid" at auction.

Accordingly, because the plaintiffs have failed to demonstrate that David Ewing, a loan specialist, possessed actual express or implied authority to enter into an oral agreement restricting HUD's ability to dispose of the mortgage for Lake Mead Villas, defendant's motion for summary judgment should be granted.

## II. Plaintiffs Fail To Demonstrate An Unambiguous Offer and Acceptance, Nor Mutual Intent To Enter Into A Contract

From the outset, plaintiffs misconstrue our contentions regarding the lack of an unambiguous offer and acceptance. In our motion, we do not assert that Mr. Ewing made no representations to the plaintiffs regarding possible scenarios for bidding upon the property. Rather, the point is that any representations would not have amounted to an unambiguous offer to grant plaintiffs a "right to bid" upon the property, should it ever be put up for auction. Statements by a Government official are not contractual in nature especially when, as here, they are simply a statement of the existing policy.

Mr. Arakaki's assertions that he was granted a right to bid, made for the first time only after the 1996 sale of the mortgage note, is not sufficient to sustain his claim upon a motion for summary judgment. Such a conclusory, self-serving statement in itself is insufficient to create a genuine issue of material fact on this point. Paragon Podiatry Lab., Inc. v. KLM Labs., Inc., 984 F.2d 1182, 1190 (Fed. Cir. 1993) ("merely conclusory statements or completely insupportable, specious, or conflicting explanations or excuses will not suffice to raise a genuine issue of fact"); see Raitport v. United States, 33 Fed. Cl. 155, 161 (1995), aff'd, 74 F.3d 1259 (Fed. Cir. 1996); Plantation Landing Resort, Inc. v. United States, 30 Fed. Cl. 63, 68 (1993), aff'd, 39 F.3d 1197 (Fed. Cir. 1994), cert. denied, 514 U.S. 1095 (1995). Indeed, Mr. Arakaki was a Government personnel specialist at the time of the meeting with Mr. Ewing, and asserted at deposition that he did not believe at the time of the meeting that Mr. Ewing had the "power to negotiate." Def. App. 198. Accordingly, he asserts that he relied upon Larry Little and Keith Matsuoka for such

matters, both of whom have testified, under oath, that no promise granting a right to bid was ever made. Id.

Plaintiffs do not contest that Mr. Matsuoka testified under oath that no such promise was made. However, they assert that Mr. Little stated that Mr. Ewing promised Mr. Arkakai a right to bid on his loan. Yet when directly asked this question, Mr. Little responded that Mr. Arakaki was not granted a right to bid on his loan.

> Q: No what he said was that if we do sell it you have a right to bid on it?
> MR. PORTNOY: Again, are you testifying or asking?
> MR. JARESS: I'm asking him a question and a statement.
> BY MR. JARESS
> Q: Is it true or not?
> A: He was not guaranteed the right to bid on his note is my understanding.

Def. App. 217 (emphasis added). Mr. Little does contend that the matter was discussed, but that no promises were made by Mr. Ewing. Indeed, Mr. Little testified that "an agent in a local office," such as Mr. Ewing, would not be able to determine if Mr. Arakaki could bid upon his loan and that Mr. Ewing lacked the authority to promise a right to bid. Def. App. 219.

Plaintiffs also rely upon an unsworn March 6, 2000 paper, purportedly signed by Mr. Little, providing that "Mr. Ewing made it clear that if HUD auctioned the note, then Mr. Arakaki will be able to actively bid on the property's note in auction." Pl. App. 23. Again, however, this document does not provide that Mr. Arakaki was promised any contractual right to bid. In fact, the document provides that "Mr. Ewing provided no elaborate explanation; and set no conditions, rep-conditions, cavaets, qualification requirements nor any other requirement to

bar Mr. Arakaki's participation in an auction of the note." Id. This marks Mr. Ewings purported statement more as an explanation of HUD's policy rather than an unambiguous contractual offer.

Finally, plaintiffs' contention that Mr. Ewing admitted that he promised Mr. Arakaki a right to bid lacks support. Plaintiffs are correct that Mr. Ewing could not recall the full specifics of his 1991 meeting with Mr. Arakaki at his 2005 deposition. This is not surprising, due to the large lapses in time between the 1991 meeting, Mr. Arakaki's first assertion that he was granted a right to bid (1996), and the filing of the lawsuit. Further, Mr. Ewing has characterized his meetings with Mr. Arakaki as "strictly informal." Def. App. 148. Mr. Ewing, however, did explain that he had no input or authority regarding the sale of a mortgage, and that he had never talked to anyone regarding an owner's right to bid. See, e.g., Def. App. 151-52. Promising any owner a right to bid would be inconsistent with Mr. Ewing's understanding of his own role in the sale of mortgages.

Plaintiffs further claim that Mr. Ewing previously stated in an 1999 interview with the HUD inspector general that he had promised Mr. Arakaki a "right to bid." Pl. Resp. 12-13. Plaintiffs are incorrect. While the inspector general's notes reflect that it was "very possible" that Mr. Ewing told Mr. Arakaki that if the note was sold, Mr. Arakaki would be able to bid upon it, there is no indication that this statement was anything other than a simple explanation of HUD's general policy, not a contractual offers. Pl .App. 52-53. Further, this report places these statements in the context of headquarters "entertaining the idea of allowing owners to bid on their loans." Pl. App. 53. If Mr. Ewing made any statements in the context of headquarters "entertaining" an idea, it certainly could not have been a definite offer.

Accordingly, even if Mr. Ewing possessed the authority to enter into an oral workout agreement providing an owner with a right to bid, no unambiguous offer to do so was made, and the Court should grant the Government's motion for summary judgment on this point.

## III. The Nevada Statute of Frauds Bars The Alleged Oral Contract

Plaintiffs assert that the alleged oral agreement in this case did not create an interest in land. An interest in land within the meaning of the Statute of Frauds is "any right, privilege, power or immunity, or combination thereof, which is an interest in land under the law of property and is not "goods" within the Uniform Commercial Code." RESTATEMENT OF CONTRACTS, SECOND § 127 (2005).

The alleged agreement at issue here is a right to bid that is contingent on the purchase of an interest in land. Plaintiffs cite California case law purporting that "no land or interest in land was sold by an oral agreement." Pl. Resp. 18. However, this is exactly what the plaintiffs are asserting in this case. They allege that they purchased Lake Meade Villas based on an oral contract giving them a right to bid on their mortgage. Moreover, plaintiffs cite Bernkrant v. Fowler, 55 Cal. 2d 588 (1961), as a case with a "somewhat similar situation." To the contrary, that case involves a decedent's estate and an oral agreement to discharge plaintiff's obligation to pay the decedent. The oral agreement was evidenced by a deed of trust that had no subordination provision. Unlike the case here, that case involved promissory notes between the plaintiff and defendant – written documentation of the oral agreement.

Plaintiffs in their pleadings assert that they bought the property in reliance on the alleged right to bid. Now, plaintiffs want to separate their right to bid from the action upon which they allege it was conditioned. Plaintiffs' alleged right to bid and the purchase of Lake Meade Villas

go hand in hand; the two rely on one another making the right to bid inseparable from the purchase of Lake Meade Villa Apartments. If plaintiffs did not also own the property securing the mortgage they sought to bid on, then it might follow that the right to bid is merely a security interest and not an interest in land. However, in this case, the two are inseparable, as the purchase of the land in this case is inextricably intertwined with the plaintiffs assertion of a right to bid.

Next, plaintiffs argue that the applicable Nevada statute is NEV. REV. STAT. section 111.220 which provides:

> Every agreement that, by the terms, is not to be performed within 1 year from the making thereof is void, unless the agreement, or some note or memorandum thereof expressing the consideration, is in writing, and subscribed by the person charged therewith.

Plaintiffs assert that an auction could have been held within one year, presumably excluding it from the writing requirement. Pl. Resp. 18. However, this assertion fails based on the undisputed facts of this case. The alleged oral assurance was made on October 18, 1991. Plaintiffs did not go to closing on Lake Meade Villa Apartments until over a year later, on October 22, 1992. Under these facts, the auction would have to have been held before they went to closing on the property, since the alleged oral assurance was supposedly premised on the plaintiffs' purchase of Lake Mead Villas.

Whether this Court deems sections 111.205, 111.210 or 111.220 as the applicable Nevada Statute, plaintiffs' alleged oral agreement is subject to the Nevada Statute of Frauds under either or all of these statutes. To avoid the Nevada Statue of Frauds, plaintiff must prove estoppel or

part performance by an "extraordinary measure of evidence." Waters v. Seyerhaeuser Mortg. Co., 582 F.2d 503, 506 (9th Cir. 1978).

In general, there can be no equitable estoppel against the Government, absent affirmative misconduct on the part of the Government. See Office of Personnel Management v. Richmond, 496 U.S. 414, 434 (holding that the courts cannot estop the Constitution and, therefore, there can be no "estoppel by a claimant seeking public funds"), reh'g denied, 497 U.S. 1046 (1990); Heckler v. Community Health Servs. of Crawford County, Inc., 467 U.S. 51, 59 (1984); JANA, Inc. v. United States, 936 F.2d 1265 (Fed. Cir.1991); Westinghouse Elec. Corp. v. United States, 41 Fed. Cl. 229, 240 (1998). Assuming for argument that the Government may be estopped, to constitute estoppel, the party relying on it must be influenced by the acts. JANA, Inc., 936 F.2d at 1270; Zunino v. Paramore, 83 Nev. 506, 509, 435 P.2d 196, 197 (1967). Estoppel requires an element of justifiable reliance by the party invoking the doctrine. See American Savings and Loan Assoc. v. Stanton, 85 Nev. 350, 354, 455 P.2d 39, 41 (1969). See also Mahban v. MGM Grand Hotels, Inc., 100 Nev. 593, 595, 691 P.2d 421, 423 (1984). The party to be estopped must be apprised of true facts, he must intend that his conduct shall be acted upon or act so that the party asserting estoppel has the right to believe it was so intended, the party asserting estoppel must be ignorant of the true state of facts, and must have relied to his detriment upon conduct of the party to be estopped. Pink v. Busch, 100 Nev. 684, 689, 691 P.2d 456, 459 (1984).

Here, plaintiffs had no reasonable reliance on the alleged statement by Mr. Ewing. Mr. Arakaki's deposition testimony demonstrates that he did not rely on Mr. Ewing's alleged statements. Rather, he claims to have relied on the judgment and assurances of Larry Little and his attorney, Keith Matsuoka. See Def. App. 198. As noted above and in our initial motion,

neither Mr. Little nor Mr. Matsuoka ever interpreted anything Mr. Ewing said during the October 1991 meeting as giving Mr. Arakaki a right to bid. Instead, Mr. Little asserted that there was a conversation in which Mr. Ewing told Mr. Arakaki that he would be able to bid if the mortgage was put up for auction but Mr. Little specifically denied that Mr. Ewing granted Mr. Arakaki a "right" to bid. Def. App. 217, 219. Indeed, he provided that Mr. Ewing provided "no elaborate explanation; set no conditions, pre-conditions, caveats, application procedures …" Pl. App. 23. This supports HUD's contention that no right to bid was given by Mr. Ewing. At best, general information about how HUD usually operates was provided.

Plaintiffs also assert that their alleged right to bid was granted in consideration for the purchase of Lake Meade Villas. But according to Mr. Little, no condition was set requiring Mr. Arakaki to purchase the property in order to preserve a right to bid. Mr. Ewing's lack of authority, as discussed above, along with all of the above-mentioned facts, demonstrate that plaintiffs had no reasonable reliance on Mr. Ewing's alleged statement and that Mr. Ewing did not promise plaintiffs a right to bid. Mr. Arakaki is the only party amongst four persons present at the October 1991 meeting, who believes a right to bid was granted. Additionally, in all of the plaintiffs' correspondence to HUD, from the time they were informed of the partially assisted sale, up until the sale date, plaintiffs only asked to negotiate the purchase of the mortgage for Lake Meade Villas. Plaintiffs never asserted a right to bid. If plaintiffs truly believed they had a right to bid, they would have asserted that they were entitled to purchase their mortgage pursuant to their alleged oral agreement with Mr. Ewing, instead of attempting to negotiate the purchase of the mortgage for Lake Meade Villas.

To constitute part performance, plaintiffs must show that the acts of HUD and plaintiffs were done with a view to the agreement being performed, plaintiffs were willing to perform, and plaintiffs must establish these requirements by an extraordinary measure or quantum of evidence. Summa Corp. v. Greenspun, 96 Nev. 247, 253, 607 P.2d 569, 572 (1980). Plaintiffs cannot show that HUD acted with a view of providing the plaintiffs a right to bid. An entire year after the alleged oral assurance, plaintiffs proceeded to go to closing on the property, and there was still no writing, nor terms in the workout agreement providing plaintiffs with a right to bid. Plaintiffs' purchase of the property may demonstrate their willingness to purchase the property, but it does not demonstrate HUD's assent, understanding or willingness to provide a right to bid. Instead, the lack of any writing demonstrates the lack of asset, understanding or willingness to provide a right to bid. Moreover, Mr. Arakaki was no newcomer to real estate transactions or questions of authority within the Government. See, e.g., Def. App. 18-19. His failure to get such an allegedly important agreement in writing demonstrates the unreasonableness of his reliance on Mr. Ewing's alleged oral assurance.

Finally, mortgage owners in prior loan sales did not have a right to bid. What owners had was the ability to bid if they were eligible bidders under the terms of the loan sale policy. See 60 Fed. Reg. 36336 (July 14, 1995); 61 Fed. Reg. 18652-01 (April 26, 1996). A right to bid implicates something more than an eligibility to bid on a mortgage. A right to bid implies the ability to bid without regard to eligibility. Plaintiffs are seeking to enforce a self-created right to bid that has never existed in any prior HUD note sales. The fact that this right has never existed for any other loan sale is evidence that it is not a right HUD has ever granted, nor is it a right Mr. Ewing would be able to grant or have the authority to grant.

**IV. Plaintiffs Fail To Respond To Our Argument That Any Breach By HUD Would Not Have Caused Foreseeable Damages**

Plaintiffs initially assert that the Court's September 7, 2005 order severed discovery on all damages issues until after the Government's dispositive motion, and imply that consideration of any questions relating to damages at this time is inappropriate. Pl. Resp. 21. While the September 7, 2005 order did defer all expert damages discovery until after the pending motion, and the Government agrees that any questions regarding the quantum of damages would be premature, the Government's motion focused solely upon questions of causation and foreseeability. While a motion regarding plaintiffs' ability to prove damages with specificity might be premature, a motion focused upon damages an essential element of an implied in fact contract claim is appropriate. Accordingly, and in order to limit the number of motions filed with the Court and secure "the just, speedy, and inexpensive determination" of this matter, we included this aspect of the damages question in our current motion for summary judgment. See RCFC 1.

Plaintiffs fail to provide any response to the Government's motion on this point, other than to allege that they invested money in Lake Mead Villas. Such a failure to respond is fatal to plaintiffs' claims. "The party opposing summary judgment must show an evidentiary conflict on the record; mere denials or conclusory statements are not sufficient." Mingus Contractors, Inc. v. United States, 812 F.2d 1387, 1390-91 (Fed. Cir. 1987). Indeed, in Celotex Corp. v. Catrett, the United States Supreme Court noted that "[t]he moving party is 'entitled to a judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." Celotex Corp. v. Catrett,

477 U.S. 317, 322 (1986) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986)). Failure to respond to summary judgment argument implicitly concedes the argument. Finch v. Hughes Aircraft Corp., 926 F.2d 1574, 1576-77 (Fed. Cir. 1991); Southern Nev. Shell Dealers Assoc. v. Shell Oil Co., 725 F. Supp. 1104, 1109 (D. Nev. 1989).

**V. Ms. Arakaki's Claims For Relief Should Be Dismissed**

In our initial motion, we demonstrated that Ms. Arakaki's claims for relief should be dismissed because her claims were filed outside of this Court's six-year statute of limitations and because she fails to state a claim upon which relief may be granted. In their response, plaintiffs assert that Ms. Arakaki assigned her claims against the United States to Mr. Arakaki in the first lawsuit.[3] Plaintiffs argue that in Hawaii, claims may be assigned by private parties by written agreement. Plaintiffs, however, fail to consider the Anti-Assignment Act, 41 U.S.C. § 15(a); 31 U.S.C. § 3727(a)(1), (b).

The assignment of claims against the Government is generally prohibited by what is commonly called the Anti-Assignment Act. That Act is composed of two provisions, 41 U.S.C. § 15(a) and 31 U.S.C. § 3727(a)(1), (b). See Fireman's Fund Ins. Co. v. England, 313 F.3d 1344, 1349 (Fed. Cir. 2002). Under that Act, as applicable here, the voluntary assignment of any claim against the Government, except to a financing institution, is prohibited. Ms. Arakaki is not a financial institution, and, accordingly, would be unable to assign her claims against the United States to Mr. Arakaki, no matter the forum in which she choose to proceed.

---

[3] Prior to filing the assignment with this Court, plaintiffs have not previously produced a copy of this assignment to the Government.

Plaintiffs further note that Ms. Arakaki has an interest in this lawsuit by virtue of the fact that she was a joint tenant with Mr. Arakaki. However, this presumes that plaintiffs are proceeding in this suit because of their relationship with HUD under the mortgage. However, if the Court has reached the question of Ms. Arakaki's ability to bring suit, the Court presumably is treating the alleged agreement as something independent from the mortgage.[4] Ms. Arakaki, thus, would need to demonstrate that she was a party to that agreement. As noted in our initial motion, Ms. Arakaki was not present at the meeting with Mr. Ewing, and was apparently uninformed of the alleged oral promise made therein. See Def. App. 195, 201. Having been unaware of any such promise, Ms. Arakaki cannot now claim to be a party to the alleged oral agreement.

## CONCLUSION

For these reasons, the United States respectfully requests that this Court enter summary judgment in favor of the defendant and dismiss plaintiffs' complaint. In the alternative, defendant respectfully requests that the Court dismiss Helen Arakaki as a plaintiff for lack of subject matter jurisdiction and for failure to state a claim upon which relief may be granted.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

---

[4] As noted in our initial motion, the Government disagrees with this characterization of the above captioned action, and has argued that any alleged agreement is a modification to a mortgage. Nevertheless, for the purposes of our partial motion to dismiss, we will presume that the Court has rejected this argument.

/s/ Kathryn A. Bleecker
KATHRYN A. BLEECKER
Assistant Director

/s/ Steven M. Mager
STEVEN M. MAGER
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L St. NW
Washington, D.C. 20530
Tele: (202) 616-2377

February 9, 2006

Attorneys for Defendant

CERTIFICATE OF FILING

I hereby certify that on this 9th day of February, 2006, a copy of the foregoing "REPLY TO PLAINTIFFS' RESPONSE TO MOTION FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, PARTIAL MOTION TO DISMISS (WITH SUPPLEMENTAL APPENDIX)" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ Steven M. Mager
Steven M. Mager
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice