IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| EDWARD T. ARAKAKI and HELEN ARAKAKI | ) | |
| | ) | |
| PlaintiffS, | ) | |
| | ) | |
| vs. | ) | No. 03-1874C |
| | ) | (Judge Hewitt) |
| | ) | |
| THE UNITED STATES | ) | |
| | ) | |
| Defendant. | ) | |

**MOTION FOR LEAVE TO FILE A COMPLETED VERSION OF "PLAINTIFF'S RESPONSE TO DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACT"**

Plaintiff's hereby request leave of the Court herein to file herewith, a completed version of "Plaintiff's Response to Defendant's Proposed Findings of Uncontroverted Fact."

"Plaintiff's Response to Defendant's Proposed Findings of Uncontroverted Fact" was originally filed electronically on 1/18/06. The version posted on PACER however, was missing the last 7 pages.

Therefore, Plaintiffs request leave of the Court to file a completed version of ""Plaintiff's Response to Defendant's Proposed Findings of Uncontroverted Fact" attached hereto as Exhibit 1.

DATED: Honolulu, Hawaii, May 16, 2006.

/s/

R. PATRICK JARESS
Attorney for Plaintiffs
EDWARD ARAKAKI and
HELEN ARAKAKI

737 Bishop St., Suite 2920
Honolulu, Hawaii 96813
Ph: (808) 531-3151
Fax: (808) 531-6064

# EXHIBIT 1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| EDWARD T. ARAKAKI and HELEN ARAKAKI | ) | |
| | ) | |
| Plaintiffs, | ) | No. 03-1874C |
| | ) | (Judge Hewitt) |
| vs. | ) | |
| | ) | |
| | ) | |
| THE UNITED STATES | ) | |
| | ) | |
| Defendant. | ) | |

**<u>PLAINTIFF'S RESPONSE TO DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACT</u>**

1. On June 5, 2002, Mr. Edward T. Arakaki filed an action in the Hawaii state court against Mel Martinez, then-Secretary of the United States Department of Housing and Urban Development ("HUD" or the "agency"), and HUD itself. Def. App. 1-6. 1

**Admitted**

2. Ms. Helen Arakaki was not listed as a separate plaintiff on the June 5, 2002 complaint. Id.

**Admitted. She gave an assignment of her claim to her son Edward Arakaki. See Pf. App. 64**

3. Ms. Helen Arakaki was first listed as a separate plaintiff on the third amended complaint, filed on March 14, 2003 with the United States district court. Def. App. 7-8.

**Admitted. Ms. Helen Arakaki permitted her name to be used in case she may be deemed a necessary or indispensable party to the case. See Pf. App. 64.**

4. Ms. Helen Arakaki is the mother of Mr. Edward Arakaki.

**Admitted**

5. On or about October 18, 1991, Mr. Arakaki, Mr. Larry Little, and Mr. Keith Matsuoka met with a HUD employee, David Ewing (the "October 1991 meeting"). Compl. ¶ 6;

**Admitted**

6. Ms. Arakaki did not attend the October 1991 meeting. Def. App. 195.

**Admitted. Edward Arakaki represented his Mother. Her first language is Japanese and she was born in Okinawa, moved to Hawaii 1991, and now is 77 years old. Pf. App. 63.**

7. Mr. Arakaki attended the October 1991 meeting in connection with possible purchase of a 76-unit apartment building in Las Vegas, Nevada, known as Lake Mead Villas ("Lake Mead"). Compl. ¶ 6.

**Admitted. He was also representing his mother's interests. Pf. App. 63**

8. At the time of the October 1991 meeting, HUD did not own Lake Mead Villas.

**Admitted**

9. At the time of the October 1991 meeting, HUD did not own the mortgage for Lake Mead Villas.

**Admitted**

10. At the time of the October 1991 meeting, HUD insured the mortgage on Lake Mead Villas.

**Admitted**

11. At the time of the October 1991 meeting, a number of units at Lake Mead Villas were subsidized through HUD's section 8 program.

**Admitted**

12. At the time of the October 1991 meeting, the mortgage loan for Lake Mead was in the process of being assigned to HUD.

**Admit that it hadn't been assigned, but the parties contemplated that it would be. Mr. Ewing said the assignment process had already formally begun. Pf. App. 63.**

13. Mr. Arakaki alleges that Mr. Ewing made oral representations at the October 1991 meeting to Mr. Arakaki that if HUD ever wished to sell the mortgage loan after assignment, plaintiffs would have the "right" to bid on the loan at an auction. Compl. ¶ 8. Admitted

14. David Ewing does not admit that he made oral representations at the October 1991 meeting to Mr. Arakaki that if HUD ever wished to sell the mortgage loan after assignment, plaintiffs would have the "right" to bid on the loan at an auction.

**Denied. Mr. Ewing admitted this in effect to the Inspector General. Pf. App 52-54, 68, 71, 72, 79 and the secretary of HUD was told this in 1996 by Mr. Ewing directly or indirectly and does not, in this case, deny telling Mr. Arakaki this.**

15. Mr. Little denies that Mr. Ewing made oral representations at the October 1991 meeting to Mr. Arakaki that if HUD ever wished to sell the mortgage loan after assignment, plaintiffs would have the "right" to bid on the loan at an auction. Def. App. 217, 219.

**Denied. Mr. Little admitted this in a signed memo. Pf. App. 21-24.**

16. Mr. Matsuoka denies that Mr. Ewing made oral representations at the October 1991 meeting to Mr. Arakaki that if HUD ever wished to sell the mortgage loan after assignment, plaintiffs would have the "right" to bid on the loan at an auction. Def. App.222.

**Admitted**.

17. No documentation (from the period October 1991 through October 1992) exists memorializing a purported agreement giving Mr. Arakaki a "right to bid" on the property should HUD sell the property at auction.

**Admitted. However documentation exists outside that time period. Pf. App. 21-24, 47-50.**

18. On October 20, 1991, Mr. Arakaki signed a purchase agreement for Lake Mead ("Purchase Agreement"). Def. App. 22.

**Admitted**.

19. The Purchase Agreement granted Mr. Arakaki the ability to purchase Lake Mead for $3,000,000. Id.

**Denied. The Purchase Agreement was not a mere option. The Purchase Agreement bound the purchaser, Mr. Arakaki and his mother to pay $3 million.**

20. Mr. Arakaki made an earnest money deposit of $15,000 in connection with the Purchase Agreement, which sum was subject to be retained as liquidated damages and consideration for execution of the agreement in the event that Mr. Arakaki failed to complete the purchase. Id.

**Admitted, and that the Arakaki's then paid the remaining $485,000. Pf. App. 55-56.**

21. On October 22, 1991, the then-owner of Lake Mead Villas signed the Purchase Agreement. Id.

**Admitted**

22. On October 28, 1991, the mortgage for Lake Mead Villas was assigned to HUD. Def. App. 24-25.

**Admitted**

23. On October 22, 1992, HUD and plaintiffs entered into an initial Provisional Workout Agreement ("October 1992 provisional workout"). Def. App. 26-29.

**Admitted**

24. Andrew Robertson, office manager for the Las Vegas, Nevada field office, signed October 1992 provisional workout on behalf of HUD. Id. at 26, 29.

**Admitted**

25. The October 1992 provisional workout contained no provisions expressly providing plaintiffs a "right to bid" on their loan at auction. Id. at 26-29.

**Admitted. There was no integration clause. Pf. App. 57-62.**

26. Closing on Lake Mead occurred on October 29, 1992, whereupon plaintiffs became the owners of Lake Mead. Def. App. 30.

**Admitted**.

27. HUD and the plaintiffs entered into another Provisional Workout Agreement, effective March 1, 1993 through February 29, 1996 ("March 1993 provisional workout"). Def.App. 31-33.

**Admitted**.

28. Andrew Robertson, office manager for the Las Vegas, Nevada field office signed the March 1993 provisional workout on behalf of HUD. Id. at 33.

**Admitted**.

29. Mr. Larry Little signed the March 1993 provisional workout on behalf of the plaintiffs. Id. at 33.

**Admitted.**

30. Mr. Arakaki reviewed the March 1993 provisional workout prior to Mr. Little's signing the document. Def. App. 216.

**Admitted.**

31. Mr. Little was authorized to sign the March 1993 provisional workout on behalf of the plaintiffs. Def. App. 202-203, 216.

**Admitted, but not as a partner of the Arakaki's.**

32. The March 1993 provisional workout contained no provisions expressly providing plaintiffs a "right to bid" on their loan at auction. Def. App. 31-33.

**Admitted but no integration clause. Pf. App. 57-62.**

35. As part of the partially assisted sale, plaintiffs' loan was transferred to a trust with 157 other loans (the "Trust"). Def. App. 210.

**Admitted**

36. A beneficial interest in the Trust, along with the responsibility for servicing the loans (the "Class A Certificate"), was placed up for auction in a partially assisted loan sale. Id.

**Admitted**

37. HUD was to maintain an interest in the Trust (the "Class B Certificate") after the sale of the Class A Certificate. This Class B Certificate gave HUD a passive interest in the Trust, as well as a potential entitlement to a pro-rata share of a portion of the cash flow from the Trust. Id.

**Admitted**

38. WHUDA Real Estate Limited was the successful bidder on the Class A certificate, and obtained a seventy percent interest in the Trust. Def. App. 36-37.

**Admitted**

39. A thirty percent interest in the Trust remained with HUD, as holder of the Class B Certificate. Def. App. 38-39.

**Admitted**

40. Closing for the partially assisted sale was held on June 27, 1996. Def. App. 36-39.

**Admitted**

41. The March 1993 provisional workout expired on February 29, 1996. Def. App. 31-33.

**Denied in part. It was supposed to have been extended, if not in default and it was not in default. Pf. App. 57-59.**

42. Plaintiffs failed to make further payments upon the mortgage to HUD after February 29, 1996. Def. App. 40-42, 43.

**Admitted. HUD Cut off about $200,000 in Section 8 money that was owed to Plaintiffs. Pf. App. 68, 71, 72, 79.**

43. On September 27, 1996, the administrator of the trust and holder of the Class A Certificate filed a foreclosure notice for Lake Mead. Def. App. 44-45.

**Admitted**

44. On September 27, 1996, Mr. Arakaki filed for Chapter 11 bankruptcy. Def. App. 46-47.See In re: Edward Arakaki, Case No. 96–02147 (Hawaii Bankruptcy Ct. 1996).

**Admitted**

45. Foreclosure was temporarily stayed by the bankruptcy. See In re: Edward Arakaki, Case No. 96–02147 (Hawaii Bankruptcy Ct. 1996).

**Admitted.**

46. On November 28, 1997 the stay of foreclosure was lifted. See In re: Edward Arakaki, Case No. 96–02147 (Hawaii Bankruptcy Ct. 1997).

**Admitted. HUD wouldn't pay money that was owed for section 8 housing. Pf. App. 68, 71, 72, 79.**

47. A foreclosure sale was held, and the plaintiffs lost ownership of Lake Mead. Compl. ¶ 18.

**Admitted.**

48. HUD Headquarters in Washington, D.C. possessed the sole authority to set the policy and terms of all multifamily note sales. Def. App. 126-31, 132-38, 140-42, 146-57, 165-66, 169-72, 175-76, 183-84, 187-89, 207-08, 209-10, 211-12.

**Denied. HUD Headquarters can't overturn an agreement already made by a field office.**

**Mr. Ewing admitted that he was responsible for protecting the financial interests of the HUD secretary (Pf. App. 7) and that the secretary benefited financially when Mr. Arakaki put new money into the property (Pf. App. 9-10). See also, Pf. App. 8, 39, 40, 44-46.**

49. The authority to set the policy and terms of all multifamily note sales was never delegated to the HUD field offices. Id.

**Admitted subject to the prior agreement in work outs which authority was delegated or an integral part of the job duties delegated.**

50. The August 1991 revisions to the Insured Project servicing handbook states:

[a] modification of Note and Mortgage is a written agreement between HUD and the mortgagor which permanently modifies the terms of the mortgage and note secured by property. Depending on local law, modification agreements may be recorded. A Modification Agreement may provide for such actions as: recasting the principal balance of the mortgage note and establishing a new amortization schedule; changing the term of the note and mortgage; increasing the interest rate or in the case of a bond refunding, changing the interest rate on the mortgage note; adding a call provision; adding a late payment fee; or taking any other action that would modify the terms of the mortgage. Def. App. 75-76.

**Admitted, but the Handbook, however, is not a statute or regulation that defines types of agreements. Pf. App. 25, 39, and a workout is not a loan modification.**

51. The August 1991 revisions to the Insured Project Servicing Handbook states that:

[a] provisional workout arrangement is a written agreement between the mortgagor and HUD acknowledging that the mortgagor's loan is in default, that the parties have agreed on steps to be taken to bring the loan current, and that HUD will hold the loan in default and will not begin foreclosure proceedings as long as the owner is complying with the terms agreed to in a workout. Def. App. 75.

**Admitted, but the Handbook is not a statute or regulation that defines types of agreements. Pf. App. 25, 39.**

52. The August 1991 revisions to the Insured Project Servicing Handbook states that:

A. Workout Arrangement
This is a formal written agreement between the project owner and HUD under which HUD agrees to hold the loan in default, provided the owner submits to HUD specified payments each month. Def. App. 80.

**Admitted, but the Handbook is not a statute or regulation that defines types of agreements. Pf. App. 25, 39.**

53. The August 1991 revisions to the Insured Project Servicing Handbook describe a workout as a “document.” Def. App. 89.

**Admitted, but the Handbook is not a statute or regulation that defines types of agreements. Pf. App. 25, 39.**

54. The August 1991 revisions to the Insured Project Servicing Handbook states that a workout is not effective until "signed." Def. App. 89.

**Admitted, but the Handbook is not a statute or regulation that defines types of agreements. Pf. App. 25, 39.**

55. The August 1991 revisions to the Insured Project Servicing Handbook provide for the distribution of "copies" to various HUD offices. Def. App. 97.

**Admitted, but the Handbook is not a statute or regulation that defines types of agreements. Pf. App. 25, 39.**

56. August 1991 revisions to the Insured Project Servicing Handbook provide that a workout is not effective until signed both by the owner and the authorized HUD representative. The authorized HUD representative at the Field Office level shall be the Director, Housing Management Division. Def. App. 89.

**Admitted, but the Handbook is not a statute or regulation that defines types of agreements. Pf. App. 25, 39.**

57. At no time did Mr. Ewing hold the position of Director, Housing Management Division, HUD.

**Admitted**

58. Mr. Ewing was not delegated the authority to enter into a workout. See Def. App. 164, 210.

**Denied. Pf. App. 47.**

59. Hal DeCell, III was the Assistant Secretary for Legislation and Congressional Relations,

**Admitted**

60. The Assistant Secretary for Legislation and Congressional Relations, HUD possessed no express contracting authority. Def. App. 63-64.

**Admitted**

61. Prior to the partially assisted loan sale, Mr. Arakaki did not inform HUD that he possessed a "right to bid" on his loan at auction. Def. App. 57, 58.

**Denied. Pf. App. 47.**

62. Prior to the partially assisted loan sale, Mr. Arakaki sought to "negotiate" to purchase his loan directly from HUD. Id.

**Admitted**

63. Mr. Arakaki thought it odd that Mr. Ewing would be able to negotiate, but relied upon Mr. Matsuoka and Mr. Little in this regard. Def. App. 196-197.

**Admitted**.

64. In his sworn deposition testimony, Mr. Matsuoka testified:

Q: Now at the meeting with Mr. Ewing, did he give any
assurances to Mr. Arakaki that if he bought the building, meaning
Lake Mead Villa apartments, that he would have an assurance that
if they ever sold the note at auction he could bid upon it?
A: No.
Def. App. 222.

**Admitted.**

65. Mr. Little provided sworn deposition testimony stating:

A: He was not guaranteed the right to bid on his note is my understanding.
Q: Well, what was, what was said?
. . . .
-9-
A. He may have an opportunity to bid on the property should it come up for auction, and there may have been other cases where
owners had bought the property when they were auctioned at a later date.
He had no idea when that or if that might happen.
. . . .
A. . . . Again, the scenarios that were pointed out to us were
that there may be a possibility, and that was it.
Q. A possibility of what?
A. That the owner may have an opportunity to bid on his note,
but certainly wasn't given that, that opportunity by an agent in the
local office. I don't think that decision would be made there.
Q. You mean that Mr. Ewing wouldn't be able to make that decision?
A. That's correct.
Def. App. 217, 219.

**In a signed memo, Mr. Little wrote that Ewing was very clear in his promise that if an auction did occur, Mr. Arakaki could bid. Pf. App. 21-24.**

66. HUD had the express right to foreclose on plaintiffs for such failure to pay. Def. App. 48, 52, 53.

**Denied. In response to that, Mr. Arakaki points out that the late payments after December 1995 after February 1996 were caused by HUD when it withheld Section 8 payments from December 1995 through May 1996. This caused a cash flow shortage which was the late payments period. Pf. App. 68, 71, 72, 79. Second, regarding the remaining late payments for January 1994 and December 1994, HUD's regulation HB 4350.1 REV-1 specified that default has occurred when payments are missed, not merely late, for two consecutive months.**

67. HUD never promised that it would not foreclose, in the event of default. Def. App.198-99.

**Denied. Ewing said HUD would not foreclose, but might sell the loan. Pf. App. 63.**

68. Mr. Arakaki did not inform Ms. Arakaki of the alleged agreement with Mr. Ewing regarding a "right to bid" prior to signing the Purchase Agreement. Def. App. 195, 201

**Admitted. Mr. Arakaki did not try to give the details to his mother because she didn't require it.**

69. Mr. Arakaki did not inform Ms. Arakaki of the alleged agreement with Mr. Ewing regarding a "right to bid" prior to November 1992. Def. App. 195, 201.

**Admitted. Mr. Arakaki did not try to give the details to his mother because she didn't require it.**

DATED: Honolulu, Hawaii, January 18, 2006.

/s/

R. PATRICK JARESS
Attorney for Plaintiffs
EDWARD ARAKAKI and
HELEN ARAKAKI

737 Bishop St., Suite 2920
Honolulu, Hawaii 96813
Ph: (808) 531-3151
Fax: (808) 531-6064