# In the United States Court of Federal Claims

No. 03-1874 C

(E-Filed: May 30, 2006)

| | |
|---|---|
| EDWARD T. ARAKAKI and HELEN ARAKAKI, Plaintiffs, v. THE UNITED STATES, Defendant. | Summary Judgment; Contract; Implied-in-Fact Agreement; Authority of Agent to Bind the United States; Ratification; Motion to Dismiss; Absence of Jurisdiction Where Plaintiff Is Not in Privity of Contract with the United States |

R. Patrick Jaress, Honolulu, HI, for plaintiffs.

Steven M. Mager, with whom were Peter D. Keisler, Assistant Attorney General, David M. Cohen, Director, and Kathryn A. Bleecker, Assistant Director, Commercial Litigation Branch, Civil Division, Department of Justice, Washington, DC, for defendant.

## OPINION

HEWITT, Judge

This case is before the court on defendant's motion for summary judgment pursuant to Rule 56 of the Rules of the United States Court of Federal Claims (RCFC) on the grounds that plaintiff has failed to demonstrate the requisite elements of a contract, the breach of which by the United States is the basis of plaintiffs' claim. Defendant also moves the court to dismiss Helen Arakaki as a plaintiff for lack of subject matter jurisdiction.[1]

[1]The court has before it Defendant's Motion for Summary Judgment, or, in the Alternative, Partial Motion to Dismiss (Def.'s Mot) and appendix (Def.'s App.), Plaintiffs'

(continued...)

# I. BACKGROUND

## A. Procedural Background

On June 5, 2002 Edward T. Arakaki, as sole plaintiff, filed suit in Hawaii state court against then-Secretary of the United States Department of Housing & Urban Development (HUD) Mel Martinez and HUD. On July 8, 2002, the case was removed to the United States District Court for the District of Hawaii pursuant to 28 U.S.C. § 1442 (2000). Notice of Removal of Civil Action filed in Arakaki v. Martinez, No. 02-00417 (July 8, 2002). On March 6, 2003, the case was dismissed with leave to amend. Arakaki v. Martinez, No. 02-00417, slip op. at 12 (D. Haw. Mar. 6, 2003). The court's Order Dismissing Case specified that if plaintiff filed a third amended complaint, he could "only name the United States as a defendant and . . . only assert contract claims arising out of HUD's alleged breach of the oral agreement to allow [Edward] Arakaki to bid on his loan at an auction." Id. On March 14, 2003, plaintiff filed his third amended complaint in the United States District Court for the District of Hawaii, joining Helen Arakaki as plaintiff for the first time. Compare Def. App. 1 (Complaint, filed in Hawaii state court, identifying Edward Arakaki as sole plaintiff) with Def. App. 7-8 (Third Amended Complaint, identifying Edward and Helen Arakaki as plaintiffs). On May 27, 2003, the District Court for the District of Hawaii ordered the case transferred to the United States Court of Federal Claims. Arakaki v. United States, No. 02-00417, slip op. at 11 (D. Haw. May 27, 2003).

Plaintiffs filed their first complaint with this court, entitled "Fourth Amended Complaint" (Complaint or Compl.), on September 10, 2003. Defendant filed a motion to dismiss plaintiffs' complaint pursuant to RCFC 12(b)(1) and 12 (b)(6) on January 16, 2004. RCFC 12(b)(6) governs dismissal of a claim for "failure to state a claim upon which relief can be granted." RCFC 12(b)(6). RCFC 12(b) provides that, in the case of a motion to dismiss under RCFC 12(b)(6), "[i]f . . . matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in RCFC 56." RCFC 12(b). In its

[1](...continued)
Memorandum in Opposition to Defendant's Motion for Summary Judgment Filed on November 15, 2005 (Pls.' Resp. or Response) and appendix (Pls.' App.), and Defendant's Reply to Plaintiffs' Response to Motion for Summary Judgment, or, in the Alternative, Partial Motion to Dismiss (Def.'s Reply) and supplemental appendix (Def.'s Supp. App.). Also before the court are Defendant's Proposed Findings of Uncontroverted Fact (Def.'s Facts) and Plaintiff[]s['] Response to Defendant's Proposed Findings of Uncontroverted Fact (Pls.' Fact Resp.).

Opinion of September 1, 2004, the court found that plaintiffs had sufficiently supported a date of accrual that was within the court's six-year statute of limitations established by 28 U.S.C. § 2501 (2000) to avoid dismissal, without determining a definitive date of accrual of plaintiffs' claim. Arakaki v. United States, 62 Fed. Cl. 244, 260 (2004). The court also held that the issue of whether the HUD agent alleged to have made an oral contract with plaintiffs possessed the requisite authority to bind the government in contract presented genuine issues of material fact that precluded granting summary judgment in defendant's favor. Id. at 265.

B. Statement of Facts

Plaintiffs[2] allege that on October 17, 1991,[3] Edward Arakaki met with David Ewing, a HUD employee, in Las Vegas, Nevada to discuss the purchase of a 76-unit apartment building located there (Lake Mead Villa Apartments, or Lake Mead Villas or the property). Compl. ¶ 6; Pls.' Resp. at 4. Plaintiffs claim that, "[p]rior to October 1991, [p]laintiff was contacted by persons working with HUD for the purpose of inducing him to purchase a 76-unit apartment building," Compl. ¶ 5, "even though the gross income from rents was below the operating expenses and money necessary to service the debt," Compl. ¶ 6. Edward Arakaki was accompanied by Keith Matsuoka (plaintiffs' lawyer) and Larry Little (plaintiffs' real estate broker) at the initial meeting with David Ewing. Pls.' Resp. at 4; Def.'s Mot. at 4. Plaintiffs allege that David Ewing promised that "HUD would allow any unpaid loan amounts to accumulate without foreclosing until the building became profitable," id. ¶ 7, and that HUD followed through on this promise, id. ¶¶ 7, 15. Plaintiffs also allege that David Ewing promised that, if HUD ever sold the note on the property, plaintiff would have the right to bid on it. See id. ¶ 8; Pls.' Resp. at 1. Defendant characterizes the alleged promise by David Ewing as an "oral representation[]," Def.'s Mot. at 4, and denies that it was made in the form of a promise, id. at 4, 21. Plaintiffs argue that "[the] right to bid on the delinquent note was the safety valve for Plaintiff since these types of notes sold at a large discount from the unpaid balance." Compl. ¶ 9. The alleged promise–that if HUD ever sold the mortgage, plaintiffs would be allowed to bid on their note–is the source of the present dispute.

---

[2]Prior to the original filing of this case by Edward T. Arakaki, his mother, Helen Arakaki, had assigned her claim to him. The signed declaration of assignment is dated June 3, 2002. Pls.' App. 4.

[3]Plaintiff Edward Arakaki subsequently determined that the date of the initial meeting with David Ewing was October 18, 1991. See Def.'s App. 196 (Declaration of Edward Arakaki).

On October 20, 1991, Edward Arakaki signed a purchase agreement for Lake Mead Villas for $3,000,000. Def.'s Mot. at 4; Compl. ¶ 14. The mortgage on the property at that time had an unpaid principal balance of $2,377,153. Pls.' App. 69 (HUD Office of the Inspector General Memorandum).[4] The prior owner of Lake Mead Villas had defaulted on its mortgage payments for the property in December 1990. Pls.' App. 69. HUD did not own the mortgage note at that time but was the insurer of the mortgage. Def.'s Mot. at 4. Due to the accumulating delinquencies resulting from the prior owner's default, the mortgage was in the process of being assigned to HUD at the time Edward Arakaki met with the HUD loan specialist, David Ewing. Def.'s Mot. at 4. On October 22, 1991, the prior owner signed the purchase agreement with Edward Arakaki. Pls.' Fact Resp. ¶ 21. The assignment of mortgage to HUD was filed on October 28, 1991. Pls.' Fact Resp. ¶ 22; Def.'s App. 24-25. Plaintiffs claim that they invested $500,000 in the purchase in consideration for "HUD's promise that Plaintiff could bid on his loan." Compl. ¶ 12. Plaintiffs also claim that "much of the money went to HUD to pay off the existing default [by the previous owner]" and that the rest of the money went to Larry Little and Keith Matsuoka. Pls.' Resp. at 14.

Plaintiffs became the owners of Lake Mead Villas at a closing on October 29, 1992. Def.'s Mot. at 5. One week prior to that closing, the Las Vegas HUD Field Office Manager, Andrew Robertson, and Edward Arakaki signed the first of two Provisional Workout Agreements initiated to address delinquencies accumulated by the previous owner and to reinstate the loan. Id.; see Def.'s App. 40; Pls.' App. 57-59. On February 2, 1993, HUD and plaintiffs entered into a second Provisional Workout Agreement, effective March 1, 1993 through February 29, 1996. Def.'s App. 31-33; Def.'s Mot. at 5. The second workout agreement was signed by Larry Little, for plaintiffs and by Andrew Robertson, HUD Field Office Manager, representing HUD. Def.'s App. 33. Neither of the Provisional Workout Agreements promised a right to bid at auction on plaintiffs' mortgage or referred to an understanding that plaintiffs would be allowed to bid on the mortgage to their property should the mortgage be sold by HUD. Def.'s Mot. at 5; Pls.' Fact Resp. ¶¶ 25, 32. In a letter dated July 5, 1995, HUD informed plaintiffs that HUD had included the mortgage on Lake Mead Villas in an upcoming sale of partially-assisted

[4]The HUD Office of the Inspector General conducted a review in April 1999 of issues raised by plaintiffs in correspondence with Congressman Neil Abercrombie. See Pls.' App. 66-78 (Memorandum to Glenn S. Warner, Dist. Inspector Gen. for Audit, from David A. McCargar, Assistant Inspector Gen. for Audit). For purposes of clarity, this Opinion will refer to the Inspector General's Memorandum as the IG Report, with page citations to Plaintiffs' Appendix. The IG Report, dated August 3, 1999, provides factual information of use in reconstructing the sequence of events but is not accorded weight in resolving the questions of law now before the court.

HUD-held multifamily mortgages. Def.'s App. 34. The letter indicates that the mortgage notes "may be sold in a competitive auction or through negotiated transactions," id., but does not specify that owners of the mortgaged properties would not be eligible to participate in the sale, see id. at 34-35.

On August 19, 1995, Edward Arakaki wrote to Robin Rains, designated in HUD's letter of July 5, 1995 as HUD's Financial Advisor, and stated

> I am extremely interested in negotiating for the mortgage on my property. I believe that negotiations will also work to HUD's advantage as I strongly believe that the amount I will be able to offer in negotiations will be better than the average which can be obtained through an open bid process.

Def.'s App. 57 (Letter to Robin Rains, Financial Advisor). One month later, Arakaki wrote again to express his interest in negotiating the purchase of his mortgage note. Def.'s App. 58 (Letter to Albert B. Sullivan, Dir., Office of Multifamily Hous. Mgmt., HUD). On April 26, 1996, HUD published a notice in the Federal Register announcing the opening of the multifamily loan auction that included the Lake Mead Villas mortgage. Def.'s Mot. at 5 (citing Notice of Sale of HUD-Held Multifamily Mortgage Loans, 61 Fed. Reg. 18,652 (Apr. 26, 1996)). The notice explained that only eligible institutional investors would be able to participate and stated that mortgagors of any of the loans to be auctioned were ineligible to participate in the auction. Id. at 5-6. The bundling of a large number of mortgages in a structured finance sale was evidently a new practice implemented following passage of the Multifamily Housing Property Disposition Reform Act of 1994, Pub. L. No. 103-233, 108 Stat. 342. See Pls.' App. 71 (IG Report); Pls.' Resp. at 7. Prior to passage of the 1994 legislation, qualified owners were generally allowed to bid on their loans in "whole loan" sales. See Def.'s App. 211 (Declaration of Audrey Hinton, HUD Senior Hous. Project Manager); Pls.' App. 71 (IG Report).

The mortgage on plaintiffs' Lake Mead Villas property was transferred to a trust along with 157 other loans and sold at auction. Def.'s Mot. at 6. The purchaser, WHUDA Real Estate Limited, obtained a seventy percent beneficial interest in the trust containing plaintiffs' mortgage in the form of a Class A certificate while HUD retained a thirty percent passive interest in the trust as holder of the Class B certificate. Id. Closing on the purchase of the block of mortgages held in the trust was held on June 27, 1996. Id. Plaintiffs claim that the purchaser paid seventy-three percent of the face amount due on plaintiffs' mortgage, or $1.75 million. Pls.' Resp. at 18.

The March 1993 Provisional Workout Agreement between HUD and plaintiffs expired on February 29, 1996, and was not extended or opened for renegotiation by HUD. Def.'s Mot. at 6; Def.'s Facts ¶ 41; Pls.' App. 74-74. HUD records indicate that "the owner was current under the workout agreement through the end of its 3-year term." Pls.' App. 74 (IG Report); Def.'s App. 41-42. Plaintiffs made no further mortgage payments after the day of expiration of the workout agreement and, on September 27, 1996, the holder of the Class A certificate filed a foreclosure notice on Lake Mead Villas. Def.'s Mot. at 6. A foreclosure sale was temporarily averted by plaintiffs' filing of bankruptcy, but plaintiffs eventually lost title to Lake Mead Villas in March 1998. Def.'s Mot. at 6; Pls.' App. 76 (IG Report).

## II. DISCUSSION

### A. Motion for Summary Judgment

#### 1. Standard of Review

Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." RCFC 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Sweats Fashions, Inc. v. Pannill Knitting Co., 833 F.2d 1560, 1562-63 (Fed. Cir. 1987). Material facts are those "that might affect the outcome of the suit under the governing law." Anderson, 477 U.S. at 248. A dispute over facts is genuine "if the evidence is such that a reasonable [fact-finder] could return a verdict for the nonmoving party." Id. To demonstrate a genuine dispute over a material fact, the nonmoving party need not "produce evidence in a form that would be admissible at trial." Celotex Corp., 477 U.S. at 324. However, the non-movant must establish the existence of a material element on which the party will bear the burden of proof at trial. Id. at 322-23.

The moving party must file with the court the documentary evidence, such as exhibits, that support its assertions that material facts are beyond genuine dispute, see RCFC 56(h), unless it is basing its motion for summary judgment on the "absence of evidence to support the nonmoving party's case," Celotex Corp., 477 U.S. at 325; see also Anchor Sav. Bank, FSB v. United States, 59 Fed. Cl. 126, 139-40 (2003). The evidence is examined in the light most favorable to the non-movant, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986), and all justifiable inferences must be drawn in favor of the non-movant, Anderson, 477 U.S. at 255. "The party opposing the

motion must point to an evidentiary conflict created on the record; mere denials or conclusory statements are insufficient." SRI Int'l v. Matsushita Elec. Corp. of Am., 775 F.2d 1107, 1116 (Fed. Cir. 1985) (citing Barmag Barmer Maschinenfabrik AG v. Murata Machinery, Ltd., 731 F.2d 831, 836 (Fed. Cir. 1984)).

Defendant argues that it is entitled to summary judgment because plaintiffs failed to demonstrate the elements of a valid breach of contract claim. Def.'s Mot. at 9. A valid breach of contract claim under the facts of this case, according to defendant, requires plaintiffs to allege "(1) the existence of either an express or implied-in-fact contract requiring HUD to allow [plaintiffs] to bid on their mortgage loan at auction, (2) a breach of that contract, and (3) resultant damages." Id. Defendant notes that "[t]he general requirements for a binding contract with the United States are identical for both express and implied-in-fact contracts," id. (citing Trauma Serv. Group v. United States, 104 F.3d 1321, 1325 (Fed. Cir. 1997)), and require that plaintiffs demonstrate (1) mutuality of intent to contract, (2) consideration, (3) lack of ambiguity in offer and acceptance, and, when the United States is a party, that (4) "the Government representative 'whose conduct is relied upon [had] actual authority to bind the [G]overnment in contract,'" id. (citing City of El Centro v. United States, 922 F.2d 816, 820 (Fed. Cir. 1990) (quoting Juda v. United States, 6 Cl. Ct. 441, 452 (1984))). In particular, defendant argues that "[p]laintiffs' complaint fails to establish the existence of a valid contract, including authority and unambiguous offer and acceptance (mutual intent)," id., and that "plaintiffs cannot demonstrate that any breach caused them damage," id. at 10. Failing to demonstrate the existence of a valid contract or damages caused by the alleged breach, defendant concludes that "this Court should grant summary judgment in favor of the United States." Id. For the following reasons, the court GRANTS defendant's motion for summary judgment.

2. Authority to Bind the United States

The case law is clear that "[t]o recover for breach of an express or implied-in-fact contract with the United States, [plaintiff] must show 'that the officer whose conduct is relied upon had actual authority to bind the government in contract.'" H. Landau & Co. v. United States, 886 F.2d 322, 324 (Fed. Cir. 1989) (quoting H.F. Allen Orchards v. United States, 749 F.2d 1571, 1575 (Fed. Cir. 1984), cert. denied, 474 U.S. 818 (1985); see also Trauma Serv. Group, 104 F.3d at 1325 ("A contract with the United States also requires that the Government representative who entered or ratified the agreement had actual authority to bind the United States.") (citing City of El Centro, 922 F.2d at 820); Juda, 6 Cl. Ct. at 452 ("The representatives of the United States whose conduct is relied upon must have actual authority to bind the government in contract.") (citing Federal

Crop Ins. Corp. v. Merrill, 332 U.S. 380, 384 (1947) and Jascourt v. United States, 521 F.2d 1406, 207 Ct. Cl. 955, cert. denied, 423 U.S. 1032 (1975)).

The apparent authority of a government agent is not sufficient to bind the government, Landau, 886 F.2d at 324, even where the agent in question believed that he held such authority, see City of El Centro, 922 F.2d at 820. In City of El Centro, the Federal Circuit determined that a Border Patrol agent lacked the actual authority required to obligate the government to pay the hospital costs of injured aliens admitted on his instructions. 922 F.2d at 820. In reversing the lower court's finding that "no statute, regulation or case . . . preclude[d] [the agent's] exercise of government authority to obligate funds," id. (quoting City of El Centro v. United States, 16 Cl. Ct. 500, 508 (1989), the Federal Circuit explained that "the issue is not whether some authority exists that prohibits [the agent] from obligating the Government in contract; rather, the issue is whether [the agent] had been granted the authority to affirmatively obligate the Government. No such authority has been cited by [appellee] nor is such authority evident from the record." Id. The Federal Circuit concluded that

> [w]hatever the form in which the Government functions, anyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority. The scope of this authority may be explicitly defined by Congress or through the rule-making power. And this is so even though, as here, the agent himself may have been unaware of the limitations upon his authority.

City of El Centro, 922 F.2d at 820 (quoting Federal Crop Ins. Corp., 332 U.S. at 384).

While it is generally accepted that a person with no actual authority may not bind the United States to the terms of a contract either express or implied, Trauma Serv. Group, 104 F.3d at 1325; City of El Centro, 922 F.2d at 820, "in some circumstances, a person with some limited actual authority impliedly may have broader authority," Cal. Sand & Gravel, Inc. v. United States, 22 Cl. Ct. 19, 27 (1990). Actual authority may be implied "when such authority is considered to be an integral part of the duties assigned to a government employee." Landau, 886 F.2d at 324 (quoting J. Cibinic & R. Nash, Formation of Government Contracts 43 (1982)); see also United States v. Bissett-Berman Corp., 481 F.2d 764, 768-69 (9th Cir. 1973) (holding that the government's attorney had the implicit authority to bind the government although the contracting officer had the express authority); Gardiner v. V. I. Water & Power Auth., 145 F.3d 635, 645 (3d Cir. 1998) (finding that plaintiff had failed to provide "evidence specifically suggesting that

the authority to bind the government was 'necessary or essential' to the duties of the federal officials involved" (quoting Roy v. United States, 38 Fed. Cl. 184, 189 (1997))).

The court in California Sand & Gravel, applying the Federal Circuit's holding in Landau that a government agent with authority to draw funds from an account may have the implicit authority to assure suppliers of payment from that account, concluded that "the court can . . . interpret the limited authority of an authorized person in a broader manner than would ordinarily be the case." 22 Cl. Ct. at 27. The California Sand & Gravel court warned, however, that

> a person with no actual authority may not gain actual authority through the court-made rule of implied actual authority. Specifically, the court may not substitute itself unconditionally for the executive in granting authority to an unauthorized person. . . . As a predicate to a finding of implied actual authority, there must be, at the least, some limited, related authority upon which the court can "administer" the law so as not to ignore the policies and decisions of those persons charged with managing government programs. The court believes that Landau and the theory of implied actual authority is of limited application, and was not intended to repeal the long established rule that, when dealing with the government, only government agents with actual authority can make a contract, express or implied.

Id. An employee's duties in supervising or managing specific contractor activities or government functions may not carry the corresponding authority to enter into or modify existing contracts in the name of the government. In Landau, the Federal Circuit remanded the case to the Claims Court to determine whether the agent in question possessed implied actual authority, an issue not reached by the trial court in the earlier proceeding. 886 F.2d at 324. The Claims Court found that the agent lacked actual authority to bind the government. H. Landau & Co. v. United States, 20 Cl. Ct. 400, 406 (1990) ("The court is satisfied after a careful examination of [the agent's] position and activities that the authority to issue letters of guarantee was not an 'integral part' of his duties.").

Plaintiffs bear the burden of proof in regard to the contracting official's authority to bind the United States. Howard v. United States, 31 Fed. Cl. 297, 312 (1994) (citing Kania v. United States, 650 F.2d 264, 268 (Ct. Cl. 1981)). Defendant argues that "plaintiffs fail to demonstrate that David Ewing, the Government employee with whom they purport to have entered into an oral contract, possessed the express or implied actual authority to enter into an oral contract with the plaintiffs regarding how HUD would

handle the sale of their note." Def.'s Reply at 2. Defendant also contends that "[p]laintiffs . . . fail to identify any specific statutory or regulatory basis for Mr. Ewing's authority to enter into the purported oral contract with HUD. To the contrary, the statute and regulations deny Mr. Ewing any such authority . . . ." Def.'s Mot. at 12.

In response, plaintiffs point to a subheading describing the contents of the August 1991 revisions to HUD's Insured Project Servicing Handbook No. 4350.1 (Handbook) as evidence of the delegation of authority. Pls.' Resp. at 8. The subheading, referring to chapter 11 of Handbook 4350.1 entitled "Workouts for HUD-Held Projects," reads: "This Chapter: . . . B. Delegates responsibility for approval of Workout Arrangements from Headquarters to the Regional and Field Office levels." Def.'s App. 65. Plaintiffs also reference excerpts from memoranda[5] sent in 1995 from officials in the Office of the Assistant Secretary for Housing to HUD Field Office senior managers regarding workout rules and policies as support for their argument that loan specialists "naturally could make workout agreements that might affect the attractiveness of a loan in some future sale." Pls.' Resp. at 6.

The court has reviewed the sections indicated in the Handbook, Def.'s App. 65-124, and the contents of the memoranda, Pls.' App. 43-46, and was unable to detect language that conferred any authority to execute workout agreements on loan specialists or asset managers or that in any way "implied [that] such authority [was] considered to be an integral part of the duties assigned" to loan specialists or asset managers. Landau, 886 F.2d at 324. To the contrary, the Handbook defines key terms in a manner that directly contradicts plaintiffs' contention that Edward Ewing had either express or implied actual authority to execute an oral workout agreement or any other contract binding on the United States. In the Handbook glossary, section 1-3(D), a "Provisional Workout Arrangement" is defined as "a written agreement between the mortgagor and HUD acknowledging that the mortgagor's loan is in default, that the parties have agreed on steps to be taken to bring the loan current, and that HUD will hold the loan in default and will not begin foreclosure proceedings as long as the owner is complying with the terms agreed to in the workout." Def.'s App. 75 (emphasis added); Def.'s Mot. at 17. In

[5]Plaintiffs cite a memorandum addressed to "All Directors of Housing," "All MF [Multifamily] Housing Division Directors," and "All MF Loan Management Branch Chiefs" date stamped as received on March 6, 1995 in Las Vegas, Nevada and another memorandum date stamped January 27, 1995 addressed to "All Directors of Housing" and "All Directors of Multifamily Housing" as support for the argument that asset managers had the authority "to make workout agreements which imposed obligations on HUD." Pls.' Resp. at 6 (citing memoranda provided in Pls.' App. 43-46). The memoranda are not addressed to asset managers or loan specialists, however, and do not include language suggesting any delegation of authority.

section 3-1(A) of the Handbook, a workout arrangement is defined as "a formal written agreement between the project owner and HUD under which HUD agrees to hold the loan in default, provided the owner submits to HUD specified payments each month." Def.'s App. 80 (emphasis added); Def.'s Mot. at 17-18. Handbook section 3-3 "Developing the Workout Arrangement" lays out in subsection (C) the requirement for legal review of all workout agreements prior to execution:

> Workout agreements are significant legal documents setting forth the contractual obligations of both HUD and the project owner under the workout. Prior to execution, the Field Office Counsel must review all Workout Agreements. All the recorded legal documents secured by the project should also be reviewed at this time to assure that the Secretary's first lien status is protected, complete, valid, and enforceable so that, in case there is a default under the workout agreement, foreclosure can be instituted quickly and effectively.

Def.'s App. 84 (emphases added). Plaintiffs' claim that David Ewing had the authority to make a binding oral contract is contradicted by the requirement of review by the Field Office Counsel "prior to execution." Id. Nor would an oral agreement granting an owner the right to bid on his mortgage note should HUD determine it is in its best interest to sell the note "assure that the Secretary's first lien status is protected, complete, valid and enforceable." Id. While such an oral promise would not disrupt the priority of government's lien, it would limit the options available to government in packaging loans for sale. See Def.'s Mot. at 16 (arguing that, "[b]y altering HUD's ability to freely dispose of a mortgage, . . . the oral agreement would permanently change the terms of the mortgage"); Def.'s Reply at 8 (contesting plaintiffs' conclusion that language in a 1995 memorandum permitted field offices to enter into agreements limiting HUD's ability to dispose of mortgages in the manner it desired). The stated objective of the mandated legal review is to ensure that, "in case there is a default under the workout agreement, foreclosure can be instituted quickly and effectively." Def.'s App. 84. An oral agreement to allow the owner to bid on his mortgage note in the event of his own default would be inconsistent with this objective.

Finally, the Handbook in section 3-4 expressly delegates the authority to execute a workout agreement to the Director, Housing Management Division:

> The Provisional Workout Arrangement is a document requiring the agreement of parties with diverse interests. It must protect HUD's interests as mortgagee by not exposing the Department to excessive loss through

> unjustified leniency, yet it also must respond to both the needs of the tenants and the owner's situation. The arrangement formalizes what HUD and the owner agreed to during the negotiation process. It also serves as the focus for administrative and monitoring procedures. The Arrangement is not effective until signed both by the owner and the authorized HUD representative. The authorized HUD representative at the Field Office level shall be the Director, Housing Management Division.

Def.'s App. 89 (emphasis added); Def.'s Mot. at 18. The Handbook makes it clear that "the authorized HUD representative" is the Director, Housing Management Division. No provision is made for further delegation to loan specialists or asset managers. While Edward Arakaki may well have understood David Ewing to have "promised" him the right to bid on his mortgage note in the event that it was sold by HUD, Ewing lacked any actual authority to make any such promise.

Both written workout agreements entered into by plaintiffs were executed by Andrew Robertson, office manager of the Las Vegas field office. Def.'s App. 26-29, 31-33; Def.'s Mot. at 19. Defendant states that, "[a]t the time of the workout agreements, Mr. Robertson supervised and had authority over the field office's Director of the Housing Management Division." Def.'s Mot. at 19. Robertson claims that he "had the authority to execute provisional workout agreements" while he was Office Manager for the Las Vegas field office and that he "sought and received the approval from Regional Counsel in the San Francisco, California HUD office before signing any workout agreements." Def.'s App. 209, ¶ 3 (Decl. of Andrew Robertson, DC). Furthermore, neither David Ewing's belief that he had such authority, were that the case, nor that he was somehow granted such authority informally, would suffice. "[A]ny alleged delegation of authority to [an agent], who was not an authorized delegatee, necessarily would have been ineffective." Cal. Sand & Gravel, 22 Cl. Ct. at 26. Robertson declares that he sought and received the approval of the appropriate HUD official before acting as the "authorized delegatee" by executing workout agreements. Def.'s App. 209, ¶ 3 (Decl. of Andrew Robertson, DC). He also declares, "I never delegated my authority to execute workout agreements to David Ewing, nor would I have delegated any of my authority to a loan specialist." Id. ¶ 4. Plaintiffs have put forward no evidence which contradicts the foregoing evidence of David Ewing's lack of express or implied actual authority.

In its September 1, 2004 Opinion, the court noted that a letter dated May 24, 1996 from Assistant Secretary Hal C. DeCell III, writing to Senator Daniel K. Inouye in response to the Senator's letter on behalf of plaintiffs, see Pls.' App. 47-48; Def.'s App. 59-60, could arguably be construed as ratification of Mr. Ewing's authority by HUD,

Arakaki, 62 Fed. Cl. at 265. Plaintiffs argue that Assistant Secretary DeCell "conceded that HUD made the promise" to allow plaintiffs to bid on their note in any future sale and that DeCell acknowledged that HUD had changed its policy in 1994 regarding whole loan sales. Pls.' Resp. at 2. Plaintiffs characterize Assistant Secretary DeCell's comment as an "admission" and argue that the admission was repeated in a subsequent letter dated September 22, 1997 to Senator Inouye. Id.; see Pls.' App. 49-50; Def.'s App. 61-62. The following extended excerpt from the May 24, 1996 letter provides Assistant Secretary DeCell's explanation of the background to the change in policy that underlies plaintiffs' claim of breach of the alleged oral agreement:

> I would like to give you some background on the Department's decision to conduct a structured financing with this loan sale. Mr. Arakaki was initially told by the Nevada State Office that if the mortgage was ever sold, he would be able to bid on it. In fact, all of the multifamily loan sales that HUD has conducted thus far have been "whole loan" sales, in which owners could bid on their loans. However, as the mortgages in the sale have project-based Section 8 subsidy, and this is the first time the market has been exposed to a product such as this, HUD reconsidered its decision to employ a whole loan sale and instead opted for a structured financing, which does not allow for the purchase of individual loans.

Pls.' App. 47; Def.'s App. 59 (emphases added). In the September 22, 1997 letter, Assistant Secretary DeCell restated the basis for the change in policy.

> In my May 24, 1996 letter, I explained that Mr. Arakaki was initially told by HUD's Nevada State Office that if the mortgage loan was ever sold he would be able to bid on it. However, as the mortgages in the Partially Assisted Loan Sale had Section 8 project-based subsidy, HUD opted for a structured financing sale, which does not allow mortgagors to purchase their loans.

Pls.' App. 50; Def.'s App. 62 (emphases added). In both letters, the Assistant Secretary acknowledged that "Mr. Arakaki was initially told" that he would be able to bid on his mortgage loan if it were sold by HUD. However, as the Assistant Secretary explained, HUD changed its policy regarding the packaging of mortgage loan sales and, under the new policy, mortgagors were not allowed to purchase their own loans. Defendant concedes that, "[a]t best, Mr. DeCell's letter might constitute an admission that Mr. Arakaki was 'told' that he would be permitted to bid upon his loan, not that a contract had been created or that a lower level Government employee had acted in a manner sufficient

to bind the Secretary." Def.'s Mot. at 19. The court agrees and finds that the intent of the Assistant Secretary's letters was to explain a change in departmental policy and the implications this change held for individuals in the plaintiffs' position. The letters do not have the legal effect of an admission of contract formation and breach.

Nor may Assistant Secretary DeCell's comments be viewed as ratification of an alleged agreement between plaintiffs and an agent lacking any actual authority to bind the government. "For effective ratification, a superior must have authority to ratify, knowledge of a subordinate's unauthorized act, and then must confirm, adopt, or acquiesce to the unauthorized action of his subordinate. Where a plaintiff claims the government ratified the act of an agent who acted without authority, 'such ratification can only be based upon a full knowledge of all the facts upon which the unauthorized action was taken.'" Cal. Sand & Gravel, 22 Cl. Ct. at 27-28 (quoting United States v. Beebe, 180 U.S. 343, 354 (1901). Defendant argues that Assistant Secretary DeCell lacked the authority to ratify an unauthorized agreement affecting the sale of HUD-held multifamily mortgages. Def.'s Mot. at 19. As the Assistant Secretary for Legislation and Congressional Relations, "Mr. DeCell was involved in legislative affairs, but possessed no contracting authority." Id. The official job description for that office includes numerous references to coordination, management, and policy responsibilities but does not refer to any authority in the area of government contracting. See Def.'s App. 63 (Directive No. 1100.3, Assistant Secretary for Legislation and Congressional Relations). Assistant Secretary DeCell's letters did not "confirm, adopt, or acquiesce" to the alleged oral agreement but simply explained the effects of a change in HUD policy on one of Sen. Inouye's constituents.

To survive a motion for summary judgment, plaintiffs must demonstrate that there is a genuine issue of material fact that would allow the court to render a verdict in their favor, based on the evidence. See Anderson, 477 U.S. at 248. Defendant has argued that plaintiffs' breach of contract claim must fail because the government agent that allegedly made the promise lacked the express or implied actual authority required to bind the government, see City of El Centro, 922 F.2d at 820, and the action was not thereafter ratified, see Cal. Sand & Gravel, 22 Cl. Ct. at 27-28. Plaintiffs have failed to meet their burden of showing that David Ewing possessed the requisite authority to bind the United States in any agreement, written or oral, and have failed to raise a genuine issue of material fact concerning ratification. The court is therefore bound to grant defendant's motion as a matter of law. RCFC 56(c).

The foregoing is, of course, a harsh result for plaintiffs. Whatever the wisdom of a policy of encouraging plaintiffs to enter into an investment that appeared from the outset

highly unlikely to prove profitable, plaintiffs had, on their side, every incentive to safeguard their investment by seeing to it that any critical terms or conditions were part of a formal agreement.[6] Plaintiffs gambled on the continued availability of a specific policy lever to serve, if needed, as a "safety valve" for a questionable investment. Compl. ¶ 9. HUD policy changed to reflect the department's evolving understanding of what was in the best interest of the government, removing plaintiffs' safety valve in the process. The court does not find that this change amounted to a breach of contract.

B. Helen Arakaki's Claims

Helen Arakaki purchased and took title to the Lake Mead Villas on October 29, 1992, as a joint owner with her son, Edward Arakaki. Pls.' Fact Resp. ¶ 23; see Def.'s App. 30 (deed). The seller was a private party. See Def.'s App. 30 (deed). The property was sold subject to a mortgage, which Edward Arakaki assumed. See Def.'s App. 13 (Plaintiff's Responses to Defendant's First Request for Answers to Interrogatories); id. at 22-23 (purchase agreement and addendum). The mortgage had been assigned to HUD on October 28, 1991. Pls.' Fact Resp. ¶ 22; Def.'s App. 24-25 (assignment). Plaintiffs allege that HUD official David Ewing made two oral promises in connection with their acquisition of the property: (1) that HUD would allow any unpaid mortgage loan amounts to accumulate without foreclosing until the property became profitable and (2) that, in the event that HUD sold the mortgage note, Edward Arakaki would have a right to bid on it. Compl. ¶¶ 7-8. Plaintiffs allege that these promises made an otherwise unwise, unprofitable investment attractive by allowing plaintiffs to avoid possible losses as a result of foreclosure. Id. ¶ 9.

Plaintiffs are suing the United States on a contract theory of liability for breach of the second oral promise. Pls.' Resp. at 1. The complaint does not allege that Helen Arakaki was present at the meeting during which the oral promise was made, that she engaged in any negotiations with representatives of the United States, or that she signed her name to any agreement with the United States. See Pls.' Fact Resp. ¶¶ 5-6, 13-15. Furthermore, plaintiffs elsewhere state that Helen Arakaki was not informed of the oral promise. Pls.' Fact Resp. ¶¶ 68-69.

Helen Arakaki did not bring suit against the government in her own name at the time the original complaint was filed. Pls.' Fact Resp. ¶ 2. Instead, Helen Arakaki

---

[6]Plaintiffs characterize the alleged right to bid on their note if it were sold as "a crucial right since the apartment building was worth substantially less than the face amount of the seriously delinquent loan and had a negative cash flow." Pls.' Resp. at 1.

assigned her claims against the government to her son. See Pls.' App. 4 (assignment). The original complaint was filed in Hawaii state court on June 5, 2002, see Def.'s App. 1-6 (complaint in Arakaki v. Martinez, No. 02-1-1368-06 (Haw. 1st Cir. June 5, 2002)), and was removed to the United States District Court for the District of Hawaii on July 8, 2002, Notice of Removal of Civil Action filed in Arakaki v. Martinez, No. 02-00417 (July 8, 2002); Arakaki, 62 Fed. Cl. at 248; see Pls.' Fact Resp. ¶ 3. Helen Arakaki was first named as a plaintiff in the third amended complaint filed in the United States District Court for the District of Hawaii on March 14, 2003. Pls.' Fact Resp. ¶ 2; see generally Def.'s App. 7-11 (Third Am. Compl.); Arakaki, 62 Fed. Cl. at 245 n.3. However, that amended complaint did not state a theory upon which defendant could be held liable to Helen Arakaki. See generally Def.'s App 7-11 (Third Am. Compl.).

At the time the alleged oral promise was made, owners of property mortgaged to HUD were generally allowed to bid on their properties in "whole loan" sales after default. See Def.'s App. 211 (Declaration of Audrey Hinton, HUD Senior Hous. Project Manager); Pls.' App. 71 (IG Report). A change in policy followed passage of the Multifamily Housing Property Disposition Reform Act of 1994, however. See Pls.' App. 71 (IG Report); Pls.' Resp. at 7. Consistent with the change in policy, the mortgage on the Arakakis' property was sold bundled with a large number of mortgages in a structured finance sale. See Pls.' App. 71 (IG Report); Pls.' Resp. at 7. According to the notice of sale announcing the sale of the mortgage on the Arakakis' property, only eligible institutional investors would be able to participate in the auction, and mortgagors of the loan were expressly excluded from participation. Notice of Sale of HUD-Held Multifamily Mortgage Loans, 61 Fed. Reg. 18,652, 18,653 (Apr. 26, 1996).

The government argues that the six-year statute of limitations applicable to Tucker Act claims bars Helen Arakaki's claim for breach of contract and that subject matter jurisdiction is therefore lacking over her claims. Def.'s Mot. at 27-30. Defendant also argues that Helen Arakaki has failed to state a claim upon which relief may be granted because she is not a party to a contract with the government.[7] Id. at 30. This court lacks

---

[7]The RCFC 12(b)(6) ground for dismissal, failure to state a claim upon which relief may be granted, bears a close relationship to the RCFC 12(b)(1) ground for dismissal, lack of subject matter jurisdiction. Failure to plead facts that identify a source actually mandating the payment of money damages to plaintiff deprives the court of jurisdiction over the subject matter. Fisher v. United States, 402 F.3d 1167, 1172 (Fed. Cir. 2005); Adair v. United States, 70 Fed. Cl. 65, 68 (2006) ("[T]he Federal Circuit, in its recent en banc decision in Fisher[], rearticulated the test as a one-step process in which the source alleged as money-mandating would be evaluated against plaintiffs' claims to determine whether the source was money-mandating as to the facts alleged."
(continued...)

jurisdiction to consider Helen Arakaki's claims because she is not in privity of contract with the government. Because there is no claim before the court that could be, if timely, within its jurisdiction, the court does not determine whether the statute of limitations has run.

Subject matter jurisdiction is a threshold issue that must be considered before proceeding to evaluate the merits of a case. Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94 (1998). "The court has an obligation to examine its own jurisdiction at all stages of a proceeding" and may raise the issue for consideration sua sponte. Hurt v. United States, 64 Fed. Cl. 88, 89 (2005); see Wood-Ivey Sys. Corp. v. United States, 4 F.3d 961, 967 (Fed. Cir. 1993). If the court finds that it lacks jurisdiction over the subject matter, it must dismiss the claim. RCFC 12(h)(3); see Miller v. United States, 67 Fed. Cl. 195, 197 (2005).

Standing is a jurisdictional issue. Castle v. United States, 301 F.3d 1328, 1337 (Fed. Cir. 2002). The Tucker Act, 28 U.S.C. § 1491 (2000), which serves at once as a jurisdictional grant and a waiver of sovereign immunity, confers on this court "jurisdiction to render judgment upon any claim against the United States founded . . . upon . . . any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1). To have standing to sue the sovereign on a contract claim, the plaintiff must be in privity of contract with the United States. Anderson v. United States, 344 F.3d 1343, 1351 (Fed. Cir. 2003); see Erickson Air Crane Co. of Wash. v. United States, 731 F.2d 810, 813 (Fed. Cir. 1984) (stating that the "government consents to be sued only by those with whom it has privity of contract"). Limited exceptions are recognized for plaintiffs who "stand[] in the shoes" of a party with privity. First Hartford Corp. Pension Plan & Trust v. United States, 194 F.3d 1279, 1289 (Fed. Cir. 1999). Included in the list of recognized exceptions are intended third-party beneficiaries of the contract, Glass v. United States, 258 F.3d 1349, 1354 (Fed. Cir. 2001); subcontractors in certain circumstances, E.R. Mitchell Constr. Co. v. Danzig, 175 F.3d 1369, 1370-71 (Fed. Cir. 1999); and sureties, Balboa Ins. Co. v. United States, 775 F.2d 1158, 1160-63 (Fed. Cir. 1985). Investors who lack privity of contract with the United States have not been recognized as an exception to the rule. S. Cal. Fed. Sav. & Loan Ass'n v. United States, 422 F.3d 1319, 1332 (Fed. Cir. 2005) (holding that investors of savings and loan company, who lacked privity of contract with the United States, could not base standing to sue on their investment alone

---

[7](...continued)
(citing Fisher, 402 F.3d at 1172-73)). Therefore, plaintiffs' failure to identify a source mandating the payment of money to Helen Arakaki, despite defendant's characterization of its motion as seeking dismissal under RCFC 12(b)(6), will be treated as a motion under RCFC 12(b)(1).

or even on their role initiating and negotiating the acquisition of a failing thrift on behalf of the association).

Defendant argues that Helen Arakaki was not a party to a contract with the United States government or to the alleged oral agreement. Def.'s Reply at 20. Defendant further argues that she could not have relied on the representations of David Ewing regarding a right to bid on the note because "Ms. Arakaki was not present at the October 1991 meeting with David Ewing, nor was Ms. Arakaki even informed of the alleged agreement . . . ." Def.'s Mot. at 30.

Plaintiffs argue that Edward Arakaki "negotiated on [Helen Arakaki's] behalf for the purchase of the Lake Mead[] Villas." Pls.' Resp. at 16. Plaintiffs point out that title vested in both Edward and Helen Arakaki as joint owners. Id. Plaintiffs argue that the provisional workout agreement, which was signed by Larry Little, was negotiated and signed on behalf of both Edward and Helen Arakaki. Id. at 16-17.

Helen Arakaki is not in privity of contract with the government. Helen Arakaki did not enter into an agreement with the United States. The purchase of the property of which Helen Arakaki is a joint owner resulted from a transaction with the former owner of the building, a private party.[8] Nor was Helen Arakaki a party to the alleged oral agreement because she was not present at the meeting during which the alleged oral agreement was reached. See Pls.' Fact Resp. ¶¶ 5-6, 13-15. The court cannot infer the existence of a contract between Helen Arakaki and the United States based on plaintiffs' allegation that negotiations were undertaken on her behalf, so that any resulting promise was made on her behalf.

Furthermore, any suggestion, see, e.g., Compl. ¶¶ 11, 20; Def.'s App. 14-15 (Plaintiff's Responses to Defendant's First Request for Answers to Interrogatories), that Helen Arakaki relied on representations of HUD employee David Ewing in reaching the decision to purchase the property, does not state a claim for breach of contract. In order to state a cognizable claim for breach of contract, a party must allege the existence of an underlying contract to which the plaintiff is a party. Trauma Serv. Group, 104 F.3d at 1325. Plaintiffs have failed to plead facts establishing that Helen Arakaki is a party to a

[8]Edward Arakaki is listed as the sole buyer in the purchase agreement. Def.'s App. 22-23 (purchase agreement and addendum). Helen Arakaki did not sign the purchase and sale agreement. Id. The deed, however, does describe a transaction between the Arakakis and the previous owner of the property. Id. at 30 (deed).

contract with the United States. Accordingly, the court DISMISSES Helen Arakaki's claim for lack of subject matter jurisdiction.

## III. CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is GRANTED. Helen Arakaki's claim for breach of contract is DISMISSED for lack of subject matter jurisdiction.

IT IS SO ORDERED.

s/ Emily C. Hewitt
EMILY C. HEWITT
Judge